Matthew G. English (SBN 204869)
LAW OFFICES OF MATTHEW G. ENGLISH
7676 Hazard Center Dr Ste 500
San Diego CA 92108-4508
(619) 725-2725

Attorney for Plaintiff JAMES SCOTT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL CHERTOFF[1], SECRETARY, DEPARTMENT OF HOMELAND SECURITY.<br><br>Defendants | Case No.: 08-CV-0735-BTM (JMA)<br><br>**PLAINTIFF JAMES SCOTT'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[**Per chambers, no oral argument unless requested by the court**]**<br><br>Date: December 4, 2009<br>Time: 11:00 a.m.<br>Courtroom: 15<br>Judge: Hon. Barry Ted Moskowitz |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Plaintiff JAMES SCOTT hereby gives notice that on December 4, 2009, at 11:00 a.m. in Courtroom 15 of the United States District Court for the Southern District of California, 940 Front Street, San Diego, CA 92101-8900, Plaintiff will and hereby does move this Court to grant partial summary judgment on the ground that there is no triable issue of material fact and that the moving party is entitled to judgment as a matter of law for the reasons that Defendant discriminated against Plaintiff in disciplining and ultimately terminated Plaintiff's employment, in

[1] Michael Chertoff is the former Secretary of the Department of Homeland Security (DHS), and was sued in that capacity pursuant to 42 USC § 2000e-16(c). Chertoff's successor and the present Secretary of DHS, Janet Napolitano, is substituted in as the named defendant by operation of law. Fed. R. Civ. P. 25(d).

violation of the Americans with Disabilities Act, the Rehabilitation Act, and the Age Discrimination in Employment Act, and retaliated against Plaintiff for opposing FPS's actions that violated the ADA/Rehab Act.

This motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of James W. Scott, the Declaration of Ruben Ballestros, the Declaration of Matthew G. English, all pleadings and papers on file in this action, and upon such other matters as may be presented to this Court upon request by the Court for oral argument.

LAW OFFICES OF MATTHEW G. ENGLISH

DATED: September 15, 2009 By: /s/ Matthew G. English .
Matthew G. English
Attorney for Plaintiff JAMES SCOTT

Matthew G. English (SBN 204869)
LAW OFFICES OF MATTHEW G. ENGLISH
7676 Hazard Center Dr Ste 500
San Diego CA 92108-4508
(619) 725-2725

Attorney for Plaintiff JAMES SCOTT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL CHERTOFF[1], SECRETARY, DEPARTMENT OF HOMELAND SECURITY.<br><br>Defendants | Case No.: 08-CV-0735-BTM (JMA)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Per chambers, no oral argument unless requested by the court]<br><br>Date: December 4, 2009<br>Time: 11:00 a.m.<br>Courtroom: 15<br>Judge: Hon. Barry Ted Moskowitz |

[1] Michael Chertoff is the former Secretary of the Department of Homeland Security (DHS), and was sued in that capacity pursuant to 42 USC § 2000e-16(c). Chertoff's successor and the present Secretary of DHS, Janet Napolitano, is substituted in as the named defendant by operation of law. Fed. R. Civ. P. 25(d).

## TABLE OF CONTENTS

**INTRODUCTION** .......... **1**

**STATEMENT OF FACTS** .......... **1**

**LEGAL STANDARDS** .......... **6**

A. STANDARDS REGARDING PARTIAL SUMMARY JUDGMENT .......... 6

B. LEGAL STANDARDS REGARDING MEDICAL EXAMINATIONS AND INQUIRIES .......... 6

1. Job Applicants (Pre-employment, or Pre-offer) .......... 7

2. Pre-Placement Applicants (Post-Offer) .......... 7

3. Employees (Incumbents) .......... 7

**ARGUMENT** .......... **9**

A. DEFENDANT DISCRIMINATED AGAINST PLAINTIFF BY TAKING ADVERSE EMPLOYMENT ACTIONS AGAINST PLAINTIFF BASED UPON MEDICAL INQUIRIES THAT VIOLATED THE ADA. .......... 9

1. FPS's Inquiries Exceeded the Scope of a Permissible Medical Exam under the ADA. 12

2. All of the Eight Questions FPS Asked Plaintiff are Disability-Related Questions, and None of the Questions are "Job-Related and Consistent With Business Necessity." .......... 13

3. The Medical Exam Form Given to Plaintiff is Fatally Flawed in Failing to Distinguish Between Pre-Placement Applicants and Incumbents .......... 18

4. The Eight Questions Violate the ADA and the Agency Took Adverse Employment Actions Against Plaintiff For Failing To Respond to Those Questions. .......... 19

B. PLAINTIFF WAS DISCIPLINED AND HIS EMPLOYMENT WAS TERMINATED IN RETALIATION FOR HIS OPPOSITION TO DEFENDANT'S UNLAWFUL PRACTICES. .......... 20

C. FPS'S MEDICAL EXAM PROGRAM VIOLATES THE ADEA BECAUSE IT MANDATES THAT EMPLOYEES OVER 40 YEARS OF AGE UNDERGO MEDICAL TESTING MORE FREQUENTLY THAN YOUNGER EMPLOYEES SOLELY BECAUSE OF THEIR AGE. .......... 22

TABLE OF CONTENTS (CONTINUED)

1. Age is not a proxy for fitness. .......... 23

**CONCLUSION .......... 24**

## TABLE OF AUTHORITIES

**Cases**

*Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6 (1st Cir. 2004) ............................................. 6
*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)............................................................................ 6
*Conroy v. New York State Dept. of Correctional Services*, 333 F.3d 88 (2nd Cir. 2003) .............. 9
*Cossette v Minnesota Power & Light*, 188 F3d 964 (8th Cir. 1999)............................................ 10
*EEOC v. County of Los Angeles*, 526 F. Supp. 1135 (C.D. Cal. 1981) ...................................... 23
*EEOC v. Massachusetts*, 987 F.2d 64 (1st Cir. 1993)................................................................ 22
*EEOC v. Prevo's Family Market, Inc.*, 135 F.3d 1089 (6th Cir. 1998) ........................................ 12
*Freadman v. Metro. Prop. and Cas. Ins. Co.*, 484 F.3d 91 (1st Cir. 2007).................................... 6
*Fredenburg v. Contra Costa County Dep't of Health Servs.*, 172 F.3d 1176 (9th Cir. 1999) ......... 9
*Gonzales v. Sandoval County*, 2 F. Supp. 2d 1442 (D. N.M. 1998) ......................................... 10
*Griffin v. Steeltek, Inc.*, 160 F.3d 591 (10th Cir. 1998)................................................................. 9
*Krouse v American Sterilizer Co.,* 126 F.3d 494 (3rd Cir. 1997)................................................. 20
*Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42 (2nd Cir. 2002).................... 9
*Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260 (9th Cir. 1998)...................... 7, 19
*Roe v. Cheyenne Mt. Conf. Resort*, 124 F.3d 1221 (10th Cir. 1997) ............................... 9, 11, 18
*Rohan v. Networks Presentation LLC*, 175 F. Supp. 2d 806 (D. Md. 2001) ................................ 7
*Ross v. Campbell Soup Co.,* 237 F.3d 701 (6th Cir. 2001) ....................................................... 12
*Squibb v. Mem. Med. Ctr.,* 497 F.3d 775, 786 (7th Cir. 2007) .................................................... 20
*Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804 (6th Cir. 1999)......................................... 10, 12
*T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626 (9th Cir. 1987) ............. 6
*Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224 (5th Cir. 1976).............................................. 23
*Weissman v Dawn Joy Fashions, Inc.* 214 F.3d 224 (2nd Cir. 2000).................................... 20, 21
*Western Air Lines v. Criswell,* 472 U.S. 400 (1985) ................................................................ 23

**Statutes**

29 U.S.C. 791(g) ......................................................................................................... 6
42 U.S.C. § 12101 ...................................................................................................... 10

42 U.S.C. § 12102(1)(A) .......... 14, 15, 19
42 U.S.C. § 12111(5)(B) .......... 6
42 U.S.C. § 12112 .......... 7, 10
42 U.S.C. § 12112(d)(2)(A) .......... 7
42 U.S.C. § 12112(d)(2)(B) .......... 7
42 U.S.C. § 12112(d)(3) .......... 7
42 U.S.C. § 12112(d)(4) .......... 6, 7, 19
42 U.S.C. § 12203(a) .......... 20
42 USC § 2000e-16(c) .......... 1

**Other Authorities**

EEOC, *Employment Tests and Selection Procedures* .......... 23
EEOC, *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities Act (ADA),* 2 EEOC Compl. Man. (CCH) P6910 (2000) .......... 8, 11, 13, 14, 15, 16, 17
EEOC*, Questions and Answers: Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)* .... 8, 11

**Rules**

Fed. R. Civ. P. 25(d) .......... 1
Fed. R. Civ. P. 56(c) .......... 6

**Regulations**

29 C.F.R. § 1630 APPENDIX .......... 8
29 C.F.R. § 1630.14 .......... 8
29 C.F.R. § 1630.14(c) .......... 10
5 C.F.R. § 339 .......... 2
5 C.F.R. § 752.404 .......... 21
5 C.F.R. 339.301(b)(3) .......... 11
5 C.F.R. 339.301-302 .......... 8

## I.

## INTRODUCTION

Plaintiff JAMES SCOTT, a career federal law enforcement officer with over 20 years of federal service, was employed by the Federal Protective Service (FPS) for 14 years before FPS directed Plaintiff to attend a so-called Periodic Medical Examination in November 2005. Plaintiff submitted to the examination as directed on November 9, 2005.

During the course of the exam, FPS made a series of disability-related medical inquiries of Plaintiff in violation of the Americans with Disabilities Act (ADA). Plaintiff declined to answer eight such questions, and asserted his right not to answer them under the ADA. The eight questions violated the ADA because they were not job-related, not consistent with any business necessity, nor were they narrowly-tailored to assess Plaintiff's present ability to perform his job duties. The medical review policy under which the Periodic Exam was required also violated the Age Discrimination in Employment Act (ADEA) in its use of age as a proxy for fitness, by requiring employees, including Plaintiff, who were over 40-years of age to submit to examination with a frequency three times greater than that of younger employees.

Defendant subsequently disciplined Plaintiff with a 14-day suspension, and then ultimately terminated Plaintiff on March 5, 2007, expressly citing Plaintiff's refusal to answer the disability-related questions and his assertion of his right not to do so. In removing Plaintiff from federal service, Defendant destroyed the career of well-regarded federal Special Agent, whose 20-year law enforcement career had been previously unblemished by any prior record of discipline.

## II.

## STATEMENT OF FACTS

Plaintiff JAMES SCOTT was first hired by the Federal Protective Service (hereinafter FPS or the Agency) in 1991, as a uniformed federal protective officer in Los Angeles, California. (Declaration of James W. Scott, ¶ 3, September 15, 2009.) FPS is a federal government service whose stated mission is to "render federal properties safe and secure for federal employees, officials and visitors…" U.S. Immigration and Customs Enforcement (ICE), *Fact Sheet - Federal*

*Protective Service*, http://www.ice.gov/doclib/pi/news/factsheets/federal_protective_service.pdf (last visited September 9, 2009).[2]

In or about 1992, Plaintiff was promoted to a GS-1811-07 Special Agent/Criminal Investigator. (Scott Decl. ¶ 4.) In 1993, Plaintiff transferred to San Diego to open a criminal investigative office for FPS. (Scott Decl. ¶ 5.) Plaintiff remained stationed in San Diego for the remainder of his employment with FPS. (Scott Decl. ¶ 5.)

In the year 2000, FPS implemented its Periodic Medical Examination Program, requiring periodic medical examinations of FPS law enforcement employees. (Scott Decl. ¶ 6; Deposition of Martha Montano, 36:1-18, July 16, 2009; Exhibit No. 1.) Per the program, purportedly implemented pursuant to 5 C.F.R. § 339 *et seq*. (Medical Qualification Determinations), periodic medical examinations were keyed to an employee's birth date (to take place within 30 days of the employee's date of birth), and the frequency of the examination depended solely upon the employee's age: every three years for employees under the age of 35, every two years for employees between the ages of 35 and 45, and annually for employees over the age of 45. (Ex. 1 at 2-3.)

In or about 2003, Plaintiff was again promoted to GS-1811-12, and was detailed to the FBI's Joint Terrorism Task Force (JTTF), an inter-agency task force whose aim is to pool and coordinate resources to better combat and defend against terrorism. (Scott Decl. ¶¶ 7, 8.) The assignment to JTTF was considered to be something of an accolade that reflected well on the Special Agents assigned to the task force. (Scott Decl. ¶ 8.)

Throughout Plaintiff's employment at FPS, he was the subject of favorable performance reviews/appraisals, and his work and contributions to the Service earned him the promotions and assignments as described above. (Scott Decl. ¶ 9-11; Exhibit Nos. 2-4.) Supervisory Special

[2] At the time Plaintiff was hired, FPS was organized under the General Services Administration (GSA). FPS was re-organized in 2003, pursuant to the Homeland Security Act of 2002, as an operational division of the U.S. Immigration and Customs Enforcement (ICE), "the largest investigative arm of the Department of Homeland Security (DHS)," and remains so organized to date. ICE, *Fact Sheet - Federal Protective Service*, http://www.ice.gov/doclib/pi/news/factsheets/federal_protective_service.pdf (last visited September 9, 2009).

Agent John Hartman, one of Plaintiff's immediate supervisors, who was in a position to observe Plaintiff in his duties, assessed Plaintiff's skills and abilities as an agent as follows:

> Special Agent Scott was ... extremely professional; as honest as anybody that I have ever worked with in law enforcement; never had any unkind thing to say about another one of his peers. Agent Scott was all business, all the time... My opinion of Special Agent Scott and my knowledge of Special Agent Scott's work product was stellar. His ability to gather intelligence information from subversive groups, to gather information from various agencies associated with the FBI's Joint Terrorism Task Force were top notch.

(Deposition of John Hartman, 68:4-70:24, July 23, 2009.)

In the fall of 2005, FPS scheduled Plaintiff for a Periodic Medical Examination, to take place at U.S. Healthworks Medical Group (Healthworks), a local medical facility that contracted with FPS through FPS's medical contracting service, Comprehensive Health Services, Inc. (CHS). (Scott Decl. ¶ 12; Declaration of Ruben Ballestros, ¶¶ 5, 6; Exhibit No. 12.) CHS is a private corporation that contracts with FPS to provide a variety of services related to medical examinations, including medical evaluations, medical information review, and medical-related recommendations to FPS. (Deposition of Lawrence Saladino, M.D. 27:7–28:10, July 28, 2009.)

On November 9, 2005, Plaintiff presented to Healthworks' San Diego facility to submit to a Periodic/Incumbent Medical Exam. At that time, Plaintiff underwent and completed a full physical examination. (Scott Decl. ¶ 13.) During this visit to Healthworks, the medical staff provided Plaintiff with a medical questionnaire form for him to fill out. (Scott Decl. ¶¶ 13, 17, Exhibit No. 5.) Plaintiff filled out the majority of the questionnaire, but specifically declined to answer eight of the Form's questions (the Eight Questions).[3] (Scott Decl. ¶¶ 14, 17, Ex. 5.) The Eight Questions were:

> Question 1. *Have you ever been treated for a mental condition? (if yes, specify when, where, and give details).*
>
> Question 2. *Have you ever had any illness, injury, or other condition (including learning disability, attention deficit disorder, etc.) other than those already noted? (If yes, specify when, where, and give details).*

---

[3] On the exam form itself, the Eight Questions are not sequentially numbered. On the form, some of the questions are referred to by a letter designation (e.g., B,E,F, & I), while others do not have a preceding letter designation. The questions are renumbered sequentially here for clarity. (Ex. 5.)

> Question 3. *Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past years for other than minor illness? (If yes, give complete address of doctor, hospital, clinic, and details).*
>
> Question 4. *Have you ever received, is there pending, or have you applied for pension or compensation for existing disability? (If yes, specify what kin[d], granted by whom, in what amount, when, why).*
>
> Questions 5-7. *Have you had or do you currently experience any of the following: Psychiatric/psychologic consult; Episodes of depression; Periods of nervousness.*
>
> Question 8. *List all medications (prescription and nonprescription) you are currently taking with dosage, and [f]requency, and reason below.*

(Scott Decl. ¶ 14, 17; Ex. 5.)

On the medical questionnaire itself, next to each question for which he did not provide an answer, Plaintiff stated his reason for not providing a response, writing "[q]uestion violates ADA/Rehab Act/EEOC" for questions 1-4, 8, and "*[u]nmarked questions violate ADA, Rehab Act, EEOC" for questions 5-7. (Scott Decl. ¶ 15; Ex. 5.)

At the bottom of the Exam Form, Plaintiff crossed out the language of a very broad medical release, which he also believed to be in violation of the ADA. Below where he crossed out the release, Plaintiff handwrote a release authorizing the release of the medical records relating to the November 9, 2005, medical exam to authorized FPS medical personnel, but no other personal medical records. ("I only authorize the release of the results of this exam to authorized agency medical personnel. I do not authorize the release of any other personal medical records.") Plaintiff then signed the handwritten release. (Scott Decl. ¶¶ 16, 17; Ex. 5.)

On April 17, 2006, FPS issues a Notice of Proposed Suspension to Agent Scott, signed by Acting Threat Management Branch Chief Rudy Negrete. The Notice proposed to discipline Plaintiff for failing to comply with the instruction to "provide medical information related to your required periodical [sic] medical exam." (Scott Decl. ¶ 18; Deposition of Rudy Negrete, 72:23-74:18, 75:21-76:17, July 20, 2009; Exhibit No. 6.)

On April 28, 2006, Plaintiff responded in writing to the Notice of Proposed Suspension, reiterating his position that the medical inquiries violated the ADA, and other authorities, and that the FPS medical program violated the "Age Discrimination Act." (Scott Decl. ¶ 19; Exhibit No. 7.)

On May 8, 2006, FPS issued a Notice of Suspension to Plaintiff for failing to answer the questions, signed by "Acting" Deputy Regional Director Joyce Nesbitt-Simon. The Notice characterized Plaintiff as insubordinate, and suspended him for 14 calendar days from May 14, 2006 to May 27, 2006. (Scott Decl. ¶ 20, Deposition of Joyce Nesbitt-Simon, 43:20-44:20, June 16, 2009; Exhibit No. 8.)

In or about June or July 2006, FPS summarily suspended the FPS Periodic Medical Examination Program. (Montano Dep. 18:21-19:22, 22:6-24:11; Saladino Dep. 85:6-17.) The Program remains suspended (as of July 2009). (Saladino Dep. 85:6-17.)

On December 21, 2006, FPS Mission Support Chief (Region 10), Tamra Hirano contacted Plaintiff by letter and again demanded that Plaintiff answer the medical questions from the *GSA/FPS Pre-Placement and Incumbent Medical Exam Form*. (Scott Decl. ¶ 21, Deposition of Tamra Hirano, pg. 35:25-39:20, June 18, 2009; Exhibit No. 9.) Attached to Hirano's hand-delivered correspondence was a re-typed copy of the Eight Questions from the November 9, 2005, Medical Exam Form. (Ex. 9; Ex. 5.)[4]

On January 25, 2007, Hirano issued a Notice of Proposed Removal, proposing to terminate Plaintiff's employment with FPS. (Scott Decl., ¶ 23; Hirano Dep. 90:23-91:12; Exhibit No. 10.)

On March 5, 2007, "Acting" Deputy Regional Director Steven Slagowski (Region 10) issued a Notice of Removal, terminating Plaintiff's employment and removing him from federal service. (Scott Decl. ¶¶ 24, 25; Deposition of Steven Slagowski, 133:17-134:1, 137:20-25, July 7, 2009; Exhibit No. 11.)

---

[4] Hirano's December 21, 2006 letter also contains a demand for Plaintiff to execute a release of "all medical records in [Hirano's] possession," without identifying what specific documents, or how many, Hirano had in her possession. (Ex. 9 at 1, 4.) On the original GSA/FPS Pre-Placement and Incumbent Medical Exam Form (Ex. 5), Plaintiff had lined out a broad general release of all Plaintiff's medical records, which had stated "I authorize any of the doctors, hospitals, or clinics mentioned on these forms to furnish the Government a complete transcript of my medical records for purposes of processing my application for this employment or service." Scott then hand-wrote and signed a separate release limited to the results of the 11/09/05 Incumbent Medical Exam only, to "authorized Agency medical personnel." (Scott Decl. ¶ 16; Ex. 5.)

## III.

## LEGAL STANDARDS

### A. STANDARDS REGARDING PARTIAL SUMMARY JUDGMENT

The Federal Rules of Civil Procedure provide for partial summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." Fed. R. Civ. P. 56(c).

"If the party moving for summary judgment meets its initial burden of identifying for the Court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)).

### B. LEGAL STANDARDS REGARDING MEDICAL EXAMINATIONS AND INQUIRIES

"A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4) (2009). [5]

"The ADA creates three categories of medical inquiries and examinations by employers: (1) those conducted prior to an offer of employment [pre-employment]; (2) those conducted "after an offer of employment has been made" but "prior to the commencement of . . .

---

[5] Although the Rehabilitation Act of 1973, as amended, (Rehab Act) is a federal employee's exclusive remedy for employment related discrimination based on a disability (42 U.S.C. § 12111(5)(B) (defining employers under the ADA), the Rehab Act expressly incorporates the ADA standards for analyzing employment discrimination claims. 29 U.S.C. 791(g); *See also, Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) ("[T]he case law construing the ADA generally pertains equally to claims under the Rehabilitation Act."); *Freadman v. Metro. Prop. and Cas. Ins. Co.*, 484 F.3d 91, 103 (1st Cir. 2007) (ADA/Rehabilitation Act claims are "analyzed under the same standards").

employment duties" [pre-placement]; and (3) those conducted at any point thereafter [incumbent]." *Norman-Bloodsaw v. Lawrence Berkeley Lab*., 135 F.3d 1260, 1273 (9th Cir. 1998). Subsection (d) of 42 U.S.C. § 12112, outlines three primary categories of individuals and the different rules and scope of medical examinations and inquiries permitted of each:

**1. <u>Job Applicants (Pre-employment, or Pre-offer)</u>**

An employer may inquire as to an *applicant's* ability to perform job-related functions, 42 U.S.C. § 12112(d)(2)(B), but it cannot not require a medical examination or make disability-related inquiries of a *job applicant* ("whether such applicant is an individual with a disability or as to the nature or severity of such disability"). 42 U.S.C. § 12112(d)(2)(A).

**2. <u>Pre-Placement Applicants (Post-Offer)</u>**

Once an employer has made an offer of employment to an applicant, it may conduct a medical examination, and may make medical inquiries (including disability-related inquiries) without regard to whether they are job-related, provided that all incoming employees are subject to an exam, and the exam results are treated as confidential. Employers may also make the offer of employment conditional, subject to the results of any medical examination. 42 U.S.C. § 12112(d)(3). Unlike Incumbent examinations, discussed below, a pre-placement examination need not be "job-related or consistent with business necessity." *Norman-Bloodsaw,* 135 F.3d at 1273 (citing 42 U.S.C. § 12112(d)(4)). Thus, in contrast to Incumbent examinations, the ADA imposes significantly less restriction on the scope of pre-placement examinations. *Id.*; *see also Rohan v. Networks Presentation LLC*, 175 F. Supp. 2d 806, 812 (D. Md. 2001). This, in turn, supports the greater restrictions imposed on examination/inquiry of Incumbents, as the employer has had the opportunity, pre-placement, to make any necessary intrusive inquiries.

**3. <u>Employees (Incumbents)</u>**

It is only this last category (Incumbents) that is directly at issue in the present case.[6] An employer may require a medical examination or make disability-related inquiries of an existing

---

[6] As discussed below, the only type of examination at issue for purposes of the present motion is a *Periodic Medical Examination*, or Incumbent Exam – the type of medical examination FPS directed Plaintiff to submit to on November 9, 2005, and that Plaintiff in fact submitted to on that date. (Scott Decl. ¶¶ 12, 13; Exs. 5, 6, 12.)

employee *only* if the examination or inquiry is "shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

Related sections of the Code of Federal Regulations further detail two specific subsets of medical examinations an employer may require of its incumbent employees: 1) so-called *Fitness for Duty* examinations may be demanded if an employer has a reasonable belief/question about whether an employee has a present ability to perform the essential functions of his/her job (because of an medical-related impairment or because employee will pose a direct threat), and in very limited circumstances, 2) so-called *Periodic physicals or exams*. 29 C.F.R. § 1630.14 (2009); 29 C.F.R. § 1630 APPENDIX, Section 1630.14(c) – Examination of Employees (2009); 5 C.F.R. 339.301-302 (2009).

The interpretive guidelines found in the Appendix to 29 C.F.R. 1630, discusses the narrow subset of circumstances in which a periodic examination of an employee may be permitted, noting that "periodic physicals" and "other medical monitoring" is permitted only "if such physicals or monitoring are required by medical standards or requirements established by Federal, state, or local law that are consistent with the ADA … [i.e.,] job-related and consistent with business necessity." 29 C.F.R. § 1630 APPENDIX, Section 1630.14(c); Equal Employment Opportunity Commission (EEOC), *Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities Act (ADA)* (hereinafter *EEOC Guidance: Disability Inquiries),* 2 EEOC Compl. Man. (CCH) P6910 (2000), Question 18, *available at* http://www.eeoc.gov/policy/docs/guidance-inquiries.html, (July 20, 2000) ("In limited circumstances, periodic medical examinations of employees in positions affecting public safety that are narrowly tailored to address specific job-related concerns are permissible"); EEOC, *Questions and Answers: Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)*, *available at* http://www.eeoc.gov/policy/docs/qanda-inquiries.html (2000).[7]

---

[7] "Even when they are not formally promulgated as regulations, such agency publications are 'at least a body of experience and informed judgment to which courts and litigants may properly resort for guidance'." *Conroy v.*

**IV.**

**ARGUMENT**

The undisputed material facts of this case establish as a matter of law that 1) Defendant FPS discriminated against Plaintiff in violation of the ADA, by making impermissible disability-related inquiries during his Periodic Medical Examination on November 9, 2005, then disciplined and ultimately terminated Plaintiff for declining to answer the ADA-proscribed inquiries; 2) Defendant retaliated against Plaintiff by disciplining and terminating Plaintiff for opposing FPS actions and conduct that violated the ADA; and, 3) FPS's Periodic Medical Examination Program fundamentally violated the ADEA because it intentionally and expressly discriminated based solely on an employee's age. Accordingly, Plaintiff is entitled to partial summary judgment.

**A. DEFENDANT DISCRIMINATED AGAINST PLAINTIFF BY TAKING ADVERSE EMPLOYMENT ACTIONS AGAINST PLAINTIFF BASED UPON MEDICAL INQUIRIES THAT VIOLATED THE ADA.**

As a threshold matter, it is important to note that a plaintiff does not have to be a "qualified individual with a disability" in order to have standing to invoke the ADA's protection against improper medical examinations. *Fredenburg v. Contra Costa County Dep't of Health Servs.*, 172 F.3d 1176, 1181 (9th Cir. 1999) (9th Cir. 1999); *Roe v. Cheyenne Mt. Conf. Resort*, 124 F.3d 1221, 1229 (10th Cir. 1997) (plaintiff not required to prove he/she is an individual with a disability to maintain action for medical inquiry violations of the ADA, as such a requirement "would defeat the very purpose of prohibiting disability-related inquiries"); *See also*, *Griffin v. Steeltek, Inc.*, 160 F.3d 591 (10th Cir. 1998), (a non-disabled job *applicant* may state cause of action under ADA when asked questions regarding his medical history or condition on employment application), *cert. denied* 526 US 1065 (1999) ; *Cossette v Minnesota Power &*

---

*New York State Dept. of Correctional Services*, 333 F.3d 88, 95 (2nd Cir. 2003) (quoting *Marcella v. Capital Dist. Physicians' Health Plan, Inc.*, 293 F.3d 42, 48 (2nd Cir. 2002).

*Light*, 188 F3d 964 (8th Cir. 1999); *Gonzales v. Sandoval County*, 2 F. Supp. 2d 1442, 1444 (D. N.M. 1998).

As discussed above, the Americans with Disabilities Act, codified at 42 U.S.C. §§ 12101 *et seq.*, forbids, with limited exceptions, all medical inquiries as to whether an employee has a disability or as to the nature or severity of a disability. 42 U.S.C. section 12112 covers both the recurring medical examination of incumbent employees (Periodic/Incumbent Exams) (subdivision (b)(6)), and discrete medical testing of an incumbent employee (Fitness for Duty Exams) (subdivision (d)(4)(A)). Under both subdivisions, an employer may not inquire whether an incumbent employee has a disability unless the examination or inquiry is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A), (b)(6); 29 C.F.R. § 1630.14(c).

This "job-related/business necessity" standard is analyzed differently depending on whether a Fitness for Duty Examination or a Periodic Examination is at issue. A Fitness for Duty Exam is an event-driven examination, based on objective evidence of an employee's performance issues or of a specific risk. Accordingly, an employer's request for a medical examination is job-related and consistent with business necessity when any of the following three criteria are met: (1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others. *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 812 (6th Cir. 1999) (stating "health problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination"); *Prevo's Family Market,* 135 F.3d at 1095 ("'[t]he determination that an individual poses a "direct threat"... shall be based on a reasonable medical judgment'") (quoting 29 C.F.R. § 1630.2(r)). The touchstones are *performance issues* and/or *direct threat*. *Sullivan,* 197 F.3d at 812.

In the present case, the medical examination at issue for purposes of this motion is a Periodic Examination – the one Plaintiff submitted to on November 9, 2005. In contrast to the Fitness for Duty evaluation standard, above, the standard for determining what constitutes a permissible disability-related inquiry ("job-related and consistent with business necessity") for a Periodic Examination is not event-driven. By its definition, a Periodic Exam is a regularly-

scheduled, recurring examination to which an Incumbent submits *in the absence of any triggering-event* that would give rise to a Fitness for Duty examination. The EEOC Enforcement Guidance interprets "job-related and consistent with business necessity" in the context of a Periodic Medical Examination as meaning "narrowly tailored to address specific job-related concerns." Equal Employment Opportunity Commission, *Enforcement Guidance: Disability Related Inquiries and Medical Examinations, supra*, at Q18. The Q & A companion to the above reference Guidance document notes that Periodic Exams are permissible only with "very limited exceptions" for public safety employees, stating "[e]ven in these limited situations, the examinations must address specific job-related concerns. For example, a police department could periodically conduct vision tests or electrocardiograms because of concerns about conditions that could affect the ability to perform essential job functions and thereby result in a direct threat." *EEOC Guidance: Q&A, supra,* at Q18.

The significant impact of the two related, but distinct, standards between Fitness for Duty and Periodic examinations is that because Periodic Exams lack, by their very routine or recurring nature, specific event triggers, such exams are necessarily more generalized in scope. In order to meet the applicable ADA standard, each specific component of a Periodic Exam, if it is disability-related, must be justified as "job-related and consistent with business necessity," as must each medical inquiry asked of the Incumbent participating in the Periodic Exam. Periodic Exams only arise in the context of an absence of any specific evidence necessitating a more probing medical inquiry. If there was specific evidence of an impairment or threat, the ADA provides and calls for a Fitness for Duty examination. 42 U.S.C. § 12112(d)(4)(A); 5 C.F.R. 339.301(b)(3).

The important difference is not in interpreting whether a particular medical inquiry is disability-related – that analysis is the same in both types of employee medical exams. The difference lies in whether a particular medical inquiry, having been established as a disability-related inquiry, violates the ADA or not, i.e., *whether the employer can justify an intrusive disability-related inquiry as "job-related and consistent with business necessity*." 42 U.S.C. § 12112(d)(4)(A). The burden is on the employer to justify the inquiry. *Id*; *Cheyenne Mt.*, 124 F.3d at 1227.

On that basis, if an employer has a reasonable belief, based on objective evidence that an employee may be unable to perform essential job functions, or poses a direct threat (Fitness for Duty Exam requirements) the employer will have a specific, individual factual basis for attempting to justify a disability-related inquiry. In the contrary circumstance of a Periodic Exam, such an independent factual basis is absent and the justification must rely on connecting the inquiry to the job duties of the specific position generally.

Here, FPS violated the ADA in implementing Plaintiff's Periodic Exam by asking clearly prohibited medical questions that are not necessary and job-related to the position of FPS Special Agent/Criminal Investigator.

1. **FPS's Inquiries Exceeded the Scope of a Permissible Medical Exam under the ADA.**

The permissible scope of medical inquiries under the ADA and related regulations reflects the defense of "business necessity." As explained above, "any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Sullivan,* 197 F.3d at 812. Medical inquiries must be narrowly tailored to this end to avoid the employment decisions based on "myths, fears, and stereotypes" the ADA was implemented to eliminate. See *Ross v. Campbell Soup Co.,* 237 F.3d 701, 708 (6th Cir. 2001). The ADA limits an employer's ability to request unfounded examinations to prevent "the unwanted exposure of the employee's disability and the stigma it may carry." *EEOC v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1094 n. 8 (6th Cir. 1998).

For example, in *Cheyenne Mt.*, 124 F.3d 1221, the district court held, and the circuit court affirmed, that the employer's requirement that employees disclose their prescription drug use violated the ADA because it constituted a disability-related inquiry. *Id.* The district court said that "defendant had not shown that the Policy [was] job-related and consistent with business necessity." *Id.*, at 1227.

Here, the broad questions on the Medical Exam Form were not narrowly tailored to verify whether Plaintiff could continue to fulfill the essential functions of the job. Many of the questions were posed without any time restriction whatsoever. (E.g., "Have you ever been treated for a mental condition?" "Have you ever had any illness, injury, or other condition

(including learning disability, attention deficit disorder, etc.) other than those already noted?") Questions beginning with the phrase "have you ever" are the diametric counter-example of a narrowly-tailored inquiry. (Scott Decl. ¶ 14; Ex. 5.)

Plaintiff declined to answer questions on the Form on November 9, 2005, indicating that the questions violated his rights under the ADA and federal regulations. (Scott Decl. ¶¶ 14, 15; Ex. 5 at 2, 4.) These inquiries were clearly designed to discover much more than an employee's current health status, and none of the questions were particularly geared toward Plaintiff's position as a Special Agent/Criminal Investigator.

**2. All of the Eight Questions FPS Asked Plaintiff are Disability-Related Questions, and None of the Questions are "Job-Related and Consistent With Business Necessity."**

Reviewing each question individually, it becomes abundantly clear that each and every question for which Plaintiff was disciplined for declining to respond fails to meet or even approach the standards for permissible medical inquiry of incumbents under the ADA, and as such violated the ADA's proscription against unjustified disability-related inquiries.[8]

Because the ADA proscribes only disability-related inquiries, not all medical inquires, the analysis begins by determining whether a particular question is a "disability-related" question. Per the EEOC Guidance documents, a "'disability-related inquiry' is a question (or series of questions) that is likely to elicit information about a disability." *EEOC Guidance: Disability Inquiries*, *supra*, at (B)(1) .[9]

---

[8] Because of the grossly overbroad scope of these eight questions, this is likely as true whether such questions were posed as part of a Fitness for Duty Examination, or as here, a Periodic Exam. Even given the wider latitude to establish job-related necessity in an FFD, (a question not placed before this Court for purposes of Plaintiff's present motion), such questions arguably would not survive scrutiny.

[9] The EEOC provides the following examples, which may prove illustrative:

- "[A]sking an employee whether s/he has (or ever had) a disability or how s/he became disabled or inquiring about the nature or severity of an employee's disability;
- asking an employee to provide medical documentation regarding his/her disability; asking an employee's co-worker, family member, doctor, or another person about an employee's disability;
- asking about an employee's genetic information;
- asking about an employee's prior workers' compensation history;

<u>*Question 1. Have you ever been treated for a mental condition? (If yes, specify when, where, and give details.)*</u> (Scott Decl. ¶ 14; Ex. 5 at 2.)

As to the threshold question of whether Question 1 is disability-related, the question is thus whether an inquiry about "treatment for a mental condition" is "likely to elicit information" about a mental disability. *EEOC Guidance: Disability Inquiries*, *supra*, at (B)(1). The ADA defines disability, in pertinent part, as a "a physical or mental impairment that substantially limits one or more major life activities of such individual…" 42 U.S.C. § 12102(1)(A). And while not all mental conditions for which a person might seek treatment may constituted an impairment, and not all impairments rise to the level of disability, a question about "treatment for a mental condition" is nonetheless likely to elicit disability information, since mental conditions may well rise to the level of a disability, and those conditions that are disabilities are commensurately more likely to be addressed through treatment, due to their severity and impact. So the question "have you treated for a mental condition" necessarily encompasses those mental conditions that are a disability. Put another way, if an employee had a mental disability, Question 1 would force him to reveal it. Question 1 is a disability-related inquiry.

The second prong of the analysis is whether the Question 1 is "job-related and consistent business necessity." In this respect, Question 1 is grossly overbroad as to time and cannot survive the ADA standard to permit a disability-related inquiry. "Have you ever" questions are posed in the broadest possible expression of a time-range for a personal question. Such questions are thus, essentially unlimited whatsoever as to time, and cannot possibly meet the "job-related/business necessity" standard. In the absence of specific objective trigger evidence of a present impairment or direct threat (Fitness for Duty Exam standard), what possible relevance can a childhood mental condition, for example, have on an employee's present ability to

---

- asking an employee whether s/he currently is taking any prescription drugs or medications, whether s/he has taken any such drugs or medications in the past, or monitoring an employee's taking of such drugs or medications; and,
- asking an employee a broad question about his/her impairments that is likely to elicit information about a disability (e.g., What impairments do you have?)"

*EEOC Guidance: Disability Inquiries, supra*, at (B)(1).

perform his essential job functions? The question is rhetorical; the answer is "none." This question may be appropriate for a Pre-Placement Inquiry, but as posed to an Incumbent as part of a Periodic Exam, Question 1 cannot survive scrutiny and Defendant violated the ADA in asking it.

*Question 2. Have you ever had any illness, injury, or other condition (including learning disability, attention deficit disorder, etc.) other than those already noted ? (If yes, specify when, where, and give details)* (Scott Decl. ¶ 14; Ex. 5 at 2.)

Question 2 also meets the definition of a disability-related inquiry, not the least because it *specifically includes the word "disability"* in the question. This is the EEOC's very first cited example of a disability-related inquiry. *EEOC Guidance: Disability Inquiries, supra*, at (B)(1). ("asking an employee whether s/he has (or ever had) a disability or how s/he became disabled or inquiring about the nature or severity of an employee's disability"). A question that asks whether a person has ever had a disability is by definition a disability-related inquiry.

Like Question 1, Question 2 cannot be demonstrated to be job-related and consistent with business necessity for an FPS Special Agent/Criminal Investigator, because like Question 1, it contains absolutely no restriction on the time-limit of the inquiry. This is another "have you ever..." question that cannot be justified as "narrowly tailored to address specific job-related concerns." It is accordingly inconsistent with business necessity and not job-related. Question 2 violates the ADA.

*Question 3. Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past years for other than minor illness? (If yes, give complete address of doctor, hospital, clinic, and details.)* (Scott Decl. ¶ 14; Ex. 5 at 2.)

Again, this question is inherently likely to elicit disability-related information, because "other than minor" illnesses is another way of saying "major illnesses," which by virtue of being considered "major" are likely to "substantially limit one or more major life activity" of someone who is afflicted by such an illness. 42 U.S.C. § 12102(1)(A). An employee with a major illness that rose to the level of a disability would be forced to reveal his/her disability in his/her answer to this question. Question 3 is a disability-related question.

Question 3 is not a "have you ever" question, per se, as were Questions 1 and 2, but because of an apparent typographical error on the questionnaire itself, it is the functional equivalent of such a question. The question uses the phrase "within the past years," [sic] presumably intending to include a numerical limit (e.g., within the past *3* years, or the past *10* years, etc...). As written, however, the question is not limited in any way as to time, and is thus fatally overbroad.

Question 3 is also overbroad in scope. Rather than limit the inquiry to a specific list of major illnesses for which the Agency might be able to specifically connect to job-related issues, it leaves the question entirely open-ended with the phrase "other than minor illness." Such an all-inclusive list would, by the plain language of the question, include every major illness in existence, without so much as a point of reference for evaluating whether such illness would have any impact on a Special Agent's job duties. Question 3 violates the ADA.

<u>*Question 4. Have you ever received, is there pending, or have you applied for pension or compensation for existing disability? (If yes, specify what kind, granted by whom, in what amount, when, why.)*</u> (Scott Decl. ¶ 14; Ex. 5 at 2.)

Like Question 2, Question 4 makes no pretense of not being a disability-related inquiry – it specifically requests information related to existing disabilities, (albeit compensation-related information). This is another question that is a prototypical example of a disability-related inquiry per the EEO Enforcement Guidance. *EEOC Guidance: Disability Inquiries, supra*, at (B)(1) ("asking about an employee's prior workers' compensation history..."). Such a question cannot be answered without revealing disability-related information (in the affirmative or the negative), and is thus a disability-related inquiry.

Similarly, such a direct question about a disability cannot be justified against the ADA standard for disability-related questions, particularly not in the context of a Periodic Medical Exam. Because the question (on a *medical* exam) asks about pension or compensation instead of a more direct question about the impact of a disability on an employee's work, it is apparently designed to elicit such information by a form of subterfuge. Moreover, the question does not limit its scope to specific disabilities that the Agency might be able to individually identify as

necessary and job-related – a limitation that is plainly available. Question 4 is not narrowly-tailored, but instead inquires about all possible disabilities. Question 4 thus violates the ADA's proscription against such inquiries.

*Questions 5-7. Have you had or are you currently experience any of the following: a. Psychiatric/psychologic consult; b. Episodes of depression; c. Periods of nervousness?* (Scott Decl. ¶ 14; Ex. 5 at 4.)

Each of the three questions in 5-7 also qualifies as disability-related questions, likely to elicit disability-related information. While none of the three episodes or events necessarily equate with a disability, each is reasonably likely to elicit information about disabilities that are related to depression, nervous conditions, or disabilities for which a psychiatric consult is necessary. Questions 5-7 are disability-related inquiries.

Moreover, none of the three questions can be said to be job-related and consistent with business necessity for the same reason as many of the prior questions cannot – they are grossly overbroad as to time. Although these questions mention (for the first time) the present tense (whether the employee is "currently experience [sic] any of the following…"), each question nonetheless also includes the unrestricted phrase "have you had," a phrasing that, once again, is completely un-tethered to any time constraints. Such an overbroad scope (an employee's entire lifespan) cannot possibly withstand scrutiny of the ADA standard for such inquiries. These questions are not narrowly-tailored, and are not job-related and consistent with business necessity. Questions 5, 6 and 7 do not stand up to ADA scrutiny, and thus violate the ADA.

*Question 8. List all medication prescription and nonprescription you are currently taking with dosage, and frequency, and reason below.* (Scott Decl. ¶ 14; Ex. 5 at 4.)

In Question 8, the Agency asks Plaintiff to list all prescription medications. This question, however, like the others before it cannot survive the scrutiny of the ADA's "job-related and consistent with business necessity" standard. Preliminarily, this question essentially mirrors yet another one of the EEOC's specific examples of a disability-related inquiry. *EEOC Guidance: Disability Inquiries, supra,* at (B)(1) ("asking an employee whether s/he currently is taking any prescription drugs or medications"); *Cheyenne Mt.*, 124 F.3d at 1228. Moreover, it is axiomatic

that an impairment that substantially limits a major life activity is also commensurately more likely to be something for which a person afflicted might seek treatment, and thus receive a prescription to address some of the symptoms. Such questions, particularly given the lack of restraint on the scope of which type of prescriptions are at issue, are demonstrably likely to elicit information about a disability. *Cheyenne Mt.*, 124 F.3d at 1228 (requiring employees to disclose prescription drug use is a disability-related inquiry that violates the ADA if not shown to be job-related and consistent with business necessity).

As with the majority of the Agency's questions on the Medical Exam Form, this inquiry is fatally overbroad; in this instance, overbroad as to scope. Question 8 places no limits whatsoever on the type of prescription medication, nor does it specify a limited range of underlying maladies for which the medicine has been prescribed. Given the full range of all prescription medications, for all conceivable underlying maladies inherent in the question, Question 8 is fatally overbroad and violates the ADA.

**3. The Medical Exam Form Given to Plaintiff is Fatally Flawed in Failing to Distinguish Between Pre-Placement Applicants and Incumbents**

The root of the problem for the Agency, perhaps, lies in the Medical Exam Form itself. For the Agency obliterates the fundamental distinction between Pre-Placement and Incumbent inquiries in its election to apparently provide the same Exam Form to both Pre-Placement Applicants and Incumbents. The medical exam form at issue in this case announces FPS's disregard for the distinction between Applicants and Incumbents in its very title: "GSA/FPS PRE-PLACEMENT **AND** INCUMBENT MEDICAL EXAM FORM." (Ex. 5 at 1, [emphasis added].)

A closer look at the language used elsewhere on the form is also instructive. For example, the initial instruction for completing the form, located at the top of the first page, immediately below the title, states "*Note: **Applicant/Incumbent** is to complete the shaded medical history portions of this form*." (Ex. 5 at 1, [emphasis added].) Similarly, the blank space provided for the examinee to write in his/her name at the bottom of each page of the form is captioned "**Applicant/Incumbent** Name:________________" (Ex. 5, [emphasis added].)

Thus, the FPS exam form provided to examinees for the examinees to answer medical history questions apparently fails to make any distinction between medical history inquiries directed at Incumbent employees and those directed at Pre-Placement Applicants. Yet, this distinction is critical, and is expressly articulated in the governing statutory language. An employer is *free* to make disability-related inquiries of Pre-Placement Applicants, and may further make inquiries of them that are not "job-related" or "consistent with business necessity." 42 U.S.C. § 12112(d)(4); *Norman-Bloodsaw,* 135 F.3d at 1273. Yet, those very inquiries are expressly proscribed by the ADA as applied to Incumbents. Handing out the same questionnaire to both *Applicants* and *Incumbents* is unsupportable, because, as here, it subjects an Incumbent to impermissible inquiries not intended under the ADA to apply to Incumbents, but only to Pre-Placement Applicants.

This conclusion is further supported by examining the language of the medical release that Plaintiff declined to execute, which reads "I authorize any of the doctors, hospitals, or clinics mentioned on these forms to furnish the Government a complete transcript of my medical records **for purposes of processing my application for this employment or service**." (Ex. 5 at 5, [emphasis added].) That release is non-sensical as applied to an Incumbent, and obviously intended for a Pre-Placement Applicant. It is of small wonder, then, that the Eight Questions on the form in this case violate Plaintiff's rights under the ADA –Pre-Placement Applicants enjoy no such protections under the ADA and thus the questions, like the medical release, would not offend the ADA as applied to them.

The Agency's failure to provide separate forms to Incumbents and Pre-Placement Applicants concedes its intent (or gross dereliction) to elicit medical history information from Incumbents unfettered by any restrictions the ADA imposes on such inquiries.

**4. <u>The Eight Questions Violate the ADA and the Agency Took Adverse Employment Actions Against Plaintiff For Failing To Respond to Those Questions.</u>**

In short, the Agency's Eight Questions are all disability-related inquiries, and none of the questions can be shown to be "job-related and consistent with business necessity." 42 U.S.C. § 12102(1)(A). The Eight Questions, and FPS's insistent demand that Plaintiff answer such

questions, constitute per se violations of the ADA, and any adverse employment action taken on the basis of a refusal to answer questions proscribed by the ADA constitutes discrimination under the ADA.

Here, on the basis of the ADA proscribed inquiries, the Agency imposed a 14-day suspension of Plaintiff in 2006, (Scott Decl. ¶¶ 18, 20; Negrete Dep. 72:23-74:18, 75:21-76:17; Nesbitt-Simon Dep. 43:20-44:20; Exs. 6; 8.), and removed Plaintiff from federal service on March 5, 2007. (Scott Decl., ¶¶ 23-25; Hirano Dep. 90:23-91:12; Slagowski Dep. 133:17-134:1; Exs. 10, 11.) Partial summary judgment should be granted.

**B. PLAINTIFF WAS DISCIPLINED AND HIS EMPLOYMENT WAS TERMINATED IN RETALIATION FOR HIS OPPOSITION TO DEFENDANT'S UNLAWFUL PRACTICES.**

The anti-retaliation provision of the ADA provides that "[n]o person shall discriminate against any individual[10] because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To establish a case of retaliation under the direct method of proof, a plaintiff must show (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) a causal connection between the two. *Squibb v. Mem. Med. Ctr.,* 497 F.3d 775, 786 (7th Cir. 2007). Notably, to establish a claim of retaliation under the ADA, an employee need not even establish that the conduct he opposed was an actual violation of the ADA, so long as he can establish that he possessed good faith, reasonable belief that underlying challenged actions of his employer violated that law. *Weissman v Dawn Joy Fashions, Inc*. 214 F.3d 224, 234 (2nd Cir. 2000).

Here, Plaintiff's employment was terminated in retaliation for his opposition to FPS's medical exam inquiries that violated the ADA. Scott declined to answer certain inquiries, as detailed above, on his employer's Periodic Medical Exam questionnaire. (Scott Decl. ¶¶13-15; Ex. 5.) In response, FPS suspended and then terminated his employment. (Scott Decl., ¶¶ 18,

---

[10] A person's status as a "qualified individual with disability" is not relevant in assessing that person's claim for retaliation under ADA since retaliation provision protects "any individual." *Krouse v American Sterilizer Co.,* 126 F.3d 494, 502 (3rd Cir. 1997).

20, 23-25; Negrete Dep. 72:23-74:18, 75:21-76:17; Nesbitt-Simon Dep. 43:20-44:20; Hirano Dep. 90:23-91:12; Slagowski Dep. 133:17-134:1; Exs. 6; 8, 10, 11.) FPS cannot now claim the termination of Plaintiff's employment was for any other reason, for its express rationale, as stated in the four official documents (Notices of Proposed Action, Notices of Adverse Action), was primarily and fundamentally because of his failure to respond to its medical inquiries.[11] (Exs. 6; 8, 10, 11.) In addition, Plaintiff's opposition to the Agency's actions that violated the ADA manifested itself in significant part in Plaintiff's *act* of declining to respond to the proscribed, invasive inquiries. In short, Plaintiff's assertion of his ADA rights and his opposition to the Agency's proscribed practices are so inextricably entwined with his *actions* declining to answer the Eight Questions – the actions upon which FPS bases its discipline – they are essentially inseparable. (Scott Decl., ¶13-15; Ex. 5.) In disciplining Plaintiff for the acts, the Agency retaliates against the very expression of his ADA-based opposition to their conduct.

Moreover, after disciplining Plaintiff with a 14-day suspension in March 2006, the Agency shut down the FPS Periodic Medical Examination Program – suspending it indefinitely. (Montano Dep. 18:21-19:22, 22:6-24:11; Saladino Dep. 85:6-17.) Nonetheless, the Agency still took aggressive action towards Plaintiff – who again had already been disciplined (14-day Suspension) for asserting his right to ADA protection – thus pursuing Plaintiff to provide answers to questions asked in a medical examination conducted pursuant to a medical program that FPS was no longer enforcing.

There is no dispute that Plaintiff engaged in a protected activity. Even in the event that (arguendo) this Court was to determine that the disputed inquiries did not violate the ADA, Plaintiff's good faith, reasonable belief that the inquiries violated the Rehabilitation Act establishes his participation in a protected activity. *Weissman,* 214 F.3d at 234.

---

[11] Note: FPS may not recant its stated reason for suspending and subsequently removing Plaintiff from federal service, because it expressly specified its rationale in its Notice(s) of Proposed Action. 5 C.F.R. § 752.404, subd. (f) ("In arriving at its decision, the agency shall not consider any reasons for action other than those specified in the notice of proposed action.").

Further, it is beyond dispute that Plaintiff suffered an adverse employment action, namely, suspension and termination. (Scott Decl., ¶¶ 18, 20, 23-25; Negrete Dep. 72:23-74:18, 75:21-76:17; Nesbitt-Simon Dep. 43:20-44:20; Hirano Dep. 90:23-91:12; Slagowski Dep. 133:17-134:1; Exs. 6; 8, 10, 11.)

Finally, the causal connection between Plaintiff's protected activity and the adverse action is conclusively established by FPS's own documentation of the adverse employment actions, and the fact that Plaintiff's actions in opposing FPS's prohibited practices – in the form of declining to be coerced into answering ADA-proscribed inquiries – is the very conduct for which FPS subjected him to discipline. In imposing the discipline, FPS concedes the cause and effect relationship between Plaintiff's protected activity and Defendant's adverse employment actions. In terminating Plaintiff for failing to respond to the Eight Questions, the Agency terminated Plaintiff for opposing prohibited practices, which equals retaliation under the ADA. Partial summary judgment should be granted on Plaintiff's retaliation cause of action.

## C. FPS'S MEDICAL EXAM PROGRAM VIOLATES THE ADEA BECAUSE IT MANDATES THAT EMPLOYEES OVER 40 YEARS OF AGE UNDERGO MEDICAL TESTING MORE FREQUENTLY THAN YOUNGER EMPLOYEES SOLELY BECAUSE OF THEIR AGE.

A policy that requires a medical examination based on no other factor than age violates the ADEA. *EEOC v. Massachusetts*, 987 F.2d 64, 70-71 (1st Cir. 1993). For example, in *Massachusetts*, state and local employees aged 70 or older had to take and pass an annual medical examination as a condition of continued employment. *Id.* Despite the state's argument that "the requirement that employees aged seventy or older pass an annual medical examination is based on fitness rather than age," the court held "an individual's fitness to work is based on a number of factors, of which age is only one. … [and there was] no evidence that any factor other than the employee's age was taken into account in requiring an annual medical examination." *Id.* at 70-71. The court emphasized that an employer may not arbitrarily pick an age as the point at which to measure the physical preparedness of its employees. *Id.*

Significantly, a recent EEOC publication specifically address this issue: "For example, an employer may not give a physical agility test only to applicants over age 50, based on a belief

that they are less able physically to perform a particular job without testing younger applicants." EEOC, *Employment Tests and Selection Procedures*, *available at* http://www.eeoc.gov/policy/docs/factemployment_procedures.html.

Here, FPS's required a 45 year-old employee be medically-examined annually, as opposed to once every three years for a 35-45 year old employee, and once every two years for a 36-44 year old employee. (Ex. 1.) FPS took no factors other than age into account in requiring more frequent examinations for those aged 45 and older. FPS's policy violated the ADEA.

**1. Age is not a proxy for fitness.**

To assert a defense to an ADEA violation, an employer must first establish that the job qualifications that the employer invokes to justify his discrimination are "'reasonably necessary to the essence of his business.'" *Western Air Lines v. Criswell,* 472 U.S. 400 (1985) (quoting *Usery v. Tamiami Trail Tours, Inc.,* 531 F.2d 224 (5th Cir. 1976). If the employer succeeds in making this showing, it must then establish that it "is compelled to rely on age as a proxy for the safety-related job qualifications validated in the first inquiry." *Criswell*, 472 U.S. at 414. To prove that age is a valid proxy, the employer must demonstrate either that it has "a factual basis for believing that all or substantially all [persons over the age qualifications] would be unable to perform safely and efficiently the duties of the job involved," or that "it is impossible or highly impractical to deal with the older employees on an individualized basis." *Id.* (quoting *Tamiami,* 531 F.2d at 235 [internal quotations omitted]).

For example, in *EEOC v. County of Los Angeles*, 526 F. Supp. 1135 (C.D. Cal. 1981), the county's policy was not to consider any applicant over age 35 for the position of deputy sheriff or as helicopter pilot. The first element of the BFOQ defense was established, because "it is beyond dispute that these jobs are physically arduous and require strength, agility, good reflexes and the ability to perform such tasks as the running of appreciable distances and the lifting of heavy objects." *Id.* at 1139. However, the county could not prove that age was a valid proxy because "there is no strict relationship between age and physical ability. Thus, the overwhelming weight of the evidence demonstrates that many persons over the age of forty are capable of physically outperforming many persons under the age of forty years." *Id.*

Similarly, here, although the physical and psychological health of its investigators is undoubtedly necessary to FPS's business, FPS may not use age as a proxy for fitness. Indeed, as the court in *County if Los Angeles* noted, "many persons over the age of forty possess the physical strength, agility and other characteristics needed for these jobs, while many persons under the age of forty lack these characteristics." *Id*. at 1139. Although FPS may argue it is using the medical exam as an individualized way of assessing the fitness of those over age 45, this misses the point that it is the increased frequency for those over age 45 that violates the ADEA.

As discussed above, Plaintiff suffered adverse employment actions, including termination, as a direct result of his being ordered to submit to a medical examination under a policy that violated the ADEA. (Scott Decl., ¶¶ 18, 20, 23-25; Negrete Dep. 72:23-74:18, 75:21-76:17; Nesbitt-Simon Dep. 43:20-44:20; Hirano Dep. 90:23-91:12; Slagowski Dep. 133:17-134:1; Exs. 6, 8, 10, 11.)

FPS violated the ADEA by requiring Plaintiff to submit to a medical examination more frequently than his younger counter-parts. Partial summary judgment should be granted on this issue.

## V.

## CONCLUSION

Based upon the foregoing, Plaintiff respectfully requests that partial summary judgment be entered in favor of Plaintiff, establishing Defendant's liability on Plaintiff's Discrimination (ADA/Rehabilitation Act/ADEA) and Retaliation/Reprisal (ADA/Rehabilitation Act) causes of action, and that the matter proceed to a determination on the issue of the precise calculation of Plaintiff's resulting damages.

LAW OFFICES OF MATTHEW G. ENGLISH

DATED: September 15, 2009

By: /s/ Matthew G. English .
Matthew G. English
Attorney for Plaintiff JAMES SCOTT

Matthew G. English (SBN 204869)
LAW OFFICES OF MATTHEW G. ENGLISH
7676 Hazard Center Dr Ste 500
San Diego CA 92108-4508
(619) 725-2725

Attorney for Plaintiff JAMES SCOTT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SCOTT,<br>Plaintiff,<br><br>vs.<br><br>MICHAEL CHERTOFF[1], SECRETARY, DEPARTMENT OF HOMELAND SECURITY.<br>Defendants | Case No.: 08-CV-0735-BTM (JMA)<br><br>**DECLARATION OF JAMES W. SCOTT IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Per chambers, no oral argument unless requested by the court]<br><br>Date: December 4, 2009<br>Time: 11:00 a.m.<br>Courtroom: 15<br>Judge: Hon. Barry Ted Moskowitz |

I, James W. Scott, hereby declare as follows:

1. I am the Plaintiff in this lawsuit. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify thereto under oath.

2. I was born on November 20, 1954. On November 9, 2005, I was 50 years old.

3. I was hired by the Federal Protective Service (FPS) in 1991, as a uniformed federal protective officer in Los Angeles, California.

4. In or about 1992, I was promoted to a GS-1811-07 Special Agent/Criminal Investigator.

[1] Michael Chertoff is the former Secretary of the Department of Homeland Security (DHS), and was sued in that capacity pursuant to 42 USC § 2000e-16(c). Chertoff's successor and the present Secretary of DHS, Janet Napolitano, is substituted in as the named defendant by operation of law. Fed. R. Civ. P. 25(d).

5. In 1993, I transferred to San Diego to open a criminal investigative office for FPS. I remained stationed in San Diego for the remainder of his employment with FPS.

6. In the year 2000, FPS implemented its Periodic Medical Examination Program, requiring periodic medical examinations of FPS employees. Attached as Exhibit 1 is a true and correct copy of the June 7, 2000 policy memorandum titled *Guidelines for Implementing the Federal Protective Service (FPS) Periodic Medical Examination Program for FPS Law Enforcement Positions*. I received a copy of this memorandum while I was employed with FPS.

7. In or about 2003, I was again promoted to GS-1811-12. My job title remained Special Agent/Criminal Investigator.

8. Also in or about 2003, I was detailed to the FBI's Joint Terrorism Task Force (JTTF). JTTF is an inter-agency task force whose aim is to pool and coordinate federal resources to better combat and defend against terrorism, both foreign and domestic. The assignment to JTTF was considered to be something of an accolade that reflected well on the career of a Special Agent assigned to the task force.

9. Throughout my employment with FPS, I was the subject of favorable performance reviews/appraisals, and my work and contributions to the Agency earned me the promotions and assignments as described above.

10. Attached as Exhibits 2 and 3, is a true and correct copy of my 10/01/04 – 1/31/05 performance review, signed by Acting Supervisory Criminal Investigator John P. Morgan on April 21, 2006 and April, 25, 2006.

11. Attached as Exhibit 4 is a true and correct copy of my 10/01/05 – 9/30/06 performance review, signed by Supervisory Special Agent John Hartman on October 31, 2006.

12. In the fall of 2005, I was notified that I was scheduled for a Periodic Medical Examination, to take place at U.S. Healthworks Medical Group (Healthworks) on November 9, 2005. My FPS colleagues and I referred to the Periodic Exam as an "Incumbent Exam."

13. On November 9, 2005, I went to Healthworks' San Diego facility and underwent a Periodic/Incumbent Medical Exam. I received a full physical examination. The office medical

staff also provided me with a medical questionnaire form to fill out, titled GSA/FPS Pre-Placement and Incumbent Medical Exam Form.

14. I filled out the majority of the exam form, but I specifically declined to answer a total eight of questions on the form that I believed violated my rights. I refer to them in this Declaration as the Eight Questions, although they were identified by letters, not numbers on the form itself. The Eight Questions were:

> Question 1. Have you ever been treated for a mental condition? (if yes, specify when, where, and give details).
>
> Question 2. Have you ever had any illness, injury, or other condition (including learning disability, attention deficit disorder, etc.) other than those already noted? (If yes, specify when, where, and give details).
>
> Question 3. Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past years for other than minor illness? (If yes, give complete address of doctor, hospital, clinic, and details).
>
> Question 4. Have you ever received, is there pending, or have you applied for pension or compensation for existing disability? (If yes, specify what kin[d], granted by whom, in what amount, when, why).
>
> Questions 5-7. Have you had or do you currently experience any of the following: Psychiatric/psychologic consult; Episodes of depression; Periods of nervousness.
>
> Question 8. List all medications (prescription and nonprescription) you are currently taking with dosage, and [f]requency, and reason below.

15. Next to Questions 1-4 and 8, I wrote "Question violates ADA/Rehab Act/EEOC". Questions 5-7 were grouped together, so below them I wrote "*[u]nmarked questions violate ADA, Rehab Act, EEOC".

16. At the bottom of the Exam Form, I crossed out the language of a very broad medical release, which I also believed to be in violation of the ADA. Below it, I handwrote a release authorizing the release of the medical records relating to the November 9, 2005, medical exam to authorized FPS medical personnel, but no other personal medical records. I then signed the handwritten release.

17. Attached as Exhibit 5 is a true and correct copy of the GSA/FPS Pre-Placement and Incumbent Medical Exam Form, as I filled it out on November 9, 2005.

18. On or about April 20, 2006, I received a Notice of Proposed Suspension, dated April 17, 2006, signed by Rudy Negrete. Attached as Exhibit 6 is a true and correct copy of the April 17, 2006, Notice of Proposed Suspension.

19. On April 28, 2006, I replied to Mr. Negrete's Notice of Proposed Suspension, by letter to "Acting" Deputy Regional Director Joyce Nesbitt-Simon. Attached as Exhibit 7 is a true and correct copy of my April 28, 2006 letter.

20. On or about May 8-9, 2006, I received a Notice of Suspension dated May 8, 2006, signed by "Acting" Assistant Regional Director Joyce Nesbitt-Simon. Per the notice I was suspended for 14 calendar days from May 14, 2006 to May 27, 2006. Attached as Exhibit 8 is a true and correct copy of the May 8, 2006, Notice of Suspension.

21. On or about December 21, 2006, I was contacted by FPS Mission Support Chief for Region 10, Tamra Hirano. In her correspondence, Ms. Hirano demanded that I answer the Eight Questions or face discipline. Attached to the correspondence was a re-typed version of the Eight Questions. Attached as Exhibit 9 is a true and correct copy of the December 21, 2006, letter I received from Ms. Hirano.

22. Ms. Hirano also asked me in her December 21, 2006, letter to sign another medical release. It was not clear to me from the release which documents she was asking me to authorize the release of.

23. On or about January 30, 2007, I received a Notice of Proposed Removal, dated January 25, 2007, signed by Tamra Hirano. Attached as Exhibit 10 is a true and correct copy of the January 25, 2007 Notice of Proposed Removal.

24. On or about March 5, 2007, I received a Notice of Removal, dated March 5, 2007, and signed by "Acting" Deputy Regional Director, Region 10, Steven Slagowski. Attached as Exhibit 11 is a true and correct copy of the March 5, 2007, Notice of Removal.

25. FPS terminated my employment effective March 5, 2007, and I was removed from federal service on that date. At the time of my removal, I had over 20 years of service with the federal government.

/ / /

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed this 15th day of September, 2009, at San Diego, California.

By: ______________________
James W. Scott, Declarant

Matthew G. English (SBN 204869)
LAW OFFICES OF MATTHEW G. ENGLISH
7676 Hazard Center Dr Ste 500
San Diego CA 92108-4508
(619) 725-2725

Attorney for Plaintiff JAMES SCOTT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL CHERTOFF, SECRETARY, DEPARTMENT OF HOMELAND SECURITY.<br><br>Defendants | Case No.: 08-CV-0735-BTM (JMA)<br><br>**DECLARATION OF RUBEN BALLESTROS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Per chambers, no oral argument unless requested by the court]<br><br>Date: December 4, 2009<br>Time: 11:00 a.m.<br>Courtroom: 15<br>Judge: Hon. Barry Ted Moskowitz |

I, Ruben Ballestros, hereby declare as follows:

1. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify thereto under oath.

2. I am a retired law enforcement officer. From 1987 to 2007, I was employed by the Federal Protective Service (FPS).

3. At the time of my retirement in 2007, I was a Senior Special Agent/Criminal Investigator and Firearms Instructor with FPS.

4. In1995, I the Senior Special Agent - Southern Section (LA/San Diego) for FPS. At time, I was in James "Bill" Scott's reporting chain. I was not directly in Scott's chain of command, but rather in his reporting chain. As the Senior Special Agent for the Southern Section, I was Scott's

conduit to his direct-line supervisors – the region's Supervisory Special Agent and the Threat Management Branch Chief, who had supervisory authority over all the Special Agent/Criminal Investigators in the region.

5. Attached hereto as Exhibit 12 is a true and correct copy of correspondence I received from FPS Region 9 Regional Medical Coordinator on or about October 26, 2005, notifying Scott of a scheduled Periodic/Incumbent Medical Examination at Heathworks in San Diego, California, on November 9, 2005.

6. Upon receipt of these documents from Martha Montano, I notified Agent Scott of the date, time and location of the scheduled exam.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed this 16th day of September, 2009 at NoRWALK, California.

By: [signature]
Ruben Ballestros, Declarant

Matthew G. English (SBN 204869)
LAW OFFICES OF MATTHEW G. ENGLISH
7676 Hazard Center Dr Ste 500
San Diego CA 92108-4508
(619) 725-2725

Attorney for Plaintiff JAMES SCOTT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL CHERTOFF[1], SECRETARY, DEPARTMENT OF HOMELAND SECURITY.<br><br>Defendants | Case No.: 08-CV-0735-BTM (JMA)<br><br>**DECLARATION OF MATTHEW G. ENGLISH IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Per chambers, no oral argument unless requested by the court]<br><br>Date: December 4, 2009<br>Time: 11:00 a.m.<br>Courtroom: 15<br>Judge: Hon. Barry Ted Moskowitz |

I, Matthew G. English, hereby declare as follows:

1. I am an attorney, duly licensed to practice in the State of California and admitted and qualified as an Attorney of the United States District Court for the Southern District of California. I am counsel for the Plaintiff in the above-captioned litigation. I have personal knowledge of the facts stated in this declaration, and if called as a witness, I could and would competently testify thereto under oath.

[1] Michael Chertoff is the former Secretary of the Department of Homeland Security (DHS), and was sued in that capacity pursuant to 42 USC § 2000e-16(c). Chertoff's successor and the present Secretary of DHS, Janet Napolitano, is substituted in as the named defendant by operation of law. Fed. R. Civ. P. 25(d).

2. Attached hereto as Exhibit 13 is a true and correct copy of portions of the Reporter's Transcript of the Deposition of Martha Montano taken on July 16, 2009.

3. Attached hereto as Exhibit 14 is a true and correct copy of portions of the Reporter's Transcript of the Deposition of John Hartman taken on July 23, 2009.

4. Attached hereto as Exhibit 15 is a true and correct copy of portions of the Reporter's Transcript of the Deposition of Lawrence Saladino, M.D. taken on July 29, 2009.

5. Attached hereto as Exhibit 16 is a true and correct copy of portions of the Reporter's Transcript of the Deposition of Rudy Negrete taken on July 20, 2009.

6. Attached hereto as Exhibit 17 is a true and correct copy of portions of the Reporter's Transcript of the Deposition of Joyce Nesbitt-Simon taken on June 16, 2009.

7. Attached hereto as Exhibit 18 is a true and correct copy of portions of the Reporter's Transcript of the Deposition of Tamra Hirano taken on June 18, 2009.

8. Attached hereto as Exhibit 19 is a true and correct copy of portions of the Reporter's Transcript of the Deposition of Steven Slagowski taken on June 26, 2009, and July 7, 2009.

9. I am in possession of the original transcript of each of the depositions identified in paragraphs 2 through 8, above, with the original signatures of court reporter and witness affixed to each transcript. I can and will lodge the original transcripts with the court upon request.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. Executed this 16th day of September, 2009, at San Diego, California.

By: /s/ Matthew G. English .
Matthew G. English, Declarant

Matthew G. English (SBN 204869)
LAW OFFICES OF MATTHEW G. ENGLISH
7676 Hazard Center Dr Ste 500
San Diego CA 92108-4508
(619) 725-2725

Attorney for Plaintiff JAMES SCOTT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL CHERTOFF[1], SECRETARY, DEPARTMENT OF HOMELAND SECURITY.<br><br>Defendants | Case No.: 08-CV-0735-BTM (JMA)<br><br>**PLAINTIFF'S NOTICE OF LODGMENT OF EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[**Per chambers, no oral argument unless requested by the court**]**<br><br>Date: December 4, 2009<br>Time: 11:00 a.m.<br>Courtroom: 15<br>Judge: Hon. Barry Ted Moskowitz |

Plaintiff JAMES SCOTT hereby lodges the following Exhibits in support of Plaintiff's Motion for Partial Summary Judgment:

| **Exhibit No.** | **Description** |
|---|---|
| 1 | *Guidelines for Implementing the Federal Protective Service (FPS) Periodic Medical Examination Program for FPS Law Enforcement Positions* (June 7, 2000) |
| 2 | 10/01/04 – 1/31/05 Performance Review – James Scott (Morgan) |

[1] Michael Chertoff is the former Secretary of the Department of Homeland Security (DHS), and was sued in that capacity pursuant to 42 USC § 2000e-16(c). Chertoff's successor and the present Secretary of DHS, Janet Napolitano, is substituted in as the named defendant by operation of law. Fed. R. Civ. P. 25(d).

| Exhibit No. | Description |
|---|---|
| 3 | 10/01/04 – 1/31/05 Performance Review – James Scott (Morgan) |
| 4 | 10/01/05 – 9/30/06 Performance Review – James Scott (Hartman) |
| 5 | *GSA/FPS Pre-Placement and Incumbent Medical Exam Form* (November 9, 2005) |
| 6 | Notice of Proposed Suspension (April 17, 2006) |
| 7 | Scott Response Letter to Notice of Proposed Suspension (April 28, 2006) |
| 8 | Notice of Suspension (May 8, 2006) |
| 9 | Hirano Letter to Scott (December 21, 2006) |
| 10 | Notice of Proposed Removal (January 25, 2007) |
| 11 | Notice of Removal (March 5, 2007) |
| 12 | Montano Letter Scheduling Incumbent Exam (October 26, 2005) |
| 13 | Transcript portions of the Deposition of Martha Montano (July 16, 2009) |
| 14 | Transcript portions of the Deposition of John Hartman (July 23, 2009) |
| 15 | Transcript portions of the Deposition of Lawrence Saladino, M.D. (July 29, 2009) |
| 16 | Transcript portions of the Deposition of Rudy Negrete (July 20, 2009) |
| 17 | Transcript portions of the Deposition of Joyce Nesbitt-Simon (June 16, 2009) |
| 18 | Transcript portions of the Deposition of Tamra Hirano (June 18, 2009) |
| 19 | Transcript portions of the Deposition of Steven Slagowski (July 7, 2009) |
| 20 | EEOC, Enforcement Guidance: *Disability-Related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities Act (ADA)*, 2 EEOC Compl. Man. (CCH) P6910 (2000) |
| 21 | EEOC, Questions and Answers: *Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)* |
| 22 | EEOC, *Employment Tests and Selection Procedures* |

/ / /

LAW OFFICES OF MATTHEW G. ENGLISH

DATED: September 16, 2009

By: /s/ Matthew G. English .
Matthew G. English
Attorney for Plaintiff JAMES SCOTT

## 1. Guidelines for Implementing the Federal Protective Service (FPS) Periodic Medical Examination Program for FPS Law Enforcement Positions (June 7, 2000)

JUN 7 2000

MEMORANDUM FOR DIRECTOR, FEDERAL PROTECTIVE SERVICE DIVISION
1PS, 2PS, 3PS, 4PS, 5PS, 6PS, 7PS, 8PS, 9PS, 10PS, WPS

DIRECTOR, HUMAN RESOURCES DIVISION
1CP, 2CP, 3CP, 4CP, 5CP, 6CP, 7CP, 9CP, WCP

FROM: CLARENCE EDWARDS
ASSISTANT COMMISSIONER
OFFICE OF FEDERAL PROTECTIVE SERVICE (PS)

for GAIL LOVELACE Thomas F Conley
CHIEF PEOPLE OFFICER
OFFICE OF THE CHIEF PEOPLE OFFICER (C)

SUBJECT: Guidelines for Implementing the Federal Protective Service (FPS) Periodic Medical Examination Program for FPS Law Enforcement Positions

This memorandum transmits the policy and procedures for implementation of the periodic medical examination program for incumbents employed in FPS positions with law enforcement authority.

This project was undertaken to complement other recently developed components of the FPS Medical Program including the FPS specific pre-hiring medical standards and the FPS Wellness/Fitness program. This component of the program provides a mechanism for the continuing medical evaluations of participating FPS law enforcement professionals. The program will assure the participant and the agency of the continuing medical fitness of FPS professionals in positions with law enforcement authority and their ability to effectively accomplish the essential functions of their respective positions.

Implementation of the new program is effective the date of this memorandum, following the procedures outlined in the attachment. In order to get the program moving, we request that each regional FPS and Human Resources Director work together to develop the initial list of FPS professionals participating in the periodic medical examinations during calendar year 2000. This information should be sent to **both** Federal Occupational Health, Office of Law Enforcement Medicine, Attn: Denise Lyons, and FPS Central Office, Attn: Susan Spannbauer, FPS Medical Program project manager, **by July 14, 2000**.

Those eligible for examinations shall be scheduled through the respective Regional Medical Coordinators (RMC). A conference call was held April 20, 2000, with the RMC's to apprise them of this correspondence and to discuss the process for scheduling and monitoring these examinations as well as the Fitness Health Screenings. Funding for Fiscal Year 2000 exams is the responsibility of each FPS regional office.

Thank you for your continued support of the FPS Medical Program. Please direct all program issues to Susan Spannbauer on (202) 501-1553 and human resources issues to Allen Pounsel on (202) 501-4678.

Attachments

cc: PS OF: PS/RF::Burns C, spannbauer, owens
EBURNS:dst: 219-8651: 3/10/00:revised 4/19/00

H:/FPSMEDPGM/Implementing Memo (Periodic Medical Examination Program).doc

Concurrences:

Susan Spannbauer PSP Susan Spannbauer 4/20/00
Regina Owens PSP Regina Owens
Allen Pounsel CPP Allen Pounsel
Wyndell Watkins PSP Regina Owens for

ICE-05-W391-ROI-000426

# Federal Protective Service
# Periodic Medical Examination Process
# For Incumbents

## Introduction

The General Services Administration (GSA), Office of Federal Protective Service (FPS), is committed to making sure all potential and incumbent FPS law enforcement employees, covered by 40 U.S.C 318, meet a level of medical and psychological fitness commensurate with the essential functions of their positions.

On May 4, 1999, the FPS in partnership with the Office of the Chief People Officer and the national labor bargaining units, published new FPS specific medical standards for all FPS positions with law enforcement authority and standardized guidelines for performing Pre-Placement Medical Examinations and Psychological Screenings. At that time we indicated that these new medical standards would also be used as the basis to begin the Incumbent Medical Examination program beginning in calendar year 2000.

The process outlined in this policy document will be used to implement a permanent periodic medical examination program for incumbents. The program will ensure a comprehensive, impartial and consistent assessment of an individual's ability to continue performing the essential functions of their occupation and also allow FPS management to monitor the state of health of the FPS law enforcement workforce.

The FPS is committed to ensuring that no incumbent is discriminated against because of a medical condition or psychological suitability issue that would otherwise have no affect on their ability to perform the duties of the position. This commitment extends to the privacy and confidentiality of medical and personnel records. Requests for medical information under this program will be processed in full compliance with Title 5, Code of Federal Regulations (C.F.R.), Part 297, Privacy Procedures for Personnel Records.

This medical evaluation program is established in full compliance with Title 5, C.F.R., Part 339, Medical Qualification Determinations.

## What are Periodic Medical Examinations?

Periodic medical examinations evaluate the employees continued medical fitness to perform the essential functions of the job and detect any pertinent changes in the condition of their health which might adversely impact their ability to safely and effectively carry out their duties. Baseline medical information from previous program examinations, if available, will be used for comparison with subsequent periodic evaluation results to determine if the employee has any significant health trends that may be occupationally related.

## Who must participate in the Periodic Medical Examination Program?

The following FPS law enforcement professionals **shall** participate in the Periodic Medical Examination Program:

1. **FPS Police Officers**, GS 083, hired or selected via competitive procedures. April 8, 1997, or later. These employees were subject to the April 8, 1997, or May 4, 1999, version of the FPS Medical Standards, and:

2. **All other FPS personnel in law enforcement positions covered by 40 U.S.C. 318** hired or selected via competitive procedures. May 4, 1999, or later. These employees were subject to the revised FPS Specific Medical Standards dated May 4, 1999.

This includes both external and internal competitive selections.

FPS Regional Directors are responsible for ensuring that all FPS personnel with law enforcement (318) authority hired in the timeframes given above participate in the Periodic Medical Examination Program.

FPS Police Officers in positions covered by 40 U.S.C. 318 hired or selected via competitive procedures. prior to April 8, 1997, and all other FPS personnel in positions covered by 40 U.S.C. 318 hired or selected via competitive procedures, prior to May 4, 1999, are not subject to the Periodic Medical Examination Program at this time.

## What is the frequency of the examinations?

All participating FPS personnel will receive medical exams on a recurring basis to make sure they continue to meet the medical qualifications of the position and can satisfactorily perform the essential functions of the job. Consistent with accepted practice, participating personnel will be evaluated based on the following guidelines:

| Ages | Frequency |
|---|---|
| 35 and under | Every 3 years |
| 36 to 44 | Every 2 years |
| 45 and above | Every year |

**How are Examinations Scheduled ?**

Regional Medical Coordinators (RMC) or designated alternates shall schedule and monitor the accomplishment of examinations in conformance with this policy and procedures.

For consistency, RMCs **shall**:

- Develop a calendar year roster. (each December), of all participating FPS employees eligible for an exam during the upcoming calendar year. The roster shall be developed in coordination with the servicing regional Human Resources office.
- Forward a copy of the calendar year roster to Federal Occupational Health, Atlanta, Georgia, and FPS Central Office, no later than December 31st of each year.
- Schedule examinations during employee's month of birth and far enough in advance to avoid potential conflicts and cancellations. (All examinations shall be completed within 30 days following the employee's month of birth). Employees should be given several weeks advance notice of the appointment.

**Who will pay for incumbent examinations ?**

In compliance with Title 5, C.F.R., Subpart C, Medical Procedures, Section 339.304, FPS will pay for the cost of the basic medical examination, including all required tests, for all participating employees. The basic medical examination will include all tests and exams outlined in the Federal Occupational Health examination form for incumbents entitled "GSA/FPS Preplacement and Incumbent Medical Exam Form." **(Attachment 1).**

**All costs associated with additional examinations and tests beyond the basic examination shall be the responsibility of the employee.**

**Funding the Periodic Examination Program**

FPS Regional Directors shall budget for the necessary funds to deliver the Periodic Medical Examination Program through the established budgeting process. The employee roster, examination frequency schedule and the annual FOH cost schedule shall be used to develop program estimates. The cost schedule will be developed annually by the Central Office, as part of the annual Interagency Memorandum of Agreement, and provided to the regions.

## Who will perform examinations?

To ensure standardization of examinations and to facilitate timely delivery of results, exams will be performed through the network of providers developed and monitored by Federal Occupational Health (FOH), Atlanta, Georgia. In most cases these providers will be local Public Health Service clinics. In locations where Public Health Service clinics are not available, FOH will make alternative arrangements to accomplish the examinations.

## What form(s) will be used?

All examinations will be accomplished using only the examination form designed for FPS by FOH (This is the same form used for pre-placement examinations). This form is specifically designed to collect the necessary information to evaluate incumbents consistent with FPS Medical Standards. **No substitute forms can be used.** Forms are available at participating Public Health Service clinics, however, the RMC should reproduce the form as necessary to provide to incumbents prior to reporting for the examination. **(<u>Attachment 1</u> - GSA/FPS Preplacement and Incumbent Medical Exam Form).**

## How will exam results be evaluated ?

Completed medical examination forms and laboratory reports will be reviewed and evaluated by one central source, the FPS designated Medical Review Officer (MRO). The Federal Occupation Health Office, Law Enforcement Medical Program, Atlanta, Georgia, has been designated as the provider of choice for this service. This is the same source that evaluates our pre-placement examinations. This will ensure that all incumbents are evaluated consistently by a physician familiar with the FPS occupations and the FPS medical standards applicable to the occupation under review. This is also critically important to the standardization of the program and potential challenges to our standards.

Once examination results are received at FOH, the package will be logged in for tracking purposes and reviewed to make sure all necessary information is included in the package. If all information is included, medical examinations will be referred to the FPS Medical Review Officer (MRO) for evaluation and final determination.

If additional medical information is required, the FOH triage nurse will contact the appropriate RMC or service provider, as appropriate, to acquire the additional information to complete the evaluation.

Completed medical examination packages will be reviewed by the MRO to ensure the incumbent possesses the medical qualifications necessary to continue performing the essential functions of the position.



ICE-05-W391-ROI-000430

**How will examination results be sent to FOH, Atlanta, Georgia**

Completed medical examinations must be sent via overnight FedEx by the examining facility to the MRO within 48 hours of completion of the examination. (Cost of shipping is included in the cost of the exam. FOH will coordinate this requirement with the regional providers and make sure mailing materials are provided to the exam providers).

**How will evaluation results be reported to the agency?**

After completing the medical evaluation, the MRO will complete a Medical Determination Statement. This document will be submitted by the MRO to the designated FPS RMC within **10 workdays** of receipt of the complete medical examination package. (**Attachment 2 – Medical Review Categories).**

The MRO will make one of four determinations for each incumbent based on their professional assessment of the medical examination and laboratory test results. These determinations are:

1. **Medically Qualified:** Incumbent has no medical conditions that are likely to hinder safe and efficient performance of essential job functions.

2. **Medical determination cannot be made due to incomplete examination results**: Please return to your examining facility for completion of the following medical information.

   (This category will only be used in those instances where there is some problem with the original exam results that prevents use of the information to make a medical determination).

3. **Medical Determination cannot be made based on available medical information.** Incumbent has medical findings that may hinder safe and efficient performance of essential job functions. Please provide the following detailed or diagnostic medical information. Per agency request, if further information is not provided, a determination will be made based on available medical information.

   (This category will only be used in those instances where it is determined that more detailed testing may impact the final medical determination). (Expenses of these additional tests will be the responsibility of the employee).

4. **Not medically qualified to perform the essential functions of the job.** The following medical condition(s) poses a significant level of risk to the health and safety of yourself and/or others in the performance of essential job functions. Medical follow-up, if required, and any restriction of duties are listed below.



ICE-05-W391-ROI-000431

## How do we deal with incumbents who are not medically qualified?

Regions shall adhere to the following procedures in all cases where an incumbent is found medically unfit to perform the essential functions of the job. These procedures will ensure consistency with Office of Personnel Management (OPM) policy and also make sure incumbents are afforded every consideration when making medical eligibility determinations for FPS positions.

When a Medical Determination letter is received from Federal Occupational Health, Atlanta, Georgia, with a determination that the incumbent is not medically qualified, regional FPS management, in conjunction with the servicing regional Human Resources and Federal Occupational Health shall:

1) **Notify the incumbent of the determination** and advise that they have the opportunity to obtain and submit additional medical information from their physician(s) for consideration by the Medical Review Officer (MRO). (Title 5 C.F.R. 339.303). **(This is at the incumbent's expense).** If the incumbent presents such additional information, it shall be provided to the MRO for evaluation. The MRO will provide a final medical determination to FPS management. If the MRO still determines that the incumbent is not medically qualified, the next step will be to:

2) Determine if a reasonable accommodation can be identified to allow continuation in present position, ensuring the health and safety of the individual and others is not endangered; (The MRO recommendation shall be fully considered when determining the applicability and appropriateness of any reasonable accommodation. If an accommodation cannot be made, then **consideration will be given for a waiver of specific standard(s). (Title 5 C.F.R. 339.204)**.

   All reasonable accommodation or waiver proceedings must be fully documented and posted to the appropriate employee records and files in conformance with existing administrative policy and procedures. Documentation shall include at a minimum:

   - Clear delineation of the medical standard(s) being considered for accommodation or waiver;
   - Essential job functions potentially impacted by the standard(s) being considered;
   - Narrative discussion of all information considered and supporting evidence used to arrive at the final management decision. (This discussion should clearly articulate the impact of past work experience on the decision making process);
   - FOH recommendation (This shall include any accommodation recommended for continuation of duty or rationale for support or non-support of medical waiver);
   - Final FPS decision.



ICE-05-W391-ROI-000432

**<u>Note</u>**: Waiver of a medical standard is a regional FPS management decision that must be factually based on "sufficient evidence that an incumbent, with or without reasonable accommodation, can perform the essential duties of the position, <u>without endangering the health and safety of the individual or others</u>."

The Law Enforcement Medical Program, Federal Occupation Health, and the servicing regional Human Resources, shall be consulted during this process to ensure consideration of all medical and personnel policy issues prior to making a final accommodation or waiver decision.

3) If the standard is not accommodated or waived, **<u>other appropriate administrative and human resources procedures will be considered</u>**. <u>These may include, but are not limited to</u>:

- Placement in an alternative (non 318 authority) position at the same or lower grade level within FPS, if a position is available and the medical problem cannot be mitigated;
- Placement in an alternative (non 318 authority) position at the same or lower grade level within GSA, if a position is available and the medical problem cannot be mitigated;
- Consideration of potential retirement options, if applicable; or
- Separation from the agency through adverse action procedures.

**<u>GSA policies and procedures shall be followed to determine the appropriate disposition of each case. In all cases the servicing Human Resources Director is the final authority regarding proper employment policies and procedures to be followed.</u>**

H:FPSMedPgm/Periodic Exam Program (Revised April 2000)

## 2. 10/01/04 – 1/31/05 Performance Review – James Scott (Morgan)

# PERFORMANCE PLAN AND APPRAISAL RECORD FOR NON-SUPERVISORY ASSOCIATES

**NOTE: Read instructions on Pages 3 and 4 before completing form.**

## PART 1. ADMINISTRATIVE INFORMATION

| 1. NAME OF ASSOCIATE *(Last, First, Middle Initial)* | 2. SOCIAL SECURITY NUMBER | 3. PAY PLAN, SERIES AND GRADE | |
|---|---|---|---|
| SCOTT, James W. Jr. | | GS12 /1811 | |
| **4. ORGANIZATION** | **5. CORRESPONDENCE SYMBOL** | **6. RATING PERIOD *(MM/DD/YYYY)*** FROM | TO |
| DHS/ICE, Federal Protective Service | | 10/01/04 | 01/31/05 |

## PART 2. POSITION DESCRIPTION REVIEW CERTIFICATION

| 7. I certify that I reviewed the associate's position description. If I do not believe it is an accurate statement of the major duties and responsibilities, I have started appropriate action. | SUPERVISOR'S INITIALS | DATE |
|---|---|---|

## PART 3. PERFORMANCE PLAN AND APPRAISAL

**Evaluate the performance plan objectives, underlying activities and tasks to assign a rating to each critical element. Base these ratings on the expectation cited below:**

LEVEL 3: Objectives, activities, and specific tasks associated with each critical element are carried out with expected levels of quantity, quality, timeliness and cost-effectiveness according to performance plan. Responsibilities are carried out according to all official guidance, policies, and applicable laws and regulations.

RATING LEVEL DEFINITIONS

| LEVEL | DEFINITION |
|---|---|
| 5 | Meets and consistently exceeds performance expectations as described in Level 3. |
| 4 | Meets and often exceeds performance expectations as described in Level 3. |
| 3 | Meets performance expectations. |
| 2 | Partially meets performance expectations as described in Level 3. |
| 1 | Does not meet performance expectations as described in Level 3. |

| | 8. CRITICAL ELEMENT | 9. CRITICAL ELEMENT WEIGHT (%) | 10. RATING LEVEL 5 | 4 | 3 | 2 | 1 |
|---|---|---|---|---|---|---|---|
| a | Administers and furnishes quality criminal investigaive assistance in a proficient and constructive manner to GSA customers and ensures the greatest advantage to the Government and the public. (See Attachment A) | 30% | X | | | | |
| b | Prepares written investigative, administrative, and oral reports. | 25% | X | | | | |
| c | Provides public, customer, and internal relations and communications in an efficient and effective manner through a variety of methods within the framework of responsibilities. | 25% | | X | | | |
| d | Initiates and maintains liaison with area law enforcement departments and agencies. | 20% | X | | | | |
| e | | | | | | | |
| f | | | | | | | |

11. COMMENTS ON OVERALL PERFORMANCE *(Use blank sheets of paper and attach to form if more space is needed)*

See Attachment "A"

## PART 4. DEVELOPMENT AND TRAINING

12. INDICATE PROFESSIONAL GROWTH NEEDS AND AVENUES TO MEET THOSE NEEDS *(Use blank sheets of paper and attach to form if more space is needed)*

In order for Agent Scott to achieve even greater success as a Criminal Investigator he should have the opportunity to attend government sponsored training sessions that will continue to enhance his knowledge and skills. I recommend that he be allowed to apply for such opportunities if and when agency funds become available. [END]

## PART 5. CERTIFICATION OF PERFORMANCE PLAN AND MID YEAR REVIEW

Signatures below certify that the supervisor and associate discussed performance expectations and a copy of the performance plan was provided and/or changes were made as necessary.

| 13. PERFORMANCE PLAN DEVELOPED | | 14. MID YEAR REVIEW | |
|---|---|---|---|
| a. SIGNATURE OF SUPERVISOR/RATING OFFICIAL<br>John P. Morgan "Acting" SSA, | b. DATE | a. SIGNATURE OF SUPERVISOR/RATING OFFICIAL | b. DATE |
| c. SIGNATURE OF ASSOCIATE *(Verifies receipt of plan only)* | d. DATE | c. SIGNATURE OF ASSOCIATE | d. DATE |

## PART 6. SUMMARY RATING

| 15. TYPE OF RATING | 16. ASSIGNED SUMMARY RATING LEVEL (1 - 5) |
|---|---|
| ☐ Annual ☒ Interim | |

| | |
|---|---|
| 17a. SIGNATURE OF SUPERVISOR/RATING OFFICIAL<br>John P. Morgan "Acting" SSA [signature] | 17b. DATE<br>4-21-06 |
| 18a. SIGNATURE OF ASSOCIATE *(Indicates receipt of appraisal, but not necessarily agreement with the rating.)* | 18b. DATE |
| 19a. SIGNATURE OF REVIEWING OFFICIAL *(For summary ratings at Level 5 or Level 1)* | 19b. DATE |

## ATTACHMENT "A"

Re: Special Agent James W. Scott Jr. For Rating Period: 10/1/04 to 1/31/05

SA Scott serves as Criminal Investigator in Region 9, San Diego, California. SA Scott during this reporting period is assigned to the FBI's Joint Terrorism Task Force in San Diego, California. SA Scott completes original, secondary, and follow-up investigations of reported crimes on GSA-controlled property as designated in a timely manner. He evaluates offense/incident reports (GSA Form 3155) on a frequent basis to establish crime tendencies and preferences to recognize cases requiring instant action. SA Scott factually ascertains the presence or absence of the required essential elements of criminal offenses for purposes of prosecution. He immediately advises the Supervisory Criminal Investigator of cases and/or circumstances of a sensitive, critical, or controversial nature. His management support is fully acceptable and indicates loyalty and dedication to accomplishing agency objectives. He successfully implements policies and decisions by higher management. His actions, based on his experience, are logical, complete, and derived from close analytical based. SA Scott organizes work to ensure that high priority and major projects and cases are completed on schedule.

SA Scott's monthly reports are forwarded to the Supervisory Criminal Investigator on a regular and timely basis. Sensitive or potential problems are brought to his Supervisor's immediate attention. Oral briefings are conducted in a professional fashion and personal delivery is made in a positive, cooperative manner. He prepares written investigative, administrative, and oral reports in a clear, concise, complete, and accurate manner in accordance with Headquarters and Regional Office guidelines, policies, and procedures. He prepares reports of investigations anytime an investigation goes beyond the preliminary stage, even if referred to an outside agency or internally to the DHS-OIG.

SA Scott's written and verbal reports are completed and arranged in logical order to support the investigative efforts of the original report of investigation. His investigative reports are factual, concise, clear, accurate, and grammatically correct. His reports are also submitted in the requested timeframes in the cases assigned.

He prepares the proper forms for sworn statements, surveillance logs, interview and background forms, etc., and attaches the same to all applicable written reports of investigations. Provides public and internal relations and communications in an efficient and effective manner through a variety of methods within the framework of his responsibilities. SA Scott promotes teamwork in improving and strengthening public and agency relations.

SA Scott maintains good liaison with local, State, and Federal law enforcement agencies in the San Diego area. SA Scott also participates in a network resources to gather criminal and intelligence data relating to criminal actions which potentially could affect GSA-controlled property and operations. SA Scott fosters reciprocal liaison with local, State, and Federal law enforcement agencies to further the investigative efforts of the Federal Protective Division, as well as assist in current case requirements.

Since becoming an agent in 1993, Agent Scott has continued to project himself as a knowledgeable professional law enforcement official with the FPS. I am highly pleased with his performance and dedication to duty during this rating period.

Submitted by:

John P. Morgan
"Acting" Supervisory Criminal Investigator
Federal Protective Service, Region 9

Date: 4-21-06

## 3. 10/01/04 – 1/31/05 Performance Review – James Scott (Morgan)

4/8/2005

# GSA EMPLOYEE PERFORMANCE REVIEW AND RATING

## PART I. GENERAL INFORMATION

Employee Name: SCOTT, James W. Jr.

Social Security Number: ______ ______

Correspondence Symbol: 9PSL

Pay Plan & Grade: GS-1811-12

Type of Rating: [ ] annual [X] interim

Review Period: from 10/01/04 to 01/31/05

[x] Supervisor [ ] Non-Supervisor

## PART II. CRITICAL ELEMENT RATING *(attach performance plan)*

| Critical Element | Rating | Comment on the employee's progress toward meeting the performance standard for each critical element (use additional pages if necessary). |
|---|---|---|
| 1. | [X] Successful<br>[ ] Unacceptable | Administered and furnished quality criminal investigative assistance in a proficient and constructive manner to GSA customers and which ensures the greatest advantage to the Government and the public. (See Attachment A) |
| 2. | [X] Successful<br>[ ] Unacceptable | Prepares written investigative, administrative, and oral reports. (See Attachment A) |
| 3. | [X] Successful<br>[ ] Unacceptable | Provides public, customer, and internal relations and communications in an efficient and effective manner through a variety of methods within the framework of responsibilities. (See Attachment A) |
| 4. | [X] Successful<br>[ ] Unacceptable | Initiates and maintains liaison with area law enforcement departments and agencies. (See Attachment A) |
| 5. | [ ] Successful<br>[ ] Unacceptable | NA |
| 6. | [ ] Successful<br>[ ] Unacceptable | NA |

*(Use additional forms if there are more than six critical elements.)*

## PART III. SUMMARY RATING

[X] Successful [ ] Unacceptable

GENERAL SERVICES ADMINISTRATION

GSA FORM 3440

HS-06-ICE-002644-ROI-000915

Apr 25 06 04:28p FPS SACRAMENTO

## PART IV. PROGRESS REVIEW CERTIFICATION

☐ Progress Review Completed          Date: ______________________

## PART V. COMMENTS ON OVERALL PERFORMANCE

*(Comment on the employee's overall performance citing specific employee projects or outputs, using additional pages if necessary.)*

See Attachment A

## PART VI. TRAINING AND DEVELOPMENT

*(Discuss professional growth needs and avenues which the employee can pursue to meet these needs. Use additional pages if necessary.)*

In order for Agent Scott to achieve even greater success as a Criminal Investigator he should have the opportunity to attend government sponsored training sessions that will continue to enhance his knowledge and skills. I recommend that he be allowed to apply for such opportunities if and when agency funds become available. [END]

## PART VII. SIGNATURES

**Rating Official:**

John P. Morgan, former "Acting" Supervisory Criminal Investigator          Date: 4-25-06

**Reviewing Official:**
*(necessary only if rating is at the unacceptable level)*

______________________          Date: ______________________

**Received by Employee:**

______________________          Date: ______________________

**GSA FORM 3440 BACK**

## ATTACHMENT "A"

Re: Special Agent James W. Scott Jr.    For Rating Period: 10/1/04 to 1/31/05

SA Scott serves as Criminal Investigator in Region 9, San Diego, California. SA Scott during this reporting period is assigned to the FBI's Joint Terrorism Task Force in San Diego, California. SA Scott completes original, secondary, and follow-up investigations of reported crimes on GSA-controlled property as designated in a timely manner. He evaluates offense/incident reports (GSA Form 3155) on a frequent basis to establish crime tendencies and preferences to recognize cases requiring instant action. SA Scott factually ascertains the presence or absence of the required essential elements of criminal offenses for purposes of prosecution. He immediately advises the Supervisory Criminal Investigator of cases and/or circumstances of a sensitive, critical, or controversial nature. His management support is fully acceptable and indicates loyalty and dedication to accomplishing agency objectives. He successfully implements policies and decisions by higher management. His actions, based on his experience, are logical, complete, and analytically based. SA Scott organizes work to ensure that high priority and major projects and cases are completed on schedule.

SA Scott's monthly reports are forwarded to the Supervisory Criminal Investigator on a regular and timely basis. Sensitive or potential problems are brought to his Supervisor's immediate attention. Oral briefings are conducted in a professional fashion and personal delivery is made in a positive, cooperative manner. He prepares written investigative, administrative, and oral reports in a clear, concise, complete and accurate manner in accordance with Headquarters and Regional Office guidelines, policies and procedures. He prepares reports of investigations anytime an investigation goes beyond the preliminary stage, even if referred to an outside agency or internally to the DHS-OIG.

SA Scott's written and verbal reports are completed and arranged in logical order to support the investigative efforts of the original report of investigation. His investigative reports are factual, concise, clear, accurate, and grammatically correct. His reports are also submitted in the requested timeframes in the cases assigned.

He prepares the proper forms for sworn statements, surveillance logs, interview and background forms, etc., and attaches the same to all applicable written reports of investigations. Provides public and internal relations and communications in an efficient and effective manner through a variety of methods within the framework of his responsibilities. SA Scott promotes teamwork in improving and strengthening public and agency relations.

SA Scott maintains good liaison with local, State, and Federal law enforcement agencies in the San Diego area. SA Scott also participates in network resources to gather criminal and intelligence data relating to criminal actions which potentially could affect GSA-controlled property and operations. SA Scott fosters reciprocal liaison with local, State, and Federal law enforcement agencies to further the investigative efforts of the Federal Protective Division, as well as assist in current case requirements.

Since becoming an agent in 1993, Agent Scott has continued to project himself as a knowledgeable professional law enforcement official with the FPS. I am highly pleased with his performance and dedication to duty during this rating period.

Submitted by:

John P. Morgan
"Acting" Supervisory Criminal Investigator
Federal Protective Service, Region 9

Date: 4-25-06

## 4. 10/01/05 – 9/30/06 Performance Review – James Scott (Hartman)

# EMPLOYEE PERFORMANCE REVIEW RATING

## PART I. GENERAL INFORMATION

| EMPLOYEE'S NAME | | | SOCIAL SECURITY NO. | CORRESPONDENCE SYMBOL | |
|---|---|---|---|---|---|
| LAST<br>SCOTT | FIRST<br>JAMES | MI | | | PLAN<br>1811 |

| TYPE OF RATING | REVIEW PERIOD FROM | REVIEW PERIOD TO | TYPE OF POSITION |
|---|---|---|---|
| X ANNUAL ☐ INTERIM | Oct 1, 2005 | Sept, 30 2006 | ☐ SUPERVISORY X NON SUPER |

## PART II. CRITICAL ELEMENT RATING *(Attach performance plan) (Use additional forms if there are more than 7 critical el*

| CRITICAL ELEMENT | RATING (*Check one*) SUCCESSFUL | UNSUCCESSFUL | COMMENT ON THE EMPLOYEE'S PROGRESS TOWARD MEETING THE PERFORMANCE STA FOR EACH CRITICAL ELEMENT *(Use additional pages if necessary)* |
|---|---|---|---|
| 1. | X | | Protecting Federal Facilities & Employees: Reducing vulnerabilities to crimes and/or terror attacks. Sharing Intel Information. Implementation across the Regions. Professior ethical conduct. |
| 2. | X | | Intelligence Data Acquisition and Dissemination Operations Monitors incoming intelligence for urgency and importance. Develops products. Disseminates products based on "neec see." |
| 3. | X | | Interpersonal Skills; Dealing with individuals from a variety backgrounds both internally and externally to promote inforr sharing and efficiency of the Threat Management Division. |
| 4. | X | | Organizational Awareness: Employee's knowledge of the organization's mission, functions, and priorities. |
| 5. | | | |
| 6. | | | |
| 7. | | | |

| PART III. SUMMARY RATING | PART IV. PROGRESS REVIEW CERTIFICATI | DATE |
|---|---|---|
| X SUCCESSFUL ☐ UNSUCCESSFUL | ☐ PROGRESSIVE REVIEW COMPLETED | |

GENERAL SERVICES ADMINISTRATION

GSA FORM 3440 (REV.
Prescribed by OAD 8430.2

## PART V. COMMENTS ON OVERALL PERFORMANCE

COMMENT ON THE EMPLOYEE'S OVERALL PERFORMANCE CITING SPECIFIC EMPLOYEE PROJECTS OR OUTPUTS. USE ADDITIONAL PAGES, IF NECESSARY

(SEE ATTACHMENT A)

## PART VI. TRAINING AND DEVELOPMENT

DISCUSS PROFESSIONAL GROWTH AND AVENUES WHICH THE EMPLOYEE CAN PURSUE TO MEET THESE NEEDS. USE ADDITIONAL PAGES, IF NECESSARY

## PART VII. SIGNATURES

| RATING OFFICIAL | NAME OF RATING OFFICIAL | DATE |
|---|---|---|
| | JOHN N. HARTMAN (SSA) | 10-31-06 |
| REVIEWING OFFICIAL *(Necessary only if rating is at the unacceptable level)* | NAME OF RATING OFFICIAL | DATE |
| | | |
| EMPLOYEE *(Indicate only that a copy of rating was received, not necessarily agreement with the rating.)* | | DATE |
| | | 11-2-06 |

GENERAL SERVICES ADMINISTRATION GSA FORM 3440 (REV. 3-97) BACK

**ATTACHMENT "A"**

<u>SA James Scott</u>

Unclassified Duties for the rating period involved the following:

SA Scott reduces vulnerabilities to crimes and/or terror attacks by sharing Intelligence Information to include State, Local intelligence and Officer Safety Bulletins to the Regional Intelligence Agent (RIA). SA Scott performs daily production / dissemination of the fused open source documents concerning upcoming protests in the southern and border districts.

SA Scott provides public and internal relations and communications in an efficient and effective manner through a variety of methods within the framework of responsibilities. SA Scott promotes teamwork in improving and strengthening public and agency relations. SA Scott maintains good liaison with local, State, and Federal law enforcement agencies. SA Scott also creates and participates in a personal network of sources to gather criminal and intelligence data relating to criminal actions which potentially could affect GSA-controlled property and operations. SA Scott fosters reciprocal liaison with local, State, and Federal law enforcement agencies to furthe the help investigative efforts of the Federal Protective Division.

SA Scott attends the San Diego JTTF and other intelligence meetings to enhance situational awareness of LE / FP that could impact the safety of FPS buildings and employees. SA Scott maintained liaison with state, local, tribal, and federal LE related to collaboration and info exchange to provide protective Intel support to the FPS mission. SA Scott is currently learning the ICE TECS II Case Management system to enhance his ability to verify intelligence reports.

SA Scott's management support is fully acceptable and indicates loyalty and dedication to accomplishing agency objectives. He successfully implements policies and decisions by higher management. His actions are logical, complete, and based on adequate analysis of the situation.

## 5. GSA/FPS Pre-Placement and Incumbent Medical Exam Form (November 9, 2005)

# GSA/FPS PRE-PLACEMENT AND INCUMBENT MEDICAL EXAM FORM

Note: Applicant/Incumbent is to complete the shaded medical history portions of this form.

Completed by Clinic (please print)

Name of Clinic: ____

Address/Location of Clinic: U.S. HealthWorks Med Grp
3930 4Th Avenue, Suite 200
San Diego, Ca 92103
Phone (619) 297-9610
Fax (619) 297-2244

Phone #: ____

RN: ____

RN Signature: ____

MD/DO

Please circle: Applicant or Incumbent

Please check the position for which you are applying/occupying:

☑ Criminal Investigator ☐ Police Officer
☐ Physical Security Specialist ☐ Law Enforcement Security Officer

Is your current position with GSA/FPS, do you have 318 Authority? ☑ Yes ☐ No

Regional Office: (415) 522-3446 Regional Office Phone #: ( ) ____

Medical Coordinator: ____ Coordinator's Phone #: ( ) ____

## DEMOGRAPHIC DATA

Name (Print or Type): James W. Scott

SSN: 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

Date of Testing: 11-9-05

Date of Birth: 11-20-54

Sex: ☑ Male ☐ Female

Home Address: 3251 Loma Riviera Dr
San Diego, CA

Phone #: (619) 221-9662 Work Phone #: (619) 557-2644

Your current occupation: Special Agent

Your current employer: DHS/Federal Protective Service

How long in current position: 13 years ____ months

Collateral duties: ____

**When Exam is Complete, FedEx within two days to:**

Comprehensive Health Services, Inc.
8229 Boone Blvd., Suite 700
Vienna, VA 22182

Disclaimer: this examination does not substitute for a periodic health examination conducted by your private provider. It is being conducted for occupational purposes.

PREPLACEMENT SERVICE:
Required Services: Check when test completed
[ ] Lab Profiles (blood & urine)
[ ] Blood Lead & ZPP
[ ] EKG (12 lead with interpretation)
[ ] PPD (TB skin test)
[ ] Audiometry (500 Hz – 8000 Hz)
[ ] Spirometry (FVC, FEV1, FEV1/FVC)
[ ] Vision screening – near & far; corr. & uncorr., L, R, & binocular
[ ] Color Vision (14 plate Ishihara)
[ ] Peripheral vision (nasal & temporal)
[ ] Depth Perception (sec. of arc or Shephard Fry)
[ ] General Physical Exam
[ ] General Medical History

INCUMBENT EXAM
Required Services:
[ ] Lab Profiles (blood & urine)
[ ] EKG (12 lead with interpretation)
[ ] Audiometry (500 Hz – 8000 Hz)
[ ] Vision screening – near & far; corr. & uncorr., L, R, & binocular
[ ] Color Vision (14 plate Ishihara)
[ ] Peripheral vision (nasal & temporal)
[ ] Depth Perception (second of arc or Shephard)
[ ] General Physical Exam
[ ] General Medical History
If indicated Services:
[ ] Chest x-ray (per Agency Physician request)
[ ] PPD (per Agency Physician request)
[ ] Stress EKG (per Agency Physician request)
[ ] Spirometry (per Agency Physician request)

EXIT EXAM
Required Services:
[ ] Lab Profiles (blood & urine)
[ ] Height, weight, vitals
[ ] EKG (12 lead with interpretation)
[ ] Audiometry (500 Hz – 8000 Hz)
[ ] Vision screening – near & far; corr. & uncorr., L, R, & binocular
[ ] Color Vision (14 plate Ishihara)
[ ] Peripheral vision (nasal & temporal)
[ ] Depth Perception
[ ] General Physical Exam
[ ] General Medical History
If indicated Services:
[ ] Chest x-ray (per Agency Physician request)
[ ] Spirometry (per Agency Physician request)
[ ] PPD (per Agency Physician request)

Applicant/Incumbent Name: James W. Scott Date: 5-11-05

Check each item "Yes" or "No." Every item checked "Yes" must be explained in the blank space on the right.

| Question | Answer | Explanation |
|---|---|---|
| A. Have you been refused employment or been unable to hold a job or stay in school due to any medical condition? | ☐ Yes ☑ No | UPS 1/21 |
| B. Have you ever been treated for a mental condition? (If yes, specify when, where, and give details.) | ☐ Yes ☐ No | Question Violates ADA/Rehab Act EEOC |
| C. Have you had, or have you been advised to have any operation? (If yes, describe and give age at which occurred.) | ☑ Yes ☐ No | Hernia, Gallbladder Removal, Tonsils |
| D. Have you ever been a patient in any type of hospital? (If yes, specify when, where, why, name of doctor and complete address of hospital.) | ☑ Yes ☐ No | See "C" |
| E. Have you ever had any illness, injury, or other condition (including learning disability, attention deficit disorder, etc.) other than those already noted? (If yes, specify when, where and give details). | ☐ Yes ☐ No | Question Violates ADA/Rehab Act EEOC UPS |
| F. Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past years for other than minor illness? (If yes, give complete address of doctor, hospital, clinic, and details.) | ☐ Yes ☐ No | Question Violates ADA/Rehab Act |
| G. Have you ever been rejected for military service because of physical, mental, or other reasons? (If yes, give date and reason for rejection.) | ☐ Yes ☑ No | |
| H. Have you ever been discharged from military service because of physical, mental, or other reasons? (If yes, give date, reason, and type of discharge: whether honorable, other than honorable, for unfitness or unsuitability.) | ☐ Yes ☑ No | |
| I. Have you ever received, is there pending, or have you applied for pension or compensation for existing disability? (If yes, specify what king, granted by whom, and what amount, when, why.) | ☐ Yes ☐ No | Question Violates ADA/Rehab Act EEOC UPS |

## MEDICAL HISTORY

Have you ever had or are you currently experiencing any of the following problems:

| | | |
|---|---|---|
| Blurred vision | ☐ Yes | ☑ No |
| Do you wear glasses? | ☑ Yes | ☐ No |
| Do you wear contact lenses? If "yes," please bring contact lens solution and case. | ☐ Yes | ☑ No |
| Glaucoma | ☐ Yes | ☐ No |
| Have you ever been diagnosed with any eye disease? | ☐ Yes | ☑ No |
| Have you had any type of eye surgery (i.e., RD, PRK, cataracts, etc.)? If yes, please explain what specific surgery was performed. | ☐ Yes | ☑ No |
| Do you have cataracts? | ☐ Yes | ☑ No |
| Are you color blind? | ☐ Yes | ☑ No |

Please specify.

## DIAGNOSTIC AND PHYSICAL FINDINGS

**Head and Neck**

| Normal | Abnormal | |
|---|---|---|
| ☑ | ☐ | Head, Face, Neck (thyroid) Scalp |
| ☑ | ☐ | Nose/Sinuses |
| ☑ | ☐ | Mouth/Throat |
| ☑ | ☐ | Pupils equal/reactive |
| ☑ | ☐ | Ocular Motility |
| ☑ | ☑ | Ophthalmoscopic findings |

↑ Error WD

**Color Vision**

#correct 7 of 15 total tested

Type of test

Titmus ☐

Ishihara plate ☑

Other ______

**Depth Perception**

Depth perception: #correct 9 of 9 total tested

Type of tester Stereotest 40 seconds of ARC

______ Shephard-Fry %

**Peripheral Vision** (in degrees)

| | | | | | |
|---|---|---|---|---|---|
| Right Eye | Temporal | 90 | Left Eye | Temporal | 90 |
| | Nasal | 45 | | Nasal | 45 |
| | Total | 135 | | Total | 135 |

**Uncorrected vision (Snellen Units)**

| | Both | Right | Left |
|---|---|---|---|
| NEAR | 20/ 20 | 20/ 30 | 20/ 200 |
| FAR | 20/ ~~70~~ 25 (initialed, 11/04/05) | 20/ 40 | 20/ 40 |

**Corrected Vision (Snellen Units)**

| | Both | Right | Left |
|---|---|---|---|
| NEAR | 20/ 20 | 20/ 20 | 20/ 20 |
| FAR | 20/ 13 | 20/ 15 | 20/ 15 |

Comment on HEENT abnormalities:

Applicant/Incumbent Name: ______ Date: ______

## MEDICAL HISTORY

| Have you experienced any of the following: | Yes | No |
|---|---|---|
| Difficulty hearing | ○ | ● |
| Dizziness | ○ | ● |
| Loud, constant noise or music within the last 14 hours | ○ | ● |
| Loud, impact noise in the past 14 hours | ○ | ● |
| Eardrum perforation | ○ | ● |
| Ear surgery | ○ | ● |
| Do you wear a hearing aid? | ○ | ● |
| Are you in a Hearing Conservation Program? | ○ | ● |
| Do you use hearing protective equipment? | ○ | ● |

Please specify: ______

| you experienced any of the following: | Yes | No |
|---|---|---|
| Chest Pains | ○ | ● |
| Ankle or foot swelling | ○ | ● |
| Leg pains | ○ | ● |
| Palpitations (rapid or skipped heart beat) | ○ | ● |
| Heart murmur | ○ | ● |
| Past history or diagnosis of heart disease | ○ | ● |
| Coronary bypass surgery/other heart surgery | ○ | ● |
| Heart attack or stroke | ○ | ● |
| Abnormal EKG (resting) | ○ | ● |
| Abnormal treadmill EKG | ○ | ● |
| Heart disease, stroke or heart attack in parents or siblings prior to age 55 | ○ | ● |
| Cold hands or feet when others are comfortable in same room | ○ | ● |
| Numbness in feet/hands | ○ | ● |
| High blood pressure | ○ | ● |
| Phlebitis or blood clots | ○ | ● |
| Problems with breathing, wheezing, persistent cough, shortness of breath | ○ | ● |
| Bronchitis, asthma, tuberculosis | ● | ○ |
| Past history or diagnosis of lung disease or surgery | ○ | ● |
| sun stroke | ○ | ● |

Please specify: Treated for Bronchitis several years ago.

Your Current Physical Activity or Exercise Program:
Intensity: Low ○ Moderate ○ High ●
Frequency of 5 Days per week.
Duration of 20-30 Minutes per session.
Activities: Walking/Running, Martial Arts, Weight Lifting

| FREQUENCY | 500Hz | 1000Hz | 2000Hz | 3000Hz | 4000Hz | 6000Hz | 8000Hz |
|---|---|---|---|---|---|---|---|
| RIGHT EAR | 10 | 20 | 10 | 15 | 20 | 35 | 40 |
| LEFT EAR | 10 | 10 | 00 | 05 | 35 | 40 | 30 |

**AUDIOGRAM:** ☐ Baseline ☒ Annual ☐ Exit
(Attach current and baseline audiogram)

Calibration Method: ☒ Oscar ☐ Biological

Date: 11/09/05

Review/compare with baseline ☐ Change ☐ No change ☐ Normal ☐ Abnormal

**LEFT EAR**
Normal/Abnormal
☑ ☐ Canal/External Ear
☑ ☐ Tympanic Membrane

**RIGHT EAR**
Normal/Abnormal
☑ ☐ Canal/External Ear
☑ ☐ Tympanic Membrane

Comments: [illegible handwriting] (RD)

**CARDIO/PULMONARY**

| Normal | Abnormal | |
|---|---|---|
| ● | ○ | EKG – Attach with interpretation |
| ● | ○ | Lungs/Chest |
| ● | ○ | Heart (murmur, palpitations, ectopic beats) |
| ● | ○ | Vascular (Varicosities) |

**PULMONARY FUNCTION TESTING: (ATTACH COPY)**

Calibration Date ______ Machine Brand ______

% Predicted FVC ______

% Predicted FEV1 ______

% Predicted FEV1/FVC N/A

**Comments:** ______

**VITAL SIGNS:**

Height 5 ft. 9 in. Weight 184 lbs.

Blood Pressure 130 / 80 mmHg (sitting)

Pulse 64 (sitting)

Temp (if indicated) 97.0

Comments: ______

**Tuberculosis Test** – for pre-placement exam only. Complete attached form.

N/A

**Last PA Chest X-ray**

Date: ______

Comments (Chest X-ray, TB treatment/dates):

N/A

Applicant/Incumbent Name: James W. Scott Date: 11-9-05

Comprehensive Health Services, Inc.

JWS002862

## MEDICAL HISTORY

Have you had or do you currently experience any of the following:

| | Yes | No | | Yes | No |
|---|---|---|---|---|---|
| Diabetes | θ | ● | Tingling in head/hands/legs | θ | ● |
| Thyroid disease | θ | ● | Lack of coordination | θ | ● |
| Pituitary gland problem | θ | ● | Epilepsy (seizures) | θ | ● |
| Blood disorder | θ | ● | Tremors/shakiness | θ | ● |
| Anemia | θ | ● | Loss of sensation | θ | ● |
| Back pain | ● | θ | Persistent stomach/abdominal pain | θ | ● |
| Back surgery | θ | ● | Stomach ulcers | θ | ● |
| Joint pain or swelling | θ | ● | Vomiting blood | θ | ● |
| Trouble using hip/knee/shoulder | ● | θ | Persistent diarrhea/constipation | θ | ● |
| Trouble walking | θ | ● | Blood in stool | θ | ● |
| Loss of joint/limb movement | θ | ● | Liver disease | θ | ● |
| Loss of strength/muscle weakness | θ | ● | Hepatitis | θ | ● |
| Limb or finger amputation/loss | θ | ● | Gall bladder problems | ● | θ |
| Arthritis | θ | ● | Hernia | ● | θ |
| C... | θ | ● | Psychiatric/psychologic consult | θ | θ |
| S... problems, urticaria | θ | ● | Episodes of depression | θ | θ |
| Urinary pain/infection/bleeding | θ | ● | Periods of nervousness | θ | θ |
| Kidney disease | θ | ● | Fainting/Syncope | θ | ● |
| Localized weakness/numbness | θ | ● | Pregnancy | θ | ● |

Are you left-handed? θ Right-handed? ●

Please specify: (A) Previous Broken Scapula (Lft), (B) Previous Back Injury (Traffic Accident), (C) Previous Gallbladder Removal (D) Previous Abdominal Hernia

* Unmarked Questions violate ADA, Rehab Acts EEOC.

**MEDICATIONS**

List all medication (prescription and non-prescription) you are currently taking with dosage and Frequency and reason below.

I am not taking any medications that would impair my ability to perform my position.

* Question violates the ADA/Rehab Act/EEOC.

(PS)

**ALLERGIES**

To which of the following are you allergic? θ None

● Drugs (specify below) θ Pollens (specify below) θ Food (specify below)

θ Dust or Molds (specify below) θ Animals (specify below) θ Other (specify below)

Specify: Septra + Augmentin

## DIAGNOSTIC AND PHYSICAL FINDINGS

**MUSCULOSKELETAL**

| Normal | Abnormal | |
|---|---|---|
| θ | θ | Upper extremities (strength) |
| θ | θ | Upper extremities (range of motion) |
| θ | θ | Lower extremities (strength) |
| θ | θ | Lower extremities (range of motion) |
| θ | θ | Feet |
| θ | θ | Spine |
| θ | θ | Flexibility (sit & reach) test |
| θ | θ | Deep tendon reflexes |
| θ | θ | Other neurological |

**OTHER SYSTEMS**

| Normal | Abnormal | |
|---|---|---|
| θ | θ | Mental/emotional affect (describe if abnormal) |
| θ | θ | G-U system |
| θ | θ | Abdomen, viscera |
| θ | θ | Rectal/prostate |
| θ | θ | Skin (scar/unique markings) |
| θ | θ | Lymphatic |
| θ | θ | Other ______ |

**Is applicant capable of the following?**

| Yes | No | |
|---|---|---|
| θ | θ | Squat and rise without holding on to any object. Maintain squatting and kneeling for up to 45 seconds repeatedly. |
| θ | θ | Kneel on one knee with arms extended in front of body at eye level for seven (7) seconds. |
| θ | θ | Assume a one and two-knee kneeling position within two (2) seconds and be able to rise without assistance. Be able to repeat twice. |
| θ | θ | Maintain a kneeling position for 2-3 minutes repeatedly. |

Please comment on "No" responses.

(PS)

**Is candidate capable of participating in the following?**

| Yes | No | |
|---|---|---|
| θ | θ | 1.5 Mile Run (vigorous exercise) |
| θ | θ | 12 Minute Bike Test / Biking in general |
| θ | θ | 3 Minute Step Test (vigorous exercise) |
| θ | θ | 3 Mile Walking Test |
| θ | θ | Push-up Test / Upper Body Exercise |
| θ | θ | Sit & Reach / Flexibility Program |
| θ | θ | Sit-ups |

Please comment on "No" responses:

Applicant/Incumbent Name: James W. Scott Date: 11-9-05

## SOCIAL HISTORY

Have you ever smoked? ☐ Yes ☑ No

If "yes," when? ☐ Current ☐ Past - years since quitting? ______

Type: ☐ Cigarettes ☐ Pipe ☐ Cigar

How many per day? ______ For how many years? ______

What is your average alcohol consumption in a week? None drinks
(1 drink = 12 oz Beer, 1 glass of wine, 1.5 oz liquor)

How often do you drink alcohol? ☐ Weekdays ☐ Weekends ☐ Both

## IMMUNIZATION HISTORY:

Has the applicant/employee received the Hepatitis B Vaccine? ☑ Yes ☐ No

If "yes" number of shots. ☐ 1 ☐ 2 ☐ 3

Year of last tetanus booster: Don't Remember

## [FAMI]LY MEDICAL HISTORY

| | | | |
|---|---|---|---|
| 1. Father ☑ Alive ☐ Deceased | Current Age 75 | General health now ☐ Excellent ☐ Good ☐ Fair ☑ Poor ☐ Unknown | Age & cause of death or reason for poor health: Cancer |
| 2. Mother ☐ Alive ☑ Deceased | Current Age 75 | General health now ☐ Excellent ☐ Good ☐ Fair ☐ Poor ☐ Unknown | Age & cause of death or reason for poor health: Heart Attack |
| 3. Number of brothers 0 | Age range | Health problems, if any | Age & cause of death or reason for poor health |
| 4. Number of sisters 1 | Age range 50's | Health problems, if any: Unknown | Age & cause of death or reason for poor health |

5. Familia[l] [D]iseases – Have any of your blood relatives had any of the following: (ONLY) grandparents, parents, siblings?

| | | | |
|---|---|---|---|
| ☐ Stroke | ☐ High Blood Pressure | ☐ Kidney Disease | ☐ Alcohol/Drug Abuse |
| ☑ Cancer | ☑ Heart Disease | ☐ Mental Disorder | ☐ Stomach Ulcer |
| ☐ Emphysema | ☑ Heart Attacks or Strokes | ☐ Migraine Headaches | ☐ Goiter |
| ☐ Bleeding Tendencies | ☐ Heart Operations | ☐ Back Trouble | ☐ Hepatitis |
| ☐ [Dia]betes | ☐ Elevated Cholesterol | ☐ Herpes | ☐ Gall Bladder Disease |
| ☐ [Epi]lepsy | ☐ Asthma | ☐ Anemia | ☐ Hernia |
| ☐ Thyroid Disorder | ☐ Hay Fever | ☐ Glaucoma | ☐ Obesity |
| ☐ Measles | ☐ Nervous Breakdown | ☐ Arthritis | ☐ Tuberculosis |
| ☐ Venereal Disease | ☐ Gout | ☐ Colitis | ☐ Other ______ |
| ☐ Fainting Spells | ☐ Leukemia | ☐ Syncope/Sudden Death | |

~~I certify that I have reviewed the foregoing information supplied by me and that it is true and complete to the best of my knowledge. I authorize any of the doctors, hospitals, or clinics mentioned on these forms to furnish the Government a complete transcript of my medical record for purposes of processing my application for this employment or service. I authorize the release of all medical information to the designated Agency Physician and on a need to know basis, the designated Regional POC, Director Management Analysis Division, Central Office POC, designated physician at FLETC and HR POC.~~

Client's Signature: See Below Date: ______

Witness' Signature: ______ Date: ______

## EDUCATION AND REFERRAL

Check the topics discussed during the diagnostic work-up or physical exam:

| | | | |
|---|---|---|---|
| Lipids | ☐ | Hearing Protection | ☐ |
| Hypertension | ☐ | Vision Referral | ☐ |
| Exercise | ☐ | Other Personal Protective Equip. | ☐ |
| Obesity | ☐ | Job Stressors | ☐ |
| Smoking Cessation | ☐ | Referral(s) | ☐ |
| Alcohol Use | ☐ | Immunizations | ☐ |

**U.S. Healthworks Medical Group**
**3930 4th Avenue, Suite 200**
**San Diego, CA 92103**
**Phone (619) 297-9610**
**Fax (619) 297-2241**

WILLIAM CHARLES PAUL MD
LIC # G13594
MEDICAL DIRECTOR
W. C. Paul MD

## EXAMINING PHYSICIAN'S SUMMARY OF SIGNIFICANT FINDINGS WITH RECOMMENDATIONS

Note: Please do not provide any official statement (oral or written) concerning the applicant's fitness or capability to perform the duties of any occupation. The Agency's Medical Review Officer will provide this statement.

I didn't get a history.
I asked him "What medicine do you take"
He says "none that would would impair my ability to work"
I asked him again
He said "That violates ADA"
He then told me about a previous incident that I didn't understand about getting a complete physical and psychiatric exam"
I stopped my history taking at that point.
On page 2 question B, E, I - violate ADA

EXAMINING PHYSICIAN

Print Name

Signature

Date



Applicant/Incumbent Name: James W. Scott Date: 11-9-05

Comprehensive Health Services, Inc. 

I only authorize the release of the results of this exam to authorized agency medical personnel. I do not authorize release of any other personal medical records.

## 6. Notice of Proposed Suspension (April 17, 2006)

*Federal Protective Service*

**U.S. Department of Homeland Security**
450 Golden Gate Ave
Suite 5474
San Francisco, California 94102

U.S. Immigration
and Customs
Enforcement

Date April 17, 2006

James William Scott Jr.
Criminal Investigator/Special Agent
Federal Protective Service
San Francisco, CA

Mr. Scott:

This notice is to advise you, in accordance with the provisions of Title 5 of the Code of Federal Regulations, Part 752 that I am proposing to suspend you from duty and pay for fourteen (14) calendar days. If a decision is made to sustain this proposal, the decision will be effected not earlier than ten (10) calendar days from the date you receive this notice. The reason for this proposed action is as follows:

## (i) REASON: FAILURE TO CARRY OUT INSTRUCTIONS OF SUPERIOR

**Specification:** On January 30, 2006, you failed to promptly and fully comply with my instructions. The instructions, issued on two separate occasions, December 8, 2005, and January 24, 2006, requested that you provide medical information related to your required periodical medical exam.

In proposing this action, I have considered your employment record and the nature of your violation. Your failure to provide the information requested of you is impeding this agency's ability to make a determination as to whether you are medically qualified to continue to perform the essential functions of your position as a Criminal Investigator. Further, your actions show a total disregard for authority. As a subordinate employee, you must comply with all reasonable and proper orders from your superiors. Disobedience to constituted authorities; deliberate refusal or failure or delay in carrying out any proper order, work assignment or instruction; insubordination, including failure to follow local or higher level policy, are all serious offenses and cannot be tolerated.

This is only a proposal. You have the right to reply to this proposal orally, in writing, or both, and to furnish affidavits and other documentary evidence, including medical documentation, in support of your reply. If you disagree with this proposal action, your reply should set forth the reasons for your belief that this action should not take place.

You are entitled to be represented in this matter by an attorney, or other representative of your choice. In order for a representative to act on your behalf in this matter, you must submit a written designation of representation, signed by you, identifying that person as your representative. A Designation of Representative form is enclosed for your use.

You and your representative, if any, are entitled to review the material relied upon to support this proposal. A copy of this material is attached. You, and your representative, if in a duty status, will be allowed a reasonable amount of official time to review the material relied upon to support this action, to secure affidavits or other documentation and to prepare and/or present any reply(s). Requests for such official time must be submitted, in advance, to your, and if applicable, your employee Representative's supervisors for approval.

Any written reply to this proposal must be directed to the Deciding Official or designee, within ten (10) calendar days beginning the day after you receive this notice. If you wish to present an oral reply, you or your designated representative, if any, must contact the Deciding Official's office within this specified timeframe to schedule an appointment for that purpose.

If you believe you need additional time to prepare a reply to this proposal, you may request an extension, in writing, within the cited timeframe from the Deciding Official. Any such request must contain an explanation as to why additional time is needed. Extensions are not automatically granted, but rather will be based upon good cause shown.

All correspondence, including any written reply, request to reply orally or any request for additional time to reply should be addressed in writing to the Deciding Official: A. Joyce Nesbitt-Simon, Deputy Regional Director (acting), Federal Protective Service, 450 Golden Gate Ave. 5th Floor Room 5474, San Francisco, CA 94102

Full consideration will be given to any timely reply. You will receive a written decision on this proposal as soon as possible after your reply is received. In the event that you elect not to reply, a decision will be made on the evidence now available and a letter containing that decision will be issued to you. You will be retained in an active duty status pending final resolution of this proposed action.

You are also advised of the Employee Assistance Program (EAP), which is free and confidential, and may be able to assist you with any personal problems that you may be experiencing. You may schedule an appointment with EAP by calling (800) 222-0364.

If you have any questions regarding your rights or other procedures contained in this notice, contact an Employee and Labor Relations Specialist in Laguna Niguel, CA at (949) 360-3060.

Please sign the receipt acknowledgment copy of this letter as evidence that you have received it. Your signature does not mean that you agree or disagree with its contents, and by signing, you do not forfeit any of your rights cited above.

Sincerely,

Rudy Negrete
Chief, Threat Management Branch

Enclosures: Designation of Representative Form
Acknowledgement of Receipt Form
Supervisory Inquiry (material relied upon to propose the action)

### *1) ACKNOWLEDGMENT OF RECEIPT*

Please sign this acknowledgment as evidence that you have received the cited letter. Your signature does not mean that you agree or disagree with its contents, and by signing, you do not forfeit any of the rights cited above. Your acknowledgement of receipt should be returned to the bearer of this notice.

I acknowledge receipt of the ________ Letter Proposing / Deciding corrective action.
*(Date)* *(Circle one)*

Employee's signature: ______________________________ Date: ____________

Witness/Bearer's signature: __________________________ Date: ____________

cc: Field File
Employee
ICE E&LR

Enclosures: Copy of the Supervisory Inquiry (material relied upon to propose the action)
Designation of Representative Form

**DESIGNATION OF REPRESENTATIVE**

*2) AND AUTHORIZATION TO RELEASE INFORMATION*

I, ___________________________ designate, _______________________, as my representative for the pending matter concerning __________________________. As my representative, (s)he is entitled and authorized to receive copies and or review all correspondence, documents and materials related to my case.

My representative's contact information (i.e. address, phone numbers, fax, etc.) is as follows:

___________________________________

___________________________________

___________________________________

___________________________________

___________________________________

___________________________________

_______________________________ Signature of Employee

_____________________ Date

Printed / Typed Name of Employee: _____________________________________



DEF_01180

You and your representative, if any, are entitled to review the material relied upon to support this proposal. A copy of this material is attached. You, and your representative, if in a duty status, will be allowed a reasonable amount of official time to review the material relied upon to support this action, to secure affidavits or other documentation and to prepare and/or present any reply(s). Requests for such official time must be submitted, in advance, to your, and if applicable, your employee Representative's supervisors for approval.

Any written reply to this proposal must be directed to the Deciding Official or designee, within ten (10) calendar days beginning the day after you receive this notice. If you wish to present an oral reply, you or your designated representative, if any, must contact the Deciding Official's office within this specified timeframe to schedule an appointment for that purpose.

If you believe you need additional time to prepare a reply to this proposal, you may request an extension, in writing, within the cited timeframe from the Deciding Official. Any such request must contain an explanation as to why additional time is needed. Extensions are not automatically granted, but rather will be based upon good cause shown.

All correspondence, including any written reply, request to reply orally or any request for additional time to reply should be addressed in writing to the Deciding Official: A. Joyce Nesbitt-Simon, Deputy Regional Director (acting), Federal Protective Service, 450 Golden Gate Ave. 5th Floor Room 5474, San Francisco, CA 94102

Full consideration will be given to any timely reply. You will receive a written decision on this proposal as soon as possible after your reply is received. In the event that you elect not to reply, a decision will be made on the evidence now available and a letter containing that decision will be issued to you. You will be retained in an active duty status pending final resolution of this proposed action.

You are also advised of the Employee Assistance Program (EAP), which is free and confidential, and may be able to assist you with any personal problems that you may be experiencing. You may schedule an appointment with EAP by calling (800) 222-0364.

If you have any questions regarding your rights or other procedures contained in this notice, contact an Employee and Labor Relations Specialist in Laguna Niguel, CA at (949) 360-3060.

Please sign the receipt acknowledgment copy of this letter as evidence that you have received it. Your signature does not mean that you agree or disagree with its contents, and by signing, you do not forfeit any of your rights cited above.

Sincerely,

Rudy Negrete
Chief, Threat Management Branch

Enclosures: Designation of Representative Form
Acknowledgement of Receipt Form
Supervisory Inquiry (material relied upon to propose the action)

# *SUPERVISORY INQUIRY*
## *"Failure / Refusal to Follow Orders"*

*March 21, 2006*

## DEPARTMENT OF HOMELAND SECURITY

## IMMIGRATION AND CUSTOMS ENFORCEMENT

## FEDERAL PROTECTIVE SERVICE

WARNING: THE INFORMATION PROVIDED HEREIN REMAINS THE PROPERTY OF THE FEDERAL PROTECTIVE SERVICE, BUREAU OF IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE) AND IS LOANED TO YOUR OFFICE FOR ADMINISTRATIVE PURPOSES ONLY. THIS REPORT CONTAINS SENSITIVE INFORMATION AND MAY CONTAIN PROPRIETARY OR OTHER SENSITIVE INFORMATION PROTECTED BY THE PRIVACY ACT OF 1974. ONLY THOSE PERSONNEL WITH A DEMONSTRATED NEED TO KNOW SHOULD BE ALLOWED ACCESS TO THIS DOCUMENT. UNAUTHORIZED DISCLOSURE OF THIS INFORMATION IS UNLAWFUL.

SYNOPSIS:

On January 30, 2006, Special Agent (SA) James William Scott failed to promptly and fully comply with instructions given him by the acting Chief of the Threat Management Branch, Rudy Negrete. The instructions, issued on two separate occasions, (12/08/2005 & 01/24/2006) requested SA Scott to provide medical information related to his Periodical Medical Exam, and were issued consistent with the policies and procedures outlined in the June 04, 2000 memorandum (June 2000-Memo) on "Guidelines for Implementing the Federal Protective Service (FPS) Periodic Medical Examination Program for FPS Law Enforcement Positions" (Attachment A).
In failing to comply with those instructions SA Scott, first, committed the offense of Failure/Refusal to Follow Orders as outlined in Part E Section 2 of the Interim ICE Table of Offenses and Penalties For Non-Bargaining Unit Employees and secondly, by failing to provide the requested medical information to the Medical Review Officer (MRO) from Comprehensive Health Services (CHS), the MRO is not able to render a medical determination as to whether SA Scott is medically qualified to continue performing the essential functions of his position as a Criminal Investigator within the 1811 Series.

BACKGROUND

Special Agent (SA) James William Scott is a Criminal Investigator (GS 12-1811) employed by Region 9s Federal Protective Service (FPS), Threat Management Branch (TMB) with a Service Computation Date (SCD) of 03/26/1985. His duty station is San Diego, CA and he is currently assigned to the San Diego office located at 880 Front Street, San Diego, CA 92101 (619/557-2644). SA Scott meets the requirements of a law enforcement professional as described within the June 2000 Memo and as such is required to undergo periodic medical examinations.

Rudy Negrete is a Senior Special Agent, Criminal Investigator (GS 13-1811) employed by FPS Headquarters, Threat Management Division, Washington DC with a SCD of 03/1988. His duty station is Chicago, IL and he is currently assigned to the Regional FPS Office located at 450 Golden Gate Ave, San Francisco, CA 94102 (415/522-3446), acting as Region 9s Chief, Threat Management Branch under a temporary detail. This detail began on November 06, 2005.

On November 09, 2005, an incumbent medical examination was performed on SA Scott and he declined to provide any specific information in response to questions B, E, F and I on page 2 of 5 of the exam form (citing violation of the "ADA/Rehab Act/EEOC"). SA Scott left three (3) questions unanswered on page 4 of 5 (citing violation of the "ADA, Rehab Act, EEOC"), and did not provide sufficient information regarding current medications (again citing violation of the "ADA/Rehab Act/EEOC") and crossed out the release on page 5 of 5.

As a result, Dr. Lawrence Saladino M.D., Medical Review Officer, advised that "the information available to me at the present time will not be sufficient for to provide a medical determination letter." Based upon definitions found within the June 2000 Memo, this response by Dr. Saladino, infers that SA Scott ".... has medical findings that **may** hinder safe and efficient performance of essential job functions...."

DETAILS:

On November 09, 2005, an incumbent medical examination was performed on SA Scott. The results of the exam were forwarded to Comprehensive Health Services for review, which was conducted by Dr Lawrence Saladino, MD.

On November 23, 2005, Dr Saladino sent an email to Martha Montano, (Regional Medical Coordinator) Personnel Security Specialist, FPS, 450 Golden Gate Ave, San Francisco, CA 94102 (415/522-3443). In that email (Attachment B), Dr Saladino indicated that the information available to him was not sufficient for to provide a medical determination letter. Dr Saladino listed several unanswered questions on the health questionnaire that SA Scott declined to answer.

Chief Negrete forwarded the email sent by Dr. Saladino to SA Scott through his supervisor, acting Supervisory Special Agent (SSA) Ruben Ballestros (Attachment C). SA Scott received the email from SSA Ballestros on Nov. 29, 2005 and subsequently responded with a request for a copy of the information being referred to.

On December 01, 2005, SA Scott within the email string originating on Nov. 23, 2005, sent an email to SSA Ballestros, which was forwarded to the attention of Chief Negrete. Within that email, SA Scott reported that the contractor who performed the medical examination called him and advised that he had not completed the exam. SA Scott reported that he had been requested to report back to the facility to complete the testing which he indicated included physical tests as well as addressing the unanswered questions. Chief Negrete checked with RMC Montano and learned that this reported contact was not requested by FPS nor was it something that CHS would have initiated on their own accord. (Author's note: While this inclusion is not directly related to the matter, it was added due to what the author felt was an inappropriate release of medical information by SA Scott on what occurred during his physical examination).

On December 08, 2005, Chief Negrete sent a letter to SA Scott that was received by him on December 15, 2005. That letter directed SA Scott to complete within 14-calendar days, a request for additional medical records and documentation made by Comprehensive Health Services (CHS). The information requested specifically pertained to several questions on the exam form that he failed to answer during his incumbent medical exam on November 09, 2005. A copy of the email from Dr. Saladino was attached to that letter (Attachment D). The letter sent to SA Scott also included the results of his medical examination from CHS, which were contained within a sealed package. Unbeknownst to this office, that package from CHS did not include the information (health questionnaire) needed to complete the issued directive. SA Scott made a request for that information. CHS was contacted and the request was made.

On December 23, 2005, CHS through FedEx had the package delivered. SA Scott signed for the delivery on December 23, 2005, at 11:02 am.

During the time period of December 24 through January 03, 2006, Chief Negrete was on Use/Lose Annual Leave.

During the time period of January 01 through January 20, Martha Montano was on leave.

January 23, 2006, Martha Montano contacted CHS employee, Dara Rivera and learned that the requested medical information has not yet been received. A second letter was initiated and sent to SA Scott. As a result of leave schedules and associated problems in getting SA Scott the required information he needed in order to comply with the December 08, 2005 directive, Chief Negrete extended SA Scott's deadline for completion to January 30, 2006 (Attachment E).

January 30, 2006, the requested medical information was not submitted by SA Scott to CHS, as such, currently SA James W. Scott is not medically cleared to perform as a Criminal Investigator with the Federal Protective Service.

RECOMMENDATION

Based upon the facts and circumstances surrounding this matter, it is my recommendation that on the issue of his refusal to comply with instruction, on two occasions, that SA James W. Scott be suspended from duty for a period not to exceed 14-days. This recommendation is consistent with the Interim ICE Guide to Offenses and Penalties for Non-Bargaining Unit Employees, Part E Section 2.

On the issue of his lack of medical clearance as a result of SA Scott's refusal to comply with instructions, it is recommended that SA Scott either be ordered for a "Fitness for Duty Examination" pursuant to authority provided under Title 5 CFR 339, and/or a decision relative to SA Scott's continued employment in his position as a Criminal Investigator.

PREPARED BY

Rudy Negrete
Chief, Threat Management Branch (acting)
ICE-Federal Protective Service
450 Golden Gate Ave
San Francisco, CA 94102
415/522-3446
202/262-9016 (cell)
rudy.negrete2@dhs.gov

DISTRIBUTION

Arnold D Jackson, Regional Director (acting), FPS Region 9
Tony Ashby, FPS HQ, Legal

ATTACHMENTS:

| | |
|---|---|
| Attachment A | Guidelines for Implementing the Federal Protective Service (FPS) Periodic Medical Examination Program for FPS Law Enforcement Positions (Dated June 04, 2000) |
| Attachment B | Medical exam results for J.S. (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). (Email dated Nov. 23, 2005) |
| Attachment C | Medical exam results for J.S. (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). (Email string Nov. 23, 2005) |
| Attachment D | Instructional Directive (Dated December 08, 2005) |
| Attachment E | Instructional Directive (Dated January 23, 2006) |

**ATTACHMENT A**

**June 7, 2000**

**MEMORANDUM FOR DIRECTOR, FEDERAL PROTECTIVE SERVICE DIVISION**

1PS, 2PS, 3PS, 4PS, 5PS, 6PS, 7PS, 8PS, 9PS, 10PS, WPS

DIRECTOR, HUMAN RESOURCES DIVISION
1CP, 2CP, 3CP, 4CP, 5CP, 6CP, 7CP, 9CP, WCP

FROM: CLARENCE EDWARDS ***/s/ Clarence Edwards***
ASSISTANT COMMISSIONER
OFFICE OF FEDERAL PROTECTIVE SERVICE (PS)

GAIL LOVELACE ***/s/ Gail Lovelace***
CHIEF PEOPLE OFFICER
OFFICE OF THE CHIEF PEOPLE OFFICER (C)

SUBJECT: Guidelines for Implementing the Federal Protective Service (FPS) Periodic Medical Examination Program for FPS Law Enforcement Positions

This memorandum transmits the policy and procedures for implementation of the periodic medical examination program for incumbents employed in FPS positions with law enforcement authority.

This project was undertaken to complement other recently developed components of the FPS Medical Program including the FPS specific pre-hiring medical standards and the FPS Wellness/Fitness program. This component of the program provides a mechanism for the continuing medical evaluations of participating FPS law enforcement professionals. The program will assure the participant and the agency of the continuing medical fitness of FPS professionals in positions with law enforcement authority and their ability to effectively accomplish the essential functions of their respective positions.

Implementation of the new program is effective the date of this memorandum, following the procedures outlined in the attachment. In order to get the program moving, we request that each regional FPS and Human Resources Director work together to develop the initial list of FPS professionals participating in the periodic medical examinations during calendar year 2000. This information should be sent to **both** Federal Occupational Health, Office of Law Enforcement Medicine, Attn: Denise Lyons, **and**
FPS Central Office, Attn: Susan Spannbauer, FPS Medical Program project manager,
by **July 14, 2000**.

Those eligible for examinations shall be scheduled through the respective Regional Medical Coordinators (RMC). A conference call was held April 20, 2000, with the RMC's to apprise them of this correspondence and to discuss the process for scheduling and monitoring these examinations as well as the Fitness Health Screenings.
Funding for Fiscal Year 2000 exams is the responsibility of each FPS regional office.

Thank you for your continued support of the FPS Medical Program.

Attachment

# Federal Protective Service
# Periodic Medical Examination Process
# For Incumbents

## Introduction

The General Services Administration (GSA), Office of Federal Protective Service (FPS), is committed to making sure all potential and incumbent FPS law enforcement employees, covered by 40 U.S.C 318, meet a level of medical and psychological fitness commensurate with the essential functions of their positions.

On May 4, 1999, the FPS in partnership with the Office of the Chief People Officer and the national labor bargaining units, published new FPS specific medical standards for all FPS positions with law enforcement authority and standardized guidelines for performing Pre-Placement Medical Examinations and Psychological Screenings. At that time we indicated that these new medical standards would also be used as the basis to begin the Incumbent Medical Examination program beginning in calendar year 2000.

The process outlined in this policy document will be used to implement a permanent periodic medical examination program for incumbents. The program will ensure a comprehensive, impartial and consistent assessment of an individual's ability to continue performing the essential functions of their occupation and also allow FPS management to monitor the state of health of the FPS law enforcement workforce.

The FPS is committed to ensuring that no incumbent is discriminated against because of a medical condition or psychological suitability issue that would otherwise have no affect on their ability to perform the duties of the position. This commitment extends to the privacy and confidentiality of medical and personnel records. Requests for medical information under this program will be processed in full compliance with Title 5, Code of Federal Regulations (C.F.R.), Part 297, Privacy Procedures for Personnel Records.

This medical evaluation program is established in full compliance with Title 5, C.F.R., Part 339, Medical Qualification Determinations.

## What are Periodic Medical Examinations?

Periodic medical examinations evaluate the employees continued medical fitness to perform the essential functions of the job and detect any pertinent changes in the condition of their health that might adversely impact their ability to safely and effectively carry out their duties. Baseline medical information from previous program examinations, if available, will be used for comparison with subsequent periodic evaluation results to determine if the employee has any significant health trends that may be occupationally related.

## Who must participate in the Periodic Medical Examination Program?

The following FPS law enforcement professionals **shall** participate in the Periodic Medical Examination Program:

1. **FPS Police Officers**, GS 083, hired or selected via competitive procedures, April 8, 1997, or later. These employees were subject to the April 8, 1997, or May 4, 1999, version of the FPS Medical Standards, and;

2. **All other FPS personnel in law enforcement positions covered by 40 U.S.C. 318** hired or selected via competitive procedures, May 4, 1999, or later. These employees were subject to the revised FPS Specific Medical Standards dated May 4, 1999.

This includes both external and internal competitive selections.

FPS Regional Directors are responsible for ensuring that all FPS personnel with law enforcement (318) authority hired in the timeframes given above participate in the Periodic Medical Examination Program.

FPS Police Officers in positions covered by 40 U.S.C. 318 hired or selected via competitive procedures, prior to April 8, 1997, and all other FPS personnel in positions covered by 40 U.S.C. 318 hired or selected via competitive procedures, prior to May 4, 1999, are not subject to the Periodic Medical Examination Program at this time.

## What is the frequency of the examinations?

All participating FPS personnel will receive medical exams on a recurring basis to make sure they continue to meet the medical qualifications of the position and can satisfactorily perform the essential functions of the job. Consistent with accepted practice, participating personnel will be evaluated based on the following guidelines:

| Ages | Frequency |
|---|---|
| 35 and under | Every 3 years |
| 36 to 44 | Every 2 years |
| 45 and above | Every year |

**How are Examinations Scheduled ?**

Regional Medical Coordinators (RMC) or designated alternates shall schedule and monitor the accomplishment of examinations in conformance with this policy and procedures.

For consistency, RMCs **shall**:

- Develop a calendar year roster, (each December), of all participating FPS employees eligible for an exam during the upcoming calendar year. The roster shall be developed in coordination with the servicing regional Human Resources office.

- Forward a copy of the calendar year roster to Federal Occupational Health, Atlanta, Georgia, and FPS Central Office, no later than December 31st of each year.

- Schedule examinations during employee's month of birth and far enough in advance to avoid potential conflicts and cancellations. (All examinations shall be completed within 30 days following the employee's month of birth). Employees should be given several weeks advance notice of the appointment.

**Who will pay for incumbent examinations ?**

In compliance with Title 5, C.F.R., Subpart C, Medical Procedures, Section 339.304, FPS will pay for the cost of the basic medical examination, including all required tests, for all participating employees. The basic medical examination will include all tests and exams outlined in the Federal Occupational Health examination form for incumbents entitled "GSA/FPS Preplacement and Incumbent Medical Exam Form." **(Attachment 1).**

**All costs associated with additional examinations and tests beyond the basic examination shall be the responsibility of the employee.**

**Funding the Periodic Examination Program**

FPS Regional Directors shall budget for the necessary funds to deliver the Periodic Medical Examination Program through the established budgeting process. The employee roster, examination frequency schedule and the annual FOH cost schedule shall be used to develop program estimates. The cost schedule will be developed annually by the Central Office, as part of the annual Interagency Memorandum of Agreement, and provided to the regions.



DEF_01191

**Who will perform examinations?**

To ensure standardization of examinations and to facilitate timely delivery of results, exams will be performed through the network of providers developed and monitored by Federal Occupational Health (FOH), Atlanta, Georgia. In most cases these providers will be local Public Health Service clinics. In locations where Public Health Service clinics are not available, FOH will make alternative arrangements to accomplish the examinations.

**What form(s) will be used?**

All examinations will be accomplished using only the examination form designed for FPS by FOH (This is the same form used for pre-placement examinations). This form is specifically designed to collect the necessary information to evaluate incumbents consistent with FPS Medical Standards. **No substitute forms can be used.** Forms are available at participating Public Health Service clinics, however, the RMC should reproduce the form as necessary to provide to incumbents prior to reporting for the examination. **(Attachment 1 - GSA/FPS Preplacement and Incumbent Medical Exam Form).**

**How will exam results be evaluated ?**

Completed medical examination forms and laboratory reports will be reviewed and evaluated by one central source, the FPS designated Medical Review Officer (MRO). The Federal Occupation Health Office, Law Enforcement Medical Program, Atlanta, Georgia, has been designated as the provider of choice for this service. This is the same source that evaluates our pre-placement examinations. This will ensure that all incumbents are evaluated consistently by a physician familiar with the FPS occupations and the FPS medical standards applicable to the occupation under review. This is also critically important to the standardization of the program and potential challenges to our standards.

Once examination results are received at FOH, the package will be logged in for tracking purposes and reviewed to make sure all necessary information is included in the package. If all information is included, medical examinations will be referred to the FPS Medical Review Officer (MRO) for evaluation and final determination.

If additional medical information is required, the FOH triage nurse will contact the appropriate RMC or service provider, as appropriate, to acquire the additional information to complete the evaluation.

Completed medical examination packages will be reviewed by the MRO to ensure the incumbent possesses the medical qualifications necessary to continue performing the essential functions of the position.

## How will examination results be sent to FOH, Atlanta, Georgia

Completed medical examinations must be sent via overnight FedEx by the examining facility to the MRO within 48 hours of completion of the examination. (Cost of shipping is included in the cost of the exam. FOH will coordinate this requirement with the regional providers and make sure mailing materials are provided to the exam providers).

## How will evaluation results be reported to the agency?

After completing the medical evaluation, the MRO will complete a Medical Determination Statement. This document will be submitted by the MRO to the designated FPS RMC within **10 workdays** of receipt of the **complete medical examination package**. **(Attachment 2 – Medical Review Categories).**

The MRO will make one of four determinations for each incumbent based on their professional assessment of the medical examination and laboratory test results.
These determinations are:

1. **Medically Qualified:** Incumbent has no medical conditions that are likely to hinder safe and efficient performance of essential job functions.

2. **Medical determination cannot be made due to incomplete examination results**: Please return to your examining facility for completion of the following medical information.

   (This category will only be used in those instances where there is some problem with the original exam results that prevents use of the information to make a medical determination).

3. **Medical Determination cannot be made based on available medical information**. Incumbent has medical findings that **may** hinder safe and efficient performance of essential job functions. Please provide the following detailed or diagnostic medical information. Per agency request, if further information is not provided, a determination will be made based on available medical information.

   (This category will only be used in those instances where it is determined that more detailed testing may impact the final medical determination). (Expenses of these additional tests will be the responsibility of the employee).

4. **Not medically qualified to perform the essential functions of the job.** The following medical condition(s) poses a significant level of risk to the health and safety of yourself and/or others in the performance of essential job functions. Medical follow-up, if required, and any restriction of duties are listed below.

**How do we deal with incumbents who are not medically qualified?**

Regions shall adhere to the following procedures in all cases where an incumbent is found medically unfit to perform the essential functions of the job. These procedures will ensure consistency with Office of Personnel Management (OPM) policy and also make sure incumbents are afforded every consideration when making medical eligibility determinations for FPS positions.

When a Medical Determination letter is received from Federal Occupational Health, Atlanta, Georgia, with a determination that the incumbent is not medically qualified, regional FPS management, in conjunction with the servicing regional Human Resources and Federal Occupational Health shall:

1) **Notify the incumbent of the determination** and advise that they have the opportunity to obtain and submit additional medical information from their physician(s) for consideration by the Medical Review Officer (MRO). (Title 5 C.F.R. 339.303). **(This is at the incumbent's expense).** If the incumbent presents such additional information, it shall be provided to the MRO for evaluation. The MRO will provide a final medical determination to FPS management. If the MRO still determines that the incumbent is not medically qualified, the next step will be to:

2) Determine if a reasonable accommodation can be identified to allow continuation in present position, ensuring the health and safety of the individual and others is not endangered; (The MRO recommendation shall be fully considered when determining the applicability and appropriateness of any reasonable accommodation. If an accommodation cannot be made, then **consideration will be given for a waiver of specific standard(s). (Title 5 C.F.R. 339.204)**.

   All reasonable accommodation or waiver proceedings must be fully documented and posted to the appropriate employee records and files in conformance with existing administrative policy and procedures. Documentation shall include at a minimum:

- Clear delineation of the medical standard(s) being considered for accommodation or waiver;
- Essential job functions potentially impacted by the standard(s) being considered;
- Narrative discussion of all information considered and supporting evidence used to arrive at the final management decision. (This discussion should clearly articulate the impact of past work experience on the decision making process);
- FOH recommendation (This shall include any accommodation recommended for continuation of duty or rationale for support or non-support of medical waiver);
- Final FPS decision.

**Note**: Waiver of a medical standard is a regional FPS management decision that must be factually based on "sufficient evidence that an incumbent, with or without reasonable accommodation, can perform the essential duties of the position, without endangering the health and safety of the individual or others."

The Law Enforcement Medical Program, Federal Occupation Health, and the servicing regional Human Resources, shall be consulted during this process to ensure consideration of all medical and personnel policy issues prior to making a final accommodation or waiver decision.

3) If the standard is not accommodated or waived, **other appropriate administrative and human resources procedures will be considered**.
These may include, but are not limited to:

- **Placement in an alternative (non 318 authority) position at the same or lower grade level within FPS, if a position is available and the medical problem cannot be mitigated;**
- **Placement in an alternative (non 318 authority) position at the same or lower grade level within GSA, if a position is available and the medical problem cannot be mitigated;**
- **Consideration of potential retirement options, if applicable; or**
- **Separation from the agency through adverse action procedures.**

GSA policies and procedures shall be followed to determine the appropriate disposition of each case. In all cases the servicing Human Resources Director is the final authority regarding proper employment policies and procedures to be followed.

## ATTACHMENT B

**From:** Lawrence Saladino [mailto:lsaladino@chsmedical.com]
**Sent:** Wednesday, November 23, 2005 10:27 AM
**To:** Montano, Martha J; Hori, Bruce T; Spannbauer, Susan B
**Cc:** Dara Rivera; Ellen Kessler
**Subject:** Medical exam results for J.S. (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).
**Importance:** High
Martha and Bruce,

An incumbent medical examination was performed on J.S. on 11/09/05. The examinee declined to provide any specific information in response to questions B, E, F and I on page 2 of 5 of the exam form (citing violation of the "ADA/Rehab Act/EEOC"), left three (3) questions unanswered on page 4 of 5 (citing violation of the "ADA, Rehab Act, EEOC"), did not provide sufficient information regarding current medications (again citing violation of the "ADA/Rehab Act/EEOC") and crossed out the release on page 5 of 5.

The examining physician wrote the following: "He then told me about a previous incident that I didn't understand … I stopped my history taking at that point" and "I couldn't get a very good hx (history)".

Unfortunately, the information available to me at the present time will not be sufficient for to provide a medical determination letter. A courtesy letter will be sent with copies of the laboratory and diagnostic test results.

L.P.Saladino, M.D.
Medical Review Officer

## ATTACHMENT C

From: Ballestros, Ruben
Sent: Thursday, December 01, 2005 2:01 PM
To: Negrete, Rudy
Subject: FW: Medical exam results for J.S. (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).

Do you know anything about this ?? Obviously someone has contacted the contracted medical office for further instructions but failed to advise S/A Scott. Maybe somebody needs to contact his EEOC investigator and inquire if we are asking for Scott to submit to something that may interfere with an ongoing unresolved issue or investigation.

---

From: Scott-Jr, James W
Sent: Thursday, December 01, 2005 1:54 PM
To: Ballestros, Ruben
Subject: RE: Medical exam results for J.S. (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).

"Following" my below Tuesday (i.e., 11-29-05) request for a both a copy of the Agency's "Recurring Physical Exam" results and the medical history documentation given to me to be filled-out that day, yesterday (on 11-30-05) I received a telephone message at home from the Physical Exam's contractor requesting a call-back.

Today, I contacted their medical staff, who informed me that I was being instructed to return to be "re-examined" (alleging that I had "failed to perform various squatting & bending exercises", and therefore that the exam had not been completed". This allegation is FALSE.

Additionally, their female staff member advised me today that there were also "unanswered questions" that needed to be addressed, apparently referring to the ADA/Rehab Act/EEOC violations referenced below on 11-23-05.

For the Record, I successfully completed a full range of "squatting & bending exercises" on the exam day in my underwear, pursuant to the examining physician's instructions (noting that he closely observed each maneuver), and that me made no comment concerning any difficulty. Furthermore, at the exam's completion, I overheard his male assistant (who had performed the diagnostic tests portion of the exam) ask him how I did...the physician responding that, "He did OK" !).

As for the comments "alleged" by Mr. Saladino below, the examining physician clearly understood my ADA/Rehab Act/EEOC reasons for not completing the "overly intrusive" portions of the medical history questionnaire(s), for at exam's end he stated to me, "I understand...You're simply protecting your right to privacy"!
*Note: Additionally, I had factually informed him of an ongoing EEOC investigation into reported ADA/Rehab Act/EEOC violations committed by certain agency officials.

In response to the contracted medical staff's instruction that I return to be "re-examined", I advised them that I would "be contacting my employer concerning this issue". With the above in mind, please review and advise.........

As before, additionally, please have someone in the agency submit to me a copy of the below referenced documentation so that I can adequately review exactly what areas of the questionnaire were contested.

*Note: The EEOC Investigator assigned to my case is Judy Maltby (612-467-7402).

---

From: Ballestros, Ruben
Sent: Wednesday, November 30, 2005 12:13 PM
To: NEGRETE, RUDY; NEGRETE, RUDY
Cc: Scott-Jr, James W
Subject: FW: Medical exam results for J.S. (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).

Rudy, can we accommodate him with this so he can accomplish this request ?

---

From: Scott-Jr, James W
Sent: Tuesday, November 29, 2005 1:13 PM
To: Ballestros, Ruben
Subject: RE: Medical exam results for J.S. (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).

Though the Agency's "Recurring Physical Exam" occurred approximately 20 days ago (on 11-9-05), I have not been provided with a copy of either it's results or the documentaton given to me to be filled-out that day.

Please have someone submit to me a copy of this information so that I can review exactly what areas of the questionare are being referred to.

Thanks....

---

From: Ballestros, Ruben
Sent: Tuesday, November 29, 2005 3:36 PM
To: Scott-Jr, James W
Subject: FW: Medical exam results for J.S. (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).
Importance: High

Scott, the medical staff advises that they can not render a report on your medical due to some insufficient information on your medical questionnaire. Please reconsider the questions asked so that the medical examiners can render a finding in your case. The question numbers are indicated below. If you would rather not, please advise of your course of action or whom we might refer to for explanation. If you can't recall the specific question or which form let me know and maybe Martha or someone can direct you where to get a copy. Thank you.

---

From: Negrete, Rudy
Sent: Wednesday, November 23, 2005 11:37 AM
To: Ballestros, Ruben
Subject: FW: Medical exam results for J.S. (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).
Importance: High

Ruben

As discussed. Please handle and advise on response.

Thanks

Rudy Negrete
Chief, Threat Management Branch

---

From: Hori, Bruce T
Sent: Wednesday, November 23, 2005 10:47 AM
To: Negrete, Rudy
Cc: Montano, Martha J
Subject: FW: Medical exam results for J.S. (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).
Importance: High

Rudy -

Please look into this.

---

From: Lawrence Saladino [mailto:lsaladino@chsmedical.com]
Sent: Wednesday, November 23, 2005 10:27 AM
To: Montano, Martha J; Hori, Bruce T; Spannbauer, Susan B
Cc: Dara Rivera; Ellen Kessler
Subject: Medical exam results for J.S. (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).

SEE ATTACMENT B FOR COMPLETE MESSAGE

## ATTACHMENT D

TMB

Federal Protective Service
U.S. Department of Homeland Security
450 Golden Gate Ave., Room 5-5474
San Francisco, CA 94102

U.S. Immigration
and Customs
Enforcement

December 8, 2005

James W. Scott
3251 Loma Riviera Drive
San Diego, CA 92411

Dear Mr. Scott:

This correspondence is related to your position as a Department of Homeland Security, Immigration & Customs Enforcement, Federal Protective Service (FPS), GS-1811 Criminal Investigator. It is the responsibility for FPS law enforcement employees, covered by 40 U.S.C. 1315 (formerly 40 U.S.C. 318), to meet a level of medical fitness commensurate with the essential functions of their positions. Periodic medical examinations are required as outlined under Memorandum dated June 7, 2000, Guidelines for Implementing the FPS Periodic Medical Examinations Program for FPS Law Enforcement Personnel, from the FPS Director (formerly titled FPS Assistant Commissioner).

Our records indicate that you were due for your FPS periodic medical examination on November 11, 2005. On December 1, 2005, we received a medical determination letter from Comprehensive Health Services (CHS), our FPS medical contractor, stating that a medical recommendation for the position of Criminal Investigator, GS-1811 could not be rendered based on the existing examination and diagnostic testing documentation.

**This letter serves to direct you to schedule and complete, within 14 calendar days from the date of this letter, the request for additional medical records and documentation as outlined in the enclosed Medical Review Form. Failure to comply within the time indicated may result in disciplinary actions.**

Please work closely with your supervisor to coordinate the scheduling of this exam as required. If you need additional time to complete the additional testing, please provide this request in writing through your supervisor with a copy to the Regional Medical Coordinator, Martha Montano, with dates when you plan to have the issue(s) addressed.

It is the responsibility of the DHS, ICE, FPS, to pay for ordered incumbent testing. Submit a copy of any bill for compensation along with a completed GSA Form 1164 (Claims for Reimbursement or Expenditures on Official Business), to your Budget Analyst.

James W. Scott, Jr.
Page 2

The requested medical information should be mailed directly from your private physician to:

**Comprehensive Health Services, Inc.**
**ATTN: Dara Rivera**
**8229 Boone Blvd., Suite 700**
**Vienna, VA 22186**
**Fax: 703-288-5441**

If you fail to provide this information, a decision will be made based on the information currently available, which may result in a decision regarding your continued employment as a Criminal Investigator. The DHS, ICE, FPS, will exercise its authority under 5 CFR 339, *Medical Qualification Determinations*, Subpart C, 339.301, *Authority to Require an Examination*, and order you for a Fitness for Duty Examination.

If you need more information or to discuss this matter further, please contact Martha Montano, your Regional Medical Coordinator on 415-522-3443.

Sincerely,

Rudy Negrete, Chief,
Threat Management Branch

Attachments:
Dr. Saladino's email, dated 11/22/05
Title 5, Part 339, Medical Qualification Determinations
Medical Review Form with Attachments

cc: Scott Medical File
Official File

## ATTACHMENT E

Federal Protective Service

U.S. Department of Homeland Security
450 Golden Gate Ave
Suite [illegible]
San Francisco, California 94102

U.S. Immigration
and Customs
Enforcement

January 24, 2006

James W. Scott
3251 Loma Riviera Drive
San Diego, CA 92411

Dear Mr. Scott:

This correspondence follows up the letter dated December 08, 2005, sent to you by this office, which you received on December 15, 2005. That letter directed you to complete a request for additional medical records and documentation made by Comprehensive Health Services (CHS). The information requested specifically pertained to several questions on the exam form you failed to answer during your incumbent medical exam on November 09, 2005

You were directed to complete and submit the required information within 14 calendar days of receipt of the letter. Because we (Federal Protective Service-FPS) do not have access to medical records between an employee and CHS, unbeknownst to this office, the package that was sent to you from CHS through FPS did not include the information you needed to complete the issued directive. Based upon your request, CHS sent you via FedEx the documents you needed. That package was delivered and signed for by you on December 23, 2005, at 11:02 am. As of January 23, 2006, CHS has reported that the requested information has not yet been received

Despite the problems identified above related to the receipt of the information, you have had more than ample time to complete the request. This letter serves notice that you have until no later than January 30, 2006 to comply with the directive as stated in the December 08, 2005 letter. If you fail to comply with this directive, the appropriate disciplinary action, as deemed necessary will be initiated. Thank you for your attention to this matter.

Sincerely,

Rudy Negrete, Chief
Threat Management Branch

Cc. Scott Medical File
Official File

## I) *ACKNOWLEDGMENT OF RECEIPT*

Please sign this acknowledgment as evidence that you have received the cited letter. Your signature does not mean that you agree or disagree with its contents, and by signing, you do not forfeit any of the rights cited above. Your acknowledgement of receipt should be returned to the bearer of this notice.

I acknowledge receipt of the 4-20-06 Letter Proposing / Deciding corrective action.
*(Date)* *(Circle one)*

Employee's signature: ____________________ Date: 4-20-06

Witness/Bearer's signature: ____________________ Date: 4-20-06

cc: Field File
Employee
ICE E&LR

Enclosures: Copy of the Supervisory Inquiry (material relied upon to propose the action)
Designation of Representative Form

## 7. Scott Response Letter to Notice of Proposed Suspension (April 28, 2006)

EXHIBIT
2
SIMON
6-16-09 gw
PENGAD 800-631-6989



James W. Scott
3251 Loma Riviera Drive
San Diego, CA 92110
Ph# (619) 224-9662

April 28, 2006

Joyce Nesbitt-Simon
450 Golden Gate Avenue
5th Floor, Room 5474
San Francisco, CA 94102

Re: Notice of Proposed 14-Day Suspension

Dear Ms. Nesbitt-Simon,

The following is submitted in response to the Proposed Suspension document, dated April 17, 2006, pursued by Acting Threat Management Chief Rudy Negrete, concerning his allegation that I quote, **"Failed to Carry out Instructions of a Superior"**.

In response, I initially direct you to a written quote from Mr. Negrete's same document, specifically:

*"As a subordinate employee, you must comply with all reasonable and proper orders from your superiors"*.

With the above in mind, the premise of Mr. Negrete's allegation obviously relies solely upon whether his specific orders in this matter were indeed "reasonable and proper".

For any order given by a superior that fails to satisfy this standard, is thus beyond the scope of their lawful authority, thereby also constituting an abusive of authority on their part.

Mr. Negrete and other agency officials involved are well aware that I previously filed a formal Equal Employment and Opportunity Commission (EEOC) Complaint which is currently under investigation by personnel assigned by the Immigration and Customs Enforcement/Equal Employment and Opportunity office.



DEF_01123

That specific complaint, as Mr. Negrete is well aware, in part addresses the issue that Federal Protective Service officials and Contract personnel both developed and implemented an Employee Medical Program which both unreasonably and improperly violates:

-the Americans with Disabilities Act/Rehabilitation Act,
-Age Discrimination Act,
-5 CFR 339 (i.e., Medical Determinations),
-Various additional regulations enforced by the Equal Employment Opportunity Commission,
-As well as other related Federal regulations and statutes.

Furthermore, the evidence of record also confirms that Mr. Negrete has been advised previously both in written documentation, as well as in a recent telephone conversation with me personally, that the FPS Incumbent Exam pursues confidential medical information that is beyond the reasonable scope permitted by Equal Employment & Opportunity Commission enforcement guidelines.

Therefore, since Mr. Negrete's threat of disciplinary action relies on this very issue, his order that I do so is hereby considered unreasonable and improper, for as stated above, it is beyond the scope of his lawful authority, thereby also constituting an abusive of his authority.

In conclusion, with the above in mind, I will not surrender confidential and protected Privacy Act information that is beyond the legal scope of Mr. Negrete's authority to demand, pursuant to the referenced statutory guidelines above.

James W. Scott
Special Agent
DHS/Federal Protective Service

## 8. Notice of Suspension (May 8, 2006)

Federal Protective Service
U.S. Department of Homeland Security
450 Golden Gate Ave. 5th Floor Room 5474
San Francisco, CA 94102

**U.S. Immigration and Customs Enforcement**

Date May 8, 2006

James William Scott Jr.
Criminal Investigator/Special Agent
Federal Protective Service
San Francisco, CA

Mr. Scott:

By letter dated April 20, 2006, from Chief, Threat Management Branch, Rudy Negrete, you were informed of a proposal to suspend you for fourteen (14) calendar days, based on the following reason:

**REASON: FAILURE TO CARRY OUT INSTRUCTIONS OF SUPERIOR**

You were supplied with copies of the documentation relied upon to support the proposed action and afforded opportunities to provide replies, both orally and/or in writing. On April 28, 2006, you provided me with your written reply.

In determining appropriate corrective action, I have considered the nature and seriousness of your offense in relation to your duties, position, and responsibilities, in addition to your performance and work records.

After reviewing your response to the proposed suspension, I find that you did fail to carry out instructions of a Superior. I understand you do not agree with the medical policy, however, while this policy is in-place all DHS FPS employees are required to comply with this policy. Therefore, I have determined that the charge and specification have been sustained, and it is my decision that a suspension for fourteen (14) calendar days is warranted and will promote the efficiency of the Agency. Accordingly, you will be suspended from duty without pay for fourteen (14) consecutive days effective May 14, 2006 through May 27, 2006. You will be returned to duty on May 28, 2006.

Mr. Scott, I must caution you that any future actions of this type or other misconduct on your part may result in a proposal of more severe disciplinary action against you to include possible removal.

You have the right to contest this action through one of the avenues outlined below. You may select one avenue and your election will be considered final on the date any appeal, dispute, or complaint is filed.

1. Consistent with Article 48A of the Negotiated Agreement between the Service and the National INS Council, you may request to contest this action through arbitration. A request

by the Union to refer the matter to arbitration must be filed after receipt of this decision letter, but not later than fifteen (15) workdays after the effective date of this action. The Union's request for arbitration must be in writing and filed with the Chief, Employee Labor Relations Branch, Department of Homeland Security, Immigration Customs and Enforcement, Laguna Niguel, CA 92677. Upon request, you and your representative, if otherwise in an active duty status, will be allowed a reasonable amount of official time in connection with this matter in accordance with the negotiated agreement.

2. If you feel this action is motivated by discrimination based on race, color, sex, religion, national origin, age, disability, and/or because of participated in the Equal Employment Opportunity (EEO) process, and you want to initiate an EEO complaint, you must seek pre-complaint counseling from your local EEO Counselor or EEO Officer within 45 days of the effective date of this action.

Should you have any questions regarding your rights or other procedures contained in this notice, please contact the Employee and Labor Relations Office for Immigration and Customs Enforcement at 24000 Avila Road, Room 5180, Laguna Niguel, CA 92677 or by phone at (949) 360-3060.

Please sign the receipt acknowledgment copy of this letter as evidence that you have received my decision, and then return it to the bearer of this notice. Your signature does not mean that you agree or disagree with its contents, and by signing, you do not forfeit any of your rights cited above.

Sincerely,

Joyce Nesbitt-Simon
Acting Regional Deputy Director

Enclosure:
Acknowledgement of Receipt

## ACKNOWLEDGMENT OF RECEIPT

Receipt of the original Decision Letter dated ____________, is hereby acknowledged.

______________________________ ____________

Signature of James William Scott Jr. Date

______________________________ ____________

Name of Witness (bearer) Date

cc: Field File
James William Scott Jr.
ICE, E&LR

May 8, 2006

Dear Mr. James Scott:

Per the request of Joyce Nesbitt-Simon, it is requested that you sign the enclosed letter. Please sign the original and keep a copy for yourself.

Thank you,

Ruth Mobley

## 9. Hirano Letter to Scott (December 21, 2006)

ATTACHMENT 1

*Federal Protective Service-Region 10*

**U.S. Department of Homeland Security**
32125 32nd Ave S
Federal Way, WA 98001

U.S. Immigration
and Customs
Enforcement

December 21, 2006

**Via hand delivery**

James William Scott, Jr.
Schwartz Federal Building/Courthouse
880 Front Street #1267
San Diego, CA 92101

Dear Mr. Scott:

As indicated in the attached memoranda, supervisory authority to handle all matters relative to your fitness for duty as a GS-12 Criminal Investigator has been delegated to me and Acting Deputy Regional Director Steven C. Slagowski. As you can see from the attached memorandum from Regional Director Donald H. Bowman, I am the Chief of Mission Support for FPS Region 10.

I am in receipt of information that you have not been performing law enforcement duties since approximately January 31, 2005. Your law enforcement authority was revoked at that time due to a "Documentation of Medical Impairment" (DMI) form dated January 27, 2005, that you provided to the agency. This DMI stated that you were restricted from lifting more than 20 pounds and that you had tendonitis and/or synovitis and/or bursitis and/or shoulder impingement. You later provided the agency with two DMI forms (dated February 22, 2005, and March 21, 2005) that included no lifting restrictions, but still indicated you had tendonitis and/or synovitis and/or bursitis and/or shoulder impingement. You have also provided the Agency with workers' compensation information relating to this medical condition.

I have been advised by the Agency's Medical Review Officer (MRO), Dr. Larry Saladino, that he is not in receipt of medical documentation regarding the extent of this injury or whether it currently limits your ability to perform the essential functions of your law enforcement position. Therefore, you are hereby ordered to sign the attached medical release authorizing the Agency to release to Dr. Saladino all medical information you have provided to the Agency regarding this injury. You must sign this release and return it to me at the address above so that I receive it no later than January 5, 2007. The release of this information to Dr. Saladino is necessary so that he can make a medical determination about whether this information is sufficient to release you to full law enforcement duties or whether additional information is required.

I am also in receipt of information that, on November 9, 2005, you had refused to answer certain questions contained in a "GSA/FPS Pre-Placement Medical Exam Form." I have also received information from MRO Dr. Larry Saladino that he is unable to make a medical determination about your fitness for duty as a Criminal Investigator without your answers to the attached questions. You are hereby ordered to fully respond to these questions, sign and date your response. You must provide your response to me at the above address so that I receive it no later than January 5, 2007.

Your failure to obey both of these direct orders by the deadline imposed will result in disciplinary action being taken against you, up to and including your removal from federal service. Your cooperation in this matter is expected and appreciated.

Sincerely,

Tamra A. Hirano
Chief, Mission Support, Region 10
Federal Protective Service

Acknowledgment of receipt:

_______________________
James William Scott, Jr.

Date:

_______________________

Per the attached memorandum to you, you are ordered to respond to the following questions so that I receive your responses no later than January 5, 2006:

1) Have you ever had a learning disability or attention deficit disorder?

2) Have you ever been treated for a mental condition? (If yes, specify when, where and give details)

3) Have you consulted or been treated by clinics, physicians, healers, or other practitioners for other than minor illness? (If yes, give complete address of doctor, hospital, clinic and details)

4) Have you ever received, is their pending, or have you applied for pension or compensation for existing disability? (If yes, specify what kind, granted by whom, what amount, when and why)

5) Have you had a psychiatric/psychologic consult?

6) Have you had episodes of depression?

7) Have you had problems with anxiety?

8) Describe all medication (prescription and non-prescription) you are currently taking with dosages, frequency, and reason for taking the medication.

James William Scott, Jr. ______________________ Date ______________

## AUTHORIZATION TO RELEASE HEALTH INFORMATION

Employee's Name: ______________________________

---

**I authorize the following individuals to receive the medical records described below:**

**Dr. Larry Saladino, his agents, employees and representatives**

**Information to be Released:**
**I authorize FPS Chief, Mission Support Tamra Hirano to release all medical records in her possession pertaining to my workers' compensation injury that occurred on or about September 8, 2004, relating to the right side of my neck, my right upper arm and shoulder area**

**Purpose:**
**To release records necessary to determine my fitness for duty as a Criminal Investigator**

---

______________________________________________

SIGNATURE OF EMPLOYEE DATE

## 10. Notice of Proposed Removal (January 25, 2007)

*Federal Protective Service*
U.S. Department of Homeland Security
[illegible]
Federal Way, WA 98001

U.S. Immigration and Customs Enforcement

January 25, 2007

**VIA Hand Delivery**

James W. Scott
Criminal Investigator
Schwartz Federal Building/Courthouse
880 Front Street #1267
San Diego, CA 92101

Mr. Scott,

This notice is to advise you, in accordance with the provisions of Title 5 of the Code of Federal Regulations, Part 752 that I am proposing to remove you from your position with the Federal Protection Service as a Criminal Investigator, GS-13. If a decision is made to sustain this proposal, the decision will be effected not earlier than thirty (30) calendar days from the date you receive this notice. The reasons for this proposed action are as follows:

**REASON: FAILURE TO COMPLY WITH A DIRECT ORDER**

Specification 1: On December 21, 2006, you received the attached letter, signed by Tamra A. Hirano, Chief, Mission Support Region 10, Federal Protective Service (Labeled Attachment #1), ordering you to sign a medical release form (attached to the December 21, 2006, letter). This medical release form authorized the Agency to further release to Dr. Larry Saladino, this Agency's Medical Review Officer (MRO), all the medical information you had previously provided to the Agency regarding the injury described in the attached medical release form. You were ordered to sign the release form and return it to Chief Hirano no later than January 5, 2007. You failed to comply with this order.

Specification 2: On December 21, 2006, you received the attached letter, signed by Tamra A. Hirano, Chief Mission Support Region 10, Federal Protective Service (Labeled Attachment #1), ordering you to fully respond to certain questions contained in a "GSA/FPS Pre-Placement Medical Exam Form." (attached to the December 21, 2006, letter) to enable MRO Dr. Saladino to make a medical determination about your fitness for duty as a Criminal Investigator. You were ordered to fully respond to these questions, and sign and date your response. Your response was to be returned to Chief Hirano no later than January 5, 2007. You failed to comply with this order.

In proposing this action, I have considered the fact that your authority to perform law enforcement duties was removed from you on or about January 31, 2005, due to the injury referenced in specification one and that you have not had your authority to perform law enforcement duties restored to you since that time. I have also considered the fact that your failure to respond to the questions referenced in specification two has resulted in the Agency's MRO informing the Agency that he is unable to make a medical determination regarding your fitness for duty without your

responses to these questions. As a GS-13 law enforcement agent, you occupy a position of great trust and responsibility. Your refusal to cooperate in providing information regarding your medical fitness for duty has resulted in your not having the authority/clearance to perform the essential functions of your law enforcement position. Because your misconduct has resulted in your inability to do your job, I find this proposal warranted and, if effected, will serve to promote the efficiency of the Agency.

This is only a proposal. You have the right to reply orally, in writing, or both, and to furnish affidavits and other documentary evidence, including medical documentation if applicable, in support of your reply. If you disagree with this proposed action, your reply should set forth the reasons for your belief that this action should not be take place.

You are entitled to be represented in this matter by an attorney, a union representative, or other representative of your choice. In order for a representative to act on your behalf in this matter, you must submit a written designation of representation, signed by you, to identifying that person as your representative. A Designation of Representative form is enclosed for your use as desired.

You and your representative, if any, are entitled to review the material relied upon to support this proposal. Copies of the cited document are attached. You, and your representative, if in a duty status, will be allowed a reasonable amount of official time to review the material relied upon to support this action, to secure affidavits or other documentation and to prepare and/or present any reply(s). Requests for such official time must be submitted, in advance, to your, and if applicable, your employee Representative's supervisor for approval.

Any written reply to this proposal must be directed to the Deciding Official, within ten (10) calendar days beginning the day after you receive this notice. If you wish to present an oral reply, you or your designated representative, if any, must contact the Deciding Official's office within the specified timeframe to schedule an appointment for that purpose.

If you believe you need additional time to prepare a reply to this proposal, you may request an extension, in writing, within the specified timeframe from the Deciding Official. Any such request must contact an explanation as to why additional time is needed. Extensions are not automatically granted, but rather will be based upon the showing of good cause.

All correspondence, including any written reply, request to reply orally, or any request for additional time to reply should be addressed in writing to the Deciding Official: Steven Slagowski, Acting Deputy Regional Director, 32125 32nd Avenue South, Federal Way, WA 98001.

Full consideration will be given to any timely reply you will receive a written decision on this proposal as soon as possible after your reply is received. In the event that you elect not to reply, a decision will be made on the evidence now available and a letter containing that decision will be issued to you. During this notice period any unauthorized absence will continue to be documented as absent without leave (AWOL).

You are also advised of the Employee Assistance Program (EAP), which is free and confidential, and may be able to assist you with any personal problems that you may be experiencing. You may schedule an appointment with EAP by calling (800) 222-0364.

If you have any questions regarding your rights or other procedures contained in this notice, contact a Labor and Employee Relations Specialist at the Administrative Center Laguna at (949) 360-3060.

Please sign the receipt acknowledgement copy of this letter as evidence that you have received it. Your signature does not mean that you agree or disagree with its contents, and by signing, you do not forfeit any of your rights cited above.

Tamra A. Hirano
Chief, Mission Support

Enclosures:
Acknowledgement of Receipt
Designation of Representative Form
Supporting Documentation

cc: Field File
ICE E&LR

ACKNOWLEDGMENT OF RECEIPT

Please sign this acknowledgment as evidence that you have received the cited letter. Your signature does not mean that you agree or disagree with its contents, and by signing, you do not forfeit any of the rights cited above. Your acknowledgement of receipt should be returned to the bearer of this notice.

I acknowledge receipt of the ________ Letter Proposing / Deciding corrective action.
*(date)* *(circle one)*

Employee's signature: ______________________________ Date: ____________

Witness/Bearer's signature: __________________________ Date: ____________

Enclosures: Copies of the material relied upon to propose the action
Copies of any cited policies, procedures, directives, etc.
Designation of Representative Form

cc: Field File
Employee
ICE E&LR

# DESIGNATION OF REPRESENTATIVE
# AND AUTHORIZATION TO RELEASE INFORMATION

I, ______________________ designate, ______________________, as my representative for the pending matter concerning ______________________. As my representative, (s)he is entitled and authorized to receive copies and or review all correspondence, documents and materials related to my case concerning ______________________.

The address/telephone number(s)/fax number of my representative is:

______________________

______________________

______________________

______________________

______________________

______________________

______________________ Signature of Employee

______________________ Date

Printed / Typed Name of Employee: ______________________

cc: Field File
ICE E&LR

## 11. Notice of Removal (March 5, 2007)

*Federal Protective Service*
U.S. Department of Homeland Security
32125 32nd Ave. S.
Federal Way, WA 98001

**U.S. Immigration and Customs Enforcement**

March 5, 2007

James W. Scott
Criminal Investigator
Schwartz Federal Building/Courthouse
880 Front Street #1267
San Diego, CA 92101

Mr. Scott:

By letter, dated January 25, 2007, which you received via hand delivery on January 31, 2007, you were notified of a proposal to remove you from Federal Service. The proposal was based on the following reason:

**REASON: FAILURE TO COMPLY WITH A DIRECT ORDER**

You were supplied with copies of the documentation relied upon to support the proposed action and afforded opportunities to provide replies both orally and/or in writing. You submitted a written response on February 8, 2007. Following thorough review of the contents of the case file, including your written response, I have concluded that the cited misconduct was proven, thus I am sustaining both specifications of this charge.

In determining the appropriate penalty, I have carefully considered the reasons for the proposed action and the nature and seriousness of your offense in relation to your duties, position, and responsibilities, in addition to your work record. I have also considered that the charge against you is very serious especially since your refusal to comply with the direct orders results in your inability to perform your duties as a Criminal Investigator. Your conduct, which is held to a higher standard by virtue of your position as a law enforcement officer, directly conflicts with the high degree of trust and responsibility your position requires.

Therefore, after giving full and impartial consideration to the circumstances surrounding the proposed action your responses to the proposal letter, and weighing your actions against the Douglas Factors, it is my decision that the reason stated in the proposal is supported by the record and warrants your removal to promote the efficiency of the Service. Accordingly, you will be separated from your position with the Service effective March 5, 2007.

You have the right to contest this action through one of the avenues outlined below. You may select only one avenue and your election will be considered final on the date any appeal, dispute, or complaint is filed.

1. You may file a grievance as provided by practice per Article 48 of the National Agreement between the National Immigration and Naturalization Service and the National Immigration and Naturalization Service Council.

2. As an alternative to the above procedure, you have the right to file an appeal of this action with the Merit Systems Protection Board (MSPB) within thirty (30) calendar days of the effective date of the action, or thirty (30) days after the receipt of this letter, whichever is later. Attached are copies of the MSPB regulations and appeal form. If you decide to appeal to MSPB, you may file your appeal by mail, by facsimile at (415) 705-2945, by commercial overnight delivery, or personal delivery to the Regional Director, Merit Systems Protection Board, 250 Montgomery Street, Suite 400, 4th Floor, San Francisco, CA 94104. You must submit two copies of both your appeal and all attachments. You may also prepare and file an appeal electronically at sanfrancisco@mspb.gov. You should advise the regional MSPB office at which you file that the following U.S. Immigration & Customs Enforcement official is the person designated to receive the Board's acknowledgement orders and appeals: Ms. Joan Slous, Deputy Chief, Customs and Administrative Law Division, Office of Principal Legal Advisor, 425 I Street, N.W., Rm 6100, Washington DC 20536, telephone: (202) 616-7969; fax: (202) 514-0455.

3. If you feel this action is motivated by discrimination based on race, color, sex, religion, national origin, age, disability, and/or because of participation in the Equal Employment Opportunity (EEO) process, you may include this allegation when appealing to the MSPB or you may initiate a discrimination complaint by seeking pre-complaint counseling from your local EEO Counselor or EEO Officer within 45 days of the effective date of this action.

If you have any questions regarding your rights or other procedures contained in this notice, contact an Employee and Labor Relations Specialist in Laguna Niguel, CA at (949) 360-3060.

Please sign the receipt acknowledgment copy of this letter as evidence that you have received it. Your signature does not mean that you agree or disagree with its contents, and by signing, you do not forfeit any of your rights cited above.

S C Slagowski

Steven Slagowski
Acting Deputy Regional Director

**Enclosures: Acknowledgement of Receipt**
**MSPB Forms**

cc: **Field File**
**ICE, E&LR**

DEF_03312

## 12. Montano Letter Scheduling Incumbent Exam (October 26, 2005)

Department of Homeland Security
ICE, Federal Protective Service
450 Golden Gate Avenue
5th Floor - Room 5474
San Francisco, CA 94102

October 26, 2005

Memo For John W. Scott, Jr.

Through: Ruben Ballestros

Subject: Pre-Medical Appointment Information

You have been scheduled for your incumbent medical and eye exam on Nov. 11, 2005, at 8:00AM. The facility address is:

US Healthworks
3930 Fourth Ave., Suite 200
San Diego, CA 92103
(T) 619-297-9610

Please arrive at the medical facility at least 15 minutes earlier than your scheduled time so that you may complete a medical questionnaire they will provide you.

** It is required that you 'fast' for at least 12 hours before hand due to required blood tests. If you need to take any medication you may do so, but meds and water is all that's allowed.

The facility may give you a TB test. If they do not tell you, let me advise you that you will need to return two days AFTER the test, to have your arm checked. Please ask them, if they don't tell you.

**FPS get charged a 'No-Show' fee if you do NOT show up.** If you need to change the time, please call them yourself and reschedule it. The telephone number is on the slip that I have given or will be giving you. Please let me know either by e-mail or telephone that you made a change and give me the new information.

Please take the Exam Request slip with you when you go for your appointment.
All medical information is confidential.

Please feel free to call me on 415-522-3443 or e-mail me if you have any questions.

Martha

Martha J. Montano
Personnel Security Specialist / RMC
**E-mail: Martha.Montano@dhs.gov**

Attachment

cc: JP Morgan
Via FAX 213 894 1419 (16:10 PDT) 10/26/05

3 pgs w/ txt

U.S. Department of Homeland Security
450 Golden Gate Avenue
San Francisco, CA 94102

**U.S. Immigration and Customs Enforcement**

Federal Protective Service

# Facsimile Transmission

Date 10/26/05, 20__

To: Ruben Ballestros

Fax: ( ) 213 894 1419

From: Martha Montano

Phone: (415) 522-3443

☐ Urgent ☐ Action ☐ Concurrence ☐ FYI

Number of pages including cover:

Comments:

Ruben:
J. Hartman told me to give this to you, since you'll be Acting next.
If you want to give this to him personally here's the "Pee" info also.
My email isn't working so I had to retype this on plain paper for him.
I haven't given this to Bill; it'll be up to you to advise him. (Per JP)

ICE-05-W391-ROI-000475

CHS
Comprehensive Health Services
INCORPORATED™

# Office of Federal Protective Service

## EXAMINATION REQUEST FORM

| Requested: | By: | Phone: | Fax: | Client Services Administrator: |
|---|---|---|---|---|
| 10/25/05 3:02PM | Martha Montano | 415-522-3443 | 415-522-3218 | Dara Rivera |

## APPLICANT

| Name: | SSN: | Sex: | Date of Birth: |
|---|---|---|---|
| Scott, James W. | | Male | 11/20/1954 |
| **Address:** | **Home Phone:** | **Work Phone:** | **Mobile Phone:** |
| 3251 Loma Riviera Drive<br>San Diego, CA 92110 | (619) 224-9662 | | (619) 954-6055 |
| | **Email:** | | |
| | James.W.Scott@dhs.gov | | |

## INSTRUCTIONS

Special Instructions: Please give us at least ten days prior appt date. Not avail: Friday Nov 11th.
Position: Criminal Investigator
Applicant Available Dates: See Above

## EXAMINATION

| Exam Type: | Region: | Purchase Order No: | P.O. No. Extension: |
|---|---|---|---|
| Incumbent Exam Age 45 and Older | 9 | PO930001 | 0125K91561 |

Please have applicant / officer fast 12 hours prior to appointment due to required blood work. Thank you.

## FACILITY

| Name: | Code: | Phone: | Appointment: |
|---|---|---|---|
| U.S. Healthworks | CA-438 | (619) 297-9610 | |
| **Address:** | **Contact:** | | |
| 3930 Fourth Avenue<br>Suite # 200<br>San Diego, CA 92103 | Appt. Desk | | |

Appt: 11/9/05
@ 8:00 AM
By: Robin

**EXAMINATION DETERMINATION - COMPLETED BY CHS**

Notified By ____ Month / Day / Year

10/26 Told JP Morgan & Hartman (Call Ruben)
LFt msg for Ballestras (14:40P)
Will FAX Slips to RB

Comprehensive Health Services, Inc.
8229 Boone Boulevard - Suite 700
Vienna, Virginia 22182-2623
TEL (800) 638-8083 - FAX (703) 760-0894

Department of Homeland Security
ICE, Federal Protective Service
450 Golden Gate Avenue
5th Floor - Room 5474
San Francisco, CA 94102

October 26, 2005

Memo For John W. Scott, Jr.

Through: Ruben Ballestros

From: Martha J. Montano

Subject: Pre-Medical Appointment Information

You have been scheduled for your incumbent medical and eye exam on Nov. 11, 2005, at 8:00AM. The facility address is:

US Healthworks
3930 Fourth Ave., Suite 200
San Diego, CA 92103
(T) 619-297-9610

Please arrive at the medical facility at least 15 minutes earlier than your scheduled time so that you may complete a medical questionnaire they will provide you.

** It is required that you 'fast' for at least 12 hours before hand due to required blood tests. If you need to take any medication you may do so, but meds and water is all that's allowed.

The facility may give
you a TB test. If they do not tell you, let me advise you that you will need to return two days AFTER the test, to have your arm checked. Please ask them, if they don't tell you.

**FPS get charged a 'No-Show' fee if you do NOT show up.** If you need to change the time, please call them yourself and reschedule it. The telephone number is on the slip that I have given or will be giving you. Please let me know either by e-mail or telephone that you made a change and give me the new information.

Please take the Exam Request slip with you when you go for your appointment.
All medical information is confidential.

Please feel free to call me on 415-522-3443 or e-mail me if you have any questions.

Martha J. Montano
Personnel Security Specialist / RMC
**E-mail: Martha.Montano@dhs.gov**

Attachment

## 13. Transcript portions of the Deposition of Martha Montano (July 16, 2009)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

_ _ _

JAMES SCOTT, )
)
Plaintiff, )No. 08-CV-0735-BTM (JMA)
)
vs. )
)
JANET NAPOLITANO, SECRETARY, )
DEPARTMENT OF HOMELAND SECURITY, )
)
Defendants. )
________________________________________)

DEPOSITION OF MARTHA MONTANO
taken at the U. S. Attorney's Office
located at 450 Golden Gate Avenue - 9th Floor
San Francisco, California
Thursday, July 16, 2009

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California 91203
(818)551-7300

REPORTED BY: MARGARET "MARGO" GURULE, CSR No. 12976

FILE NO.: A3057F2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

_ _ _

| | |
|---|---|
| JAMES SCOTT, | ) |
| | ) |
| Plaintiff, | )No. 08-CV-0735-BTM (JMA) |
| | ) |
| vs. | ) |
| | ) |
| JANET NAPOLITANO, SECRETARY, | ) |
| DEPARTMENT OF HOMELAND SECURITY, | ) |
| | ) |
| Defendants. | ) |
| ___________________________________ | ) |

Deposition of Martha Montano, taken on behalf of Plaintiff, at the U.S. Attorney's Office, 450 Golden Gate Avenue, San Francisco, California, 94102, on Thursday, July 16, 2009, commencing at 9:24 a.m., before Margaret "Margo" Gurule, CSR No. 12976.

A P P E A R A N C E S

For the Plaintiff:

LAW OFFICES OF MATTHEW G. ENGLISH
7676 Hazard Center Drive - Suite 500
San Diego, CA 92108
(619)725-2725
BY: MATTHEW G. ENGLISH, ESQ.

For the Defendants:

U. S. ATTORNEY'S OFFICE
880 Front Street - Room 6293
San Diego, CA 92102
(619)557-5610
BY: TIMOTHY STUTLER, ESQ.

Appearing Telephonically:

IMMIGRATION AND CUSTOMS ENFORCEMENT
Labor Employment Law Division
Associate Legal Counsel
185 West F Street - Suite 600
San Diego, California 92101
(619)550-5199
BY: MICHELE KENNEY, ESQ.

MARTHA MONTANO

called as a witness for the Plaintiff herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ENGLISH:

Q. Good morning. Could you please state and spell your full name for the record.

A. Martha Jane Montano, M-O-N-T-A-N-O.

Q. And where is the day and location of your birth?

A. My date of birth is September 12, 1955. I was born in the State of New Mexico.

Q. Ms. Montano, my name is Matthew English. I am counsel for James Scott in the matter that brings you to deposition here today.

Have you ever had your deposition taken before?

A. Yes, once.

Q. How long ago was that?

A. A couple of years ago.

Q. And what was that -- what type of matter, what brought you to deposition?

A. A similar situation.

Q. Work related?

A. Yes.

Q. Involving the removal of an employee?

A. He was appealing his being medically examined by the

A. Department of Homeland Security, Federal Protective Service.
Q. And what is your present job title?
A. I'm a personnel security specialist.
Q. How long have you been employed by the Federal Protective Service, FPS?
A. Since June 1996.
Q. How long have you held the present job title of personnel security specialist with FPS?
A. December '98.
Q. And prior to serving as a personnel security specialist for FPS, what job title did you hold?
A. I was an administrative officer.
Q. And how long did you hold the position of administrative officer?
A. Several years.
Q. Did have you held any other job titles with FPS other than personnel security specialist or administrative officer?
A. I'm an adjudicator.
Q. What was the position that you first held when you joined FPS in 1996?
A. Security specialist.
Q. How long did you hold the position of security specialist after joining FPS in 1996?
A. A little over two years.

Q. And what was the next job title that you held?
A. I stayed with personnel security specialist, but I was just doing different tasks.
Q. Was there a time period when you held a separate title of administrative officer, apart from either being a personnel security specialist or a security specialist?
A. I was an administrative officer before I entered Federal Protective Service.
Q. Oh, I see. But the first position that you held with FPS was security specialist which you held for approximately two years; is that correct?
A. It was a little over two years, correct.
Q. And then after that, you became a personnel security specialist, which is the job title that you hold today; is that correct?
A. Yes.
Q. When you served as an administrative officer, where were you employed?
A. With another division of GSA.
Q. What division was that?
A. The Office of Information -- OIS, Office of Information Security.
Q. Did FPS transition from being part of GSA to becoming part of Homeland Security during the time when you were employed with FPS?

A. Yes.
Q. Do you recall when that was?
A. I think officially 2003.
Q. Could you give me a brief overview of your job duties as a personnel security specialist for Federal Protective Service?
A. Today?
Q. Yeah, as you currently hold the position.
A. I work in the contract suitability program under threat management branch. I was reassigned in December 2007 as an adjudicator to review -- do a limited criminal history check on the contract employees that work on GSA contracts for the government.
Q. And I'm sorry, you gave me a date that you were reassigned to that. When was that?
A. That I transferred -- when I transferred into threat management, it was December 2007.
MR. ENGLISH: Hang on just a second. We're going to go off the record for just a minute.
MR. STUTLER: We were just talking about the exhibits. My assistant came in that she faxed up there, so we're trying to figure out if they're in transit or what. But go can we go off the record?
MR. ENGLISH: We're off the record.
(A brief recess was taken.)

MR. STUTLER: They're on their way.
THE WITNESS: Okay. Thank you.
BY MR. ENGLISH:
Q. Okay. We're back on the record. Ms. Montano, we may go off the record periodically for breaks or for other administrative details.
Do you understand that you are still testifying under the oath that you swore to at the beginning of this deposition even though you have not been resworn in after we're back on the record?
A. Yes.
Q. And just before we went off the record, you told me that your reassignment to handling these or to working on the contract suitability program in the threat management branch was in December of 2007, correct?
A. Yes.
Q. And prior to that point, what were you doing as a personnel security specialist for FPS?
A. I was the medical coordinator for Federal Protective Service when the medical program expanded into the full -- into the full-blown program that it was, that's pretty much what I mainly did was just the medical coordinator work.
Q. Have you -- could that also be referred to as a regional medical coordinator?
A. Yes.

Q. And you were servicing Region 9; is that correct?
A. Yes.
Q. If I understand your testimony, the job duties associated with being regional medical coordinator occupied a majority of your time or at least a certain period of time since you have worked for FPS, correct?
A. Yes.
Q. What was the approximate time frame or the time span when your duties as regional medical coordinator for Region 9 occupied the majority of your job duties for the agency?
A. I would say around 2000, 2001.
Q. Until how long?
A. Until December 2007 when I was reassigned to the threat management branch.
Q. Are you aware of a specific reason why you were reassigned to the threat management branch?
A. The quantity of work as a medical coordinator had drastically decreased, so -- as well as a personnel shortage in the contract suitability program. And since I had done that before, they just reassigned me back into doing it.
Q. Generally speaking, are you aware of a specific reason or reasons that the quantity of work as a medical coordinator diminished prior to your transfer?
MR. STUTLER: Objection, no foundation of personal knowledge. But go ahead.

THE WITNESS: The agency had suspended doing the periodic examinations on the law enforcement officers, so they -- they weren't doing them anymore, so the quantity of work decreased.

BY MR. ENGLISH:

Q. How did -- how do you know or how did you become aware that the agency suspended the periodic medical exams?

A. They had sent us an e-mail advising us that they were -- the periodics were ceasing.

Q. And when you say "they," who are you referring to?

A. Our FPS head Washington, D.C., office.

Q. Do you recall who specifically in the Washington, D.C., office sent you an e-mail suspending the periodic medical examinations?

A. No.

Q. Do you recall when you received an e-mail or notification that FPS was suspending periodic medical examinations?

A. In 2006.

Q. When you're referring to the Washington, D.C., office, that is also commonly known as FPS headquarters?

A. Yes.

Q. Or "Headquarters"? I'm sorry?

A. Yes.

Q. Do you have any knowledge as to why headquarters

MR. STUTLER: Just keep those in the same order we've got them in order here, so it will help us track them a little better.

THE WITNESS: Yes. Okay.

MR. ENGLISH: Okay. We're back on the record.

Q. Did you have any understanding as to why FPS suspended the periodic medical examination program?

A. There's too many problems with it.

Q. Too many problems? How do you know that?

A. How do I know that? Because I get --

Q. Well, let me stop you because the question wasn't particularly precise. There's actually two parts to that. Number one, how do you know that there were too many problems with the periodic medical examination program?

A. Because the other -- like our, the GSA human resources director, they were handling -- they were handling problems. FPS, when -- I don't know the jurisdiction of it. FPS then began handling the problems with it. Employees were constantly going to court, grieving it. I mean, it's problems.

Q. Okay. And generally speaking, how is it that you know that GSA human resources director was handling problems and FPS had problems and there were frequent grievances? How is it that you have that knowledge? How do you know that?

A. Because with my being the medical coordinator, I would have to clarify things for the -- for HR.

Q. You were in the middle of it?
A. Yeah. Yes.
Q. All right. The second part of the how-do-you-know question I started with a moment ago is: How do you know that that was the reason that FPS discontinued the periodic medical examination program?
A. I think in conversation with FPS employees, that was pretty much the consensus of it.
Q. And when you say "consensus," do you mean that people were standing around the water cooler speculating as to what the reasons were, or something else?
A. Well, not necessarily standing around the water cooler, but I mean, all the regions were having problems. It wasn't just this region.
Q. Did you have occasion to talk with the regional medical coordinator from other regions from time to time?
A. We would have teleconferences. Susan Spannbauer, who was the, I guess the program leader out of Washington, DC she would have period -- teleconferences periodically to clarify issues or to go over changes with the medical program. And if we had problems or issues, we'd have, you know, the chance to discuss them.
Q. And so the problems that other regions were having would come up in these periodic teleconferences that you would have with -- or led by Susan Spannbauer or otherwise?

A. Yeah. Yes.
Q. Did you ever hear Susan Spannbauer say why the periodic medical examination program was being discontinued?
A. I think she just says that they were, you know, going to put a hold on it, and -- but it wasn't clear whether it was going to be temporary or permanent.
Q. And this was in 2006 that FPS put a hold on the periodic medical examination program?
A. Yes.
Q. Do you recall what part of the year?
A. June or July.
Q. And as of December 2007, when you your job responsibilities shifted to the threat management branch, had the periodic medical examination program been put back into effect?
A. The examinations, it's just the quantity of them started decreasing.
Q. Well, I understand you to say that you received notice from FPS headquarters in D.C. in June or July of 2006 that they were suspending the periodic medical examination program; is that correct?
A. The incumbent portion of it, not the whole medical program. There still were other types of medical examinations that were being done, fitness for duties, new hires, closing out examinations on employees that had, you know, transpired

REPORTER'S CERTIFICATE

I, MARGARET GURULE, No. 12976, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That the statements made at the time of the proceedings were recorded stenographically by me and were thereinafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

DATED: August 12, 2009

___________________________________

MARGARET GURULE, C.S.R. No. 12976

REPORTER'S CERTIFICATION OF CERTIFIED COPY

I, MARGARET "MARGO" GURULE, CSR No. 12976, a Certified Shorthand Reporter in the State of California, certify that the foregoing pages ________through________, constitute a true and correct copy of the original deposition of MARTHA MONTANO, taken on July 16, 2009. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this 12th day of August 2009.

___________________________
MARGARET "MARGO" GURULE

## 14. Transcript portions of the Deposition of John Hartman (July 23, 2009)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

_ _ _

| | |
|---|---|
| JAMES SCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>JANET NAPOLITANO, SECRETARY,<br>DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | No. 08-CV-0735-BTM (JMA) |

DEPOSITION OF JOHN HARTMAN
taken at Premier Business Center
located at 101 California Street - Suite 2450
San Francisco, California
Thursday, July 23, 2009

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California 91203
(818)551-7300

REPORTED BY: MARGARET "MARGO" GURULE, CSR No. 12976

FILE NO.: A306676

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

_ _ _

| | |
|---|---|
| JAMES SCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>JANET NAPOLITANO, SECRETARY, DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | No. 08-CV-0735-BTM (JMA) |

Deposition of John Hartman, taken on behalf of Plaintiff, at Premier Business Center, 101 California Street, Suite 2450, San Francisco, California, 94111, on Thursday, July 23, 2009, commencing at 9:27 a.m., before Margaret "Margo" Gurule, CSR No. 12976.

A P P E A R A N C E S

For the Plaintiff:

LAW OFFICES OF MATTHEW G. ENGLISH
7676 Hazard Center Drive - Suite 500
San Diego, CA 92108
(619)725-2725
BY: MATTHEW G. ENGLISH, ESQ.

For the Defendants:

U. S. ATTORNEY'S OFFICE
880 Front Street - Room 6293
San Diego, CA 92102
(619)557-5610
BY: TIMOTHY STUTLER, ESQ.

Appearing Telephonically:

IMMIGRATION AND CUSTOMS ENFORCEMENT
Labor Employment Law Division
Associate Legal Counsel
185 West F Street - Suite 600
San Diego, California 92101
(619)550-5199
BY: MICHELE KENNEY, ESQ.

JOHN HARTMAN

called as a witness for the Plaintiff herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. ENGLISH:

Q. Good morning.

A. Good morning.

Q. We met just a moment ago off the record, but allow me to introduce myself again on the record.

My name is Matthew English. I'm counsel for James Scott, the plaintiff, in the litigation that brings you here to deposition today.

Could you please state and spell your full name for the record.

A. John Hartman. First is John, J-O-H-N. Last Hartman, H-A-R-T-M-A-N.

Q. And what's your date of birth?

A. 03/31/65.

Q. And where were you born?

A. Fremont, California.

Q. Mr. Hartman, have you ever had your deposition taken before?

A. Yes.

Q. How many times?

A. Half a dozen.

it having been refreshed and a recollection that you have as a result of being reminded from viewing documents. And both are valid, but it's importance to make a distinction. So to the extent that you do refer to a document, let's just make sure that we're clear on the record that what your recollection is without having looking at the document and what it is otherwise. I have some documents here, as well, and we will talk about those as we go along. Okay?

A. Yes.

Q. Did you speak to anyone in preparation for your deposition here today?

A. No.

Q. Are you presently employed?

A. Yes.

Q. What's the name of your present employer?

A. U.S. Department of Treasury.

Q. Are you in a particular branch or a subset of the treasury?

A. The inspector general's office.

Q. And what is current job title?

A. Special agent.

Q. And how long have you held the position of Special Agent for the Office of Inspector General with the Department of Treasury?

A. Since November 26, 2007.

Q. Have you held any other job titles with the Department of Treasury other than special agent?
A. No.
Q. And prior to being employed as a special agent with the Department of Treasury, where were you employed?
A. I was employed with the Department of Homeland Security, Federal Protective Service.
Q. What was your last job title you held with the Federal Protective Service?
A. Supervisory special agent.
Q. Was that in a specific region?
A. In Region 9.
Q. And how long did you hold the job title of supervisory special agent, Region 9?
A. Since, I believe, February of 2006.
Q. Until November 2007?
A. Correct.
Q. Prior to holding the job title of supervisory special agent -- well, strike that.
Did you hold any other job titles during your employment with the Federal Protective Service?
A. For a period of time in March 2005, I was detailed as a supervisor special agent for a period of time. Prior to that, I was a special agent since 1993. And from '91 to '93, I was a patrolman with the Federal Protective Service.

Q. Where were you stationed as a patrolman?
A. San Francisco Region 9.
Q. So you started with the Federal Protective Service as a patrolman in 1991?
A. That's correct.
Q. And then in 1993, you became a special agent?
A. Yes.
Q. And you held the position of special agent until 2006, with the exception of one period of time where you were detailed into another job?
A. I was detailed as a supervisory special agent for a period of time in March 2005. I don't recall how many days. While working for the Federal Protective Service, I was also assigned to the Federal Bureau of Investigation for nine years, ending in 2006.
Q. So how did you have -- during that period of time when you were with -- the FBI, you said, correct?
A. Yes.
Q. During the period of time that you were working with the FBI, did you have a dual role? Were you both a special agent with FPS and working with the FBI?
A. Yes.
Q. Did you have an FBI job title or --
A. I was a task force agent with the joint terrorism task force working with both domestic and international

terrorism.

Q. And you were detailed as a supervisory special agent or acting supervisory special agent -- or is that --

A. Correct.

Q. -- in March 2005?

A. Yes.

Q. Was that -- you said something about you weren't sure how many days. Was it just in March or was it --

A. It was -- I believe it went past March. I don't recall the term.

Q. Generally speaking, do you think it was -- it was less than a year, I gather?

A. Yes.

Q. Sixty days, 90 days or less than that?

A. Possibly 120. It may have been 90.

Q. How many years in federal law enforcement have you been working, total?

A. Since February of 1990.

Q. And what position did you hold from 1990 to 1991?

A. I was a patrolman with the Department of Treasury.

Q. Can you give me just a brief summary overview of your present job duties as a special agent at the Office of Inspector General for the Department of Treasury?

A. I investigate cases involves waste fraud and abuse within the Department of Treasury. The majority of those cases

involve the IRS internal affairs cases, and I also work cases external to the Department of Treasury as they involve the use of the treasury, for example, in a lottery scheme using the treasury involved in such a scheme.

MR. STUTLER: Did you say "lottery"?

THE WITNESS: Yeah.

BY MR. ENGLISH:

Q. How would the -- not with any specific reference to a case, but how would a lottery scheme implicate the treasury or get involved with the treasury?

A. Well, if a citizen receives a call from an unknown individual who purports to be from the IRS or from a lottery official, purported lottery official says that you have won money, and in order to collect that money, you'll have to pay the federal taxes, and therefore completing the scheme.

Q. And then with regard to the waste fraud and abuse cases, you indicated the majority of which involved the IRS did, you also refer to that as internal investigations?

A. Some would call it internal affairs.

Q. And is it specific to the Department of Treasury itself or within the government broader?

A. With the Department of Treasury. Every agency has its own Inspector General's office, Homeland Security, Social Security Administration. Each agency has its own Internal Affairs, example -- internal -- Inspector General's office.

Q. And when you're saying "internal affairs," you're using the phrase colloquially or --

A. Colloquially, yes.

Q. Okay. Going back to the time that you served as a special agent for the Federal Protective Service, can you give me a brief description of your job duties as a special agent, both as a special agent alone and with regard to your role with the joint terrorism task force?

A. As a special agent alone with the federal protective service, the job duties included investigating general crimes as they related to federal property and federal employees. For example, if a federal employee is threatened based on their duties as a federal employee, we would investigate that. Or if somebody caused a disturbance or assaulted an employee on federal property, we would investigate that.

The duties involved a wide range of crimes from petty theft to rape, robbery, homicide, such as a local police department but in a narrower scale as it pertains to federal property and employees.

Q. Did your job responsibilities and obligations include the authority to arrest people?

A. Yes.

Q. Let me back up just a second. Is the Department of Treasury, is that a GS job classification?

A. Yes, it's the same job classification. I'm in the

same job classification now with the Department of Treasury as I was as a supervisory special agent with the Department of Homeland Security.

Q. Is that an 1811 position?

A. Yes.

Q. And GS-13?

A. Yes.

Q. And were you a GS-1811-12 as a special agent?

A. Yes, for the Department of Homeland Security.

Q. When FPS was part of the General Services Administration, was there a different classification?

A. No, it was the same.

Q. Okay.

A. When I became a supervisor, then I became a GS-13. And when I transferred to the Treasury Department, nothing changed. It was the same salary and benefits. In fact, it was the same USD organization that cuts my check, nothing changed.

Q. When you became part of the joint terrorism task force in 1997, did you retain the duties that you just described a moment ago about investigating general crimes as they relate to federal property and employees?

A. The duties changed in the respect that my duties or job description expanded to the extent that the Department of Homeland Security and the FBI signed a joint MOU or Memorandum of Understanding where I would investigate crimes related to

terrorism, whether domestic or international. And I would try to pull those cases that were similar in nature to threats against federal property or employees such as bomb threats or terroristic threats to federal employees or federal property.

Q. And during the time that you were first special agent with FPS in 1993, were stationed here in San Francisco?

A. Yes.

Q. When you indicate that your responsibilities were expanded to include investigation of terrorism, both domestic and internal, did that require a change in your duty station or --

A. Yes.

Q. Where did you go to?

A. At first I was assigned to the FBI office in San Francisco for a period of two years, and subsequently the task force moved to the Oakland FBI office for the remainder of the term.

Q. I see. And when you -- when you refer to international terrorism, terrorism not on U.S. soil, is that what that meant, or terrorism where the source of the illegal act or conduct is coming from outside the United States?

A. Well, the distinction between the two, domestic terrorism, would relate to terrorism as it exists domestically within country, within the United States, such as right-wing groups militia groups. For example, the Timothy McVays.

International terrorism is the squad that I worked on. I worked on international terrorism overseas and I would try to direct my focus on anything that could potentially be a threat to domestic federal facilities or federal employees.

Q. I see.

A. But it wasn't always the case. And on some occasions, I would work cases involving international terrorism proper to the FBI.

Q. Do you recall the circumstances surrounding your first placement in the detail as acting supervisory special agent in March 2005?

A. Well, I was stationed in Oakland, away from the Federal Protective Service, and I had some interaction with the regional office but very little. I was asked by regional management to work in an acting position during the transition of various managers within the Federal Protective Service.

Q. Do you recall specifically who in regional management for FPS asked you to step into the role as acting supervisory special agent?

A. I don't want to guess. I don't recall who specifically.

Q. Do you recall maybe the position or job title? Was it the threat management branch chief or the assistant regional director or the regional director or if it was --

A. It seemed, at the time, that there was a lot of

turmoil in the regional office and positions were changing almost on a weekly if not monthly basis. It was difficult to remember who was in what position at any given time without looking at the documents such as a form 50 to recollect -- to refresh my memory.

Q. You do have a recollection that the request for you to become a detailed supervisory special agent came from regional management as opposed to, for example, headquarters in DC, for example?

A. Yes, it was formational management.

Q. Do you have an understanding of what the circumstances were that gave rise to what you described as "turmoil in the regional office"?

MR. STUTLER: Objection to the extent it calls for speculation. You can answer.

THE WITNESS: I can't specifically recall the prevents that led up to me becoming an acting supervisory special agent without looking at documents or e-mails to refresh my memory in that respect.

BY MR. ENGLISH:

Q. Sure. But when I was asking you about who might have been the specific person or the job title that had made the request and you told me you couldn't recall, you described that people were assuming positions, there was a lot of turnover or people assuming different roles, something along those lines?

A. The first time was at or near March in 19 -- in 2005, as an acting supervisory special agent, and subsequently 2006 as a supervisory special agent.

Q. Prior to those time periods you just referred to in March 2005 and the year 2006, did you have an opportunity to observe Special Agent Scott in the execution of his duties?

A. Yes.

Q. What type of occasions?

A. During significant events, protests, on large-scale events when we were -- when I was deployed to Southern California. I had the opportunity to interact with Agent Scott during enforcement operations as they relate to protests or gathering intelligence related to those events.

Q. Prior to the -- your taking over in a supervisorial capacity, prior to your becoming Special Agent Scott's supervisor in March 2005, had you had had the occasion to form an opinion about the -- or an assessment about the quality of Special Agent Scott's work?

MR. STUTLER: Objection, calls for an inadmissible opinion.

THE WITNESS: My opinion of Special Agent Scott was that he was extremely professional; as honest as anybody that I have ever worked with in law enforcement; never had any unkind thing to say about another one of his peers. Agent Scott was all business, all the time.

BY MR. ENGLISH:
Q. And this assessment that you're describing, is this over the entire course of the periods that you worked with Special Agent Scott or was it again -- were you of that opinion prior to becoming a supervisory, or had you formed an opinion prior to becoming his supervisor in March 2005?
A. Prior to and during the course of the time period that I was his supervisor, I had the same opinion. Agent Scott was always professional. I never -- there was -- I never had any questions concerning his character. His performance with the joint Terrorism Task Force was stellar according to managers and employees that worked with him.
Q. Did you work on the joint terrorism task force at the same time as Special Agent Scott, if you know?
A. I don't recall. Keep in mind that the Joint Terrorism Task Forces are separate according to region. I mean, we didn't participate on the same one.
Q. Oh, I see.
A. He would have participated -- each city, in their respective locations with the FBI, have their own joint Terrorism Task Force with local and federal entities based in those areas.
Q. So, for example, if you both worked in Region 9 at FPS, that analogy doesn't translate to the work with the JTTF -- in other words, they weren't -- you weren't part of

Region 9 JTTF?

A. No, no. They're only indicative to the FBI. And if FBI in San Diego or Los Angeles were doing something, we would not have any knowledge of it.

Q. Did you have -- did you ever form an assessment as to the relative quality of Special Agent Scott's skillset as an investigator?

MR. STUTLER: Objection, calls for an inadmissible opinion.

THE WITNESS: At what time period?

BY MR. ENGLISH:

Q. At any time period.

A. My opinion of Special Agent Scott and my knowledge of Special Agent Scott's work product was stellar. His ability to gather intelligence information from subversive groups, to gather information from various agencies associated with the FBI's Joint Terrorism Task Force were top notch.

He could go into a crowd of 100,000 protestors and come out with information related to activities that helped the agency divert resources to an area that we knew would need protection at a later time.

Q. Did you consider Special Agent Scott to be an asset to the Federal Protective Service?

A. Yes.

Q. Around the time that you became Special Agent

REPORTER'S CERTIFICATE

I, MARGARET GURULE, No. 12976, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That the statements made at the time of the proceedings were recorded stenographically by me and were thereinafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

DATED: July 30, 2009

___________________________________

MARGARET GURULE, C.S.R. No. 12976

REPORTER'S CERTIFICATION OF CERTIFIED COPY

I, MARGARET "MARGO" GURULE, CSR No. 12976, a Certified Shorthand Reporter in the State of California, certify that the foregoing pages ________through________, constitute a true and correct copy of the original deposition of JOHN HARTMAN, taken on July 23, 2009. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this 30th day of July 2009.

___________________________
MARGARET "MARGO" GURULE

**15. Transcript portions of the Deposition of Lawrence Saladino, M.D.**
**(July 29, 2009)**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

\- - -

JAMES SCOTT, )
)
Plaintiff, )
)
vs. ) No. 08-CV-0735-BTM (JMA)
)
JANET NAPOLITANO, SECRETARY, ) VOLUME I
DEPARTMENT OF HOMELAND SECURITY,)
)
Defendants. )
________________________________)

DEPOSITION OF

LAWRENCE P. SALADINO, M.D.

SAN DIEGO, CALIFORNIA

JULY 28, 2009

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

Reported By: Rebecca Lynn Martin, CSR 6308
File No.: A305FCE

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

- - -

```
JAMES SCOTT,                       )
                                   )
              Plaintiff,           )
                                   )
vs.                                ) No. 08-CV-0735-BTM (JMA)
                                   )
JANET NAPOLITANO, SECRETARY,       )     VOLUME I
DEPARTMENT OF HOMELAND SECURITY,   )
                                   )
              Defendants.          )
___________________________________)
```

Deposition of LAWRENCE P. SALADINO, M.D., taken on behalf of Plaintiff, at 101 West Broadway, 15th Floor, San Diego, California, commencing at 10:15 a.m., Tuesday, July 28, 2009, before Rebecca Lynn Martin, CSR 6308.

A P P E A R A N C E S

For Plaintiff:

LAW OFFICES OF MATTHEW G. ENGLISH
BY: MATTHEW G. ENGLISH
7676 Hazard Center Drive, Suite 500
San Diego, California 92108
(619) 725-2725

For Defendants:

UNITED STATES DEPARTMENT OF JUSTICE
OFFICE OF THE UNITED STATES ATTORNEY
BY: CINDY M. CIPRIANI
ASSISTANT U.S. ATTORNEY
and
ELIZABETH BAGBY
880 Front Street, Room 6293
San Diego, California 92101
(619) 557-7390

Also Present: Greg Sperla

# I N D E X

WITNESS: LAWRENCE P. SALADINO, M.D.


| EXAMINATION BY | PAGE |
|---|---|
| Mr. English | 5 |


## E X H I B I T S


| PLAINTIFF | DESCRIPTION | PAGE |
|---|---|---|
| 1. | Curriculum Vitae of Dr. Lawrence P. Saladino | 24 |
| 2. | CHS IME Request Form, April 13, 2005 | 104 |
| 3. | E-Mail from Linda Hayes to Martha Montano, April 14, 2005 | 112 |
| 4. | E-Mail from Linda Hayes to Martha Montano, April 20, 2005 | 113 |
| 5. | E-Mail from Lawrence Saladino to Martha Montano, September 15, 2005 | 143 |
| 6. | CHS IME Request Form, September 16, 2005 | 144 |
| 7. | CHS Appointment Information Sheet | 145 |
| 8. | Curriculum Vitae of William H. Davidson, M.D. | 155 |
| 9. | E-Mail from Lawrence Saladino to Martha Montano, Bruce Hori and Susan Spannbauer, November 23, 2005 | 168 |
| 10. | Letter to Carlin from William C. Paul, M.D., December 7, 2005 | 174 |


INFORMATION REQUESTED:

(None.)

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

(None.)

LAWRENCE P. SALADINO, M.D.,

having been first duly sworn, testified as follows:

-EXAMINATION-

BY MR. ENGLISH:

Q Good morning.

A Good morning.

Q My name is Matthew English. I'm counsel for Mr. James Scott the plaintiff in this matter that brings you here to deposition.

Would you please state and spell your full name for the record.

A My full name is Lawrence, L-a-w-r-e-n-c-e, Paul, P-a-u-l, Saladino, S-a-l-a-d-i-n-o.

Q And what is your date of birth?

A My date of birth is August 9th, 1950.

Q And where were you born?

A Born in Brooklyn, New York.

Q Have you ever had your deposition taken before? Have you ever had your deposition taken before?

A Have I ever had a deposition taken before?

Q Yourself, yeah.

A You mean in this case?

Q Have you ever?

question pending that you answer the question before we go on a break. But in any event, for whatever reason if you need to take a break just let me know and we'll do so. Okay?

A I understand.

Q Did you review any documents in preparation for your deposition today?

A Yes.

Q What documents did you review?

A I reviewed a number of documents including e-mails, the original exam form, my Declaration, my EEO Declaration. There were quite a few.

Q Other than the ones you just specifically identified, did any stand out other than those?

A Did any stand out in?

Q In your memory as you sit here right now.

A Does this include, does the question include documents that I might have reviewed with counsel?

Q Well, let me just do some, ask some preliminary questions on that.

What is the name of your current employer?

A Comprehensive Health Services, Inc.

Q And have you ever been a managing employee of the Federal Protective Services?

A No.

Q Have you ever been a federal employee?
A Yes.
Q How long ago?
A Federal employee during active duty military service with the United States Navy from 1975 to 1978.
MS. CIPRIANI: I can tell you he provided his entire file including communications.
MR. ENGLISH: Okay.
Q And you're aware that you are not a defendant in this lawsuit that brings you here today; correct?
A Correct.
Q And you are aware that CHS, Incorporated is not a defendant in this lawsuit?
A Correct.
Q And the U.S. Attorney's not representing you here today; correct?
A Maybe you can clarify that for me.
Q Well, you didn't retain -- I don't know that you can retain, but you didn't retain the U.S. Attorney's office to represent your individual interests, did you?
A No.
Q So, yes, then my question would include about any documents that specifically recall any documents that you reviewed with counsel.
A Again?

Q Do you have any specific recollection of individual documents that you reviewed that you indicated, there was a lot of, and also specifically mentioned exams, exam form, your EEO Declaration. Anything else that you specifically recall?

A The ones, you want to know the ones that stand out?

Q Yeah.

A The ones that stand out are an IME Request, Independent Medical Evaluation Request Form from Martha Montano from April 2005; an e-mail that I sent to Mr. Stutler recently within the last 30 days regarding periodic medical examinations and my experience with them in various settings; a document right on top of the stack to your left which is a computer print out, relates to, these are notes that were made by an administrative person at Comprehensive Health Services whose responsibility was for scheduling Mr. Scott, attempting to schedule Mr. Scott for various medical exams and other evaluations, and difficulties that were encountered.

Q Anything else?

A Those are the principal ones.

Q And did you speak to anyone in preparation for your deposition today?

A Ms. Cipriani last night. Mr. Stutler at

various times. I did receive an e-mail from Mr. Spottswood from OPM.

Q What was the general nature of your discussion with Ms. Cipriani in preparation for your deposition today?

A We discussed the -- We discussed the records, the e-mails. We discussed the general facts of the case.

Q Anything else?

A That's a pretty broad question. You have something particular I --

Q Well, I'm not -- Asking for a broad question specifically rather than walking you through a step by step and then what did you do, and then what did you do. I'm just wondering as a general overview if you identified one topic as a general overview the factual underpinnings of the case, something of that nature from the --

A Can you read back my answer?

It's almost impossible for me to answer. I, we discussed the case. We discussed the documents that you have before you. We discussed the documents that were in the medical records.

Q Anything else you specifically recall?

A No, not at this time.

Q How about with Mr. Stutler, do you recall any specific aspects of your conversation with Mr. Stutler in

preparation for your deposition today?
A No.
Q You do recall having conversations with Mr. Stutler?
A Yes.
Q But you don't recall the contents?
A I did not talk to Mr. Stutler in preparation for the deposition today.
Q Oh, I'm sorry, I had him on the list of people that you spoke to in preparation.
A Well, we have conference calls with Mr. Stutler. We exchanged e-mails prior to the, you know, depending on how far back you want. Yeah, there were several conference calls, there were e-mails, phone calls.
Q And you also mentioned something from OPM; is that correct?
A Yes, Mr. Spottswood.
Q And Mr. Spottswood, that was in preparation for your deposition today?
A Mr. Spottswood sent me several e-mails that were unsolicited. One of them related directly to periodic medical exams for one of my other programs. Involved with several programs. He also sent several e-mails that involved cases I was not familiar with and I did review those e-mails. May have printed them. Did not

review them in preparation for the deposition.

Q Are those part of the exhibit package that you have brought with you today?

A I'll defer to counsel.

MS. CIPRIANI: Yeah, I don't think those are in there. He said he hadn't reviewed them and they weren't related to this case, so.

MR. ENGLISH: Okay.

Q Do you know why you -- Well, can you tell me why you mentioned Mr. Spottswood in response to my question about any communications with anyone in preparation for your deposition?

MS. CIPRIANI: If I could just, there may be one or two Spottswood communications in these, but some that weren't related to this case that he said he didn't read aren't in here, so.

MR. ENGLISH: So, some may be?

MS. CIPRIANI: Yeah, they may be.

MR. ENGLISH: Okay. Well, when we get to a break we'll take a look at the documents, follow questions from there.

Q Did you speak to anyone else that you can recall in preparation for your deposition today?

A Ms. Bagby briefly this morning.

Q And what was the nature of your brief

conversation with Ms. Bagby this morning?

A     Ms. Bagby was present while Ms. Cipriani and I were conversing.

Q     Anyone else present?

A     No.

Q     And did you talk to anyone else that you can think of other than the people you already mentioned?

A     No.  Except I did talk to Ms. Spannbauer within the last two months that let her know that Ms. Cipriani and/or Mr. Stutler would be getting in touch with her about a case.

Q     Did you initiate that call?

A     I did.

Q     And what was the reason for that?

A     To let her know that counsel would be getting in touch with her, that I had been contacted and that she would probably be contacted.  My recommendation was that Ms. Cipriani and Mr. Stutler get in touch with Ms. Spannbauer and Mr. Spottswood because of their direct involvement with this.  Ms. Spannbauer because of her direct involvement with this case.  Mr. Spottswood because of my involvement with him on numerous programs, medical programs.  I felt they both had important information that I could not provide, firsthand information related to, in Ms. Spannbauer's case related to this case, and Mr.

Spottswood's situation related to medical exam programs in general.

Q And what did you understand Mr. Spottswood's knowledge of information regarding periodic medical exams as related to this case?

A Mr. Spottswood and I have worked together on four different medical examination programs. I have been a lead physician on all of them and he's been official/unofficial consultant on all of them. And on one of the exam programs, which is called Wildland Firefighter Program.

Q Yes?

A He was directly involved in a meeting that we attended in Missoula, Montana in October of 2003 which the issue of periodic medical programs was discussed and a paper was provided by the Occupational Medicine consultant.

Q Why does this specific -- Was it a conference? I'm sorry, was this conference in Missoula, or this meeting that you attended, conference, meeting, I'm trying to find the right word.

A It was a special meeting of the interagency Medical Standards Team, interagency for the National Interagency Fire Center.

Q And why does that meeting in Missoula stand

out in your mind?

A Periodic examinations, age-based examinations were one of the topics that were discussed at the meeting. And that issue had also been raised by Mr. Stutler at some point as potentially impacting this case.

Q What was your understanding about the impact, if any, of age on periodic medical examination programs arising out of your attendance at this October 2003 meeting in Missoula, Montana?

MS. CIPRIANI: I'm going to object as vague and overbroad.

THE WITNESS: Say that again.

MS. CIPRIANI: I may occasionally object. You can answer not withstanding my objection unless there is some reason I would instruct you not to answer, which is highly unusual. Did you want the question read back?

THE WITNESS: You just objected?

MS. CIPRIANI: I objected.

THE WITNESS: Can you repeat the question?

MR. ENGLISH: I doubt it. I'll rephrase it.

Q But exactly as Ms. Cipriani indicated, if you give a little bit of a pause before you begin your response after I have completed my question, that will allow her the opportunity to do what one of the rules is she --

A Yes, I understand.
Q -- which is to provide objections for the record.
I wanted to know what your understanding of the impact of age on periodic medical examination programs, which I understood was one of the issues that was discussed at this October 2003 Missoula meeting.
A My understanding was that it's clear from the medical literature that certain illnesses or diseases or conditions are more common with increasing age including coronary artery disease, diabetes, cancer. Hearing also, the clients with age causes something called presbycusis. Lung function can decline with age. Some senility, emphysema. Musculoskeletal conditions are more common as individuals age. And this is the basis for, this is one way of justifying age related periodic medical examinations on a more frequent basis as an individual ages.
Q Okay. You told me that you served in that active duty military 1975 to 1978; is that correct?
A Correct. I also served on active duty for brief periods in between 1973 and 1975.
Q And was that the Navy?
A Yes.
Q And both instances?

A Yes, in all instances.
Q Was the '73 to '75 time periods, was that not a continuous?
A Correct.
Q How did that work?
A I don't know the correct term, if it's temporary additional duty or TDY, TDYAB. Was basically a medical student on scholarship from the Navy and I had an opportunity to go on active duty and do some of my rotations at military hospitals while in uniform while collecting full salary and benefits.
I spent time at the National Medical Center at Bethesda, Maryland and interned at Oak Knoll Naval Hospital in Oakland, California as a medical student.
Q Where did you go to medical school?
A Went to Georgetown University College and Medical School in Washington D.C.
Q And did you do an internship that is in --
A I did an internship at Naval Regional Medical Center in Philadelphia, Pennsylvania.
Q And where did you do your residency?
A I did my residency at the University of Kentucky in Lexington, Kentucky.
Q I'm going to hand you a document and ask you to take a look at it. You have the some packets, a

All of the entries above the entry first identifying and Comprehensive Health Services at the bottom of Page 2, are those -- Explain what these are. There are six entries, job positions on Page 2 and one further one just below the heading Experience on the first page of your Curriculum Vitae.

And since you were working continuously with Comprehensive Health Services since 2002, could you just briefly explain what those entries are?

A October 2004 to the present, Medical Review Officer for the Federal Protective Service.

Q What is that? You told me earlier that you didn't have, never been an employee of the Federal Protective Service; correct? Yes?

A Correct.

Q So, what is that designation and why is it on your resume?

A Comprehensive Health Services has a contract with the Federal Protective Service to provide examinations, evaluations, to review medical information, and make recommendations to the agency. And since October 1st of 2004, I have been the lead physician and/or Medical Review Officer, as you like to call it, for all matters that relate to Federal Protective Service. And initially it included a periodic examination program with

pre-placement and incumbent medical exams, review of HAZMAT or special exams, NAPR's respirator clearance program. Firearms instructors get their own exams. Special components that were also exams for fitness program. Also reviewed information related to return-to-work after accident, injury, surgery. Participated in review of independent medical evaluations. Participated in the Medical Review Board meetings via conference call for the agency. Do you want me to keep going with the next --

Q I don't actually want the specific details. We'll leave that for the Exhibit which we'll attach.

I was just more trying to understand, appears to me, and I just didn't want to make the assumption, that it appears to me these are subcategories or subsets of your job duties within or for Comprehensive Health Services in these particular programs.

A That's correct. Not particular. This is a program.

Q Well --

A But these are --

Q Seven entries.

A Oh, yes. These are, yes, these are programs where I have been, spent the majority of my time. Let's see. Yes.

as Exhibit 1 to this deposition, under the Experience section makes specific reference to the Federal Protective Service Periodic Medical Examination October 2004 to present. Are you -- We have already identified that this document is at least one or two versions old of your C.V.

Are you currently involved in evaluating or reviewing examinations under the FPS Periodic Medical Examination Program?

A No. The Periodic Medical Examination Program was suspended 2006.

Q Are you aware of the circumstances regarding how the program came to be suspended?

A No.

Q How did you learn that the program was suspended?

A I was informed by Dr. Kessler and by Ms. Spannbauer in July of 2006.

Q Were you curious as to why it was suspended?

A Yes.

Q Did you make inquiries?

A Yes.

Q What was the result of your inquiries?

A I was not, was not able to find out anything more.

Q Mystery?

REPORTER'S CERTIFICATE

I, REBECCA LYNN MARTIN, CSR NO. 6308, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney or of any of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this ______ day of _____________, 2009.

_____________________________________________

REBECCA LYNN MARTIN, CSR NO. 6308

REPORTER'S CERTIFICATION OF CERTIFIED COPY

I, REBECCA LYNN MARTIN, CSR NO. 6308, a Certified Shorthand Reporter in the State of California, certify that the foregoing Pages 1 through 178 constitute a true and correct copy of the original transcript of LAWRENCE P. SALADINO, M.D. taken on July 28, 2009.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this ______ day of ______________, 2009.

____________________________________________

REBECCA LYNN MARTIN, CSR NO. 6308

## 16. Transcript portions of the Deposition of Rudy Negrete (July 20, 2009)

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JAMES SCOTT,

Plaintiff,

-vs- No. 08-CV-0735-BTM (JMA)

JANET NAPOLITANO,
Secretary, Department
of Homeland Security,

Defendant.

---

The teleconference deposition of RUDY NEGRETE, taken before David J. Demski, Certified Shorthand Reporter, and Notary Public, pursuant to the provisions of the Federal Rules of Civil Procedure of the State of California and the Rules of the Supreme Court thereof, pertaining to the taking of depositions for the purpose of discovery, at the Office of the United States Attorney, 219 South Dearborn Street, Fifth Floor, Chicago, Illinois, at 11:00 o'clock a.m. on Monday, July 20, 2009.

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

FILE NO.: A3057F6

A P P E A R A N C E S:

LAW OFFICES OF MATTHEW G. ENGLISH
BY: MR. MATTHEW G. ENGLISH
7676 Hazard Center Drive - Suite 500
San Diego, California 92108
(619)725-2725
(619)725-2726 (fax)

On behalf of the Plaintiff

U.S. ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF CALIFORNIA
BY: MR. TIMOTHY C. STUTLER
880 Front Street - Room 6293
San Diego, California 92101
(619)557-7387
(619)557-5004 (fax)
E-mail: tim.stutler@usdog.gov

On behalf of the Defendant

ALSO PRESENT: Carmen Everett (via telephone)

I N D E X


| WITNESS | PAGE |
|---|---|
| RUDY NEGRETE | |
| Examination by Mr. English | 3 |
| Examination by Mr. Stutler | 89 |
| Reexamination by Mr. English | 93 |
| Reexamination by Mr. Stutler | 95 |


E X H I B I T S


| | | |
|---|---|---|
| DX-1 | E-mails | 36 |
| DX-2 | December 8, 2005 Correspondence | 38 |
| DX-3 | January 24, 2006 Correspondence | 66 |
| DX-4 | April 17, 2006 Notice | 74 |
| DX-5 | E-mail | 75 |
| DX-6 | Supervisory Inquiry | 82 |

RUDY NEGRETE

having been first duly sworn by the court reporter, was examined and testified on his oath as follows:

EXAMINATION

BY MR. ENGLISH:

Q. Good morning.

A. Good morning.

Q. Could you please state and spell your full name, for the record?

A. Rudy Negrete. That's R-u-d-y, N-e-g-r-e-t-e.

Q. Mr. Negrete, what is the date and location of your birth?

A. Can you repeat?

Q. What is the date and location of your birth?

A. That is Chicago, Illinois. May 15th, 1959.

Q. We met very briefly off the record, allow me to introduce myself while we're on the record. My name is Matt English. I'm counsel for James Scott, the Plaintiff in the matter that brings you here to the deposition today.

Mr. Negrete, have you ever had your deposition taken before?

A. Yes, once.

Q. How long ago was that?

Q. Did you review any other documents, other than the ones you've already discussed this morning?
A. No, I have not.
Q. Did you bring copies of e-mails that you referred to with you to the deposition today?
A. Yes, I did.
Q. Approximately how many pages are those documents?
A. If I may, I'm going to pull that right now.
On the e-mails, those would be five pages.
Q. Mr. Negrete, did you speak to anyone in preparation for your deposition here today, other than counsel for the agency?
A. No, I have not.
Q. Are you presently employed?
A. Yes, I am.
Q. What's the name of your employer?
A. That is the Department of Homeland Security, Immigration and Customs Enforcement, Federal Protective Service.
Q. What is your present job title with the Federal Protective Service?
A. I am currently a supervisory special agent.
Q. What region?
A. That is region five.

Q. Is that a GS 1811 position?
A. Yes, it is.
Q. What step or what grade?
A. That is GS 14, step three.
Q. How long have you held the position of senior special agent for region five?
A. As the senior special agent, that was approximately four years.
Q. From when to when?
A. That would have been -- I believe that was July 2004 through April of 2009.
Q. I think I misspoke a moment ago. You told me that you were a supervisory special agent, is that correct?
A. That's correct.
Q. And there's a distinction between a supervisory special agent and senior special agent?
A. Yes, there is.
Q. What is the difference between the two?
A. The senior special agent was a GS 13 position.
Q. Were there any supervisory duties associated with the senior special agent GS 13 position?
A. No, there was not.
Q. Do you presently have supervisory authority over

other FPS employes in your role as a supervisory special agent?

A. Yes, I do.

Q. How many employees do you have supervisory authority over?

A. Currently, I have authority over 12 -- excuse me, 12 employees.

Q. Are those all special agents?

A. No.

Q. Can you give me the breakdown of the 12 employees you have supervisory authority over?

A. Currently I have supervisory authority over five special agents and six -- excuse me, that would be six special agents and six members of the adjudication staff, personal security specialists.

Q. Am I correct in inferring that you have held the position of supervisory special agent since April of '09?

A. Yes.

Q. How long have you been employed by the Federal Protective Service?

A. For approximately 21 years.

Q. How long have you been employed by the federal government?

A. That would be the same.
Q. Were you employed prior to joining FPS approximately 21 years ago?
A. Yes, I was.
Q. What did you do for them?
A. Prior to my coming on board with the Federal Protective Service, I was a contract security officer on their contract for a few years.
Q. How long have you worked in region five?
A. In region five, with the exception of temporary assignments or details, for the 21 years.
Q. Have you ever worked on a temporary assignment or detail to region nine?
A. Yes, I have.
Q. More than one time?
A. Yes.
Q. How many different times have you been detailed or worked on professional assignments in region nine?
A. That would have been two times.
Q. Do you recall the approximate dates of those two assignments?
A. Yes, I do.
Q. Could you tell them to me now, please?
A. The first assignment was November of 2005 through

March of 2006, and the second assignment was December of 2007 through April of 2008.

Q. Referring to the assignment that you mentioned last, the most recent assignment, from December 2007 to April of 2008, what was the nature of the assignment?

A. I was temporarily assigned as the deputy regional director for region nine Federal Protective Service.

Q. Would it be fair to characterize that as the acting deputy regional director?

A. Yes. That is exactly what it is, the acting deputy regional director.

Q. Who were you reporting to when you were serving as the acting deputy regional director in early 2008?

A. That would be Ralph McNamara.

Q. Was Mr. McNamara the regional director at that time?

A. For the -- I don't recall approximately the time span that occurred, when I began my detail and when he came on board, but it was within about 30 days of my assignment.

Q. Did you have more than one person that you were directly reporting to when you served as deputy regional director for region nine between April 2007 and April 2008?

A. It was right in the middle of a transition. A gentleman whose name I don't recall at the moment was the outgoing acting regional director when Mr. McNamara was coming in.

Q. Do you know if Mr. McNamara was coming in as an acting regional director or as the new regional director for region nine?

A. He was coming in as the new regional director.

Q. Do you have an understanding as to why you were detailed as the acting deputy regional director for region nine during this time period?

MR. STUTLER: Objection, calls for speculation. You can answer, if you know.

THE WITNESS: As far as the exact reason, it was my understanding that they still had vacancies and voids with upper management at that time. When Mr. McNamara was scheduled to come in they still did not have a deputy regional director nor did they have a threat management branch chief.

BY MR. ENGLISH:

Q. During the entire time period that you worked in or were in region five, have you ever been detailed into the deputy regional director position for region five?

A. No.
Q. Do you have a threat management branch in region five?
A. Yes.
Q. Have you ever been detailed into the head of the threat management branch position in region five?
A. No.
Q. Have you ever been detailed or served as acting regional director for region five?
A. No.
Q. During the time period that you last served as acting deputy regional director for region nine, between December of 2007 and April of 2008, did anyone assume the duties of the threat management branch chief?
A. Yes. At the beginning of my assignment I was handling both positions. However, a selection was made of an individual, Mario Canton, who became the threat management branch chief during that time.
Q. Do you recall approximately when Mr. Canton assumed the role of chief of the threat management branch of region nine?
A. I don't recall the exact date, no.
Q. Do you recall the approximate date in terms of, for example, was it near the beginning or the end or

middle of the time period that you were working as the acting deputy regional director?

A. It would have been near the beginning.

Q. Do you have any understanding of how long the position of threat management branch chief had been vacant in region nine at the time that you assumed the role of acting deputy regional director in December of 2007?

A. I believe my recollection was the position had been vacant for at least one to two years prior to 2007.

Q. Do you have any understanding or knowledge as to why the position of threat management branch chief was vacant for one to two years in region nine?

MR. STUTLER: Objection calls for speculation. You can answer any question, unless I tell you not to.

THE WITNESS: Oh, okay, and I apologize.

It was my understanding that the position had been vacant and the region nine management staff had difficulty trying to fill the position with individuals due to a variety of reasons. One that comes to mind right at the moment was the cost of living in San Francisco. The second, my understanding was it was an extremely, extremely small pool of individuals that had

been applying for the job.

BY MR. ENGLISH:

Q. You also indicate that you worked on detail or special assignment in region nine between November 2005 and March 2006, correct?

A. Yes.

Q. Did you hold a specific job title when you were detailed during that time period?

A. Yes, I did.

Q. What was it?

A. That was the acting threat management branch chief.

Q. Do you know whose decision it was to put you in the position of acting threat management branch chief for region nine in November of 2005?

A. No. I don't have a recollection on who exactly, but I know the circumstances surrounding my assignment there.

Q. What were the circumstances surrounding your assignment there?

A. It was my understanding that the prior acting threat management branch chief was nearing the end of his one-year assignment and region nine management personnel had requested through headquarters volunteers

for persons to go on assignment, to pick up where that chief was -- had left off.

Q. What was the name of that chief?

A. That would have been Mr. J.P. Morgan, John P. Morgan.

Q. I didn't mean to interrupt you. Is there something else that you wanted to add to your description of the circumstances?

A. Yes. And apparently after receiving a request for person on assignment, my supervisor at the time, Mr. William Bonk, had asked me if I would be interested in going out there for this assignment, which I acknowledged that I would.

Q. Did you know or did Mr. Bonk tell you why he asked you if you would be interested?

A. Yes, for the reasons that I just mentioned. That the supervisor was going out and could not be extended and they needed somebody to take over as the acting chief.

Q. I meant more specifically as to why he asked you?

A. He was -- no, I really can't say. I worked for him.

Q. Sure. I mean, he didn't ask everyone, though, right?

A. No. But understandably at that particular time his pool of individuals that would have been able to apply for that temporary assignment was very limited. They needed to be a GS 13 agent.
Q. You told him you were interested in that position, correct?
A. Yes.
Q. Why is that?
A. Well, I've been working for FPS for a number of years, I was a GS 13 senior special agent and I saw an opportunity to take a position in management in regards to just -- two things personally that came to mind. One is whether I could do it, and secondly, being able to increase my upper mobility within the organization.
Q. Were those Chicago winters a factor at all?
A. Actually, truth be told, I didn't have an interest in going there permanently. I kind of like where I'm at in Chicago.
Q. Do you recall when you were first notified about the possibility of the temporary assignment that you ultimately took in -- I'm sorry, in November of 2005?
A. Could you repeat that?
Q. I'm just wondering when you first learned about the assignment. You went out there in November of 2005,

A. Actually I concluded nothing that I would be able to take action upon. It was just my own thought processes to why he refused to answer several questions. It was just a concern.
Q. Did you consider ordering a fitness for duty examination?
A. No, I did not.
Q. So it was -- I'm trying to get a sense of the level of your thought process, as we were describing and you told me you've gone through this process, you didn't reach any final conclusions. Am I correct in assuming that it did not rise to the level of calling for a fitness for duty examination in your mind?
A. Yes, with an explanation.
Q. Please?
A. I'm methodical in how I approach this and how I approach a lot of what I become involved with, and thinking in terms of a fit for duty to me was too far in advance. We haven't even begun getting close to obtaining information that would allow me to formulate a decision as to whether a fit for duty was needed, so that didn't come into play.
Q. Near the bottom of the stack of papers that were provided to you this morning is a letter dated

April 17th, 2006. It's a four-page letter with the bates number DEF 04863 and continuing consecutively to 04866.

A. Yes, I have that.

Q. Did you author this letter?

A. No, I did not.

Q. Well, take a look at the letter and tell me if you recognize it?

A. Yes, I recognize the letter.

Q. How do you recognize it?

A. My signature appears on page two at the bottom.

Q. Are you aware of how this letter came into being?

A. Yes.

Q. How is that?

A. After this disciplinary process moved to the next phase, which was the proposal for the suspension, at that point and in some of the earlier stages our employee and labor relations office was involved. All the documentation that I had put together at this point, which included the supervisory inquiry as well as the letters had all been sent to the ELR office as well. They generated this letter, sent it to me for review, to ensure that the letters were sent out consistently to all employees in these type of situations. I conducted

the review to ensure that the information was correct and that the substantive information was consistent with my supervisory inquiries and my reviews. Once I did that, I went ahead and signed it and then sent it back to region nine, I believe at that point would have been Ms. Joyce Nesbitt-Simon.

MR. ENGLISH: Let's go off the record.

(Off the record.)

MR. STUTLER: I was just indicating off the record that we have Carmen Everett on the telephone and she has been sitting through most of the deposition by telephone and is presently listening in.

MR. ENGLISH: Let's go ahead and have the court reporter mark the April 17th, 2006 letter with the bates number beginning 4863 Exhibit No. 4 for this deposition.

(Deposition Exhibit No. 4 was marked for identification.)

BY MR. ENGLISH:

Q. The last page that was sent to you in that original package has the bates number DEF 4861?

A. Yes, I have that.

Q. Do you recognize this e-mail?

A. Yes.

Q. How do you recognize it?
A. I authored it.
Q. Do you recall sending it to John Hartman?
A. Yes, I do.
Q. What's going on in this e-mail?
A. This was the request that I made for special agent Hartman to hand carry the proposal letter to Mr. Scott. I was authorizing him his travel to San Diego and indicating what the package consisted of so that when he gave Mr. Scott his, he -- well, he would know what Mr. Scott received and what he was to bring back.
Q. To your recollection, you sent this on or about Wednesday, April 19th, 2006?
A. Yes.
MR. ENGLISH: Ask the court reporter to mark this as Exhibit No. 5.
(Deposition Exhibit No. 5 was marked for identification.)
BY MR. ENGLISH:
Q. You should also have the supervisory inquiry report dated March 21, 2006?
A. Yes, I do.
Q. Some of the attachment pages are of questionable

legibility, but if you could take a look through, the first bates number is 7-0, this is from the ICE ROI, and the last bates number is 0-9-0.

Could you tell me if you understand whether or not this is -- this was the complete supervisory inquiry report that you prepared?

A. Yes. From all appearances, it does appear to be the supervisory inquiry that I initiated.

Q. What is this document, other than -- or can you give me any more detail than the title indicates, supervisory inquiry?

A. This was my statement of the facts surrounding the circumstances in regards to Mr. Scott's failure to follow instructions as -- as instructed. Basically it sets forth the facts of the circumstances, the penalty offenses, and my recommendations based on the totality of those facts.

Q. Prior to your making the decision to propose the suspension of Special Agent Scott, did you understand that Special Agent Scott considered the questions asked of him to be unlawful?

A. I considered the questions that were asked of him, based off of his e-mail, as his contention that they were a violation of ADA.

STATE OF ILLINOIS )
)SS.
COUNTY OF C O O K )

I, DAVID J. DEMSKI, Certified Shorthand Reporter, in and for the County of Cook, State of Illinois, do hereby certify that on the 20th day of July 2009, the deposition of the witness, RUDY NEGRETE, called by the Plaintiff, was taken before me, reported stenographically and was thereafter reduced to typewriting through computer-aided transcription.

The said witness, RUDY NEGRETE, was first duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

I further certify that the foregoing is a true, accurate and complete record of the questions asked of and answers made by the said witness, at the time and place hereinabove referred to.

The signature of the witness was not waived by agreement.

Witness my official signature as Notary Public, in and for Cook County, Illinois on this 5th day of August, 2009.

_________________________________
DAVID J. DEMSKI
C.S.R. No. 084-004386

## 17. Transcript portions of the Deposition of Joyce Nesbitt-Simon (June 16, 2009)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JAMES SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 08cv0735BTM |
| | ) | (JMA) |
| vs. | ) | |
| | ) | |
| JANET A. NAPOLITANO, SECRETARY, | ) | |
| DEPARTMENT OF HOMELAND SECURITY, | ) | |
| | ) | |
| Defendants. | ) | |
| ________________________________ | ) | |

DEPOSITION OF

JOYCE NESBITT-SIMON

SAN DIEGO, CALIFORNIA

JUNE 16, 2009

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY: GRACIELA WARNER, CSR NO. 9502
FILE NO.: A3057E9

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SCOTT,<br><br>Plaintiff,<br><br>vs.<br><br>JANET A. NAPOLITANO, SECRETARY, DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Civil No. 08cv0735BTM (JMA) |

DEPOSITION OF JOYCE NESBITT-SIMON, taken on behalf of Plaintiff, at 101 West Broadway, Fifteenth Floor, San Diego, California commencing at 1:35 p.m., Tuesday, June 16, 2009 before Graciela Warner, CSR No. 9502.

A P P E A R A N C E S

FOR THE PLAINTIFF:

LAW OFFICES OF MATTHEW G. ENGLISH
BY: MATTHEW G. ENGLISH, ESQUIRE
7676 Hazard Center Drive
Suite 500
San Diego, California 92108

FOR THE DEFENDANT:

OFFICE OF THE UNITED STATES ATTORNEY
BY: TIMOTHY C. STUTLER, ESQUIRE
880 Front Street
Room 6293
San Diego, California 92101

ALSO PRESENT:
Carmen Z. Everett, Esquire, U.S. Department of Homeland Security

Andrew Smith, law clerk, Office of the United States Attorney

I N D E X

WITNESS: JOYCE NESBITT-SIMON


| EXAMINATION | PAGE |
|---|---|
| BY MR. ENGLISH | 5 |
| BY MR. STUTLER | 86 |
| BY MR. ENGLISH | 96 |
| BY MR. STUTLER | 103 |


EXHIBITS:

PLAINTIFF'S


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 - Letter dated May 8, 2006 to James William Scott, Jr. (3 pages) | | 44 |
| 2 - Letter dated April 28, 2006 to Joyce Nesbitt-Simon (2 pages) | | 69 |


DEFENDANTS'


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 3 - Letter dated April 17, 2006 to James William Scott, Jr. (5 pages) | | 86 |
| 4 - Supervisory Inquiry "Failure/Refusal to Follow Orders" (22 pages) | | 88 |


QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER:

(NONE)

INFORMATION TO BE SUPPLIED:

(NONE)

JOYCE NESBITT-SIMON,
having first been duly sworn, was
examined and testified as follows:

EXAMINATION

BY MR. ENGLISH:

Q. Good afternoon.

A. Good afternoon.

Q. Could you please state and spell your full name for the record.

A. Joyce Nesbitt-Simon; Joyce, J-o-y-c-e, Nesbitt, N-e-s-b-i-t-t, hyphen, Simon, S-i-m-o-n.

Q. And please state the date and location of your birth.

A. 4/6/59; location, New Jersey.

Q. When we met a moment before off the record, you introduced yourself as Ms. Simon, and I had noticed the deposition for Joyce Nesbitt-Simon.

For the purpose of conducting the proceedings today, how would you prefer I refer to you, as Ms. Nesbitt-Simon or Ms. Simon? Do you have a preference?

A. Ms. Simon.

Q. Well, we did meet just a moment ago, but allow me to state, I'm Matthew English. I'm counsel

would be my preference if there's a question pending that you answer the question before we go on break.

But in any event, if you would like to take a break, just let us know. Okay?

A. Yes.

Q. Ms. Simon, are you currently employed?

A. Yes.

Q. Where are you employed?

A. Department of Homeland Security, Federal Protective Service.

Q. Did you review any documents in preparation for your deposition today?

A. Yes.

Q. And by "document," I mean -- well, what documents did you review?

A. Emails and my affidavit.

Q. What affidavit are you referring to?

A. I believe it was two affidavits. The affidavits were in regards to -- shoot, I can't remember. The affidavits that -- in regards to Scott's case.

Q. The underlying EEO proceeding?

A. Yes, for those.

Q. And what emails did you review?

A. Emails pertaining to the case, as well -- as

far as emails that I had sent, emails that I had a person send to me.

Q. What was the general tenor of the emails?

A. Some of the emails were about a fit-for-duty, vehicle -- use of the vehicles, and trying to get documentation for the counselor in regards to Scott's case.

Q. Trying to provide documents?

A. Right, trying to gather the documents that the counselor had requested.

Q. Was this Mr. Shariff [phonetic] or someone else?

A. Yes.

Q. What is your current job title?

A. District commander.

Q. And what district are you district commander for?

A. Southern District.

Q. How long have you held the job title of district commander for the Southern District of FPS?

A. For approximately seven years.

Q. How long total have you worked for FPS?

A. Since 1990.

Q. Prior to serving as district commander for the Southern District, what was your job title for FPS?

A. Area commander.
Q. And was that a specific area that you were an area commander --
A. For the southern area.
Q. Approximately what period of time or how long were you --
A. Approximately --
Q. -- area commander?
A. -- a year and a half to two years.
Q. Okay. I'll caution you early on here, so that we don't trip over each other. If you can give a little bit of a pause to be sure that I complete my question, it will help the court reporter quite a bit and make a cleaner record of things. It's extremely common in ordinary conversation because we know what the question is and we know where we're going and it's not noticed, but it's much more noticeable in a deposition which is why I paused for a moment here to caution you about it. Okay?
A. Yes.
Q. Prior to serving as area commander for FPS, what was your job title?
A. Physical securities specialist.
Q. How long were you physical securities specialist for FPS?

A. Approximately eight to nine years.
Q. Did you hold any job title prior to serving as a physical securities specialist?
A. With FPS?
Q. Yes.
A. No.
Q. Very briefly, can you give me just a general overview of your job responsibilities as district commander for the Southern District for FPS.
A. The duties -- responsible for the entire Southern District where I'm supervisor over area commanders as well as law enforcement personnel. The responsibility entails being responsible for handling all law enforcement and federal laws on GSA federal properties.
Q. I have seen an old chart from some time in the past that indicated that you served as a Southern District director?
A. Deputy regional director.
Q. This is actually -- instead of district commander for the Southern District, this has Southern District director.
Is that basically the same job title?
A. No, I was detail. In 2006, I was detailed as the deputy regional director.

Q. Okay. When was that again?
A. That was approximately May of 2006.
Q. How long did you serve in that detail?
A. Until mid December, 2006.
Q. All right. I want to talk about that in a minute, but my question was, rather, regarding whether or not your job title was ever identified as Southern District director?
A. Yes. At one point the -- the position was district director and not district commander. It was changed somewhere when we went under the Department of Homeland Security, I believe.
Q. I see. But essentially, the same position?
A. Same title -- same position, just different title.
Q. Did you serve on any other details during your time with FPS?
A. No.
Q. Did you know the plaintiff in this case, James Scott?
A. Yes.
Q. How do you know him?
A. I know him -- I met Scott in 1990. We were coworkers when I first started with FPS.
Q. Was that in Los Angeles?

A. Yes.
Q. How long were you coworkers, approximately?
A. Well, I guess we were actually coworkers until -- we need clarification of "coworker," because in 1990, I believe, Scott wasn't there the whole year. He transferred to San Diego. We were still coworkers --
Q. Right.
A. -- so I believe we were coworkers until I became a manager.
Q. And area commander was the first management position?
A. Yes.
Q. Okay. At any point in your career with FPS, did you have any supervisorial authority over James Scott?
A. As a deputy regional director, I had some authority, yes.
Q. You were above him in the chain of command?
A. Yes.
Q. But only during the period when you were detailed into the deputy regional director from May of 2006 until approximately December of 2006?
A. Yes, I believe so.
Q. And no other periods were you above Special

Agent Scott in the chain of command; is that correct?
A. Not that I recall.
Q. Since you first became department commander for FPS, then you became an area commander, have you been involved in discipline actions against employees?
A. Yes.
Q. Have you been involved in removal actions against employees?
A. Yes.
Q. How many different times have you been involved in a removal action for an employee with FPS?
A. I believe two.
Q. When were those times?
A. Well, maybe not two. It depends on what you would consider. One of them was approximately November of 2008 and -- actually, that would be it. The other one I was thinking about was just a delivery of the letter, but I wasn't a part of the removal. So it would be one.
Q. Since you have been in department commander for FPS, how many employee disciplines involving suspensions have you been involved in?
A. Involving suspension? Approximately three.
Q. And when were those suspensions, to the best you can recall?

A. To the best I can recall, I think one of them was 2007, and one of them might have been 2005. I think there's only two, two suspensions -- oh, three, and then Scott's.

Q. Prior to your involvement with the suspension of Special Agent Scott, you had been involved with one discipline involving a suspension?

A. Two.

Q. Two?

A. Uh-huh.

Q. Prior to --

A. Prior to Scott, correct.

Q. And when was the discipline imposed against Special Agent Scott that you recall?

A. 2006.

Q. I heard you testify earlier -- and my notes may not be incorrect which is why I'm going back over this -- I heard you testifying earlier that you had been involved in three suspensions -- one in 2007, one in 2005, and Special Agent Scott; is that inaccurate?

A. That's correct.

Q. So my math, which is admittedly suspect, that's only one suspension prior to Special Agent Scott's in 2006, correct?

A. No. I said one in 2005, one in two

thousand -- approximately 2007, and Mr. Scott's in 2006 -- oh, yeah, 2006. Okay. 2006 is after, so no. Scott's would have been the last one in 2006, so -- let me see. So he probably got suspended in 2005 -- so must have been 2005, and then the other one must have been about 2003.

Q. What was your role in the two prior disciplinary actions involving a suspension that you just testified about?

A. Deciding official.

Q. In both occasions?

A. Yes.

Q. Did you have any involvement in the removal of Special Agent Scott from the Federal Service?

A. No.

Q. Did you have any involvement in the transfer of the removal authority for Special Agent Scott to Region 10?

A. No.

Q. Did you have any involvement in the removal of Special Agent Scott's law enforcement authority?

A. No.

Q. And what was your involvement in the suspension of Special Agent Scott?

A. Deciding official.

Q. What does the role of deciding official in a discipline action entail?

A. The deciding official reviews the documents that was submitted to the employee and then receives the response from the employee on the document proposing the suspension. And the deciding official reviews the documents and makes a determination.

Q. So when an employee receives a notice to a proposed action or a proposed discipline, does that document contain an invitation to respond to that notice?

A. Yes.

Q. Does that document -- in the instances when you have been involved as a deciding official, does that document identify you as the person to whom the responses are to be directed?

A. Yes.

Q. Did you receive a response to the Notice of Proposed Suspension in the matter of Special Agent Scott?

A. Yes.

Q. And did you review his response?

A. Yes.

Q. You indicated that part of the process of -- in the role of deciding official is to review

documents.

What documents were you referring to with regard to Special Agent Scott's suspension -- proposed suspension?

A. I reviewed what he supplied me, his response.

Q. Anything else?

A. No.

Q. Did you review the Notice of Proposed Suspension?

A. Oh, yes.

Q. Did you review any FPS policies and procedures?

A. Did I review any policies or procedures? Yes, I do believe I did.

Q. What policies and procedures did you review, if you recall?

A. I believe I reviewed the -- it was either the fit-for-duty policy or the return-to-work policy, one of the policies that dealt with the physical.

Q. Did you review anything else that you can recall in your role as the deciding official for the suspension of James Scott?

A. No.

Q. Did you review any legal authority governing fitness-for-duty examinations or medical examinations

Q. First question is, is this all one document?
A. Yes.
Q. The last page appears to be either an email or a short note. That is signed or thank you'd by Ruth Mobley.
Do you know who Ruth Mobley is?
A. She is a contract employee in the regional office.
Q. Is this last page in the nature of a cover letter or --
A. That's what it looks like.
Q. Do you recognize the last page at all?
A. No. I probably didn't see the last page.
Q. Okay. Is it fair to say that that last page is separate then from the few pages prior?
A. Right. That's not my document, the last page.
Q. If you would, just remove the last page, and you can set it aside there.
Now we have a three-page document, 96, 97 and 98, correct?
A. Correct.
Q. Do you recognize this document?
A. Yes.
Q. What is this document?

A. This is the deciding official response to Mr. Scott's proposed suspension.

Q. On the bottom of page 2, there is a signature above your name identified as "Acting Regional Deputy Director."

Is that your signature?

A. Yes.

Q. What is this document again? What is the function of this document?

A. It's my response to the proposed suspension.

Q. So is this the actual action taken --

A. Yes.

Q. -- or the notice of the --

A. This is the notice.

Q. Notice of suspension?

A. Correct.

MR. ENGLISH: I'm going to ask the court reporter to mark your copy as Exhibit 1 to this deposition.

(Exhibit 1 was marked for identification.)

Q. BY MR. ENGLISH: Within FPS, is there a range of various disciplines that may be imposed upon a particular employee for a given action?

A. Yes.

Q. For example, is a Letter of Warning one of

REPORTER'S CERTIFICATE

I, GRACIELA WARNER, CSR No. 9502, Certified Shorthand Reporter, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Dated this 29th day of June, 2009.

______________________________
GRACIELA WARNER, C.S.R. No. 9502

REPORTER'S CERTIFICATION OF CERTIFIED COPY

I, GRACIELA WARNER, CSR No. 9502, a Certified Shorthand Reporter in the State of California, certify that the foregoing pages 1 through 107, constitute a true and correct copy of the original deposition of JOYCE NESBITT-SIMON taken on June 16, 2009.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated this 29th day of June, 2009.

___________________________________

GRACIELA WARNER, C.S.R. NO. 9502

## 18. Transcript portions of the Deposition of Tamra Hirano (June 18, 2009)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

- - -

| | | |
|---|---|---|
| JAMES SCOTT, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No.: 08-CV-0735-BTM(JMA) |
| JANET NAPOLITANO, SECRETARY, DEPARTMENT OF HOMELAND SECURITY, | ) | |
| Defendants. | ) | |

DEPOSITION OF

TAMRA A. HIRANO

TACOMA, WASHINGTON

JUNE 18, 2009

ATKINSON-BAKER, INC.
COURT REPORTERS
www.depo.com
800-288-3376

REPORTED BY: CATHY KAPASKA, CCR NO. 266

FILE NO.: A3057EA

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

- - -

JAMES SCOTT, )

Plaintiff, )

vs. ) Case No.: 08-CV-0735-BTM(JMA)

JANET NAPOLITANO, SECRETARY, )
DEPARTMENT OF HOMELAND SECURITY, )

Defendants. )

Deposition of TAMRA A. HIRANO, taken on behalf of Plaintiff, at 1201 Pacific Avenue, Suite 700, Tacoma, Washington, commencing at 9:00 a.m., Thursday, June 18, 2009, before CATHY KAPASKA, CCR NO. 266.

A P P E A R A N C E S

FOR THE PLAINTIFF:
(Present via video conference)

LAW OFFICES OF MATTHEW G. ENGLISH
BY: MATTHEW G. ENGLISH, ATTORNEY AT LAW
7676 Hazard Center Drive, Suite 500
San Diego, California 92108

FOR THE DEFENDANTS:
(Present via video conference)

UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF CALIFORNIA
BY: CINDY CIPRIANI, UNITED STATES ATTORNEY
TIMOTHY STUTLER, UNITED STATES ATTORNEY
880 Front Street, Room 6293
San Diego, California 92101-8893

# I N D E X

WITNESS: TAMRA A. HIRANO


| EXAMINATION | PAGE |
| --- | --- |
| BY MR. ENGLISH | 5 |
| BY MS. CIPRIANI | 94 |

EXHIBITS

| NUMBER | PLAINTIFF'S DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 - | December 21, 2006 Letter | 39 |
| 2 - | November 15, 2006 Letter | 81 |
| 3 - | January 25, 2007 Letter | 91 |

| LETTER | DEFENDANTS' DESCRIPTION | PAGE |
| --- | --- | --- |
| | (NONE) | |

QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER:

| PAGE | LINE |
| --- | --- |
| 36 | 6 |
| 89 | 23 |

INFORMATION TO BE SUPPLIED:

(NONE)

TAMRA A. HIRANO
having first been duly sworn, was
examined and testified as follows:

EXAMINATION

BY MR. ENGLISH:

Q. Good morning. My name is Matthew English. I am counsel for James Scott, the Plaintiff in the matter that brings you here to deposition. Could you please state your full name for the record and spell it

A. Tamra, T-a-m-r-a, Ann, A-n-n, Hirano, H-i-r-a-n-o.

Q. What is the date and location of your birth?

A. The date is August 2, 1962. I was born in Tacoma, Washington.

Q. Ms. Hirano, have you ever had your deposition taken before?

A. Yes.

Q. How many times?

A. Once.

Q. How long ago was that?

A. I honestly don't recall. A year or more.

Q. Within the last five years?

A. Yes.

Q. Was that a work-related deposition?

Q. That's better.
A. I moved it closer. Is that better?
Q. That is better. Approximately how many different documents there do you have in front of you?
A. Two groups. I have the letter that I had sent to Mr. Scott.
Q. December 21, 2006 letter?
A. Yes.
Q. Okay. What else?
A. Some e-mails and the Declaration that I made. Some other e-mails and the Declaration Mr. Scott made.
Q. Did your review of those documents refresh your recollection about the events described in the documents?
A. Yes, I read them.
Q. I understand that you read them. Did it refresh your recollection about the events, or is your recollection unchanged after having read the documents?
A. It did refresh my recollection. I've not looked at these documents for quite some time.
Q. Are you currently employed?
A. Yes.
Q. What's the name of your employer?
A. Federal Protective Service, Immigrations and Customs Enforcement.
Q. Part of the Department of Homeland Security?

A. Yes.
Q. What is your present job title?
A. I'm the Chief of Mission Support.
Q. This is for Region 10; correct?
A. Yes.
Q. Are you the Chief of Mission Support for all of FPS, or is it limited to Region 10?
A. Limited to Region 10.
Q. How long have you been employed by FPS?
A. In this position, since February of 2002.
Q. How long have you been employed by the FPS in entirety?
A. Well, I don't remember the exact year that I started in FPS. I've been a federal employee since 1979, once with GSA and then once when we transferred to Homeland Security.
Q. 1979?
A. Uh-huh, yes. Next month is my thirtieth year.
Q. Congratulations. Do you recall what position you held prior to serving as Chief of Mission Support, Region 10?
A. Yes, I was the Area Commander for the Tacoma Command.
Q. How long did you serve as Area Commander for the Tacoma Command?
A. About a year and a half, give or take.

Q. Could you briefly describe for me your job duties as Chief Mission Support, Region 10?
A. In a nutshell, if you know Radar O'Reily of MASH, it's basically that type of a position. I get the officers the tools and equipment and office space they need, cars, uniforms, et cetera, through my staff to be able to do their jobs.
Q. That's very descriptive in a nutshell. Thank you. Have your job duties remained approximately consistent throughout the time that you served as Chief of Mission Support since approximately February 2002?
A. Yes.
Q. Do you know the Plaintiff in this case, James Scott?
A. No, only by what I've read.
Q. Have you ever met James Scott?
A. No.
Q. You know of him?
A. I know --
Q. Is that fair to say?
A. I know he's an employee in Region 9.
Q. Do you know if he's still employed in Region 9?
A. I assume that he has been dismissed. I don't know if he's still there or not, no, to be honest. I know I proposed his termination.

Q. Other than proposing Special Agent Scott's termination, were you involved in his removal in any other fashion?

A. No.

MS. CIPRIANI: Objection. Vague.

Q. BY MR. ENGLISH: How did you get to be involved in -- strike that. How is it that you came to propose Special Agent Scott's removal?

A. I was given a letter stating that I needed to review documents and make a determination in the case. We needed to -- I needed to review the information provided in front of me and see if I couldn't get Mr. Scott back to work. We were lacking some medical documentation.

Q. Was this your first contact or involvement with anything to do with Mr. Scott?

A. Yes.

Q. Who gave you a letter that you're referring to?

A. It came through Mr. Bowman.

Q. Who is Mr. Bowman?

A. He is the Regional Director for Region 10.

Q. When you say the letter came through Mr. Bowman, what do you mean by that?

A. The authority to look at the case was redelegated to me.

Q. Did Mr. Bowman do the redelegation?

A. He did one redelegation. The original letter came from Region 9 delegating it to him, and he, in turn, delegated it down to my level.

Q. Do you have that letter in front of you?

A. I am not sure. Let me look through what I got.

(Pause in proceedings.)

THE WITNESS: No, I don't have that letter.

Q. BY MR. ENGLISH: Well, to the extent you can recall, can you please describe the letter for me.

MS. CIPRIANI: Object. The document speaks for itself.

THE WITNESS: I don't recall exactly what the document said to be able to give you an accurate answer. I do know that the authority was delegated to me.

Q. BY MR. ENGLISH: Well, I don't expect you to recall exactly what the letter says or what the exact phrasing of the letter was. But you're making reference to a document that we're not looking at presently in front of us, so I would like to ask you to give me your best recollection of everything that you can about this letter that you have in your memory.

A. The letter told me that -- I'm sorry.

Q. Go ahead, please. It was my fault. Go ahead, please.

A. The letter told me that I would be the proposing official in this case.

Q. And who was the author of the letter?
A. Which one? The beginning one or the one Mr. Bowman redelegated to me?
Q. Is there two documents you're referring to? You just indicated that the letter told you that you were to be the proposing official with regards to James Scott; correct?
A. Yes.
Q. Who told you through this letter that you would be the proposing official in regards to James Scott?
A. The letter came from Mr. Bowman to me.
Q. I guess that's what I'm trying to clarify a little bit. The letter came from Mr. Bowman to you. I think earlier you had testified that the letter came through Mr. Bowman, or something to that effect, that made me infer that the letter had actually come from somewhere else, and that's what I'm trying to understand, if that's, in fact, the case.
A. There was a letter from Region 9 that came to Mr. Bowman delegating the case to our region. And then there was a letter from Mr. Bowman to me delegating me to look at this case.
MR. ENGLISH: We're going to go off the record for just a moment.
(Proceedings in recess.)
MR. ENGLISH: Back on the record.
Q. BY MR. ENGLISH: Your recollection is that there

were actually two letters, two correspondence, one, a letter from Region 9 to a Mr. Bowman, and a second letter from Bowman to you; correct?

A. I believe so.

Q. And the second letter from Bowman to you indicated you would be the proposing official with regards to James Scott; correct?

A. Yes.

Q. What was it you were to be proposing?

A. I was to look at the case and figure out how to get Mr. Scott back to work.

Q. But it was your understanding that you were to be the proposing official with regards to discipline for James Scott; correct?

MS. CIPRIANI: Objection. Lacks foundation. Assumes facts not in evidence.

THE WITNESS: I don't know how to answer your question. Can you restate it for me?

Q. BY MR. ENGLISH: I can. You testified a few minutes ago, a few moments ago, that you understood that you were -- the communication to you instructed you to be -- that you were to be the proposing official with regards to James Scott; correct?

A. Yes.

Q. And my further question to you is that by

deposition. He had an EEO case, I believe.

Q. You believe that it was a deposition associated with a pending EEO matter?

A. Yes.

Q. It was not something that was in federal court, for example?

A. I don't recall for sure.

Q. Were you questioned by an attorney?

A. Yes.

Q. Do you recall the date of your deposition?

A. No.

Q. Do you recall the attorney's name?

A. Malmsheimer. It was a very long name with a lot of letters.

Q. Can you give me a rough approximation of the spelling that you have there?

A. M-a-l-m-s-h-e-i-m-e-r. I'm sorry. I'm guessing.

MR. ENGLISH: Why don't we go off the record for about three to five minutes, please.

(Proceedings in recess.)

MS. CIPRIANI: Back on the record. Ready?

MR. ENGLISH: I'm ready. Are you ready?

THE WITNESS: Yes.

Q. BY MR. ENGLISH: After you received the initial

delegation of authority regarding Special Agent Scott's medical issues and your role as the proposing official, what steps did you take?

A. I reviewed all of the documentation, discussed with counsel the course that I thought I needed to take.

MS. CIPRIANI: I'm going go object and instruct her not to answer as far as any conversations with counsel. Go ahead.

Q. BY MR. ENGLISH: This is one of those distinctions between an ordinary objection and instruction not to answer. As a general notion, discussions that you have with counsel for the Agency is not something that I'm entitled to and I'm not asking you questions about those communications. That is considered privileged, generally speaking.

So in this instance, Ms. Cipriani has instructed you not to answer, and I can just modify my questions to the extent that I'm just looking for the steps that you took in handling your responsibility with regard to Special Agent Scott, other than communications that you may have had, privileged communications you may have had with counsel; okay?

A. Okay.

Q. With that clarification, can you answer my previous question about the steps that you took?

A. Yes. I reviewed the medical information. I am not a medical doctor. There was other information that

Dr. Saladino needed from Mr. Scott to be able to perform his review to determine if Mr. Scott could return to work. I asked for that information and Mr. Scott didn't provide it to me.

Q. Is that the end of the analysis as far as you were concerned?

A. Yes.

Q. You asked for the information. Mr. Scott didn't provide it. You recommended removal?

A. In a nutshell, yes.

Q. What was the other information that Dr. Saladino requested?

A. Dr. Saladino requested the answers to the questions that I sent to him by mail and wanted to be able to review the office of Worker's Compensation claim and the other information that he had submitted to me. I wanted him to be able to sign the release to release that information to Dr. Saladino so he could make his determination.

Q. You understood that Special Agent Scott had a shoulder impingement that you testified about already; correct?

A. Yes.

Q. Did you have any understanding of any other medical condition or impairments that Mr. Scott may have had?

A. No.

Q. And it was your understanding that -- strike that. Did you -- well, do you have a document in front of you

that -- do you have the letter in front of you that you sent to James Scott on December 21, 2006?

A. Yes.

Q. How many pages is that document?

A. Four.

Q. And are there numbers in the lower right-hand corner of the document on each page?

A. Yes.

Q. Or combination of letters and numbers?

A. Yes.

Q. What's the letters and numbers on the first page?

A. DEF_03830.

Q. And are the pages numbered sequentially thereafter?

A. Yes.

Q. What is the number on the last page?

A. The number on the last page of the letter is DEF_03833.

Q. On the second page of the letter your name appears above your job title, and there is a signature above your name. Do you see that?

A. Yes.

Q. Is that your signature?

A. Yes.

Q. Look at the whole document and tell me if you recognize it, please, including the attachments.
A. I'm sorry. I didn't hear the last part.
Q. Including the attachments, please.
(Pause in proceedings.)
THE WITNESS: There are four pages to the letter.
Q. BY MR. ENGLISH: Do you recognize it?
A. Yes.
Q. How do you recognize it?
A. Because I wrote it.
Q. Sometimes the answers are real simple. I'm going to ask you to either do so now or after we're done with these questions, hand this document to the court reporter and to have her mark it as next in order, Exhibit 5.
(Proceedings in recess.)
MR. ENGLISH: We're back on the record. I'm going to ask the court reporter to mark this as Exhibit 1 to this deposition.
(Defendants' Exhibit No. 1 was marked for identification.)
Q. BY MR. ENGLISH: Was it your understanding that at the time you were reviewing this medical documentation and making requests of Special Agent Scott, that he was being evaluated for a Fitness For Duty Examination?
A. I don't know if he was being evaluated for a

MR. ENGLISH: And what privilege or privacy are you invoking and instructing the witness not to answer?

MS. CIPRIANI: If you can answer it, go ahead. You want her to go through the regulation and do a legal analysis of what allows her to ask that question? I don't think that's a fair question for a laywitness.

THE WITNESS: I'll go back and restate that questions that were in the December 21st letter were questions that needed to be answered so that Dr. Saladino could review his medical information and return him back to work.

Q. BY MR. ENGLISH: You never made any independent discermination that these were questions, that he needed to answer them, did you?

MS. CIPRIANI: Objection. Misstates her testimony. Asked and answered. Vague and ambiguous.

(Pause in proceedings.)

THE WITNESS: There's someone at the door. Could we take a break?

MR. ENGLISH: Let's go off the record for a minute.

(Proceedings in recess.)

MR. ENGLISH: Let's go back on the record if we're all ready.

Q. BY MR. ENGLISH: Why don't we go ahead and start with the fax that you just received. Take a look at that document, and tell me if you recognize it after you review it.

(Pause in proceedings.)
THE WITNESS:  Yes, I recognize it.
Q.   BY MR. ENGLISH:  How is it that you recognize it?
A.   It has my signature on it.
Q.   What is this document?
A.   It is the January 25th letter proposing Mr. Scott's removal.
MR. ENGLISH:  I'll ask the court reporter to mark this as next in order.
(Defendants' Exhibit No. 3 was marked for identification.)
Q.   BY MR. ENGLISH:  Now that we're back on the record after a rather extended break, you do recall that you are testifying under the penalty of perjury pursuant to the oath you took at the beginning of the deposition; correct?
A.   Yes.
Q.   We were talking before the break about the things that you took into consideration leading to your decision to recommend the removal of Agent Scott.  Do you recall that?
A.   Yes.
Q.   Would it be fair to characterize -- strike that. Would it be accurate to state that you deferred to Dr. Saladino as to whether or not the questions that you posed in the

STATE OF (____________________________)

) ss.

COUNTY OF (___________________________)

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions, or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

Executed this _____ day of _____, 20___, at

_________________________________

Tamra A. Hirano

# C E R T I F I C A T E

I, CATHERINE E. KAPASKA, CCR. NO. 266, Certified Court Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth; at which time the witness was put under oath by me;

That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken;

That the reading and signing was RESERVED by the Witness.

I further certify that I am not a relative or employee of any attorney or of any of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of Washington that the foregoing is true and correct.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 30th day of June, 2009.

CATHY KAPASKA, CCR NO. 266

## 19. Transcript portions of the Deposition of Steven Slagowski (July 7, 2009)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JAMES SCOTT, Plaintiff, | ) | |
| vs. | ) | No. 08-CV-0735-BTM(JMA) |
| JANET NAPOLITANO, SECRETARY, DEPARTMENT OF HOMELAND SECURITY, Defendant. | ) | |

VIDEO TELECONFERENCE DEPOSITION OF

STEVEN C. SLAGOWSKI, VOLUME 1

TACOMA, WASHINGTON

JUNE 26, 2009

ATKINSON-BAKER, INC.
COURT REPORTERS
www.depo.com
(800) 288-3376

REPORTED BY: Toni R. Bailey, CCR No. 2598

FILE NO.: A305F82

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

```
JAMES SCOTT,                 )
                             )
            Plaintiff,       )
                             )
        vs.                  )
                             )   No. 08-CV-0735-BTM(JMA)
JANET NAPOLITANO,            )
SECRETARY, DEPARTMENT OF     )
HOMELAND SECURITY,           )
                             )
            Defendant.       )
_____________________________)
```

Video teleconference deposition of STEVEN C. SLAGOWSKI, taken on behalf of Plaintiff, at 1201 Pacific Avenue, Suite 700, Tacoma, Washington, commencing at 10:44 a.m., Friday, June 26, 2009, before Toni R. Bailey, CCR No. 2598.

A P P E A R A N C E S:

FOR PLAINTIFF:

LAW OFFICES OF MATTHEW G. ENGLISH
BY: MATTHEW G. ENGLISH (by video teleconference)
7676 Hazard Center Drive, Suite 500
San Diego, California 92108

FOR DEFENDANT:

OFFICE OF THE UNITED STATES ATTORNEY
BY: CYNTHIA M. CIPRIANI (by video teleconference)
880 Front Street, Suite 6293
San Diego, California 92101-8893

FOR THE AGENCY:

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
BY: CARMEN Z. EVERETT (by telephone)
24000 Avila Road, Room 6080
Laguna Niguel, California 92607

# I N D E X

WITNESS: STEVEN C. SLAGOWSKI


| EXAMINATION | PAGE NO. |
|---|---|
| By Mr. English | 5 |


## E X H I B I T S


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | 1-page memorandum to S. Dade, from D. Olson, 11/8/06 | 52 |
| 2 | 1-page memorandum to S. Slagowski, from D. Bowman, 11/13/06 | 52 |
| 3 | 1-page memorandum to T. Hirano, from S. Slagowski, 11/15/06 | 52 |
| 4 | 1-page email chain, 12/26/06 | 73 |
| 5 | 1-page email chain, 12/26/06 | 76 |
| 6 | 3-page email chain, 2/5/07 | 80 |
| 7 | 5-page letter to S. Slagowski, from J. Scott, 2/8/07 | 83 |


QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

(NONE)

INFORMATION TO BE SUPPLIED:

(NONE)

TACOMA, WASHINGTON; FRIDAY, JUNE 26, 2009;
10:44 A.M.

MS. CIPRIANI: Okay. We're on the record.

THE REPORTER: Thank you.

MS. CIPRIANI: Plaintiff's counsel and the government has stipulated that this particular deposition will be videotaped using the government's teleconferencing equipment, which also creates a DVD video record, and that that record will be admissible at trial in the same manner as if we'd hired an outside contractor to videotape the deposition.

So stipulated?

MR. ENGLISH: So stipulated.

Has the witness been sworn in?

STEVEN C. SLAGOWSKI,
having first been duly sworn, was
examined and testified as follows:

EXAMINATION

BY MR. ENGLISH:

Q. Good morning.

A. Good morning.

Q. My name is Matthew English. I'm counsel for

James Scott in the matter that brings you to your deposition here today.

Can you please state your full name and spell it for the record?

A. My name is Steven Craig Slagowski. The spelling of the first is S-t-e-v-e-n, middle is C-r-a-i-g, the last is S-l-a-g-o-w-s-k-i.

Q. And what is the date and location of your birth?

A. February 16, 1951, San Antonio, Texas.

Q. Mr. Slagowski, have you ever had your deposition taken before?

A. Yes.

Q. How many times?

A. Twice, I believe.

Q. When was the last time you had your deposition taken?

A. I can't recall the exact year, but I estimate 2006.

Q. And what was the nature of the proceeding that brought you to deposition in 2006, or thereabouts?

A. It was a -- I believe it was a grievance by an employee against the Federal Protective Service.

Q. You mentioned one other additional time that you seem to recall that you were deposed; is that correct?

A. Yes.

that might help you remember better, then I would ask you at that point to identify the document.

I can't see the conference table in front of you entirely, but it would be -- it is my request that you do not refer to the documents in providing your answers unless we specifically identify that you're looking at a document for a particular purpose, either because I've asked you about it or because you've indicated that there's information there that would help you recall something that you can't recall in the absence of reviewing the document.

Does that make sense?

A. Are you saying, sir, that you prefer that I don't look at the document unless I identify it to you to help my recollection?

Q. My questions to you will be to talk about -- ask you about your recollections and your knowledge and understanding of events as you sit here today unaided by any documents unless we specifically start talking about a document.

A. Yes, sir. I understand.

Q. So just set the documents aside for now. Okay?

A. Okay. (Complies.)

Q. Mr. Slagowski, are you presently employed?

A. Yes.

Q. Who is your employer?
A. Department of Homeland Security, Federal Protective Service.
Q. How long have you been employed by the Federal Protective Service?
A. Since August of 1998.
Q. You currently work in Region 10; is that correct?
A. Yes.
Q. Has the area or division where you work always been referred to as Region 10 --
A. Yes.
Q. -- since 1998?
A. I'm sorry. Yes, it has.
Q. And have you always worked in Region 10 since 1998?
A. Yes.
Q. What is your present job title?
A. Threat management chief. Threat management branch chief. I'm sorry. I'm a supervisory special agent.
Q. How long have you held the title of threat management branch chief?
A. Since August of 2007, I believe it was.
Q. Prior to serving as threat management branch chief for FPS, what job title did you hold?

A. I was acting deputy regional director for a period of time. And I was -- at the same time I was district commander for Region 10.

Q. How long did you serve as district commander for Region 10, or from what year to what year?

A. From 2002 until, I believe, 2007 when I became the branch chief, or threat branch chief.

Q. Within that time frame you also served as acting deputy regional commander; is that correct?

A. Acting deputy regional director.

Q. Director. I'm sorry. Let me ask the question again.

During the same time period that you served as district commander for Region 10, you also served, at least part of the time, as acting deputy regional director; is that correct?

A. Yes.

Q. What time period did you serve as acting deputy regional director while your job title was district commander?

A. I don't have a calendar in front of me, but it would have been ending sometime in around, I would say, May or June of 2007, and the preceding approximately ten months before that.

Q. Was the time that you just described the only

time that you have served as the acting deputy regional director for FPS?

A. Yes. I'm not sure if I have those months exactly right, but it was for approximately ten months that I was the acting deputy regional director.

Q. And that was the only instance you served in that capacity; is that correct?

A. Yes.

Q. Prior to serving as district commander for Region 10 from approximately 2002 to 2007, do you recall what job title you held?

A. I was a special agent for a while, supervisory special agent. And I was also an area commander for a while.

Q. Can you give me the approximate time frames for each of those positions?

A. I was hired as a commander in 1998. I became a special agent approximately in 2001.

Q. Was there a period of time when you served as special agent distinct from when you served as a supervisory special agent?

A. When I served as a supervisory special agent, I was an acting supervisory special agent. In both cases I had the GS rank of GS-12. And, yes, sir, to answer your question, there was a period of time when I was a field

agent during that time.

Q. Approximately how long did you serve as a field agent for FPS?

A. The whole time that I was a special agent, even as a supervisor. We didn't have many agents. And so I was doing field work for something for the entire period of time. I can't recall when I became agent, somewhere in 2001. And in 2002 I became a district commander. I did various types of field work during that entire time.

Q. Can you briefly summarize for me your job duties as threat management branch chief? Just an overview.

A. I supervise the investigative and intelligence programs of the region.

Q. And with the same level of generality or specificity, could you describe your job duties when you served as district commander for Region 10 for FPS?

A. I supervised area commanders throughout the region that commanded the uniform force.

Q. For the ten months that you served as acting deputy regional director, could you describe or characterize in a general overview kind of way your job duties in that role?

A. I supervised the threat management branch chief, and I maintained my role as district commander supervising area commanders.

Q. In the approximate ten months that you served as acting deputy regional director, was there more than one threat management branch chief that was reporting to you?

A. No.

Q. Who was the threat management branch chief that reported to you when you were serving as the acting deputy regional director for Region 10?

A. Karen Gaston.

Q. Other than your ongoing duties as district commander for Region 10, did you have any other primary duties in your role as acting deputy regional director other than to supervise the threat management branch chief?

A. Primary duties? I don't recall at this time anything else.

Q. During the entire time that you have been employed by FPS, and other than the case that brings us here today, have you had any involvement with the removal of any FPS employees from federal service?

A. No.

Q. Have you had any involvement across the entire time period that you worked for FPS with proposing removal of any FPS employees?

A. I do not believe I have. I don't recall ever having had to.

Q. Is it accurate to say that you've only been involved with one removal action in the entire time that you've worked for FPS?

A. Well, I've not been a decider. I don't recall being a recommender. I think that would be accurate.

Q. So the only removal action that you've been involved in is the one that brings us to deposition here today involving Special Agent Scott; is that correct?

A. There was an employee removed in one of the prior cases I mentioned, but I don't recall that I had -- that I was part of the process. So --

Q. Which of the -- please go ahead.

A. Could you repeat your question for me?

Q. Unlikely, but I'll try and rephrase it.

Is it accurate to say that the only removal action, termination you've been involved in during the entire time period that you have worked for FPS, is the one involving Special Agent Scott?

A. Well, could you explain to me what you mean by involved?

Q. Well, I guess I would like to know what you would consider to be involved. Are you thinking of certain instances when you were involved in an action in a way that wasn't in the role of a proposing official or deciding official?

A. I believe there to be -- I was going to be a witness in a situation where an employee was removed, but I was not part of the removal process. I was just going to be a witness. So I don't think it's accurate to say that I've been involved. My definition of involved would be as a proposer or decider.

Q. Well, as a proposing official, do I understand your testimony correctly that you have never been involved in a removal action as the proposing official?

A. Not to my recollection.

Q. And is it accurate to state that you have only been involved as the deciding official in one action, that being the removal of Special Agent Scott from federal service?

A. Yes, as far as I can recall.

Q. Is there some uncertainly? When you say as far as you can recall, is there some uncertainty that there may actually have been an instance where you were the deciding official for the removal of a employee from federal service that you can't recall as you sit here today?

A. We had approximately three grievances out of one office that to some degree or another I was a witness in, and I do not -- I don't recall being a proposer or decider in any of those.

Q. So to the best of your recollection --
A. Yes.
Q. -- the removal of James Scott was the only one where you were the deciding official, correct?
A. Yes.
Q. How is it that you came to be involved in the removal of Special Agent Scott from federal service?
A. My supervisor assigned me to review any recommendations that Chief Hirano would have with the situation.
Q. Who is the supervisor you're referring to?
A. Regional Director Don Bowman.
Q. Was Don Bowman serving as the acting regional director or the regional director at the time he gave you this assignment?
A. I don't recall.
Q. Do you recall when Regional Director Don Bowman gave you the assignment to review any documents or conclusions, or whatever it was that he asked you to review, with regard to Ms. Hirano and Special Agent Scott?
A. As I sit here today, I don't recall when he assigned that.
Q. Do you recall approximately?
A. I can probably generally estimate it was in 2006.
Q. Do you recall whether or not you were serving as

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JAMES SCOTT, )
)
Plaintiff, )
)
vs. )
) No. 08-CV-0735-BTM(JMA)
JANET NAPOLITANO, )
SECRETARY, DEPARTMENT OF )
HOMELAND SECURITY, )
)
Defendant. )
__________________________)

VIDEO TELECONFERENCE DEPOSITION OF

STEVEN C. SLAGOWSKI, VOLUME 2

TACOMA, WASHINGTON

JULY 7, 2009

ATKINSON-BAKER, INC.
COURT REPORTERS
www.depo.com
(800) 288-3376

REPORTED BY: Toni R. Bailey, CCR No. 2598

FILE NO.: A3061EE

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JAMES SCOTT, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 08-CV-0735-BTM(JMA) |
| JANET NAPOLITANO, SECRETARY, DEPARTMENT OF HOMELAND SECURITY, | ) | |
| Defendant. | ) | |

Video teleconference deposition of STEVEN C. SLAGOWSKI, taken on behalf of Plaintiff, at 1201 Pacific Avenue, Suite 700, Tacoma, Washington, commencing at 9:31 a.m., Tuesday, July 7, 2009, before Toni R. Bailey, CCR No. 2598.

A P P E A R A N C E S:

FOR PLAINTIFF:

LAW OFFICES OF MATTHEW G. ENGLISH
BY: MATTHEW G. ENGLISH (by video teleconference)
7676 Hazard Center Drive, Suite 500
San Diego, California 92108

FOR DEFENDANT:

OFFICE OF THE UNITED STATES ATTORNEY
BY: CYNTHIA M. CIPRIANI (by video teleconference)
880 Front Street, Suite 6293
San Diego, California 92101-8893

I N D E X

WITNESS: STEVEN C. SLAGOWSKI

| EXAMINATION | PAGE NO. |
|---|---|
| By Ms. Cipriani | 108, 182 |
| By Mr. English | 140 |

his removal --

A. There was.

Q. -- for failure to -- for failure to cooperate?

A. There was.

Q. And who wrote that letter?

A. Chief Hirano.

Q. Do you have that letter in front of you?

A. I do. This is Exhibit 8. Oh, no.

Q. No. I think that Exhibit 8 is the letter asking him --

A. Right.

Q. -- to initially answer the questions. Is that correct?

A. That's correct.

Q. I know that we actually marked the letter that she sent proposing this rule. (Pause.)

Let's focus on your letter that actually implements the removal decision. Do you have a letter in front of you dated March 5, 2007?

A. I do.

Q. Can you explain what that document is?

A. I explained to Mr. Scott the opportunities that he had to comply with the two directives. I explained to him that I carefully considered the facts of the matter. And I explained to him that I find removal warranted, and

I give him recourse that he can take in.
Q. I've now located, Mr. Slagowski, the letter that Ms. Hirano sent. It's marked on the bottom DEF 03727 through 03731. Do you have that document in front of you?
A. I do not believe I do.
Q. Were you aware before you sent the letter in March of 2007 that Ms. Hirano had sent a letter proposing Mr. Scott's removal to Mr. Scott on January 25th, 2007?
A. I am.
Q. And were you aware that he had an opportunity to review her proposal that he be removed for failure to comply with two direct orders and also have the opportunity to respond to it?
A. I believe I have her letter now. I -- could you restate that question?
Q. Were you aware that she had advised him that she was proposing his removal for failure to comply with two specific direct orders and that she also gave him an opportunity to reply to the proposal?
A. I am. This is not the letter we're talking about though. I am.
Q. I think at this point I would propose that we take a very brief break. I'm going to go ahead and have this letter faxed to you so we can mark it as an exhibit. So off the record for about five minutes.

to provide the release of his Worker's Comp records to the medical review officer, would that have been an independent basis for terminating him?

A. By the same token, Dr. Saladino would not have been able to assure his fitness for duty, if he had not provided that.

Q. Is it your understanding that Mr. Scott did respond to the request for -- or the proposed removal?

A. He did. I believe he did.

Q. Did you review his response before making the decision to remove him?

A. I -- yes, I did.

Q. And why is it that his response didn't cause you to rethink your decision to remove him?

A. Because bottom line is he did not follow the direct orders given to him. In fact --

MS. CIPRIANI: Madame Court Reporter, I'd like you -- oh, I'm sorry. Go ahead, Mr. Slagowski.

THE WITNESS: That's fine. Go ahead.

MS. CIPRIANI: Now, with regard to the March 5, 2007, letter, Madame Court Reporter, if you could mark that as Exhibit No. 11.

Q. (By Ms. Cipriani) And that is the actual letter that you wrote, correct, that makes the removal decision?

A. Yes.

STATE OF _____________________)
)SS.
COUNTY OF ____________________)

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this ________ day of _______________________,
20___, at _______________________, _______________________.
[City] [State]

_________________________________
STEVEN C. SLAGOWSKI

C E R T I F I C A T E

STATE OF WASHINGTON )
)SS
County of Pierce )

I, TONI R. BAILEY, CCR, RPR, CCR #2598, a duly authorized Notary Public in and for the State of Washington, residing at Roy, do hereby certify:

That the foregoing deposition of STEVEN C. SLAGOWSKI, Volume 2, was taken before me and completed on July 7, 2009, and thereafter was transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved the right of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing the said deposition and promptly delivering the same to MATTHEW G. ENGLISH, Attorney.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 16th day of July, 2009.

____________________________________

Toni R. Bailey, CCR, RPR
Notary Public in and for the State
of Washington, residing at Roy.
My Commission Expires: 7-15-2012

**20. EEOC, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities Act (ADA), 2 EEOC Compl. Man. (CCH) P6910 (2000)**

*The U.S. Equal Employment Opportunity Commission*

| | | |
|---|---|---|
| | | **Number** |
| ***EEOC*** | ***NOTICE*** | 915.002 |
| | | **Date** |
| | | 7/27/00 |

1. SUBJECT: EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)

2. PURPOSE: This enforcement guidance explains when it is permissible foremployers to make disability-related inquiries or require medical examinations of employees.

3. EFFECTIVE DATE: Upon receipt.

4. EXPIRATION DATE: As an exception to EEOC Order 205.001, Appendix B,Attachment 4, § a(5), this Notice will remain in effect until rescinded or superseded.

5. ORIGINATOR: ADA Division, Office of Legal Counsel.

6. INSTRUCTIONS: File after Section 902 of Volume II of the Compliance Manual.

```
7/27/00                  /s/
Date                Ida L. Castro
                    Chairwoman
```

**DISTRIBUTION: CM Holders**

# ENFORCEMENT GUIDANCE: DISABILITY-RELATED INQUIRIES AND MEDICAL EXAMINATIONS OF EMPLOYEES UNDER THE AMERICANS WITH DISABILITIES ACT (ADA)

## TABLE OF CONTENTS


INTRODUCTION

GENERAL PRINCIPLES

- Background
- Disability-Related Inquiries and Medical Examinations of Employees

JOB-RELATED AND CONSISTENT WITH BUSINESS NECESSITY


## Notice Concerning The Americans With Disabilities Act Amendments Act Of 2008

The Americans with Disabilities Act (ADA) Amendments Act of 2008 was signed into law on

In General

Scope and Manner of Disability-Related Inquiries and Medical Examinations

Disability-Related Inquiries and Medical Examinations Relating to Leave

Periodic Testing and Monitoring

OTHER ACCEPTABLE DISABILITY-RELATED INQUIRIES AND MEDICAL EXAMINATIONS OF EMPLOYEES

INDEX

September 25, 2008 and becomes effective January 1, 2009. Because this law makes several significant changes, including changes to the definition of the term "disability," the EEOC will be evaluating the impact of these changes on this document and other publications. See the list of specific changes to the ADA made by the ADA Amendments Act.

# INTRODUCTION

Title I of the Americans with Disabilities Act of 1990 (the "ADA")[(1)] limits an employer's ability to make disability-related inquiries or require medical examinations at three stages: pre-offer, post-offer, and during employment. In its guidance on preemployment disability-related inquiries and medical examinations, the Commission addressed the ADA's restrictions on disability-related inquiries and medical examinations at the pre- and post-offer stages.[(2)] This enforcement guidance focuses on the ADA's limitations on disability-related inquiries and medical examinations during employment.[(3)]

Disability-related inquiries and medical examinations of employees must be "job-related and consistent with business necessity." This guidance gives examples of the kinds of questions that are and are not "disability-related" and examples of tests and procedures that generally are and are not "medical." The guidance also defines what the term "job-related and consistent with business necessity" means and addresses situations in which an employer would meet the general standard for asking an employee a disability-related question or requiring a medical examination. Other acceptable inquiries and examinations of employees, such as inquiries and examinations required by federal law and those that are part of voluntary wellness and health screening programs, as well as invitations to voluntarily self-identify as persons with disabilities for affirmative action purposes, also are addressed.[(4)]

# GENERAL PRINCIPLES

## A. Background

Historically, many employers asked applicants and employees to provide information concerning their physical and/or mental condition. This information often was used to exclude and otherwise discriminate against individuals with disabilities -- particularly nonvisible disabilities, such as diabetes, epilepsy, heart disease, cancer, and mental illness -- despite their ability to perform the job. The ADA's provisions concerning disability-related inquiries and medical examinations reflect Congress's intent to protect the rights of applicants and employees to be assessed on merit alone, while protecting the rights of employers to ensure that individuals in the workplace can efficiently perform the essential functions of their jobs.[(5)]

Under the ADA, an employer's ability to make disability-related inquiries or require medical examinations is analyzed in three stages: pre-offer, post-offer, and employment. At the first stage **(prior to an offer of employment)**, the ADA prohibits all disability-related inquiries and medical examinations, *even if* they are related to the job.[(6)] At the second stage **(after an applicant is given a conditional job offer, but before s/he starts work)**, an employer may make disability-related inquiries and conduct medical examinations, regardless of whether they are related to the job, as long as it does so for all entering employees in the same job category.[(7)] At the third stage **(after employment begins)**, an employer may make disability-related inquiries and require medical examinations *only* if they are job-related and consistent with business necessity.[(8)]

The ADA requires employers to treat any medical information obtained from a disability-related inquiry or medical examination (including medical information from voluntary health or wellness programs [(9)]), as well as any medical information voluntarily disclosed by an employee, as a confidential medical record. Employers may share such information only in limited circumstances with supervisors, managers, first aid and safety personnel, and government officials investigating compliance with the ADA.[(10)]

## B. Disability-Related Inquiries and Medical Examinations of Employees

The ADA states, in relevant part:

> A covered entity[(11)] shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature and severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.[(12)]

This statutory language makes clear that the ADA's restrictions on inquiries and examinations apply to all employees, not just those with disabilities. Unlike other provisions of the ADA which are limited to qualified individuals with disabilities,[(13)] the use of the term "employee" in this provision reflects Congress's intent to cover a broader class of individuals and to prevent employers from asking questions and conducting medical examinations that serve no legitimate purpose.[(14)] Requiring an individual to show that s/he is a person with a disability in order to challenge a disability-related inquiry or medical examination would defeat this purpose.[(15)] *Any* employee, therefore, has a right to challenge a disability-related inquiry or medical examination that is not job-related and consistent with business necessity.

Only disability-related inquiries and medical examinations are subject to the ADA's restrictions. Thus, the first issue that must be addressed is whether the employer's question is a "disability-related inquiry" or whether the test or procedure it is requiring is a "medical examination." The next issue is whether the person being questioned or asked to submit to a medical examination is an "employee." If the person is an employee (rather than an applicant or a person who has received a conditional job offer), the final issue is whether the inquiry or examination is "job-related and consistent with business necessity" or is otherwise permitted by the ADA.[(16)]

1. What is a **"disability-related inquiry"**?

In its guidance on Preemployment Questions and Medical Examinations, the Commission explained in detail what is and is not a disability-related inquiry.[(17)] A "disability-related inquiry" is a **question (or series of questions) that is likely to elicit information about a disability.**[(18)] The same standards for determining whether a question is disability-related in the pre- and post-offer stages apply to the employment stage.[(19)]

Disability-related inquiries may include the following:

- asking an employee whether s/he has (or ever had) a disability or how s/he became disabled or inquiring about the nature or severity of an employee's disability;[(20)]
- asking an employee to provide medical documentation regarding his/her disability;
- asking an employee's co-worker, family member, doctor, or another person about an employee's disability;
- asking about an employee's genetic information;[(21)]
- asking about an employee's prior workers' compensation history;[(22)]
- asking an employee whether s/he currently is taking any prescription drugs or medications, whether s/he has taken any such drugs or medications in the past, or monitoring an employee's taking of such drugs or medications;[(23)] and,
- asking an employee a **broad** question about his/her impairments that is likely to elicit information about a disability (e.g., What impairments do you have?).[(24)]

**Questions that are not likely to elicit information** about a disability are *not* disability-related inquiries and, therefore, are not prohibited under the ADA.

**Questions that are permitted** include the following:

- asking generally about an employee's **well being** (e.g., How are you?), asking an employee who looks tired or ill if s/he is feeling okay, asking an employee who is sneezing or coughing whether s/he has a cold or allergies, or asking how an employee is doing following the death of a loved one or the

end of a marriage/relationship;

- asking an employee about nondisability-related impairments (e.g., How did you break your leg?)[(25)]
- asking an employee whether s/he can perform job functions;
- asking an employee whether s/he has been drinking;[(26)]
- asking an employee about his/her **current illegal use of drugs**;[(27)]
- asking a pregnant employee how she is feeling or when her baby is due;[(28)] and,
- asking an employee to provide the name and telephone number of a person to contact in case of a medical emergency.

2. What is a **"medical examination"**?

A "medical examination" is a **procedure or test that seeks information about an individual's physical or mental impairments or health**.[(29)] The guidance on Preemployment Questions and Medical Examinations lists the following factors that should be considered to determine whether a test (or procedure) is a medical examination: (1) whether the test is administered by a health care professional; (2) whether the test is interpreted by a health care professional; (3) whether the test is designed to reveal an impairment or physical or mental health; (4) whether the test is invasive; (5) whether the test measures an employee's performance of a task or measures his/her physiological responses to performing the task ; (6) whether the test normally is given in a medical setting; and, (7) whether medical equipment is used.[(30)]

In many cases, a combination of factors will be relevant in determining whether a test or procedure is a medical examination. In other cases, one factor may be enough to determine that a test or procedure is medical.

**Medical examinations** include, but are not limited to, the following:

- vision tests conducted and analyzed by an ophthalmologist or optometrist;
- blood, urine, and breath analyses to check for alcohol use;[(31)]
- blood, urine, saliva, and hair analyses to detect disease or genetic markers (e.g., for conditions such as sickle cell trait, breast cancer, Huntington's disease);
- blood pressure screening and cholesterol testing;
- nerve conduction tests (i.e., tests that screen for possible nerve damage and susceptibility to injury, such as carpal tunnel syndrome);
- range-of-motion tests that measure muscle strength and motor function;
- pulmonary function tests (i.e., tests that measure the capacity of the lungs to hold air and to move air in and out);
- psychological tests that are designed to identify a mental disorder or impairment; and,
- diagnostic procedures such as x-rays, computerized axial tomography (CAT) scans, and magnetic resonance imaging (MRI).

There are a **number of procedures and tests employers may require that generally are not considered medical examinations**, including:

- tests to determine the **current illegal use of drugs**;[(32)]
- **physical agility tests**, which measure an employee's ability to perform actual or simulated job tasks, and **physical fitness tests**, which measure an employee's performance of physical tasks, such as running or lifting, as long as these tests do not include examinations that could be considered medical (e.g., measuring heart rate or blood pressure);
- tests that evaluate an employee's ability to read labels or distinguish objects as part of a demonstration of the ability to perform actual job functions;
- **psychological tests** that measure personality traits such as honesty, preferences, and habits; and,

- polygraph examinations.[(33)]

3. Who is an **"employee"**?

The ADA defines the term "employee" as "an individual employed by an employer."[(34)] As a general rule, an individual is an employee if an entity controls the means and manner of his/her work performance.[(35)]

Where more than one entity controls the means and manner of how an individual's work is done, the individual is an employee of each entity.

> Example: XYZ, a temporary employment agency, hires a computer programmer and assigns him to Business Systems, Inc. (BSI), one of its clients. XYZ determines when the programmer's assignment begins and pays him a salary based on the number of hours worked as reported by BSI. XYZ also withholds social security and taxes and provides workers' compensation coverage. BSI sets the hours of work, the duration of the job, and oversees the programmer's work. XYZ can terminate the programmer if his performance is unacceptable to BSI.
>
> The programmer is an employee of both XYZ and BSI. Thus, XYZ and BSI may ask the programmer disability-related questions and require a medical examination only if they are job-related and consistent with business necessity.

4. How should an employer treat an employee who **applies for a new (i.e., different) job with the same employer**?

An employer should treat an employee who *applies* for a new job as an **applicant** for the new job.[(36)] The employer, therefore, is prohibited from asking disability-related questions or requiring a medical examination before making the individual a conditional offer of the new position.[(37)] Further, where a current supervisor has medical information regarding an employee who is applying for a new job, s/he may not disclose that information to the person interviewing the employee for the new job or to the supervisor of that job.

After the employer extends an offer for the new position, it may ask the individual disability-related questions or require a medical examination as long as it does so for all entering employees in the same job category. If an employer withdraws the offer based on medical information (i.e., screens him/her out because of a disability), it must show that the reason for doing so was job-related and consistent with business necessity.

An individual is *not* an applicant where s/he is **noncompetitively** entitled to another position with the same employer (e.g., because of seniority or satisfactory performance in his/her current position). An individual who is temporarily assigned to another position and then returns to his/her regular job also is not an applicant. These individuals are employees and, therefore, the employer only may make a disability-related inquiry or require a medical examination that is job-related and consistent with business necessity.

> Example A: Ruth, an inventory clerk for a retail store, applies for a position as a sales associate at the same store. Ruth is an applicant for the new job. Accordingly, her employer may not ask any disability-related questions or require a medical examination before extending her a conditional offer of the sales associate position. Following a conditional offer of employment, the employer may ask disability-related questions and conduct medical examinations, regardless of whether they are related to the job, as long as it does so for all entering employees in the same job category.[(38)]
>
> Example B: A grade 4 clerk typist has worked in the same position for one year and received a rating of outstanding on her annual performance appraisal. When she was hired, she was told that she automatically would be considered for promotion to the next grade after 12 months of satisfactory performance. Because the clerk typist is noncompetitively entitled to a promotion, she is an employee and not an applicant. The employer, therefore, only may make a disability-related inquiry or require a medical examination that is job-related and consistent with business necessity.
>
> Example C: A newspaper reporter, who regularly works out of his employer's New York headquarters, is temporarily assigned to its bureau in South Africa to cover the political elections. Because the reporter is on a temporary assignment doing the same job, he is an employee; the employer, therefore, may make disability-related inquiries or require medical

examinations only if they are job-related and consistent with business necessity.

## JOB-RELATED AND CONSISTENT WITH BUSINESS NECESSITY

Once an employee is on the job, his/her actual performance is the best measure of ability to do the job. When a need arises to question the ability of an employee to do the essential functions of his/her job or to question whether the employee can do the job without posing a direct threat due to a medical condition, it may be job-related and consistent with business necessity for an employer to make disability-related inquiries or require a medical examination.

### A. In General

5. When may a disability-related inquiry or medical examination of an employee be "**job-related and consistent with business necessity"**?

Generally, a disability-related inquiry or medical examination of an employee may be "job-related and consistent with business necessity" when an employer "has a reasonable belief, based on objective evidence, that: (1) an employee's ability to perform essential job functions will be impaired by a medical condition; or (2) an employee will pose a direct threat[(39)] due to a medical condition."[(40)] Disability-related inquiries and medical examinations that follow up on a request for reasonable accommodation when the disability or need for accommodation is not known or obvious also may be job-related and consistent with business necessity. In addition, periodic medical examinations and other monitoring under specific circumstances may be job-related and consistent with business necessity.[(41)]

Sometimes this standard may be met when an employer knows about a particular employee's medical condition, has observed performance problems, and reasonably can attribute the problems to the medical condition. An employer also may be given **reliable information** by a credible third party that an employee has a medical condition,[(42)] or the employer may observe symptoms indicating that an employee may have a medical condition that will impair his/her ability to perform essential job functions or will pose a direct threat. In these situations, it may be job-related and consistent with business necessity for an employer to make disability-related inquiries or require a medical examination.

> Example A: For the past two months, Sally, a tax auditor for a federal government agency, has done a third fewer audits than the average employee in her unit. She also has made numerous mistakes in assessing whether taxpayers provided appropriate documentation for claimed deductions. When questioned about her poor performance, Sally tells her supervisor that the medication she takes for her lupus makes her lethargic and unable to concentrate.
>
> Based on Sally's explanation for her performance problems, the agency has a reasonable belief that her ability to perform the essential functions of her job will be impaired because of a medical condition.[(43)] Sally's supervisor, therefore, may make disability-related inquiries (e.g.,ask her whether she is taking a new medication and how long the medication's side effects are expected to last), or the supervisor may ask Sally to provide documentation from her health care provider explaining the effects of the medication on Sally's ability to perform her job.
>
> Example B: A crane operator works at construction sites hoisting concrete panels weighing several tons. A rigger on the ground helps him load the panels, and several other workers help him position them. During a break, the crane operator appears to become light-headed, has to sit down abruptly, and seems to have some difficulty catching his breath. In response to a question from his supervisor about whether he is feeling all right, the crane operator says that this has happened to him a few times during the past several months, but he does not know why.
>
> The employer has a reasonable belief, based on objective evidence, that the employee will pose a direct threat and, therefore, may require the crane operator to have a medical examination to ascertain whether the symptoms he is experiencing make him unfit to perform his job. To ensure that it receives sufficient information to make this determination, the employer may want to provide the doctor who does the examination with a description of the employee's duties, including any physical qualification standards, and require that the employee provide documentation of his ability to work following the examination.[(44)]
>
> Example C: Six months ago, a supervisor heard a secretary tell her co-worker that she

discovered a lump in her breast and is afraid that she may have breast cancer. Since that conversation, the secretary still comes to work every day and performs her duties in her normal efficient manner.

In this case, the employer does not have a reasonable belief, based on objective evidence, either that the secretary's ability to perform her essential job functions will be impaired by a medical condition or that she will pose a direct threat due to a medical condition. The employer, therefore, may not make any disability-related inquiries or require the employee to submit to a medical examination.

An employer's reasonable belief that an employee's ability to perform essential job functions will be impaired by a medical condition or that s/he will pose a direct threat due to a medical condition must be based on *objective evidence* obtained, or reasonably available to the employer, prior to making a disability-related inquiry or requiring a medical examination. Such a belief requires an assessment of the employee and his/her position and cannot be based on general assumptions.

Example D: An employee who works in the produce department of a large grocery store tells her supervisor that she is HIV-positive. The employer is concerned that the employee poses a direct threat to the health and safety of others because she frequently works with sharp knives and might cut herself while preparing produce for display. The store requires any employee working with sharp knives to wear gloves and frequently observes employees to determine whether they are complying with this policy. Available scientific evidence shows that the possibility of transmitting HIV from a produce clerk to other employees or the public, assuming the store's policy is observed, is virtually nonexistent. Moreover, the Department of Health and Human Services (HHS), which has the responsibility under the ADA for preparing a list of infectious and communicable diseases that may be transmitted through food handling,[(45)] does not include HIV on the list.[(46)]

In this case, the employer does *not* have a reasonable belief, based on objective evidence, that this employee's ability to perform the essential functions of her position will be impaired or that she will pose a direct threat due to her medical condition. The employer, therefore, may not make any disability-related inquiries or require the employee to submit to a medical examination.[(47)]

6. May an employer make disability-related inquiries or require a medical examination of an employee **based, in whole or in part, on information learned from another person**?

Yes, if the information learned is **reliable** and would give rise to a reasonable belief that the employee's ability to perform essential job functions will be impaired by a medical condition or that s/he will pose a direct threat due to a medical condition, an employer may make disability-related inquiries or require a medical examination.

Factors that an employer might consider in assessing whether information learned from another person is sufficient to justify asking disability-related questions or requiring a medical examination of an employee include: (1) the relationship of the person providing the information to the employee about whom it is being provided; (2) the seriousness of the medical condition at issue; (3) the possible motivation of the person providing the information; (4) how the person learned the information (e.g., directly from the employee whose medical condition is in question or from someone else); and (5) other evidence that the employer has that bears on the reliability of the information provided.

Example A: Bob and Joe are close friends who work as copy editors for an advertising firm. Bob tells Joe that he is worried because he has just learned that he had a positive reaction to a tuberculin skin test and believes that he has tuberculosis. Joe encourages Bob to tell their supervisor, but Bob refuses. Joe is reluctant to breach Bob's trust but is concerned that he and the other editors may be at risk since they all work closely together in the same room. After a couple of sleepless nights, Joe tells his supervisor about Bob. The supervisor questions Joe about how he learned of Bob's alleged condition and finds Joe's explanation credible.

Because tuberculosis is a potentially life-threatening medical condition and can be passed from person to person by coughing or sneezing, the supervisor has a reasonable belief, based on objective evidence, that Bob will pose a direct threat if he in fact has active tuberculosis. Under these circumstances, the employer may make disability-related inquiries or require a medical examination to the extent necessary to determine whether Bob has tuberculosis and is

contagious.[(48)]

Example B: Kim works for a small computer consulting firm. When her mother died suddenly, she asked her employer for three weeks off, in addition to the five days that the company customarily provides in the event of the death of a parent or spouse, to deal with family matters. During her extended absence, a rumor circulated among some employees that Kim had been given additional time off to be treated for depression. Shortly after Kim's return to work, Dave, who works on the same team with Kim, approached his manager to say that he had heard that some workers were concerned about their safety. According to Dave, people in the office claimed that Kim was talking to herself and threatening to harm them. Dave said that he had not observed the strange behavior himself but was not surprised to hear about it given Kim's alleged recent treatment for depression. Dave's manager sees Kim every day and never has observed this kind of behavior. In addition, none of the co-workers to whom the manager spoke confirmed Dave's statements.

In this case, the employer does not have a reasonable belief, based on objective evidence, that Kim's ability to perform essential functions will be impaired or that s/he will pose a direct threat because of a medical condition. The employer, therefore, would not be justified in asking Kim disability-related questions or requiring her to submit to a medical examination because the information provided by Dave is not reliable.

Example C: Several customers have complained that Richard, a customer service representative for a mail order company, has made numerous errors on their orders. They consistently have complained that Richard seems to have a problem hearing because he always asks them to repeat the item number(s), color(s), size(s), credit card number(s), etc., and frequently asks them to speak louder. They also have complained that he incorrectly reads back their addresses even when they have enunciated clearly and spelled street names.

In this case, the employer has a reasonable belief, based on objective evidence, that Richard's ability to correctly process mail orders will be impaired by a medical condition (i.e., a problem with his hearing). The employer, therefore, may make disability-related inquiries of Richard or require him to submit to a medical examination to determine whether he can perform the essential functions of his job.

7. May an employer ask an employee for **documentation** when s/he requests a **reasonable accommodation?**

Yes. The employer is entitled to know that an employee has a covered disability that requires a reasonable accommodation.[(49)] Thus, when the **disability or the need for the accommodation is not known or obvious,** it is job-related and consistent with business necessity for an employer to ask an employee for reasonable documentation about his/her disability and its functional limitations that require reasonable accommodation.[(50)]

8. May an employer ask **all employees what prescription medications** they are taking?

Generally, no. Asking all employees about their use of prescription medications is not job-related and consistent with business necessity.[(51)] In limited circumstances, however, certain employers may be able to demonstrate that it *is* job-related and consistent with business necessity to require employees in positions affecting public safety to report when they are taking medication that may affect their ability to perform essential functions. **Under these limited circumstances, an employer must be able to demonstrate that an employee's inability or impaired ability to perform essential functions will result in a direct threat.** For example, a police department could require armed officers to report when they are taking medications that may affect their ability to use a firearm or to perform other essential functions of their job. Similarly, an airline could require its pilots to report when they are taking any medications that may impair their ability to fly. A fire department, however, could not require fire department employees who perform only administrative duties to report their use of medications because it is unlikely that it could show that these employees would pose a direct threat as a result of their inability or impaired ability to perform their essential job functions.

9. **What action may an employer take if an employee fails to respond to a disability-related inquiry or fails to submit to a medical examination** that is job-related and consistent with business necessity?

The action the employer may take depends on its reason for making the disability-related inquiry or requiring a medical examination.

> Example A: A supervisor notices that the quality of work from an ordinarily outstanding employee has deteriorated over the past several months. Specifically, the employee requires more time to complete routine reports, which frequently are submitted late and contain numerous errors. The supervisor also has observed during this period of time that the employee appears to be squinting to see her computer monitor, is holding printed material close to her face to read it, and takes frequent breaks during which she sometimes is seen rubbing her eyes. Concerned about the employee's declining performance, which appears to be due to a medical condition, the supervisor tells her to go see the company doctor, but she does not.
>
> Any discipline that the employer decides to impose should focus on the employee's **performance problems**. Thus, the employer may discipline the employee for past and future performance problems in accordance with a uniformly applied policy.
>
> Example B: An accountant with no known disability asks for an ergonomic chair because she says she is having back pain. The employer asks the employee to provide documentation from her treating physician that: (1) describes the nature, severity, and duration of her impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits her ability to perform the activity or activities; and (2) substantiates why an ergonomic chair is needed.
>
> Here, the employee's possible disability and **need for reasonable accommodation** are not obvious. Therefore, if the employee fails to provide the requested documentation or if the documentation does not demonstrate the existence of a disability, the employer can refuse to provide the chair.[(52)]

## B. Scope and Manner of Disability-Related Inquiries and Medical Examinations

10. **What documentation** may an employer require from an employee who requests a **reasonable accommodation**?

An employer may require an employee to provide documentation that is **sufficient** to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested, but cannot ask for unrelated documentation. This means that, in most circumstances, an employer cannot ask for an employee's complete medical records because they are likely to contain information unrelated to the disability at issue and the need for accommodation.[(53)]

Documentation is sufficient if it: (1) describes the nature, severity, and duration of the employee's impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits the employee's ability to perform the activity or activities; and, (2) substantiates why the requested reasonable accommodation is needed.

> Example: An employee, who has exhausted all of his available leave, telephones his supervisor on Monday morning to inform him that he had a severe pain episode on Saturday due to his sickle cell anemia, is in the hospital, and needs time off. Prior to this call, the supervisor was unaware of the employee's medical condition.
>
> The employer can ask the employee to send in documentation from his treating physician that substantiates that the employee has a disability, confirms that his hospitalization is related to his disability, and provides information on how long he may be absent from work.[(54)]

11. May an employer **require an employee to go to a health care professional of the employer's (rather than the employee's) choice** when the employee requests a **reasonable accommodation?**

The ADA does not prevent an employer from requiring an employee to go to an appropriate health care professional of the employer's choice if the employee provides **insufficient documentation** from his/her treating physician (or other health care professional) to substantiate that s/he has an ADA disability and needs a reasonable accommodation.[(55)] However, if an employee provides insufficient documentation in response to the employer's initial request, the employer should explain why the documentation is insufficient and allow the employee an opportunity to provide the missing information in a timely manner.[(56)] The employer also should consider consulting with the employee's doctor (with the employee's consent) before

requiring the employee to go to a health care professional of its choice.[57]

**Documentation is insufficient** if it does not specify the existence of an ADA disability and explain the need for reasonable accommodation.[58] Documentation also might be insufficient where, for example: (1) the health care professional does not have the expertise to give an opinion about the employee's medical condition and the limitations imposed by it; (2) the information does not specify the functional limitations due to the disability; or, (3) other factors indicate that the information provided is not credible or is fraudulent. If an employee provides insufficient documentation, an employer does not have to provide reasonable accommodation until sufficient documentation is provided.

Any medical examination conducted by the employer's health care professional must be job-related and consistent with business necessity. This means that the examination must be limited to determining the existence of an ADA disability and the functional limitations that require reasonable accommodation. If an employer requires an employee to go to a health care professional of the employer's choice, the employer must pay all costs associated with the visit(s).[59]

The Commission has previously stated that when an employee provides sufficient evidence of the existence of a disability and the need for reasonable accommodation, continued efforts by the employer to require that the individual provide more documentation and/or submit to a medical examination could be considered retaliation.[60] However, an employer that requests additional information or requires a medical examination based on a good faith belief that the documentation the employee submitted is insufficient would *not* be liable for retaliation.

12. May an employer require that an **employee, who it reasonably believes will pose a direct threat, be examined by an appropriate health care professional of the employer's choice?**

Yes. The determination that an employee poses a direct threat must be based on an individualized assessment of the employee's present ability to safely perform the essential functions of the job. This assessment must be based on a reasonable medical judgment that relies on the most current medical knowledge and/or best objective evidence.[61] To meet this burden, an employer may want to have the employee examined by a health care professional of its choice who has expertise in the employee's specific condition and can provide medical information that allows the employer to determine the effects of the condition on the employee's ability to perform his/her job. Any medical examination, however, must be limited to determining whether the employee can perform his/her job without posing a direct threat, with or without reasonable accommodation. An employer also must pay all costs associated with the employee's visit(s) to its health care professional.[62]

An employer should be cautious about relying solely on the opinion of its own health care professional that an employee poses a direct threat where that opinion is contradicted by documentation from the employee's own treating physician, who is knowledgeable about the employee's medical condition and job functions, and/or other objective evidence. In evaluating conflicting medical information, the employer may find it helpful to consider: (1) the area of expertise of each medical professional who has provided information; (2) the kind of information each person providing documentation has about the job's essential functions and the work environment in which they are performed; (3) whether a particular opinion is based on speculation or on current, objectively verifiable information about the risks associated with a particular condition; and, (4) whether the medical opinion is contradicted by information known to or observed by the employer (e.g., information about the employee's actual experience in the job in question or in previous similar jobs).

13. **How much** medical information can an employer obtain about an employee when it reasonably believes that an employee's **ability to perform the essential functions** of his/her job will be impaired by a medical condition or that s/he **will pose a direct threat** due to a medical condition?

An employer is entitled only to the information necessary to determine whether the employee can do the essential functions of the job or work without posing a direct threat. This means that, in most situations, an employer cannot request an employee's complete medical records because they are likely to contain information unrelated to whether the employee can perform his/her essential functions or work without posing a direct threat.

14. May an employer require an employee to provide **medical certification that s/he can safely perform a physical agility or physical fitness test**?

Yes. Employers that require physical agility or physical fitness tests may ask an employee to have a

physician certify whether s/he can safely perform the test. [(63)] In this situation, however, the employer is entitled to obtain only **a note simply stating that the employee can safely perform the test or, alternatively, an explanation of the reason(s) why the employee cannot perform the test.** An employer may not obtain the employee's complete medical records or information about any conditions that do not affect the employee's ability to perform the physical agility or physical fitness test safely.

## C. Disability-Related Inquiries and Medical Examinations Relating to Leave[(64)]

15. May an employer request an employee to provide a **doctor's note or other explanation** to substantiate his/her use of sick leave?

Yes. An employer is entitled to know why an employee is requesting sick leave. An employer, therefore, may ask an employee to justify his/her use of sick leave by providing a doctor's note or other explanation, as long as it has a policy or practice of requiring all employees, with and without disabilities, to do so.

16. May an employer require **periodic updates** when an employee is on extended leave because of a medical condition?

Yes. If the employee's request for leave did not specify an exact or fairly specific return date (e.g., October 4 or around the second week of November) or if the employee needs continued leave beyond what was originally granted, the employer may require the employee to provide periodic updates on his/her condition and possible date of return.[(65)] However, where the employer has granted a fixed period of extended leave and the employee has not requested additional leave, the employer *cannot* require the employee to provide periodic updates. Employers, of course, may call employees on extended leave to check on their progress or to express concern for their health.

17. May an employer make disability-related inquiries or require a medical examination**when an employee who has been on leave for a medical condition seeks to return to work**?

Yes. If an employer has a reasonable belief that an employee's **present** ability to perform essential job functions will be impaired by a medical condition or that s/he will pose a direct threat due to a medical condition, the employer may make disability-related inquiries or require the employee to submit to a medical examination. Any inquiries or examination, however, must be limited in scope to what is needed to make an assessment of the employee's ability to work. Usually, inquiries or examinations related to the specific medical condition for which the employee took leave will be all that is warranted. The employer may not use the employee's leave as a justification for making far-ranging disability-related inquiries or requiring an unrelated medical examination.

> Example A: A data entry clerk broke her leg while skiing and was out of work for four weeks, after which time she returned to work on crutches. In this case, the employer does not have a reasonable belief, based on objective evidence, either that the clerk's ability to perform her essential job functions will be impaired by a medical condition or that she will pose a direct threat due to a medical condition. The employer, therefore, may not make any disability-related inquiries or require a medical examination but generally may ask the clerk how she is doing and express concern about her injury.
>
> Example B: As the result of problems he was having with his medication, an employee with a known psychiatric disability threatened several of his co-workers and was disciplined. Shortly thereafter, he was hospitalized for six weeks for treatment related to the condition. Two days after his release, the employee returns to work with a note from his doctor indicating only that he is "cleared to return to work." Because the employer has a reasonable belief, based on objective evidence, that the employee will pose a direct threat due to a medical condition, it may ask the employee for additional documentation regarding his medication(s) or treatment or request that he submit to a medical examination.

## D. Periodic Testing and Monitoring

In most instances, an employer's need to make disability-related inquiries or require medical examinations will be triggered by evidence of **current** performance problems or observable evidence suggesting that a particular employee will pose a direct threat. The following questions, however, address situations in which disability-related inquiries and medical examinations of employees may be permissible absent such evidence.

18. May **employers** require **periodic medical examinations** of employees in **positions affecting public safety (e.g., police officers and firefighters)**?

Yes. In limited circumstances, periodic medical examinations of employees in positions affecting public safety that are narrowly tailored to address specific job-related concerns are permissible.[(66)]

> Example A: A fire department requires employees for whom firefighting is an essential job function to have a comprehensive visual examination every two years and to have an annual electrocardiogram because it is concerned that certain visual disorders and heart problems will affect their ability to do their job without posing a direct threat. These periodic medical examinations are permitted by the ADA.
>
> Example B: A police department may not periodically test all of its officers to determine whether they are HIV-positive because a diagnosis of that condition alone is not likely to result in an inability or impaired ability to perform essential functions that would result in a direct threat.
>
> Example C: A private security company may require its armed security officers who are expected to pursue and detain fleeing criminal suspects to have periodic blood pressure screenings and stress tests because it is concerned about the risk of harm to the public that could result if an officer has a sudden stroke.

If an employer decides to terminate or take other adverse action against an employee with a disability based on the results of a medical examination, it must demonstrate that the employee is unable to perform his/her essential job functions or, in fact, poses a direct threat that cannot be eliminated or reduced by reasonable accommodation.[(67)] Therefore, when an employer discovers that an employee has a condition for which it lawfully may test as part of a periodic medical examination, it may make additional inquiries or require additional medical examinations that are **necessary to determine whether the employee currently is unable to perform his/her essential job functions or poses a direct threat due to the condition.**

19. May an employer subject an employee, who has been off from work in an alcohol rehabilitation program, to **periodic alcohol testing** when s/he returns to work?

Yes, but only if the employer has a reasonable belief, based on objective evidence, that the employee will pose a direct threat in the absence of periodic testing. Such a reasonable belief requires an individualized assessment of the employee and his/her position and cannot be based on general assumptions. Employers also may conduct periodic alcohol testing pursuant to "last chance" agreements.[(68)]

In determining whether to subject an employee to periodic alcohol testing (in the absence of a "last chance" agreement), the employer should consider the safety risks associated with the position the employee holds, the consequences of the employee's inability or impaired ability to perform his/her job functions, and how recently the event(s) occurred that cause the employer to believe that the employee will pose a direct threat (e.g., how long the individual has been an employee, when s/he completed rehabilitation, whether s/he previously has relapsed). Further, the duration and frequency of the testing must be designed to address particular safety concerns and should not be used to harass, intimidate, or retaliate against the employee because of his/her disability. Where the employee repeatedly has tested negative for alcohol, continued testing may not be job-related and consistent with business necessity because the employer no longer may have a *reasonable* belief that the employee will pose a direct threat.

> Example A: Three months after being hired, a city bus driver informed his supervisor of his alcoholism and requested leave to enroll in a rehabilitation program. The driver explained that he had not had a drink in more than 10 years until he recently started having a couple of beers before bed to deal with the recent separation from his wife. After four months of rehabilitation and counseling, the driver was cleared to return to work. Given the safety risks associated with the bus driver's position, his short period of employment, and recent completion of rehabilitation, the city can show that it would be job-related and consistent with business necessity to subject the driver to frequent periodic alcohol tests following his return to work.
>
> Example B: An attorney has been off from work in a residential alcohol treatment program for six weeks and has been cleared to return to work. Her supervisor wants to perform periodic alcohol tests to determine whether the attorney has resumed drinking. Assuming that there is no evidence that the attorney will pose a direct threat, the employer cannot show that periodic alcohol testing would be job-related and consistent with business necessity.[(69)]

# OTHER ACCEPTABLE DISABILITY-RELATED INQUIRIES AND MEDICAL EXAMINATIONS OF EMPLOYEES

20. May an **Employee Assistance Program (EAP)[(70)] counselor** ask an employee seeking help for personal problems about any physical or mental condition(s) s/he may have?

Yes. An EAP counselor may ask employees about their medical condition(s) if s/he: (1) does not act for or on behalf of the employer; (2) is obligated to shield any information the employee reveals from decision makers; and, (3) has no power to affect employment decisions. Many employers contract with EAP counselors so that employees can voluntarily and confidentially seek professional counseling for personal or work-related problems without having to be concerned that their employment status will be affected because they sought help.[(71)]

21. May an employer make disability-related inquiries and require medical examinations that are required or necessitated by another **federal law or regulation**?

Yes. An employer may make disability-related inquiries and require employees to submit to medical examinations that are mandated or necessitated by another federal law or regulation.[(72)] For example, under federal safety regulations, interstate bus and truck drivers must undergo medical examinations at least once every two years. Similarly, airline pilots and flight attendants must continually meet certain medical requirements.[(73)] Other federal laws that require medical examinations or medical inquiries of employees without violating the ADA include:

- the Occupational Safety and Health Act;[(74)]
- the Federal Mine Health and Safety Act;[(75)] and
- other federal statutes that require employees exposed to toxic or hazardous substances to be medically monitored at specific intervals.[(76)]

22. May an employer make disability-related inquiries or conduct medical examinations that are part of its **voluntary wellness program**?

Yes. The ADA allows employers to conduct voluntary medical examinations and activities, including voluntary medical histories, which are part of an employee health program without having to show that they are job-related and consistent with business necessity, as long as any medical records acquired as part of the wellness program are kept confidential and separate from personnel records.[(77)] These programs often include blood pressure screening, cholesterol testing, glaucoma testing, and cancer detection screening. Employees may be asked disability-related questions and may be given medical examinations pursuant to such voluntary wellness programs.[(78)]

A **wellness program is "voluntary"** as long as an employer neither requires participation nor penalizes employees who do not participate.

23. May an employer ask employees to **voluntarily self-identify as persons with disabilities for affirmative action purposes?**

Yes. An employer may ask employees to voluntarily self-identify as individuals with disabilities when the employer is:

- undertaking affirmative action because of a federal, state, or local law (including a veterans' preference law) that requires affirmative action for individuals with disabilities (i.e., the law requires some action to be taken on behalf of such individuals); or,
- *voluntarily* using the information to benefit individuals with disabilities.[(79)]

If an employer invites employees to voluntarily self-identify in connection with the above-mentioned situations, the employer must indicate clearly and conspicuously on any written questionnaire used for this purpose, or state clearly (if no written questionnaire is used), that: (1) the specific information requested is intended for use solely in connection with its affirmative action obligations or its voluntary affirmative action efforts; and, (2) the specific information is being requested on a voluntary basis, that it will be kept confidential in accordance with the ADA, that refusal to provide it will not subject the employee to any

adverse treatment, and that it will be used only in accordance with the ADA.[(80)]

In order to invite self-identification for purposes of an affirmative action program that is voluntarily undertaken or undertaken pursuant to a law that encourages (rather than requires) affirmative action, an employer must be taking some action that actually benefits individuals with disabilities. The invitation to self-identify also must be *necessary* in order to provide the benefit.

---

## INDEX

*Note: Page numbering and references removed for on-line version.*


Affirmative action

Airline pilots

Alcohol testing

Application for new job

Centers for Disease Control

Confidentiality

Direct threat

Disability-related inquiry, defined

Documentation

conflicting

insufficient

requests for reasonable accommodation

Employee Assistance Program (EAP)

Employee, defined

Employer's doctor

Failure to respond to disability-related inquiry

Failure to submit to medical examination

Family and Medical Leave Act (FMLA)

Firefighters

Genetic information

HIV

Illegal use of drugs

Information from another person

Job-related and consistent with business necessity, defined

Medical certification

Medical examination, defined

Performance problems

Periodic medical examinations

Periodic updates

Police officers

Pregnancy

Prescription drugs and medications

Procedures and tests

blood analyses

blood pressure screening

breath analyses

cholesterol testing

diagnostic procedures

hair analyses

nerve conduction tests

physical agility tests

physical fitness tests

polygraph examinations

psychological tests

pulmonary function tests

range-of-motion tests

saliva analyses

urine analyses

vision tests

Public safety positions

Reasonable accommodation

Return to work

Sick leave

Voluntary self-identification

Voluntary wellness program

Workers' compensation

---

1. 42 U.S.C. §§ 12101-12117, 12201-12213 (1994)(codified as amended).

2. Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations Under the Americans with Disabilities Act of 1990, 8 FEP Manual (BNA) 405:7191 (1995) [hereinafter Preemployment Questions and Medical Examinations]. This and other ADA guidances are available through the Internet at http://www.eeoc.gov.

3. Pursuant to the Rehabilitation Act Amendment of 1992, the ADA's employment standards apply to all

nonaffirmative action employment discrimination claims of individuals with disabilities who are federal employees or applicants for federal employment. Pub. L. No. 102-569 §503(b), 106 Stat. 4344, 4424 (1992) (codified as amended at 29 U.S.C. §791(g)(1994)). Accordingly, the analysis in the guidance applies to federal sector complaints of nonaffirmative action employment discrimination arising under section 501 of the Rehabilitation Act of 1973. It also applies to complaints of nonaffirmative action employment discrimination arising under section 503 and to employment discrimination under section 504 of the Rehabilitation Act. Id. at §§793 (d), 794(d)(1994).

4. The purpose of this guidance is to explain when it is permissible for an employer to make a disability-related inquiry or require a medical examination of an employee. It does not focus on what actions an employer may take based on what it learns in response to such an inquiry or after it receives the result of a medical examination.

5. In the ADA legislative history, Congress stated that an employee's "actual performance on the job is, of course, the best measure of ability to do the job." S. Rep. No. 101-116, at 39 (1989); H.R. Rep. No. 101-485, pt. 2, at 75 (1990).

6. However, where an applicant has an obvious disability, and the employer has a reasonable belief that s/he will need a reasonable accommodation to perform specific job functions, the employer may ask whether the applicant needs a reasonable accommodation and, if so, what type of accommodation. These same two questions may be asked when an individual voluntarily discloses a nonvisible disability or voluntarily tells the employer that s/he will need a reasonable accommodation to perform a job. 42 U.S.C. §12112(c)(B)(1994); 29 C.F.R. §1630.13(a)(1998); see also Preemployment Questions and Medical Examinations, supra note 2, at 6-8, 8 FEP at 405:7193-94; EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities at 13-15, 8 FEP Manual (BNA) 405:7461, 7467-68 (1997)[hereinafter The ADA and Psychiatric Disabilities]; Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act at 20-21, 8 FEP Manual (BNA) 405:7601, 7611(1999)[hereinafter Reasonable Accommodation Under the ADA]. Under certain circumstances, an employer also may ask applicants to self-identify as individuals with disabilities for purposes of its affirmative action program. See Preemployment Questions and Medical Examinations, supra note 2, at 12-13, 8 FEP at 405:7196-97.

7. 42 U.S.C. §12112(d)(3)(1994); 29 C.F.R. §1630.14(b)(1998). However, if an individual is screened out because of a disability, the employer must show that the exclusionary criterion is job-related and consistent with business necessity. 42 U.S.C. §12112(b)(6)(1994); 29 C.F.R. §§1630.10, 1630.14(b)(3)(1998).

8. 42 U.S.C. §12112(d)(4)(A)(1994); 29 C.F.R. §1630.14(c)(1998).

9. See infra note 77.

10. 42 U.S.C. §§12112(d)(3)(B), (4)(C)(1994); 29 C.F.R. §1630.14(b)(1)(1998). The Commission also has interpreted the ADA to allow employers to disclose medical information to state workers' compensation offices, state second injury funds, workers' compensation insurance carriers, and to health care professionals when seeking advice in making reasonable accommodation determinations. 29 C.F.R. pt. 1630, app. §1630.14(b)(1998). Employers also may use medical information for insurance purposes. Id. See also Preemployment Questions and Medical Examinations, supra note 2, at 21-23, 8 FEP at 405:7201; EEOC Enforcement Guidance: Workers' Compensation and the ADA at 7, 8 FEP Manual (BNA) 405:7391, 7394 (1996)[hereinafter Workers' Compensation and the ADA].

11. "Covered entity" means an employer, employment agency, labor organization, or joint labor management committee. 29 C.F.R. §1630.2(b)(1998). For simplicity, this guidance refers to all covered entities as "employers." The definition of "employer" includes persons who are "agents" of the employer, such as managers, supervisors, or others who act for the employer (e.g., agencies used to conduct background checks on applicants and employees). 42 U.S.C. §12111(5)(1994).

12. 42 U.S.C. §12112(d)(4)(A)(1994); 29 C.F.R. §1630.14(c)(1998). See infra Question 5 and accompanying text for a discussion of what the "job-related and consistent with business necessity" standard means.

13. See e.g., 42 U.S.C. §12112(a)(1994)(no entity shall discriminate against a qualified individual with a disability because of the disability of such individual).

14. Congress was particularly concerned about questions that allowed employers to learn which employees have disabilities that are not apparent from observation. It concluded that the only way to protect employees with nonvisible disabilities is to prohibit employers from making disability-related inquiries and requiring

medical examinations that are not job-related and consistent with business necessity. See S. Rep. No. 101-116 at 39-40 (1989); H.R. Rep. No. 101-485, pt. 2, at 75 (1990) ("An inquiry or medical examination that is not job-related serves no legitimate employer purpose, but simply serves to stigmatize the person with a disability." A person with cancer "may object merely to being identified, independent of the consequences [since] being identified as [a person with a disability] often carries both blatant and subtle stigma").

15. See Roe v. Cheyenne Mountain Resort, 124 F.3d 1221, 1229, 7 AD Cas. (BNA) 779, 783 (10th Cir. 1997)("it makes little sense to require an employee to demonstrate that he has a disability to prevent his employer from inquiring as to whether or not he has a disability"). Although Roe involved only the issue of disability-related inquiries of employees, the same rationale applies to medical examinations of employees and to disability-related inquiries and medical examinations of applicants. The ADA's restrictions on disability-related inquiries and medical examinations apply to individuals both with and without disabilities at all three stages: pre-offer, post-offer, and during employment. See also Griffin v. Steeltek ,Inc., 160 F.3d 591, 595, 8 AD Cas.1249, 1252 (10th Cir. 1998), *cert. denied,* 119 S.Ct. 1455, 9 AD Cas. 416 (1999)(a job applicant without a disability can sue under the ADA regarding medical history questions); Gonzales v. Sandoval County, 2 F.Supp. 2d 1442, 1445, 8 AD Cas.1337, 1340 (D. N.M. 1998)(plaintiff need not establish disability to state a claim for a prohibited inquiry under the ADA); Fredenburg v. Contra Costa County Department of Health Services, 172 F.3d 1176, 9 AD Cas. 385 (9th Cir. 1999)(requiring plaintiffs to prove that they are persons with disabilities to challenge a medical examination would render §12112(d)(4)(A) of the ADA "nugatory"; thus, plaintiffs need not prove that they are qualified individuals with a disability to bring claims challenging the scope of medical examinations under the ADA).

Some courts, however, have held that to bring a claim alleging a violation of the ADA's prohibition against disability-related inquiries and medical examinations, an individual must demonstrate that s/he is a qualified individual with a disability. See e.g., Armstrong v. Turner Industries, Inc., 141 F.3d 554, 558, 8 AD Cas. (BNA) 118, 124 (5th Cir. 1998), *aff'g* 950 F. Supp. 162, 7 AD Cas. 875 (M.D. La. 1996) (plaintiff must be a qualified individual with a disability to challenge an illegal preemployment inquiry); Hunter v. Habegger Corp., 139 F.3d 901(7th Cir. 1998)("it seems clear that in order to assert that one has been discriminated against because of an improper inquiry, that person must also have been otherwise qualified"). For the reasons stated above, it is the Commission's position that the plain language of the statute explicitly protects individuals with and *without* disabilities from improper disability-related inquiries and medical examinations.

16. For example, employers may make disability-related inquiries and require medical examinations that are required or necessitated by another federal law or regulation. See infra Question 21 and accompanying text. Employers also may make disability-related inquiries and conduct medical examinations that are part of their voluntary wellness programs. See infra Question 22 and accompanying text.

17. Preemployment Questions and Medical Examinations, supra note 2, at 4-13, 8 FEP at 405:7191, 7192-97.

18. Id. at 4, 8 FEP at 405:7192.

19. Id. at 4-13, 8 FEP at 405:7192-97.

20. The prohibition against making disability-related inquiries applies to inquiries made directly to an employee, as well as to indirect or surreptitious inquiries such as a search through an employee's belongings to confirm an employer's suspicions about an employee's medical condition. See Doe v. Kohn Nast & Graf, P.C., 866 F. Supp. 190, 3 AD Cas. (BNA) 1322 (E.D. Pa. 1994) (employer conducted an unlawful medical inquiry when it searched the office of an employee it knew was sick and discovered a letter indicating the employee had AIDS).

21. As used in this guidance, the term "genetic information" has the same definition as "protected genetic information" in Executive Order 13145. In general, genetic information is information about an individual's genetic tests, information about the genetic tests of an individual's family members, or information about the occurrence of a disease, medical condition, or disorder in family members of the individual. See Exec. Order No. 13,145, To Prohibit Discrimination in Federal Employment Based on Genetic Information, 65 Fed. Reg. 6877 (Feb. 8, 2000).

22. See Griffin v. Steeltek, Inc., 160 F.3d 591, 594, 8 AD Cas. (BNA) 1249, 1252 (10th Cir. 1998), *cert. denied,* 119 S.Ct. 1455, 9 AD. Cas. 416 (1999) (on its application for employment, employer unlawfully asked: "Have you received workers' compensation or disability payments? If yes, describe.").

23. See Roe v. Cheyenne Mountain Conference Resort, Inc., 124 F.3d 1221, 7 AD Cas. (BNA) 779 (10th Cir. 1997)(employer had a policy of requiring all employees to report every drug, including legal prescription drugs); Krocka v. Bransfield, 969 F. Supp. 1073 (N.D. Ill. 1997)(police department implemented a policy of monitoring employees taking psychotropic medication).

24. Preemployment Questions and Medical Examinations, supra note 2, at 9, 8 FEP at 405:7195.

25. Preemployment Questions and Medical Examinations, supra note 2, at 9, 8 FEP at 405:7195.

26. Employers also may maintain and enforce rules prohibiting employees from being under the influence of alcohol in the workplace and may conduct alcohol testing for this purpose if they have a reasonable belief that an employee may be under the influence of alcohol at work.

27. An individual who currently uses drugs illegally is not protected under the ADA; therefore, questions about current illegal drug use are not disability-related inquiries. 42 U.S.C. §12114(a)(1994); 29 C.F.R. §1630.3(a)(1998). However, questions about *past* addiction to illegal drugs or questions about whether an employee ever has participated in a rehabilitation program *are* disability-related because past drug addiction generally is a disability. Individuals who were addicted to drugs, but are not currently using drugs illegally, are protected under the ADA. 29 C.F.R. §1630.3(b)(1),(2)(1998).

28. Pregnancy is not a disability for purposes of the ADA. 29 C.F.R. pt. 1630, app. §1630.2(h)(1998). However, discrimination on that basis may violate the Pregnancy Discrimination Act amendments to Title VII. 42 U.S.C. §2000e(k)(1994).

29. Preemployment Questions and Medical Examinations supra note 2, at 14, 8 FEP at 405:7197.

30. Id.

31. See supra note 26.

32. See supra note 27.

33. Under the ADA, polygraph examinations, which purportedly measure whether a person believes s/he is telling the truth in response to a particular inquiry, are not medical examinations. However, an employer cannot ask disability-related questions as part of the examination. See Preemployment Questions and Medical Examinations, supra note 2, at 17, 8 FEP at 405:7199.

34. 42 U.S.C. §12111(4)(1994); 29 C.F.R. §1630.2(f)(1998). This term has the same meaning as it does under Title VII of the Civil Rights Act of 1964. 42 U.S.C. §2000e(f)(1994).

35. In its guidance on contingent workers, the Commission lists additional factors that indicate when a worker is an employee and explains that other aspects of the relationship between the parties may affect the determination of whether an employee-employer relationship exists. See EEOC Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms at 4-7, 8 FEP Manual (BNA) 405:7551, 7554-55 (1997).

36. An employee in this situation is an applicant with respect to rules concerning disability-related inquiries and medical examinations but *not* for employee benefits (e.g., retirement, health and life insurance, leave accrual) or other purposes.

37. Where the employer already has medical information concerning an individual at the pre-offer stage for the new position (e.g., information obtained in connection with the individual's request for reasonable accommodation in his/her current position) and this information causes the employer to have a reasonable belief that the individual will need a reasonable accommodation to perform the functions of the *new* job, the employer may ask what type of reasonable accommodation would be needed to perform the functions of the new job, before extending an offer for that job. An employer, however, may not use its knowledge of an applicant's disability to discriminate against him/her. The employer also may not use the fact that the individual will need a reasonable accommodation in the new position to deny him/her the new job unless it can show that providing the accommodation would cause an undue hardship.

38. 42 U.S.C. §12112(d)(3)(1994); 29 C.F.R. §1630.14(b)(1998).

39. "Direct threat" means a significant risk of substantial harm that cannot be eliminated or reduced by reasonable accommodation. 29 C.F.R. §1630.2(r)(1998). Direct threat determinations must be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the

job, considering a reasonable medical judgment relying on the most current medical knowledge and/or best available objective evidence. Id. To determine whether an employee poses a direct threat, the following factors should be considered: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and, (4) the imminence of the potential harm. Id.

40. The Commission explained this standard in its enforcement guidance on The ADA and Psychiatric Disabilities, supra note 6, at 15, 8 FEP at 405:7468-69.

41. See infra Questions 18 and 19 and accompanying text.

42. See infra Question 6 and accompanying text.

43. See Yin v. State of California, 95 F.3d 864, 868, 5 AD Cas. (BNA) 1487, 1489 (9th Cir. 1996)(where employee missed an inordinate number of days and her performance declined, employer's request that she submit to a medical examination was job-related and consistent with business necessity).

44. See also infra Question 12.

45. 42 U.S.C. §12113 (d)(1994).

46. The most current list was published by HHS, Centers for Disease Control and Prevention (CDC), in 1998. 63 Fed.Reg. 49359 (Sept. 15, 1998).

47. But see EEOC v. Prevo's Family Market, Inc., 135 F.3d 1089, 1097, 8 AD Cas. (BNA) 401, 408 (6th Cir. 1998) (employer did not violate the ADA when it required a produce clerk, who claimed to be HIV-positive, to submit to a medical examination to determine whether he posed a direct threat). The Commission believes that Prevo's was wrongly decided because the employer did not base its belief that the employee posed a direct threat on reasonably available objective evidence and, therefore, its request that the employee submit to a medical examination was not job-related and consistent with business necessity. A number of sources, such as the Centers for Disease Control (www.cdc.gov), a physician or health care provider knowledgeable about HIV and other infectious diseases, a state or local health department, a public or university library, or a state or county medical association can provide information about the likelihood of an employee transmitting HIV or other infectious diseases to co-workers or the public.

48. This guidance does not affect the obligation of a physician, under any state law, to report cases of active tuberculosis to appropriate public health authorities.

49. See Reasonable Accommodation Under the ADA, supra note 6, at 14-15, 8 FEP at 405:7608 for examples of other situations where employers may ask for documentation; see also id. at 16-17, 8 FEP at 405: 7609 for examples of situations in which an employer **cannot** ask for documentation in response to a request for reasonable accommodation.

50. 29 C.F.R. pt. 1630 app. §1630.9 (1998); see also Preemployment Questions and Medical Examinations, supra note 2, at 6, 8 FEP at 405: 7193; ADA and Psychiatric Disabilities, supra note 6, at 22-23, 8 FEP at 405:7472-73; Reasonable Accommodation Under the ADA, supra note 6, at 12-13, 8 FEP at 405: 7607. See also Templeton v. Neodata Services, Inc., 162 F.3d 617, 618, 8 AD Cas. (BNA) 1615, 1616 (10th Cir. 1998)(employer's request for updated medical information was reasonable in light of treating physician's letter indicating doubt as to employee's ability to return to work as scheduled, and employer needed the requested information to determine appropriate reasonable accommodation for employee in event she was able to return to work).

51. See Roe v. Cheyenne Mountain Conference Resort, 124 F.3d 1221, 1229, 7 AD Cas. (BNA) 779, 784 (10th Cir. 1997) (employer, who implemented a drug and alcohol policy that included many permissible inquiries but also asked employees to inform the employer of every drug they were taking, including legal prescription drugs, violated the ADA by failing to demonstrate that this inquiry was job-related and consistent with business necessity).

52. See Reasonable Accommodation Under the ADA, supra note 6, at 15, 8 FEP at 405:7608.

53. See id. at 13, 8 FEP at 405:7607. (An "employer may require only the documentation that is needed to establish that a person has an ADA disability, and that the disability necessitates a reasonable accommodation." If an employee has more than one disability, an employer can request information pertaining only to the disability for which the employee is requesting an accommodation.)

54. See Reasonable Accommodation Under the ADA, supra note 6, at 14-15, 16-17, 8 FEP at 405:7607-09. If the employee subsequently should request another reasonable accommodation related to his sickle cell anemia, the employer may ask for reasonable documentation relating to the new request (if the need is not obvious). The employer, however, cannot ask again for documentation that the employee has an ADA disability where the medical information the employee provided in support of his first reasonable accommodation request established the existence of a long-term impairment that substantially limits a major life activity. Id. at 16-17, 8 FEP at 405: 7609.

55. See Reasonable Accommodation Under the ADA, supra note 6, at 15-16, 8 FEP at 405:7698; The ADA and Psychiatric Disabilities, supra note 6, at 23, 8 FEP at 405:7473.

56. See Reasonable Accommodation Under the ADA, supra note 6, at 15, 8 FEP at 405:7608.

57. Since a doctor cannot disclose information about a patient without his/her permission, an employer must obtain a release from the employee that will permit the doctor to answer questions. The release should be clear as to what information will be requested. See Reasonable Accommodation Under the ADA, supra note 6, at 13-14, 8 FEP at 405:7607.

58. Id. at 15, 8 FEP at 405:7608-09.

59. Id. at 16, 8 FEP at 405:7609; The ADA and Psychiatric Disabilities, supra note 6, at 23, 8 FEP at 405:7473.

60. See Reasonable Accommodation Under the ADA, supra note 6, at 15 (n.30), 8 FEP at 405:7609.

61. 29 C.F.R. §1630.2(r)(1998).

62. See Reasonable Accommodation Under the ADA, supra note 6, at 16, 8 FEP at 405:7609; The ADA and Psychiatric Disabilities, supra note 6, at 23, 8 FEP at 405:7473.

63. See Preemployment Questions and Medical Examinations, supra note 2, at 16, 8 FEP at 405:7198.

64. The questions and answers in this section address situations in which an employee has used sick, annual, or some other kind of leave because of a medical condition, but has **not** taken leave under the **Family and Medical Leave Act (FMLA)**. 29 U.S.C. §2601(1994). Where an employee has been on leave under the FMLA, the employer must comply with the requirements of that statute. For example, the FMLA generally does not authorize an employer to make its own determination of whether an employee is fit to return to work but, rather, states that the employer must rely on the evaluation done by the employee's own health care provider. Id. at §2613(b).

65. See Reasonable Accommodation Under the ADA, supra note 6, at 57, 8 FEP at 405:7632.

66. See The ADA and Psychiatric Disabilities, supra note 6, at 16 (n.41), 8 FEP at 405:7469.

67. See supra note 39.

68. Some employers, including some federal government agencies, commonly use "last chance agreements" in disciplinary actions involving employee use of alcohol. Such agreements typically provide that, as a condition of continued employment, employees must enter into a rehabilitation program and submit to periodic alcohol testing.

69. The employer, however, may require the attorney to submit to an alcohol test if it has objective evidence that she is violating a workplace policy prohibiting all employees from being under the influence of alcohol on the job. See supra note 26.

70. Generally, EAPs are confidential programs designed to assist employees in coping with personal issues (e.g., substance abuse, grief) that may interfere with their job performance.

71. See Vardiman v. Ford Motor Co., 981 F. Supp. 1279, 1283, 7 AD Cas. (BNA) 1068, 1072 (E.D. Mo. 1997)(EAP representative had no power to affect employment decisions and, in fact, was obligated to shield the decision makers from an employee's personal or substance abuse problems).

72. 29 C.F.R. 1630.15(e)(1998)("it may be a defense to a charge of discrimination . . . that a challenged action is required or necessitated by another Federal law or regulation . . . .").

73. See e.g., 14 C.F.R. pt. 67(1999)(Federal Aviation Administration (FAA) and Department of Transportation (DOT) medical certifications); 14 C.F.R. pt. 121, app. I (1999)(FAA and DOT drug testing program); 49 C.F.R. pt. 40 and app. (1999)(procedures for transportation workplace drug testing programs); 49 C.F.R. 240.207(1996)(Federal Railroad Administration and DOT procedures for making determination on hearing and visual acuity); 49 C.F.R. pt. 391(1999)(Federal Highway Administration and DOT medical certification requirements); 49 C.F.R. pt. 653(1999)(Federal Transit Administration (FTA) procedures for prevention of prohibited drug use in transit operations); 49 C.F.R. pt. 654(1999)(FTA procedures for prevention of alcohol abuse in transit operations).

74. 29 U.S.C. §§651-678 (1994).

75. 30 U.S.C. §§801-962 (1994).

76. See e.g., The Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601(1994).

77. See H.R. Rep. No. 101-485, pt. 2, at 75 (1990) ("As long as the programs are voluntary and the medical records are maintained in a confidential manner and not used for the purpose of limiting health insurance eligibility or preventing occupational advancement, these activities would fall within the purview of accepted activities.").

78. If a program simply promotes a healthier life style but does not ask any disability-related questions or require medical examinations (e.g., a smoking cessation program that is available to anyone who smokes and only asks participants to disclose how much they smoke), it is not subject to the ADA's requirements concerning disability-related inquiries and medical examinations.

79. See Preemployment Questions and Medical Examinations, supra note 2, at 12, 8 FEP at 405:7196-97.

80. Id.

---

*This page was last modified on March 24, 2005.*

Return to Home Page

## 21. EEOC, Questions and Answers: Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (ADA)

*The U.S. Equal Employment Opportunity Commission*

# QUESTIONS AND ANSWERS: ENFORCEMENT GUIDANCE ON DISABILITY-RELATED INQUIRIES AND MEDICAL EXAMINATIONS OF EMPLOYEES UNDER THE AMERICANS WITH DISABILITIES ACT (ADA)

## INTRODUCTION

***What does this Guidance address?***

- The Guidance explains the ADA's rules concerning when employers may and may not obtain medical information about their employees.

***Why did the EEOC issue this Guidance?***

- In October 1995, the EEOC issued enforcement guidance explaining the ADA's rules concerning when an employer may and may not make disability-related inquiries and require medical examinations of **applicants**. Since that time, we have had many inquiries from EEOC investigators and attorneys in the field, employers, and employees about how the law applies with respect to **people who are already working**. This Guidance is intended to answer some of the most frequently-asked questions we have received.

***To whom does the Guidance apply?***

- The Guidance applies to private and to state and local government employers with fifteen or more employees. Federal sector employers are also covered by the Guidance, as the result of the 1992 amendments to the Rehabilitation Act.
- The ADA's requirements regarding disability-related inquiries and medical examinations apply to *all* of the employees of a covered employer, whether or not they have disabilities.

## Notice Concerning The Americans With Disabilities Act Amendments Act Of 2008

The Americans with Disabilities Act (ADA) Amendments Act of 2008 was signed into law on September 25, 2008 and becomes effective January 1, 2009. Because this law makes several significant changes, including changes to the definition of the term "disability," the EEOC will be evaluating the impact of these changes on this document and other publications. See the list of specific changes to the ADA made by the ADA Amendments Act.

## IN GENERAL

***Are the rules about when an employer may make disability-related inquiries and require medical examinations the same for employees and applicants? (Introduction)*** (For more information about this and other issues discussed in these Questions and Answers, please consult the referenced question numbers from the Guidance.)

- No. The ADA limits an employer's ability to make disability-related inquiries or require medical examinations at three stages: **pre-offer**, **post-offer**, and **during employment**. The rules concerning disability-related inquiries and medical examinations are different at each stage.
  - At the first stage **(prior to an offer of employment)**, an employer may not ask any disability-related questions or require any medical examinations, even if they are related to the job.
  - At the second stage **(after an applicant is given a conditional job offer, but before he or she starts work),** an employer may ask disability-related questions and conduct medical examinations, regardless of whether they are related to the job, as long as it does so for all

entering employees in the same job category.

- At the third stage **(after employment begins),** an employer may make disability-related inquiries and require medical examinations only if they are **job-related and consistent with business necessity.**

***What is a "disability-related inquiry"? (Question 1)***

- A "disability-related inquiry" is a question that is likely to elicit information about a disability, such as asking employees about: whether they have or ever had a disability; the kinds of prescription medications they are taking; and, the results of any genetic tests they have had.
- Disability-related inquires also include asking an employee's co-worker, family member, or doctor about the employee's disability.
- Questions that are *not* likely to elicit information about a disability are always permitted, and they include asking employees about their general well-being; whether they can perform job functions; and about their current illegal use of drugs.

***What is a "medical examination"? (Question 2)***

- A "medical examination" is a procedure or test usually given by a health care professional or in a medical setting that seeks information about an individual's physical or mental impairments or health. Medical examinations include vision tests; blood, urine, and breath analyses; blood pressure screening and cholesterol testing; and diagnostic procedures, such as x-rays, CAT scans, and MRIs.

***Are there any procedures or tests employers may require that would not be considered medical examinations? (Question 2)***

- Yes. There are a number of procedures and tests that employers may require that are not considered medical examinations, including: blood and urine tests to determine the current illegal use of drugs; physical agility and physical fitness tests; and polygraph examinations.

## JOB RELATED AND CONSISTENT WITH BUSINESS NECESSITY

***When may an employer ask an employee a disability-related question or require an employee to submit to a medical examination? (Question 5)***

- Generally, an employer only may seek information about an employee's medical condition when it is **job related and consistent with business necessity**. This means that the employer must have a reasonable belief based on objective evidence that:
  - an employee will be unable to perform the essential functions his or her job because of a medical condition; or,
  - the employee will pose a direct threat because of a medical condition.
- Employers also may obtain medical information about an employee when the employee has requested a **reasonable accommodation** and his or her disability or need for accommodation is not obvious.
- In addition, employers can obtain medical information about employees when they:
  - are required to do so by another **federal law or regulation** (e.g., DOT medical certification requirements for interstate truck drivers); ***(Question 21)***
  - offer **voluntary** programs aimed at identifying and treating common health problems, such as high blood pressure and cholesterol; ***(Question 22)***
  - are undertaking **affirmative action** because of a federal, state, or local law that requires affirmative action for individuals with disabilities or voluntarily using the information they obtain to benefit individuals with disabilities. ***(Question 23)***

***What should an employer do if it learns about an employee's medical condition from someone else? (Question 6)***

- First, the employer should determine whether the information learned is **reliable**. The employer should consider how well the person providing the information knows the individual, the seriousness of the medical condition, and how the person learned the information.
- The employer should then determine whether the information gives rise to a reasonable belief that the employee in question will be unable to perform the essential functions of his or her job because of the medical condition or will pose a direct threat because of the condition.
- If the information does give rise to such a reasonable belief, then the employer may make disability-related inquiries or require a medical examination as permitted by the Guidance.

***May an employer ask all employees what prescription medications they are taking? (Question 8)***

- Generally, no. In limited circumstances, however, employers may be able to ask **employees in positions affecting public safety** about their use of medications that may affect their ability to perform essential functions and **thereby result in a direct threat**.
- For example, an airline could require pilots to report when they are taking medications that may affect their ability to fly. A fire department, however, could not require employees in administrative positions to report their use of medication because it is unlikely that these employees would pose a direct threat as a result of an inability, or impaired ability, to do their jobs.

***What may an employer do if it believes that an employee is having performance problems because of a medical condition, but the employee won't answer any questions or go to the doctor? (Question 9)***

- The employer may discipline the employee for his or her performance problems just as it would any other employee having similar performance problems.

## SCOPE AND MANNER OF INQUIRIES AND EXAMINATIONS

***May an employer have an employee who is requesting a reasonable accommodation examined by its own health care provider? (Question 11)***

- In some instances, yes. If the employer has explained what type of documentation is needed, and the employee fails to provide it or provides insufficient documentation, the employer may require the employee to see a health care professional of the employer's choice.
- Even where an employee initially provides insufficient documentation, however, the employer should consider asking the employee's health care provider for additional information before requiring an examination by the employer's health care professional. This is because an employee's health care provider frequently is in the best position to provide information about the employee's limitations.

***May an employer have an employee who it reasonably believes will pose a direct threat examined by its own health care provider? (Question 12)***

- Yes. This is because the employer is responsible for assessing whether an employee poses a direct threat based on a reasonable medical judgment that relies on the **most current medical knowledge and/or best objective evidence**.
- The health care professional the employer chooses should have expertise in the employee's specific medical condition and be able to provide medical information that allows the employer to determine the effects of the condition on the employee's ability to perform his or her job.
- If the employer's health care professional believes that the employee poses a direct threat, but the employee's own doctor disagrees, the employer should evaluate the conflicting medical information by considering, for example, the area of expertise of each medical professional; the kind of information each provided; and, whether the information provided is consistent with the employer's own observations of or knowledge about the employee.

## DISABILITY-RELATED INQUIRIES AND MEDICAL EXAMINATIONS RELATED

## TO LEAVE

***May an employer request that an employee provide a doctor's note or other explanation when the employee has used sick leave? (Question 15)***

- Yes. An employer is entitled to know why an employee is requesting sick leave. An employer, therefore, may ask an employee to provide a doctor's note or other explanation, as long as it has a policy or practice of requiring all employees to do so.

***May an employer ask disability-related questions or require a medical examination when an employee who has been on leave for a medical condition wants to return to work? (Question 17)***

- Yes, if an employer has a reasonable belief that an employee's **present** ability to perform essential functions will be impaired by a medical condition or that he or she will pose a direct threat because of a medical condition.
- Any inquiries or examination, however, must be limited in scope to what is needed to determine whether the employee is able to work.

## PERIODIC MEDICAL EXAMINATIONS AND TESTING

***May employers require employees to have periodic medical examinations? (Question 18)***

- No, with **very limited exceptions** for employees who work in positions affecting public safety, such as police officers, firefighters, or airline pilots. Even in these limited situations, the examinations must address specific job-related concerns. For example, a police department could periodically conduct vision tests or electrocardiograms because of concerns about conditions that could affect the ability to perform essential job functions and thereby result in a direct threat. A police department could not, however, periodically test its officers to determine whether they are HIV-positive, because a diagnosis of this condition alone would not result in a direct threat.

***May employers subject employees to periodic alcohol testing? (Question 19)***

- Generally, no. Employers, however, may subject employees who have been in **alcohol rehabilitation programs** to periodic alcohol testing where the employer has a reasonable belief that the employee will pose a direct threat in absence of such testing.
- In determining whether to subject such an employee to periodic alcohol testing, the employer should consider the safety risks associated with the position the employee holds, the consequences of the employee's inability or impaired ability to do his or her job, and the reason(s) why the employer believes that the employee will pose a direct threat.
- Of course, an employer may maintain and enforce rules prohibiting employees from being under the influence of alcohol in the workplace and may conduct alcohol testing for this purpose if it has a reasonable belief that an employee has been drinking during work hours.

# 22. EEOC, Employment Tests and Selection Procedures

*The U.S. Equal Employment Opportunity Commission*

# Employment Tests and Selection Procedures

Employers often use tests and other selection procedures to screen applicants for hire and employees for promotion. There are many different types of tests and selection procedures, including cognitive tests, personality tests, medical examinations, credit checks, and criminal background checks.

The use of tests and other selection procedures can be a very effective means of determining which applicants or employees are most qualified for a particular job. However, use of these tools can violate the federal anti-discrimination laws if an employer intentionally uses them to discriminate based on race, color, sex, national origin, religion, disability, or age (40 or older). Use of tests and other selection procedures can also violate the federal anti-discrimination laws if they disproportionately exclude people in a particular group by race, sex, or another covered basis, unless the employer can justify the test or procedure under the law.

On May 16, 2007, the EEOC held a public meeting on Employment Testing and Screening. Witnesses addressed legal issues related to the use of employment tests and other selection procedures. (To see the testimony of these witnesses, please see the EEOC's website at http://www.eeoc.gov/abouteeoc/meetings/5-16-07/index.html.)

This fact sheet provides technical assistance on some common issues relating to the federal anti-discrimination laws and the use of tests and other selection procedures in the employment process.

## Background

- Title VII of the Civil Rights Act of 1964 (Title VII), the Americans with Disabilities Act of 1990 (ADA), and the Age Discrimination in Employment Act of 1967 (ADEA) prohibit the use of discriminatory employment tests and selection procedures.
- There has been an increase in employment testing due in part to post 9-11 security concerns as well as concerns about workplace violence, safety, and liability. In addition, the large-scale adoption of online job applications has motivated employers to seek efficient ways to screen large numbers of online applicants in a non-subjective way.
- The number of discrimination charges raising issues of employment testing, and exclusions based on criminal background checks, credit reports, and other selection procedures, reached a high point in FY 2007 at 304 charges.

## Types of Employment Tests and Selection Procedures

Many employers use employment tests and other selection procedures in making employment decisions. Examples of these tools, many of which can be administered online, include the following:

- Cognitive tests assess reasoning, memory, perceptual speed and accuracy, and skills in arithmetic and reading comprehension, as well as knowledge of a particular function or job;
- Physical ability tests measure the physical ability to perform a particular task or the strength of specific muscle groups, as well as strength and stamina in general;
- Sample job tasks (e.g., performance tests, simulations, work samples, and realistic job previews) assess performance and aptitude on particular tasks;
- Medical inquiries and physical examinations, including psychological tests, assess physical or mental health;
- Personality tests and integrity tests assess the degree to which a person has certain traits or dispositions (e.g., dependability, cooperativeness, safety) or aim to predict the likelihood that a person will engage in certain conduct (e.g., theft, absenteeism);
- Criminal background checks provide information on arrest and conviction history;

- Credit checks provide information on credit and financial history;
- Performance appraisals reflect a supervisor's assessment of an individual's performance; and
- English proficiency tests determine English fluency.

## Governing EEO Laws

- Title VII of the Civil Rights Act of 1964
  - Title VII prohibits employment discrimination based on race, color, religion, sex, or national origin.
  - With respect to tests in particular, Title VII permits employment tests as long as they are not "designed, intended or used to discriminate because of race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(h). Title VII also imposes restrictions on how to score tests. Employers are not permitted to (1) adjust the scores of, (2) use different cutoff scores for, or (3) otherwise alter the results of employment-related tests on the basis of race, color, religion, sex, or national origin. *Id*. at §2000e-2(l).
  - Title VII prohibits both "disparate treatment" and "disparate impact" discrimination.
    - Title VII prohibits **intentional** discrimination based on race, color, religion, sex, or national origin. For example, Title VII forbids a covered employer from testing the reading ability of African American applicants or employees but not testing the reading ability of their white counterparts. This is called **"disparate treatment"** discrimination. Disparate treatment cases typically involve the following issues:
      - Were people of a different race, color, religion, sex, or national origin treated differently?
      - Is there any evidence of bias, such as discriminatory statements?
      - What is the employer's reason for the difference in treatment?
      - Does the evidence show that the employer's reason for the difference in treatment is untrue, and that the real reason for the different treatment is race, color, religion, sex, or national origin?
    - Title VII also prohibits employers from using neutral tests or selection procedures that have the **effect** of disproportionately excluding persons based on race, color, religion, sex, or national origin, where the tests or selection procedures are not "job-related and consistent with business necessity." This is called **"disparate impact"** discrimination.

  Disparate impact cases typically involve the following issues:

    - Does the employer use a particular employment practice that has a **disparate impact** on the basis of race, color, religion, sex, or national origin? For example, if an employer requires that all applicants pass a physical agility test, does the test disproportionately screen out women? Determining whether a test or other selection procedure has a disparate impact on a particular group ordinarily requires a statistical analysis.
    - If the selection procedure has a disparate impact based on race, color, religion, sex, or national origin, can the employer show that the selection **procedure is job-related and consistent with business necessity**? An employer can meet this standard by showing that it is necessary to the safe and efficient performance of the job. The challenged policy or practice should therefore be associated with the skills needed to perform the job successfully. In contrast to a general measurement of applicants' or employees' skills, the challenged policy or practice must evaluate an individual's skills as related to the particular job in question.
    - If the employer shows that the selection procedure is job-related and consistent with business necessity, can the person challenging the selection procedure demonstrate that there is a **less discriminatory alternative** available? For example, is another test available that would be equally effective in predicting job performance but would not disproportionately exclude the protected group?

See 42 U.S.C. § 2000e-2 (k). This method of analysis is consistent with the seminal Supreme Court decision about disparate impact discrimination, *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).

- In 1978, the EEOC adopted the Uniform Guidelines on Employee Selection Procedures or "UGESP" under Title VII. *See* 29 C.F.R. Part 1607.[1] UGESP provided uniform guidance for employers about how to determine if their tests and selection procedures were lawful for purposes of Title VII disparate impact theory.
  - UGESP outlines three different ways employers can show that their employment tests and other selection criteria are job-related and consistent with business necessity. These methods of demonstrating job-relatedness are called "test validation." UGESP provides detailed guidance about each method of test validation.

- Title I of the Americans with Disabilities Act (ADA)
  - Title I of the ADA prohibits private employers and state and local governments from discriminating against qualified individuals with disabilities on the basis of their disabilities.
  - The ADA specifies when an employer may require an applicant or employee to undergo a medical examination, *i.e.*, a procedure or test that seeks information about an individual's physical or mental impairments or health. The ADA also specifies when an employer may make "disability-related inquiries," *i.e.*, inquiries that are likely to elicit information about a disability.
    - When hiring, an employer may not ask questions about disability or require medical examinations until **after** it makes a conditional job offer to the applicant. 42 U.S.C. §12112 (d)(2);
    - After making a job offer (but before the person starts working), an employer may ask disability-related questions and conduct medical examinations as long as it does so for **all individuals entering the same job category**. *Id.* at § 12112(d)(3); and
    - With respect to **employees**, an employer may ask questions about disability or require medical examinations only if doing so is **job-related and consistent with business necessity**. Thus, for example, an employer could request medical information when it has a **reasonable belief**, based on **objective evidence**, that a particular employee will be unable to perform essential job functions or will pose a direct threat because of a medical condition, or when an employer receives a request for a **reasonable accommodation** and the person's disability and/or need for accommodation is not obvious. *Id*. at § 12112(d)(4).
  - The ADA also makes it unlawful to:
    - Use employment tests that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the test, as used by the employer, is shown to be job-related and consistent with business necessity. 42 U.S.C. § 12112(b)(6);
    - Fail to select and administer employment tests in the most effective manner to ensure that test results accurately reflect the skills, aptitude or whatever other factor that such test purports to measure, rather than reflecting an applicant's or employee's impairment. *Id*. at § 12112(b)(7); and
    - Fail to make reasonable accommodations, including in the administration of tests, to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such accommodation would impose an undue hardship. *Id*. at § 12112(b)(5).

- The Age Discrimination in Employment Act (ADEA)
  - The ADEA prohibits discrimination based on age (40 and over) with respect to any term, condition, or privilege of employment. Under the ADEA, covered employers may not select individuals for hiring, promotion, or reductions in force in a way that unlawfully discriminates on the basis of age.
  - The ADEA prohibits **disparate treatment** discrimination, i.e., intentional discrimination based on age. For example, the ADEA forbids an employer from giving a physical agility test only to applicants over age 50, based on a belief that they are less physically able to perform a particular job, but not testing younger applicants.

- The ADEA also prohibits employers from using neutral tests or selection procedures that have a **discriminatory impact** on persons based on age (40 or older), unless the challenged employment action is based on a **reasonable factor other than age**. *Smith v. City of Jackson*, 544 U.S. 228 (2005). Thus, if a test or other selection procedure has a disparate impact based on age, the employer must show that the test or device chosen was a reasonable one.

## Recent EEOC Litigation and Settlements

A number of recent EEOC enforcement actions illustrating basic EEO principles focus on testing.

- **Title VII and Cognitive Tests**: Less Discriminatory Alternative for Cognitive Test with Disparate Impact. *EEOC v. Ford Motor Co. and United Automobile Workers of America*, involved a court-approved settlement agreement on behalf of a nationwide class of African Americans who were rejected for an apprenticeship program after taking a cognitive test known as the Apprenticeship Training Selection System (ATSS). The ATSS was a written cognitive test that measured verbal, numerical, and spatial reasoning in order to evaluate mechanical aptitude. Although it had been validated in 1991, the ATSS continued to have a statistically significant disparate impact by excluding African American applicants. Less discriminatory selection procedures were subsequently developed that would have served Ford's needs, but Ford did not modify its procedures. In the settlement agreement, Ford agreed to replace the ATSS with a selection procedure, to be designed by a jointly-selected industrial psychologist, that would predict job success and reduce adverse impact. Additionally, Ford paid $8.55 million in monetary relief.
- **Title VII and Physical Strength Tests**: Strength Test Must Be Job-Related and Consistent with Business Necessity If It Disproportionately Excludes Women. In *EEOC v. Dial Corp.*, women were disproportionately rejected for entry-level production jobs because of a strength test. The test had a significant adverse impact on women – prior to the use of the test, 46% of hires were women; after use of the test, only 15% of hires were women. Dial defended the test by noting that it looked like the job and use of the test had resulted in fewer injuries to hired workers. The EEOC established through expert testimony, however, that the test was considerably more difficult than the job and that the reduction in injuries occurred two years before the test was implemented, most likely due to improved training and better job rotation procedures. On appeal, the Eighth Circuit upheld the trial court's finding that Dial's use of the test violated Title VII under the disparate impact theory of discrimination. *See* http://www.eeoc.gov/press/11-20-06.html
- **ADA and Test Accommodation**: Employer Must Provide Reasonable Accommodation on Pre-employment Test for Hourly, Unskilled Manufacturing Jobs. The EEOC settled *EEOC v. Daimler Chrysler Corp.*, a case brought on behalf of applicants with learning disabilities who needed reading accommodations during a pre-employment test given for hourly unskilled manufacturing jobs. The resulting settlement agreement provided monetary relief for 12 identified individuals and the opportunity to take the hiring test with the assistance of a reader. The settlement agreement also required that the employer provide a reasonable accommodation on this particular test to each applicant who requested a reader and provided documentation establishing an ADA disability. The accommodation consisted of either a reader for all instructions and all written parts of the test, or an audiotape providing the same information.

## Employer Best Practices for Testing and Selection

- Employers should administer tests and other selection procedures without regard to race, color, national origin, sex, religion, age (40 or older), or disability.
- Employers should ensure that employment tests and other selection procedures are properly validated for the positions and purposes for which they are used. The test or selection procedure must be job-related and its results appropriate for the employer's purpose. While a test vendor's documentation supporting the validity of a test may be helpful, the employer is still responsible for ensuring that its tests are valid under UGESP.
- If a selection procedure screens out a protected group, the employer should determine whether there is an equally effective alternative selection procedure that has less adverse impact and, if so, adopt the alternative procedure. For example, if the selection procedure is a test, the employer should determine whether another test would predict job performance but not disproportionately exclude the protected group.

- To ensure that a test or selection procedure remains predictive of success in a job, employers should keep abreast of changes in job requirements and should update the test specifications or selection procedures accordingly.
- Employers should ensure that tests and selection procedures are not adopted casually by managers who know little about these processes. A test or selection procedure can be an effective management tool, but no test or selection procedure should be implemented without an understanding of its effectiveness and limitations for the organization, its appropriateness for a specific job, and whether it can be appropriately administered and scored.
- For further background on experiences and challenges encountered by employers, employees, and job seekers in testing, see the testimony from the Commission's meeting on testing, located on the EEOC's public web site at: http://www.eeoc.gov/abouteeoc/meetings/5-16-07/index.html.
- For general information on discrimination Title VII, the ADA and the ADEA see EEOC's web site at:
  - http://www.eeoc.gov/abouteeo/overview_practices.html and
  - http://www.eeoc.gov/abouteeo/overview_laws.html

---

**Footnote**

[1]The Departments of Labor and Justice and the Office of Personnel Management (then called the Civil Service Commission) issued UGESP along with the EEOC.

---

*This page was last modified on June 23, 2008.*

Return to Home Page

*Scott v. Chertoff*
Case No. 08-CV-0735 BTM (JMA)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**PROOF OF SERVICE – ECF SYSTEM**

I, Matthew G. English, am an attorney in the County of San Diego, State of California, at the Law Offices of Matthew G. English, 7676 Hazard Center Drive, Suite 500, San Diego, California 92108-4508. I am over the age of eighteen and am not a party to the within action.

On **September 16, 2009,** I caused service of the following document(s) on the parties indicated below by electronically filing said document(s) with the Clerk of the District Court using its ECF System, which electronically notifies them:

1. **PLAINTIFF JAMES SCOTT'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**
2. **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
3. **DECLARATION OF JAMES W. SCOTT IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
4. **DECLARATION OF RUBEN BALLESTROS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
5. **DECLARATION OF MATTHEW G. ENGLISH IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
6. **NOTICE OF LODGMENT OF EXHIBITS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
7. **EXHIBITS 1 THROUGH 12 - DOCUMENTS**
8. **EXHIBITS 13 THROUGH 19 - DEPOSITION TRANSCRIPTS**
9. **EXHIBITS 20 THROUGH 22 – EEOC ENFORCEMENT GUIDANCE**

**Parties Served:**

Timothy Stutler tim.stutler@usdoj.gov
Assistant United States Attorney
OFFICE OF THE UNITED STATES ATTORNEY
Counsel for Defendant

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on September 16, 2009, at San Diego, California.

/s/ Matthew G. English
Matthew G. English