KAREN P. HEWITT
United States Attorney
TIMOTHY C. STUTLER
Assistant U.S. Attorney
California State Bar No. 131794
CINDY M. CIPRIANI
Assistant U.S. Attorney
California State Bar No. 144402
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7387/7390
tim.stutler@usdoj.gov
cindy.cipriani@usdoj.gov

Attorneys for the Defendant

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JAMES SCOTT,<br><br>Plaintiff,<br><br>v.<br><br>JANET A. NAPOLITANO, SECRETARY, DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | ) | Civil No. 08cv0735BTM(JMA)<br><br>DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [REDACTED]<br><br>DATE: December 4, 2009<br>TIME: 11:00 a.m.<br>CTRM: 15<br>JUDGE: Hon. Barry T. Moskowitz<br><br>Per Chambers: No Oral Argument unless requested by the court |

///

///

///

///

///

///

///

///

///

///

///

# TOPICAL INDEX


| | Page |
|---|---|
| TABLE OF AUTHORITIES | iii |
| I INTRODUCTION AND STATEMENT OF FACTS | 1 |
| A. INTRODUCTION | 1 |
| B. STATEMENT OF FACTS | 2 |
| 1. Criminal Investigator Job Requirements | 2 |
| 2. Plaintiff's 2004 Health Issues | 2 |
| 3. 2005 Revocation of Plaintiff's Law Enforcement Authority | 4 |
| 4. 2005 Efforts to Assess Plaintiff's Fitness to Resume Law Enforcement Duties | 5 |
| a. Initial Efforts to Obtain Medical Information | 5 |
| b. April 2005 Request For Comprehensive Physical Examination, Followed by Psychiatric Independent Medical Examination | 5 |
| c. The MRO Recommends Comprehensive Medical Examination And Psych IME | 8 |
| d. May 2005 Efforts to Examine Plaintiff | 8 |
| e. [redacted] Birth-Month Examination | 9 |
| 5. 2006 Suspension | 10 |
| 6. 2007 Termination | 10 |
| II DISCUSSION | 10 |
| A. THE AGENCY'S MEDICAL INQUIRIES WERE LAWFUL | 10 |
| 1. The Exams at Issue Were Fitness-for-Duty Exams | 10 |
| 2. All Inquiries Were Job-Related and Consistent with Business Necessity | 13 |
| 3. The Exam Form Complied with the ADA | 19 |
| B. ALLEGED RETALIATION | 20 |
| 1. Plaintiff's Disruptive Actions Did Not Constitute Protected Activity | 20 |

TOPICAL INDEX(Continued)


2. Plaintiff Cannot Show That He Would Not Have Been Suspended or Terminated But For His Protected Activity . . . . . . . . . . . . . . . . . . . . . . 21

3. Plaintiff Cannot Rebut Defendant's Stated Non-Retaliatory Reasons for His Suspension and Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

4. Plaintiff Cannot Show That Defendant Would Not Have Terminated Him "But for" His Alleged Protected Activities . . . . . . . . . . . . . . . . . . . . . 22

C. ALLEGED ADEA VIOLATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1. Plaintiff Was Not Treated Differently than Younger Employees . . . . . . . 23

2. Plaintiff Lacks Standing to Challenge the Birth-Month Exam Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

Cases — Page

Auerbach, et al. v. Bd of Education of the Harborfields Central School District of Greenlawn, 136 F.3d 104 (2d Cir. 1998) . . . 23

Barnes v. The Benham Group, Inc., 22 F. Supp. 2d 1013 (D. Minn. 1998) . . . 20

Coffman v. Indianapolis Fire Department, 578 F.3d 559 (7th Cir. 2009) . . . 18

Cohen v. Fred Meyer, Inc., 686 F.2d 793 (9th Cir. 1982) . . . 22

Equality Employment Opportunity Commission v. Shoney's, Inc., 536 F. Supp. 875 (N.D. Ala. 1982) . . . 20

Hochstadt v. Worcester Foundation for Experimental Biology, 545 F.2d 222 (1st Cir. 1976) . . . 20

Kempcke v. Monsanto Co., 132 F.3d 442 (8th Cir. 1998) . . . 20

Krocka v. City of Chicago, 203 F.3d 515 (7th Cir. 2000) . . . 19

Lee v. City of Syracuse, 603 F. Supp. 2d 417 (N.D.N.Y 2009) . . . 19

Mazarez v. Department of the Navy, 302 F.3d 1382 (Fed. Cir. 2002) . . . 21

Miller v. Champaign Community Unit Sch. District, 983 F. Supp. 1201 (C.D. Ill. 1997) . . . 15

Porter v. U.S. Alumoweld Co., Inc., 125 F.3d 243 (4th Cir. 1997) . . . 19

Rosser v. Laborer's International Union of N. America, Local Number 438, 616 F.2d 221 (5th Cir. 1980) . . . 20

Shannon v. Verizon New York Inc., 2009 WL 1514478 (N.D.N.Y. 2009) . . . 19

Stegall v. Citadel Broadcasting Company, 350 F.3d 1061 (9th Cir. 2004) . . . 21

Thomas v. Corwin, 483 F.3d 516 (8th Cir. 2007) . . . 17

United Government Security Officers of America v. Akal Security, Inc., 475 F. Supp. 2d 732 (S.D.Oh. 2006) . . . 23

TABLE OF AUTHORITIES (Continued)

Cases — Page

Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054 (9th Cir. 2002) . . . . . 21

Watson v. City of Miami Beach, 177 F.3d 932 (11th Cir. 1999) . . . . . 15

Weissman v. Dawn Joy Fashions, Inc., 215 F.3d 224 (2nd Cir. 2000) . . . . . 20

Yin v. State of Cal., 95 F.3d 864 (9th Cir. 1996) . . . . . 18

Statutes

5 U.S.C. § 7513 (2000) . . . . . 22

29 U.S.C. §§ 633a . . . . . 1, 2

29 U.S.C. § 794a . . . . . 1

42 U.S.C. §12112 . . . . . 1, 13

42 U.S.C. § 2000e-16 . . . . . 1

# I. INTRODUCTION AND STATEMENT OF FACTS

## A. INTRODUCTION.

This is an employment discrimination case filed against the Secretary of the U.S. Department of Homeland Security ("DHS") by James W. Scott. Before he was terminated in 2007, Plaintiff was a Special Agent and Criminal Investigator ("CI") with the DHS's Federal Protective Service ("FPS"). The events leading to his firing started in January 2005, when he was scheduled to attend refresher law enforcement training at the FPS National Academy. The training included activities that officers routinely perform. But immediately upon learning this, Plaintiff reported that he had suffered a relapse of prior respiratory problems and also that a previous injury to his shooting arm and shoulder prevented him from lifting more than twenty pounds -- meaning he could not do the training.

Based on his inability to perform standard law enforcement duties, Defendant embarked on a two-year effort to persuade Plaintiff to submit to a medical examination and provide medical releases and other information that Defendant's Medical Review Officer ("MRO") needed to assess Plaintiff's fitness to return to duty. Plaintiff declined to provide most of the requested information and releases, preventing the MRO from assessing Plaintiff's fitness to resume his law enforcement duties. Defendant directed Plaintiff to provide the rest of the information the physician needed. Plaintiff refused, and was suspended for fourteen days. He was then given a third chance to provide the information, again refused, and was fired.

Plaintiff claims that these and other related employment decisions constitute disability discrimination, age discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-16), the Rehabilitation Act of 1973 (29 U.S.C. § 794a), the Americans With Disabilities Act (42 U.S.C. §12112) ("ADA"), and the Age Discrimination in Employment Act of 1967, as amended in 1974 ("ADEA"). 29 U.S.C. §§ 633a. He now moves for partial summary judgment, based on three arguments. First, he contends that the medical questions at issue violated the ADA. Plaintiff next claims that his suspension and subsequent termination were prohibited retaliation for opposing these alleged ADA violations. Finally, he claims that Defendant's medical exam program violated the ADEA by requiring employees over the age of 40 to undergo medical testing more frequently than younger employees.

Plaintiff's arguments lack merit. With respect to Plaintiff's ADA assertions, Defendant's medical inquiries and examinations were proper because they were job-related and consistent with business necessity. Plaintiff's retaliation argument also fails as his refusals to cooperate were not protected EEO activity. Nor can he cannot establish that the challenged decisions were motived by unlawful retaliatory animus. Moreover, even if he could meet his burden, Plaintiff can neither rebut Defendant's stated non-retaliatory reasons nor show that the agency would have retained him but for his prior protected activity. Finally, Plaintiff's ADEA claim is fatally flawed, as he cannot identify any similarly situated younger employees who were treated better than him. Because he was not treated differently based on age, he has no standing to challenge the examination program. Accordingly, as more fully set forth below, Plaintiff's motion for partial summary judgment should be denied.

B. STATEMENT OF FACTS.

1. Criminal Investigator Job Requirements.

Plaintiff Position Description specifies that a CI "carries firearms, makes arrests, and . . . serves search and arrest warrants." Exh. 4, p. 5.[1/] CIs also participate in surveillance and undercover operations. Exh. 4, p. 8. In addition to these standard law-enforcement activities, the CI position includes a number of unique duties. For example, a CI must be able to perform "physical protection duties," which include providing protection and security for Cabinet-level officials. Exh. 4, p. 2. Also, when threats of violence, physical harm, or other criminal acts against federal employees are discovered, CIs must be able to physically protect the facilities and individuals involved. Id.

2. Plaintiff's 2004 Health Issues.

In early 2004, Plaintiff experienced respiratory problems, diagnosed as sinusitis and rhinitis. He complained that construction dust in his office exacerbated the problem. He filed an OWCP claim regarding his breathing problems. Exh. 88, 205:6-21; Exh. 10. On September 17, 2004, Plaintiff reported that his shooting hand, arm and shoulder were injured. Exh. 11. He then submitted a doctor's

[1/]To economize, and minimize the burden on the Court's files of more sealed documents, Defendant incorporates herein by reference the 96 exhibits he filed in support of his Memorandum of Points and Authorities in Support of Motion for Summary Judgment or Partial Summary Judgment, filed September 16, 2009 ("Defendant's MSJ Ps&As"), which he will cite herein as if submitted anew with the present brief. He also submits three new exhibits with this opposition, which are paginated and numbered next in order (Exhibits 97 99).

"Documentation of Medical Impairment" ("DMI"), which said that he "cannot perform" any grasping, hand motion, pushing and pulling, reaching above his shoulder or lifting. Exh. 12; Exh. 88, 210:5-10, 211:17-23.

On September 21st, his supervisor, John Morgan, told Plaintiff that based on his reported limitations, "I believe it prudent that you NOT carry a FPS duty firearm at this time until your condition improves and you are no longer under doctor's care." Exh. 88, 207:2-9; Exh. 13. Plaintiff wanted to keep his gun, and two days later reported that he had gone back to the doctor, and that now "[c]arrying a firearm is authorized, and no work restrictions have been imposed." Exh. 88, 208:8-12; Exh. 14. He also submitted a new DMI reversing the doctor's week-old opinion that Plaintiff cannot grasp with, lift or even move his shooting hand. Exh. 88, 209:7-10; Exh. 15.

The following month, on October 8, 2004, Plaintiff submitted another OWCP claim, this one for his arm and shoulder, claiming his injury was the result of over tasking and overuse of his computer mouse at work. Exh. 16. Mr. Morgan was surprised by Plaintiff's report of continuing medical problems. He sent Plaintiff an e-mail on October 18th reminding him that Mr. Morgan worked out of the FPS's San Francisco office, hundreds of miles from Plaintiff, and so was relying on Plaintiff to keep him apprised of his condition. Exh. 17; Exh. 88, 263:14-20. Based on Plaintiff's OWCP claim, Mr. Morgan was concerned that he was still "conducting the same work activities that, in your doctor[']s opinion, caused your 'mouse-related' arm and shoulder injury." Exh. 17. As Mr. Morgan explained:

> I have been attentive to your medical condition, but at the same time I must address the issue of whether you can perform your duties as confirmed by your doctor or suffer further injury by continued use.

Exh. 17.

The next day, Plaintiff submitted another DMI from his doctor confirming that he could work without restriction. Exh. 19. In all, Plaintiff submitted a total of four DMIs between September 23, 2004 and January 10, 2005 that stated he could work with no restrictions. Exh. 88, 214:12-15, 215:10-15; Exh. 15; Exh. 19; Exh. 21; Exh. 22. But then, on January 26, 2005, Plaintiff received a training notice that caused him to get a new DMI contradicting all those DMIs. Exh. 29.

///

///

3. 2005 Revocation of Plaintiff's Law Enforcement Authority.

On January 26, 2005, the FPS National Academy notified Plaintiff and other FPS officers that they were scheduled to attend an "ALERT 504" law enforcement training course in Glynco, Georgia on February 7th. Exh. 88, 216:2-8; Exh. 26. The notification informed them that the course included Practical Exercise Performance Requirements, or "PEPRs," explaining that:

> PEPR's are physical activities related to law enforcement tasks, e.g. conducting searches and making arrests. Students must satisfactorily perform these requirements to successfully complete the training program. This is a rigorous program containing advanced training in the areas of arrest techniques, defensive tactics and firearms designed to emulate the physical stresses of the field. Therefore, it is the FPS National Academy's expectation that all attendees have a baseline fitness level required for FPS law enforcement positions.

Exh. 28.

The day after Plaintiff received this information, he got a new DMI from his doctor imposing a twenty-pound weight lifting restriction -- due to what supposedly were resolved medical problems. Exh. 88, 228:2-7; Exh. 29. Plaintiff expressed reservations about the training, because he:

> [H]ad lost significant upper body strength since the injury occurred last September, due to the fact that "general" upper body weight training had been forbidden until about a week ago. . ..

Exh. 87, 99:7-14, 101:3-6; Exh. 28. Finally, Plaintiff also told Mr. Morgan that he had just developed another upper respiratory infection, noting cryptically, "I'll file another DOL/OWCP Claim later this month." Exh. 27.

Plaintiff's apparent inability to safely perform his duties gravely concerned the agency. See Exh. 30. Based on the latest DMI, Plaintiff was relieved of his law enforcement authority on January 31, 2005. Exh. 87, 35:23-25, 66:18-22, 82:18 -- 83:1, 87:19-22; Exh. 85, 45:5-17.

On February 22, 2005 -- after the risk of attending the standard training had passed -- Plaintiff submitted the fourth DMI to contradict a preceding DMI or OWCP claim. This DMI, which he turned in two weeks after the ALERT class, cancelled the weight-lifting limit and again cleared him to work without restriction. Exh. 88, 228:8-14; Exh. 34.

///

///

///

4. 2005 Efforts to Assess Plaintiff's Fitness to Resume Law Enforcement Duties.

a. Initial Efforts to Obtain Medical Information.

In January 2005, the FPS issued new policy guidelines for return-to-work examinations. Exh. 92, 60:14 -- 61:14, 62:5-8; Exh. 23. Under the new policy, the MRO was required to determine if a CI could return to full duty. Exh. 92, 64:6 - 65:3. Because the FPS does not have in-house medical professionals to evaluate agency employees, it had retained a medical contractor, Comprehensive Health Services, Inc. ("CHS"), to perform those functions. Id., 55:6-17, 65:4-6, 111:22 -- 112:3. On March 1, 2005, Plaintiff was directed to submit to a medical examination, and informed that he would remain in non-law enforcement status until he passed. Exh. 87, 113:23 -- 114:6, 117:14-17; Exh. 37. On March 4, 2005, Martha Montano contacted Plaintiff to schedule a fitness-for-duty ("FFD") examination in conjunction with CHS. Exh. 86, 52:14-20, 53:13-20; Exh. 38. Ms. Montano was the FPS staff employee who coordinated medical examinations for Region 9. Exh. 86, 17:12 18:2, 66:9-14.

On March 31, 2005, Ms. Montano sent Plaintiff two "Return to Work Clearance" forms authorizing Plaintiff's physician to release his records to CHS. Exh. 82, 361:14-25; Exh. 43; Exh. 24; Exh. 25. Plaintiff refused to sign. Exh. 82, 362:1-2; Exh. 42. Despite repeated efforts over the next two years to persuade Plaintiff to sign the releases, he never did. Exh. 81, 136:17-20, 137:20 -- 138:5, 142:3-9; Exh. 82, 362:1-2.

b. April 2005 Request For Comprehensive Physical Examination, Followed by Psychiatric Independent Medical Examination.

On April 13, 2005, Ms. Montano requested that CHS schedule a FFD focusing on Plaintiff's shoulder and respiratory problems, as well as a psychiatric "IME," or independent medical examination. Exh. 86, 89:9-15, 92:2-6, 95:22-24; Exh. 45. She reported that he had pain in his arm up to and including his shoulder, ostensibly from excessive use of a computer mouse, and that for the last year he had experienced recurrent sinusitis and upper respiratory infections. Mr. Montano also revealed:

> Mr. Scott appears to be apprehensive with heightened states of anxiety and we are concerned with a potential of hostile encounters with the public. There is a concern with his emotional stability as he has had a vexation about an "FPS management conspiracy against him."

Exh. 45; Exh. 86, 95:8-13, 97:9-13.

Those concerns stemmed from Plaintiff's increasingly bizarre conduct and statements over the past several months. Region 9's management was aware that he had previously submitted documentation revealing that he had [redacted] before [redacted] Exh. 82, 500:11-13, 501:4-5, 501:21-502:8; Exh. 7; Exh. 83, 85:14 86:10, 87:15 88:6. In fact, Plaintiff had suffered from [redacted] issues as far back as [redacted]. Exh. 82, 469:8-11, 18-22, 472:23-473:20.

In [redacted], Plaintiff was diagnosed with [redacted] (id., 485:2-5); placed on [redacted] (Exh. 82, 485:6-8, 498:19-24); placed in [redacted] (id., 494:5-9, 496:20-497:1); again placed [redacted], this time [redacted], and [redacted] Id., 475:13-24, 478:17-479:12, 490:16-20, 491:1-5, 499:19-24; Exh. 95:189:3-7. In 2000, Plaintiff filed an OWCP claim for his [redacted] (Exh. 82, 488:6-7, 22-23, 490:7-10), and was sent by DOL for a [redacted], resulting in a diagnosis of [redacted] Id., 491:17-492:7. Characterization of the problem as [redacted] was borne out by the fact that Plaintiff was [redacted]. Exh. 82, 475:13-24, 478:17-479:11.

By April 2005, when Ms. Montano requested a psychiatric examination, Plaintiff had been making statements for about a year and engaging in conduct that created concerns about his emotional state. He first revealed an apparent conspiracy obsession to Mr. Morgan on March 10, 2004, when Mr. Morgan innocently asked whether he had contacted the GSA project manager about the construction that was exacerbating his respiratory problems. Plaintiff snapped back:

> [T]he local GSA/Building Management Office has a well documented history of either poor judgement, negligence, or collusion associated with my previously filed Whistleblower Retaliation Case(s) involving GSA/FPS officials . . ..

Exh. 8 (emphasis added).[2]

On January 31, 2005, when Mr. Morgan relieved him of his law enforcement authority, Plaintiff's hostility, oppositional behavior, paranoia and other odd behavior became more frequent and

---

[2] Plaintiff had previously filed and, ultimately, lost an MSPB whistleblower complaint against a prior supervisor, Michael Conrad, who is not involved in any of the incidents in the present case.

blatant. That day, Plaintiff lashed out at Mr. Morgan with a "verbal warning" that he and other agency officials were violating his civil rights. Exh. 51. A few days later, a supervisor from another branch reported that Plaintiff had inexplicably claimed that he no longer worked for the FPS. Exh. 32. Then, when Plaintiff was first contacted about a medical examination, he fired off an e-mail to Mr. Morgan and Plaintiff's second level supervisor, Branch Chief Donald Meyerhoff, stating that "[b]ased on previous events, of which evidence reveals you had an involvement," he was requesting an immediately investigation into "continuing unethical and illegal retaliation." Exh. 35. A few hours later, he sent a second e-mail suggesting his supervisors were guilty of "abuse," "retaliation," "corruption," and "obstruction of justice" against him, and that the FBI, "who is also tasked with eliminating agency corruption as a primary mission, is not nearly as ignorant of the abuse suffered by me at the hands of this agency's officials as you may think." Exh. 36. However, like Mr. Morgan, Mr. Meyerhoff had never had any prior disputes with Plaintiff, and Plaintiff had never accused him of anything before. Exh. 81, 123:11 -- 124:1.

Plaintiff was assigned to perform non-law enforcement tasks for Area Commander David Handschin. Exh. 87, 125:23 -- 126:11; Exh. 39. Mr. Handschin was in a different branch from Plaintiff, Mr. Meyerhoff and Mr. Morgan, was stationed in Region 9's Phoenix office, and had never worked with Plaintiff before. Exh. 81, 112:24 -- 113:22; Exh. 88, 225:9-22. But Mr. Handschin reported that during his very first conversation with his new subordinate, Plaintiff "started talking about the illegal activities that FPS is doing," and told Mr. Handschin "that I am now his supervisor so I am part of the illegal activity." Exh. 41. When Mr. Handschin asked Plaintiff to sign the Return to Work Clearance forms, Plaintiff snorted that they were "designed to both 'intimidate and coerce' my release of private/confidential medical records." Exh. 42. He added, "those agency officials behind the above actions should . . . consider 'obeying the law instead of breaking [i]t'." Id.

His accusations soon degenerated into insubordination. On April 7, 2005, Mr. Morgan received a report from Mr. Handschin detailing several incidents of such defiance. Exh.44; Exh. 88, 243:2 243:7. For example, Plaintiff ignored Mr. Morgan's instructions to contact Mr. Handschin; instead, he sent Mr. Handschin an e-mail that came back "undeliverable," and then "did nothing for two whole days." Id. On March 31st, Mr. Handschin had directed him to obtain certain information ASAP, and

told him to contact Mr. Handschin if he had any problems. He failed to do either. After several days of silence, on April 6th, Mr. Handschin contacted the FPS national dispatcher to locate the missing officer. The dispatcher tried all day to reach him, on both his office and cell phones. Plaintiff later claimed he could not leave his office, and had not charged his cell phone. Mr. Handschin reminded the seasoned veteran that he had to have his cell phone with him and charged each day at work. Plaintiff rudely rebuked his superior, "Do you hear me?" Exh. 44.

These are the incidents that caused Region 9 to question Plaintiff's emotional state. Exh. 87, 139:10 -- 141:19, 149:12 -- 150:10, 153:17  153:2; Exh. 88, 229:24  230:3, 230:24  231:7, 231:20  232:11, 232:20  233:18, 234:1-12, 235:7  236:3, 238:15  239:25, 243:2  244:7.

c. <u>The MRO Recommends Comprehensive Medical Examination and Psych IME.</u>

CHS's MRO, Dr. Lawrence P. Saladino, reviewed Ms. Montano's April 2005 report about Plaintiff's problems with his arm and shoulder, recurrent sinusitis and upper respiratory infections, and possibly emotional problems. Exh. 97, p. 2, ¶¶ 3-5. He knew that Plaintiff's physical problems potentially affected his ability to safely perform his law enforcement duties. Also, as discussed above, Plaintiff's doctors had [redacted] after he was [redacted]. Exh. 82, 475:13-24, 478:17-479:12, 490:16-20, 491:1-5, 499:19-24; Exh. 95:189:3-7. Dr. Saladino had a report from Plaintiff confirming [redacted]. Exh. 91, 122:14-22; Exh. 97, p. 2, ¶ 3. As a medical doctor, Dr. Saladino knew [redacted]. <u>Id.</u>

In response to Ms. Montano's request for a FFD focused on Plaintiff's shoulder and respiratory issues and a psychiatric IME, on April 20, 2005, Dr. Saladino recommended a more comprehensive "Incumbent Medical Exam and Psych IME." Exh. 86, 103:17 -- 104:3, 106:16-19; Exh. 47.

d. <u>May 2005 Efforts to Examine Plaintiff</u>.

Based on Dr. Saladino's recommendation, CHS scheduled Plaintiff for the comprehensive physical examination on May 6, 2005, Exh. 86, 67:9-23 140:9-11; Exh. 48; Exh. 87, 147:1-12; Exh. 49. But Plaintiff presented the clinic with a letter he had written stating that it "will only be permitted by

me" to conduct an examination "regarding the following medical conditions . . .. Recurring Sinusitis or Rhinitis [and] Computer-related Repetitive Motion Injury to the: Upper Right Arm and Shoulder." Exh. 82, 369:17-15; Exh. 52. He refused to submit to a more comprehensive examination, because of his interpretation of a document the FPS had disseminated in 2000 called "Guidelines for Implementing the Federal Protective Service (FPS) Periodic Medical Examination Process" ("Birth-Month Examination Guidelines"). Exh. 92; Exh. 6.

Those Guidelines called for periodic birth-month examinations for current, or "incumbent," FPS officers. Because Plaintiff was born in [redacted] rather than May, he felt that the FPS could not subject him to the comprehensive examination recommended by Dr. Saladino. Due to Plaintiff's refusal to submit to a full examination, the clinic asked him to leave the property on May 6, 2005, the date of the first scheduled examination. Exh. 81, 166:8-25.

Mr. Morgan told him that his physical examination, "termed Incumbent Exam," would be rescheduled, as well as a subsequent psych exam. Exh. 50. Mr. Morgan explained that the physical examination was not intended as a birth-month examination: "the exam type a FPS associate receives is called an Incumbent Exam regardless of when an associate is examined. Incumbent Exams are not exclusive to one's birthday." Exh. 50.

The physical examination was rescheduled for May 24, 2005, but Plaintiff again showed up with a letter containing the same self-imposed restrictions as before (Exh. 81, 167:2-5; Exh. 82, 369:17-25), and was again sent away. The psych exam was cancelled too.

e. [redacted] 2005 Birth-Month Examination.

Further attempts to evaluate Plaintiff's fitness for duty were shelved until [redacted] 2005, when he was scheduled for a birth-month examination. Exh. 53; Exh. 88, 281:5-24. He appeared but again refused to release any of his medical records to Dr. Saladino except the examination results, and selectively answered only parts of the medical questionnaire. Exh. 81, 172:20-24, 173:16-20, 175:3 -- 176:4, 178:6-8; Exh. 57. Dr. Saladino reviewed the questionnaire, examination report, and lab results, and concluded that "the information available to me at the present time will not be sufficient for [me] to provide a medical determination letter. . . ." Exh. 89; Exh. 58.

///

5. 2006 Suspension.

On [redacted] 2005, Rudy Negrete, Plaintiff's new Branch Chief, directed Plaintiff to answer all the unanswered questions and to sign the release. Exh. 59; Exh. 62; Exh. 73, pp. 4-5; 89, 37:8 -- 38:6, 67:2-20. Plaintiff refused. Exh. 89, 23:11-19. On April 17, 2006, Mr. Negrete sent him a proposed fourteen-day suspension for disobeying his instructions. Exh. 89, 72:23 -- 73:11, 74:13-18; Exh. 63; Exh. 74, p. 3. On May 8, 2006, Joyce Nesbitt Simon, Region 9's new Acting Deputy Director, agreed and suspended him from May 15 to May 27, 2006. Exh. 75, p. 2; Exh. 64.

6. 2007 Termination.

On November 8, 2006, the FPS transferred to Region 10, in Seattle, Washington, authority to handle Plaintiff's fitness for duty issues. Exh. 93, 46:21 -- 50:9; Exh. 65; Exh. 66; Exh. 67. On December 21, 2006, Tamra Hirano, Region 10's Chief of Mission Support, ordered Plaintiff to respond to a pared-down version of the questions he had refused to answer. Exh. 84, 38:1 -- 39:20; Exh. 68. She also directed him to sign a medical release that was much narrower than the previous release, and simply authorized the agency to release to CHS and Dr. Saladino records that Plaintiff had already given it regarding his shoulder injury. Exh. 81, 221:24 - 222:8. Exh. 68.

Plaintiff disobeyed Ms. Hirano's order, which prevented Dr. Saladino from returning him to duty. Exh. 97, p. 5, ¶ 15. Accordingly, on January 25th, Ms. Hirano proposed Plaintiff's removal for disobeying her orders. Exh. 93, 91:6-12; Exh. 70. Stephen Slagowski, Region 10's Acting Regional Director, agreed with her and fired Plaintiff on March 5, 2007. Exh. 78, p. 2; Exh. 71.

## II. DISCUSSION

### A. THE AGENCY'S MEDICAL INQUIRIES WERE LAWFUL.

#### 1. The Exams at Issue Were Fitness-for-Duty Exams.

Plaintiff's motion deals with the [redacted] 2005 examination and the December 2006 attempt to require Plaintiff to respond to a pared down version of the exam questions. Plaintiff's MSJ Ps&As, 10:27-28, n. 6. Plaintiff argues that the [redacted] 2005 examination was solely a periodic examination, and that such examinations are mutually exclusive from fitness-for-duty examinations. Id., 10:24-28. This is significant, he argues, because the permissible scope of periodic examinations is narrower than fitness-for-duty examinations. Id., 11:13 -- 12:9.

Although Plaintiff attempts to pigeon-hole the [redacted] 2005 examination into a single category by repeatedly labeling it a "Periodic Medical Examination" (Plaintiff's MSJ Ps&As, 10:27-28, n. 6), this argument is based purely on semantics and ignores the undisputed facts of this case, particularly the context in which the [redacted] 2005 examination occurred.[3] When an FPS CI's job is interrupted on account of health problems, the MRO is tasked with determining whether those health problems render that officer unfit to return to duty. Exh. 23; Exh. 92, 60:14 -- 61:14, 62:5-8, 64:6 - 65:3; Exh. 97, p. 1, ¶ 1. The process starts by asking the CI to complete release forms created by CHS. Exh. 92, 60:14 61:5. The forms' purpose is to gather all the relevant documents for CHS and its MRO, Dr. Saladino. Id., 60:14 61:5, 147:16-22, 148:5-11. Dr. Saladino reviews whatever information the CI and his physician provide, and either makes a medical determination based on that, or recommends an examination. Id., 75:1 -- 76:13. If he chooses the latter option, the CI is scheduled for an examination at a local clinic, after which Dr. Saladino reviews the results. Id., 74:10-22. The FPS' policy is to defer to the MRO's judgment as to whether the CI should be returned to full duty. Id., 65:4-20.

In January 2005, Plaintiff lost his law enforcement status. As of April 2005, Plaintiff was still unable to perform his law enforcement duties. Ms. Montano reported his health issues to CHS. Dr. Saladino responded by recommending an "Incumbent Medical Exam and Psych IME" for Plaintiff. Exh. 86, 103:17 -- 104:3, 106:16-19; Exh. 47. By "incumbent," he was referring to the broad, comprehensive examination often conducted during an employee's birth month. Exh. 91, 47:8-12, 114:23 - 115:18.

There is no question, as Plaintiff agrees, that the comprehensive examination Dr. Saladino asked for in April 2005 was a fitness-for-duty exam, i.e., an examination performed in response to information about a particular employee's performance issues or risks posed by that employee. See Plaintiff's MSJ Ps&As, 10:12-14. But Plaintiff successfully delayed the recommended examination until [redacted] 2005, arguing that the examination was not allowed until his birth month. He even managed to persuade John Hartman, his new supervisor and one of his strongest advocates, to get the agency to administer

[3] Additionally, as discussed below, the questions are permissible irrespective of which category they fall within.

a birth-month examination in lieu of a scheduled orthopedic examination that would have focused on Plaintiff's reported shoulder and arm issues. Exh. 88, 290:6-25; Exh. 55. Plaintiff now argues that because he successfully delayed the examination until his birth month, it must be considered solely as a periodic examination, and may not be regarded as one conducted for the purpose of determining whether his previously reported health issues rendered him unfit for duty. As stated above, this argument relies on semantics, not reality. There is no dispute that the examination conducted in [redacted] was the exact same one Dr. Saladino had asked for, was requiring and was awaiting in order to determine whether Plaintiff's reported health problems rendered him unfit to return to full duty.[4/] Nor is there any dispute that Defendant utilized the [redacted] examination for that precise purpose. Exh. 91, 147:6 -- 149:6; Exh. 95, 218:5-13.

During Dr. Saladino's deposition, Plaintiff attempted to wrest from the MRO a concession that since the agency in [redacted] 2005 was not scheduling Plaintiff for the psychiatric IME that Dr. Saladino had asked for, then it was no longer an issue. Exh. 91, 147:6 148:11. Plaintiff's implication was that the incumbent examination was no longer for the purpose of determining whether Plaintiff's reported health problems rendered him unfit for duty, but rather was solely for the purpose of satisfying the periodic examination requirement. Dr. Saladino forcefully rejected that position:

> I think the documentation was sufficient in [Ms. Montano's April 2005] IME request. I would think [the psychiatric concern] can't be left unaddressed. I think that it needs to be addressed.
>
> . . .
>
> I'm not just going to drop what was in the earlier e-mail, what was the earlier IME request.

Id., 147:13-14, 148: 9-11. When Plaintiff pressed again during the second day of the doctor's deposition, Dr. Saladino explained the flaw in Plaintiff's reasoning:

> Well, you know, you are looking at the case in a vacuum. You are looking at something that occurred. You are taking You are taking events out of context and you are looking back in time and you are not really getting every detail of the case.

Exh. 95, 217:13-17.

As much as Plaintiff might wish that the [redacted] 2005 examination was conducted solely for

---

[4/] This is not to say that the incumbent examination of itself would necessarily have ended the issue only that it was a necessary step. As discussed below, based on Plaintiff's reported psychological issues, the question of Plaintiff's mental health still needed to be addressed. Exh. 91, 147:6 -- 147:11.

the purpose of fulfilling a periodic examination requirement, he cannot ignore the status quo: unlike other officers who might be required to submit to a birth month examination, Plaintiff had been pulled off of law enforcement duty and needed to pass the examination in order to return to duty. Thus, whatever appeal his argument might have if he had been a fully performing law enforcement officer, because a significant purpose of Plaintiff's examination was to determine whether his reported health problems rendered him unfit to return to full duty, the argument does not apply here.

Plaintiff's argument appears to be part of an untoward "gotcha" strategy. Had he submitted to the Spring 2005 incumbent examination as twice ordered, or had Defendant fired him then for disobeying the orders, Plaintiff would be left with only the argument that a fitness-for-duty examination was not justified under the circumstances of this case.[5] But he manipulated the scheduling of the examination, delaying it until his birth month. And now he argues, in effect, "You should never have listened to me and waited until my birth month." That argument must fail, regardless of what label Plaintiff attaches to the [redacted] 2005 examination; one of its indisputable purposes was to determine whether Plaintiff's reported mental and physical problems precluded a return to duty. It was a fitness for duty examination. Exh. 97, p. 5, ¶ 14.

2. All Inquiries Were Job-Related and Consistent with Business Necessity.

The ADA allows disability-related inquiries of current employees when they are job-related and consistent with business necessity. 42 U.S.C. § 12112(d)(4). Each of the eight inquiries that Plaintiff refused to answer were job-related and consistent with business necessity, in light of Plaintiff's particularized history and the special safety concerns law enforcement positions involve. When one examines each question individually through a prism that reflects the unique pressures placed on law enforcement officers, it is clear the agency's inquiry was both justified and legally permissible.

Question 1. Have you ever been treated for a mental condition? (If yes, specify when, where, and give details.) Exh. 56, p. 2.[6]

[5] Plaintiff's motion is not based on that argument. His only reference to such an argument is a passing, unsupported footnote quip. Plaintiff's MSJ Ps&As, 13:22-23, n. 8.

[6] This opposition focuses on the questions posed in the [redacted] 2005 examination form. The questions posed in December 2006 are a pared down version. As discussed below, the 2005 questions comply with the ADA. A fortiori, the narrower 2006 questions comply as well.

As a law enforcement officer, Plaintiff was subject to a highly stressful and mentally challenging environment. Exh. 4, p. 2; Exh. 97, p.2, ¶2. Unlike most jobs, the work conditions of a FPS law enforcement officer can involve potential loss of life or serious injury. Exh. 97, p. 2, ¶2. In particular, the carrying and possible use of a firearm in time-sensitive, stressful, anxiety-provoking and potentially life-threatening situations is an absolute and non-negotiable requirement of the job of an FPS law enforcement officer. Id. Any hesitation, reluctance or inability to fully engage and any impairments that would affect the exercise of competent judgment in such a situation could set in motion a series of events with tragic, if not fatal, consequences. Id. Conversely, an officer's precipitate or otherwise inappropriate discharge of weapons or other use of lethal force could have obvious and catastrophic consequences for the officer, the agency and the public. Id.

Given these pressures, law enforcement agencies cannot afford to speculate regarding the ability of an officer to safely perform his duties. Waiting for an incident to occur with respect to a particular officer before inquiring about possible mental and physical issues is not a feasible option. This is especially true when an officer has a history of [redacted] and/or has made statements or taken actions that may pose a serious concern.

In the instant case, all of the above concerns were present. As discussed in Section I.B.4.b above, by Spring 2005, Plaintiff has a long history of disruptive behavior, [redacted] including [redacted], and [redacted] By April 2005, his more recent conduct had degraded to the point that the agency reported to the MRO both that Plaintiff "appear[ed] to be apprehensive with heightened states of anxiety" and that FPS was "concerned with a potential of hostile encounters with the public." See Section I.B.4.b above. The agency conveyed a particular concern about his "emotional stability," because of Plaintiff's "vexation about an FPS management conspiracy against him." Plaintiff's subsequent obstreperous and disruptive behavior at the medical clinics did nothing to assuage the agency's concerns.

Plaintiff objects to Question 1 as overbroad because it does not contain a time limit. Plaintiff's MSJ Ps&As, 14:17-18). The ADA, however, does not impose a bright-line rule for how far back a law enforcement agency may reach in exploring the ability of an officer to safely perform his job. Setting

an arbitrary time-frame would pose the risk of missing a mental condition and as a result the public's safety could be put in jeopardy. Plaintiff rhetorically asks "[W]hat possible relevance can a childhood mental condition...have on an employee's present ability to perform his essential job functions?" Plaintiff's MSJ Ps&As, 14:22-23 15:1. Although he sees none, he has no medical experts or other evidence to support his position. In the experience of the MRO, prior mental conditions are especially important to evaluate, considering the great safety concerns of a law enforcement position. Imposing a time limit on this question would run the risk of missing potentially serious mental conditions that could affect a law enforcement officer's ability to safely perform his duties. Exh. 97, p. 3, ¶7.

Even childhood mental issues have the potential to affect an adult's daily life. Id.[7/] With an arbitrary cut-off date, a MRO would not be able to obtain all of the necessary medical information. Accordingly, Defendant could not set an arbitrary time limit without risking that it would miss a potentially serious mental health issue. Id.

Given the above, Question 1 is both job-related and consistent with business necessity. As explained in Watson v. City of Miami Beach, 177 F.3d 932, 935 (11th Cir. 1999), a law enforcement officer who is perceived as being even "mildly paranoid, hostile, or oppositional" can be ordered to an exam and that requirement is deemed job-related and consistent with business necessity. Id. at 935. Indeed, courts have generally granted broad discretion to employers of individuals who engage in sensitive public interactions that could put others in harm's way. In Miller v. Champaign Cmty. Unit Sch. Dist., 983 F.Supp. 1201, 1206 (C.D. Ill. 1997), for example, the district court noted that:

> In this case the 'job-related or business necessity language' . . . exonerates the school district from all forms for ADA liability. . . As a matter of law a psychiatric examination is 'job-related and consistent with business necessity' when an elementary school employee shows even mild signs of 'schizophreniform' behavior. Because elementary school personnel deal directly with very young children, it is appropriate for principals and other school supervisors to require medical/psychiatric follow-up to any and all allegations of paranoia or other mental disorder . . .

Miller, 983 F. Supp. At 1206-07. Here, as in Miller, a narrow ruling is appropriate, holding that the

---

[7/]For example, a study recently published in the *British Journal of Psychiatry* found that "adolescents with minor depressive orders are at an elevated risk for major depressive disorder during adulthood. They may also be at elevated risk for other psychiatric disorders during adulthood." Johnson, J.G., Cohen, P. and Kasen S., Minor Depression During Adolescence and Mental Health Outcomes during Adulthood, *Br. J. Psychiatry*, Sep. 2009, 195, 264-265. Those teens with mild depression were at greater risk for anxiety disorders as well. Id.

agency's attempted exam of was both job-related and consistent with business necessity, given his physical and mental history and unusual behavior.

Question 2. Have you ever had any illness, injury or other condition (including learning disability, attention deficit disorder, etc.) other than those already noted? (If Yes, specify when, where, and give details.) Exh. 56, p. 2.

Again, Plaintiff's concern regarding this question is that it has no time limit. As emphasized above, however, problems from childhood can affect adult life. Exh. 97, p. 3, ¶¶7, 8. The mental conditions referenced have the potential to manifest at a young age and continue into adulthood. Id. For example, Attention Deficit Disorder may be manifested by impulsiveness, inattentiveness and distractability, any of which can impair an officer's performance in critical situations if not properly treated. It is simply not possible for a MRO to determine where one might learn something important about the officer. Because a MRO needs accurate, complete and up-to-date information when making a fitness determination, the information sought by this question is medically necessary. Id.

For the reasons set forth above, the instant medical inquiry could not be subject to an arbitrary time limit. As such, the question posed to Plaintiff was job-related and consistent with business necessity.

Question 3. Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past years for other than minor illness? (If yes, give complete address of doctor, hospital, clinic, and details.) Exh. 56, p. 2.

Plaintiff contends this question is over-broad as to time and scope. On its face, however, the question excludes minor illnesses. And with respect to the time-limit issue, the MRO could not easily determine how far back to reach when exploring Plaintiff's history of treatment for non-minor medical issues, given the unique requirements of a law enforcement position and Plaintiff's recent physical injury. As discussed in Section I.B.4.b above, Plaintiff had a history of physical and mental issues.

Plaintiff argues that the Agency should have limited the inquiry "to a specific list of major illnesses for which the Agency might be able to specifically connect to job-related issues." Plaintiff's MSJ Ps&As, 16:7-9. But listing every major illness or problem that could affect a law enforcement officer's ability to do his job is simply not feasible. Having knowledge of prior treatment for non-minor conditions ensures an accurate, complete evaluation. Exh. 97, pp. 3- 4, ¶9. Any physical issue that could hamper the ability to quickly react would have to be listed as well as any mental issue that could

preclude an officer from making safe, quick, intelligent decisions. Despite diligent efforts to be complete and exhaustive, a list of specific conditions could easily miss a serious physical or mental issue that may affect a law enforcement officer's ability to perform. Id. Significantly, in the law enforcement setting, even one missed issue has the potential to put both the officer and the public's safety in danger.

Question 4. Have you ever received, is there pending, or have you applied for pension or compensation for existing disability? (If yes, specify what kind, granted by whom, in what amount, when, why.) Exh. 56, p.2.

Plaintiff again advances the argument that this inquiry should have "individually identif[ied]" specific disabilities. Plaintiff's MSJ Ps&As, 16:27-28 17:1-2. As explained above, however, it is neither feasible nor workable to individually list every illness and medical issue that could impede duty performance and thereby endanger the public's safety. Moreover, as Dr. Saladino noted, question 4 is potentially relevant to ferreting out a repetitive stress injury. Exh. 95, p. 209:13-17. Significantly, the question specifically asks for only information covering "existing disability." This facially narrows the inquiry into current problems that could affect an employee's ability to do his or her job. This appropriate question should be deemed job-related and consistent with business necessity.

Questions 5-7. Have you had or do you currently experience any of the following: Psychiatric/psychologic consult; Episodes of depression; Periods of nervousness? Exh. 56, p. 4.

Dr. Saladino has sufficiently described how past medical issues can manifest in adulthood and affect a person's current ability to perform his or her work in a safe manner. Exh. 97. This reasoning behind conclusion is explained in note 7 above, which discusses the potential that episodes of childhood depression can affect adults by making them prone to deeper depression and other mental issues.

As the Eighth Circuit noted in Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007), the relevant analysis is whether the medical inquiry is "a reasonably effective method to achieve the employer's goals." Id. Ensuring the safety of the workforce and the public is a business necessity for a law enforcement agency, and the question posed was a reasonably effective method of achieving that goal.

Question 8. List all medication prescription and nonprescription you are currently taking with dosage, and frequency, and reason below. Exh. 56, p. 4.

In addition to again claiming that the inquiry is overbroad as to scope [Plaintiff's brief at18:8-9], he also implicitly argues that a limitation on the type of prescriptions or a limited range of "underlying

maladies" should be defined for this question to be permissible. Id. at 18:9-11. However, it would be impossible to specify the specific maladies or kinds of prescription or non-prescription medications that could be relevant, particularly given the very real prospect of drug side effects unrelated to the malady treated and drug-drug interactions. As explained by Dr. Saladino:

> This information is necessary to ensure there are no drug side effects or adverse reactions, drug-drug interactions, signs of drug toxicity or other complications associated with medication use, or any other medication related medical complications that may impact on safe and efficient job performance in accordance with the FPS law enforcement responsibilities that the individual is required to perform.

Exh. 76, p. 17. It would be infeasible to list every example in the broad universe of medications that could affect an officer's ability to perform his duties. Exh. 97,p. 4, ¶ 12. Such a list would quickly become obsolete as new drugs enter the picture. Moreover, an effort to narrow down the specified medications would be made even more difficult by the fact that identifying drug side effects and averse reactions is a very individualized process, as not every person will be allergic to the same drug or suffer the same side effects. Without the ability to examine Plaintiff about [redacted] and any other [redacted] and [redacted] a complete and accurate determination could not be made. Id.

All of the above eight questions were necessary for the MRO to determine whether Plaintiff could safely perform his job:

> [Plaintiff's] failure to provide information related to past medical conditions or illnesses, ... including mental or psychiatric conditions, and pension or disability compensation makes it impossible for a Medical Review Officer to provide...an assessment regarding his ability to work without posing a direct threat to himself or others . . . , as well as his ability to continue to work safely and efficiently under the hazardous and arduous requirements of the position of a Supervisory Criminal Investigator. In addition, his failure...makes it impossible...to provide the agency with an assessment of his ability to safely and efficiently use a firearm or appropriate force in subduing and arresting uncooperative or combative subjects.

Exh. 76, pp. 16-17.

Courts have recognized that public safety is an especially important factor when determining which medical exams and inquiries are job-related and consistent with business necessity. See Coffman v. Indianapolis Fire Dep't, 578 F.3d 559, 565-66 (7th Cir. 2009) ("The Department has an obligation to the public to ensure that its workforce is both mentally and physically capable of performing what is doubtlessly mentally and physically demanding work. This special [firefighting] work environment

convinces us that the Department's decision to refer Coffman for the fitness for duty evaluations was job-related and consistent with business necessity."); Yin v. State of Cal., 95 F.3d 864, 868 (9th Cir. 1996); Porter v. U.S. Alumoweld Co., Inc., 125 F.3d 243, 247 (4th Cir. 1997); Krocka, 203 F.3d at 515. Shannon v. Verizon New York Inc., 2009 WL 1514478 at *4 (N.D.N.Y. 2009) ("Workplace safety, most certainly, constitutes business necessity and having Plaintiff submit to psychological evaluation prior to returning . . . is a reasonably effective method of achieving this goal."); Lee v. City of Syracuse, 603 F.Supp.2d 417, 440-41 (N.D.N.Y 2009) ("Whether a police officer is able to perform her work-related functions, including whether she can handle a gun, is a legitimate and non-discriminatory reason for [inquiries regarding mental health] because of obvious safety concerns both internally . . . and for the public at large."). Here, given the public safety concerns at issue, the agency was justified in submitting relevant medical inquiries and requesting a release of records, and as a matter of law the information sought was job-related and consistent with business necessity.

3. The Exam Form Complied With the ADA.

Plaintiff insists that because the agency's examination form is titled "GSA/FPS Pre-Placement and Incumbent Medical Exam Form," the questions included necessarily violate the ADA. Plaintiff's MSJ Ps&As, 18:19-21. This conclusion, however, does not logically follow.

While Plaintiff correctly notes that a broad scope of inquiries can be submitted to Pre-Placement Applicants, he ignores the reality that it may be appropriate to pose the same questions to incumbent employees, particularly when public safety concerns render the information sought "job-related" and "consistent with business necessity." Also, as discussed above, in the instant case a significant purpose of the examination was to determine whether Plaintiff's unique and reported health problems rendered him unfit to return to duty. As explained by Dr. Saladino, the exam form questions were job-related and consistent with business necessity. Exh. 76. Accordingly, Plaintiff is incorrect in suggesting that merely "[h]anding out the same questionnaire to both *Applicants* and *Incumbents* is unsupportable." To the contrary, provided that the questions posed to an employee meet the relevant legal standard, the agency's decision to use the form for pre-placement exams is immaterial.

///

///

B. ALLEGED RETALIATION.

1. Plaintiff's Disruptive Actions Did Not Constitute Protected Activity.

Protected activity usually includes opposing illegal employer conduct. Additionally, absent any actual discriminatory motive by an employer, an employee can still engage in protected activity by having a good faith, reasonable belief that employer's conduct was unlawful. Weissman v. Dawn Joy Fashions, Inc., 215 F.3d 224, 234 (2nd Cir. 2000). However, it is possible for a plaintiff's actions to be "so disruptive, excessive, or 'generally inimical to [the] employer's interests . . . as to be beyond the protection' of the ADA." See, e.g., Kempcke v. Monsanto Co., 132 F.3d 442, 445 (8th Cir. 1998); Hochstadt v. Worcester Found. for Experimental Biology, 545 F.2d 222, 230 (1st Cir. 1976); Barnes v. The Benham Group, Inc., 22 F.Supp.2d 1013, 1022 (D. Minn. 1998). Plaintiff's opposition is protected, but "such protection is not absolute." Rosser v. Laborer's Int'l Union of N. Am., Local No. 438, 616 F.2d 221, 223 (5th Cir. 1980); Equal Employment Opportunity Comm'n v. Shoney's, Inc., 536 F. Supp. 875, 878 (N.D. Ala. 1982). If the employee's opposition overwhelmingly interferes with his ability to perform his job, the opposition is not protected. Rosser, 616 F.2d at 223.

Barnes is particularly instructive. Just as Plaintiff here refused to answer appropriate medical questions, in Barnes the plaintiff refused to answer questions on a health care application. The court ruled that the refusal was "unreasonably disruptive to defendant's interests." Barnes, 22 F. Supp 2d at 1023. Barnes' refusal merely prevented his company from acquiring an improved insurance policy. Id. To compare, Plaintiff's refusal in this case to answer questions and sign releases left the FPS with zero criminal investigators in San Diego. Exh. 97, 116:24 -- 117:10. Plaintiff's mission as an investigator and a member of the Joint Terrorism Task Force ("JTTF") were critical. Id. Without the ability to clear Plaintiff to return to work, Region 9 was left with no investigators in this district to complete the missions. Exh. 98, p. 46. Plaintiff's "opposition" thus completely negated his ability to perform his job.

In the past, other officers had expressed concern over some inquiries. However, they all found a way to answer the questions and pass a medical clearance. Exh. 95, 218:17 219:11. According to Dr. Saladino, the MRO has not seen a comparable case where an employee refused to cooperate to this degree. Id. Other employees had previously taken much less disruptive actions, such as editing the

exam form to say that they objected to the exam and were providing the information under duress. Even though they objected, however, they provided the necessary information and could be medically cleared for return to work. Id.

Unlike other CIs nationwide who may have objected to the questions, yet answered them and released their medical records and were thus able to perform their duties until the matter was resolved, Plaintiff absolutely refused to cooperate. His adamant refusal in this case to answer the eight inquiries and sign the medical releases did more than simply interfere with his ability to perform his job; it prevented him from functioning at all as law enforcement officer. His actions severely disrupted the mission of FPS, which was forced to operate with no CIs in the Southern District of California. The duties Plaintiff missed were essential to that mission. Given that Plaintiff's opposition interfered with his job to such an extraordinary degree, his opposition lost its protected nature.

2. Plaintiff Cannot Show That He Would Not Have Been Suspended or Terminated But For His Protected Activity.

To establish the required causal link between his protected activity and termination, Plaintiff must prove that he would not have been terminated but for his protected activity. Villiarimo, 281 F.3d at 1064-65. To do so, he needs either direct or specific and substantial circumstantial evidence that retaliation motivated his termination in order to avoid summary judgment. Stegall v. Citadel Broadcasting Company, 350 F.3d 1061, 1066 (9th Cir. 2004).

Plaintiff mistakenly conflates Defendant's legitimate, non-retaliatory basis for suspending and terminating Plaintiff with a retaliatory motive. Defendant's non-retaliatory basis for suspending and removing Plaintiff was that he had violated direct orders by not answering the questions and refusing to sign the release form. Federal courts recognize a federal agency's right to have its orders respected. In Mazarez v. Dep't of the Navy, 302 F.3d 1382, 1385 (Fed. Cir. 2002), for example, two employees were terminated because they refused to obey a direct order to receive the anthrax immunization vaccine. The Federal Circuit affirmed the agency's right to take this action, noting that the reason the employees were removed was "failure to obey a direct order" and such "misconduct constituted insubordination, which this court defines as a willful and intentional refusal to obey an authorized order of a superior officer which the officer is entitled to have obeyed." Id. The Federal Circuit explained

that:

> Insubordination is a serious offense that disrupts the work place and interferes with and threatens the ability of the work force to perform its duties . . . In this case, there was a clear and unjustified refusal to obey the lawful order of a superior. There can be no question that the removal of Mazares and Testman was "for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513 (2000).

Id. Here, the agency had the right to expect Plaintiff to abide by its order that he provide the requested information. His refusal to do so constituted insubordination, which justified his removal.

Plaintiff merely assumes, without factual support, that because his suspension and termination followed his alleged protected activity, there must be a causal link. Plaintiff cannot meet his burden through speculation alone. The record reflects that Ms. Hirano ordered Plaintiff to provide medical information and documents because Dr. Saladino informed her that he could not make a medical determination without them. Mot. Ps&As, 12:8-9. When Plaintiff disobeyed this order, he was terminated. Id. at 12:10. Notably, Ms. Hirano had asked Plaintiff for an extremely limited and narrowly tailored release of records related to his arm injury; both Ms. Hirano and Mr. Slagowski stated that they would have terminated Plaintiff for failing to sign the release alone. Id. at 13:25-26. There are no facts suggesting Plaintiff was terminated in retaliation for EEO activity rather than for refusing to provide critical medical information and a narrowly tailored and reasonable release of records.

3. Plaintiff Cannot Rebut Defendant's Stated Non-Retaliatory Reasons for His Suspension and Termination.

Even if Plaintiff could satisfy his burden of raising an inference that protected EEO activity was the likely reason for his termination, Defendant had legitimate, non-retaliatory reasons for the decision. Mot. Ps&As, 12:6-8. A "defendant need not prove the absence of retaliatory intent or motive; it simply must produce evidence sufficient to dispel the inference of retaliation raised by the plaintiff." Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982). Plaintiff cannot even establish an inference of retaliation and even if he could, he could not rebut Defendant's legitimate, non-retaliatory reasons for suspending and terminating Plaintiff.

4. Plaintiff Cannot Show That Defendant Would Not Have Terminated Him "But For" His Alleged Protected Activities.

Because the mixed-motive defense still applies to retaliation cases in the Ninth Circuit, Plaintiff needs to show that Defendant would not have terminated him but-for his alleged protected activities.

Mot. Ps&As, 13:10-12. Plaintiff has not met this burden. Ms. Hirano and Mr. Slagowski would have terminated Plaintiff for failing to sign the release alone. Id. at 13:25-26. Therefore, even if Plaintiff could prove a prima facie case of retaliation, Plaintiff's argument ultimately fails because Defendant had legitimate, non-retaliatory reasons for suspending and terminating Plaintiff.

C. ALLEGED ADEA VIOLATIONS.

1. Plaintiff Was Not Treated Differently than Younger Employees.

As set forth in Defendant's summary judgment motion, which Defendant incorporates here by reference, Plaintiff cannot attack the agency's periodic examination policy in this forum because he did not undergo medical exams any more often than similarly situated younger employees. Under the FPS Periodic Exam scheduling policy, when Plaintiff was promoted in 2003, at the age of [redacted], he should have had his first examination in [redacted] his second in [redacted], and his third in [redacted]. Defendant's MSJ Ps&As, 23:18-21. However, Plaintiff was not scheduled for and did not attend an initial exam until [redacted] 2005. Id. at 23:22 24:1. Thus Plaintiff was examined on what amounted to a three-year schedule. That was the schedule set for FPS CIs in the "35 and under" age group. Id. at 24:3-4. Accordingly, Plaintiff has not established that he was treated worse than a single similarly situated younger employee. Without proof of a preferentially treated employee outside his protected class, Plaintiff cannot establish that his birth month examination violated the ADEA. Id. at 24:5-6.

2. Plaintiff Lacks Standing to Challenge the Birth-Month Exam Program.

Because Plaintiff cannot find any similarly situated younger employee who was treated better than him, he has no standing to challenge the Birth-Month Exam Program under the ADEA. Auerbach, et al. v. Bd of Educ. of the Harborfields Central School District of Greenlawn, 136 F.3d 104 (2d Cir. 1998); United Government Security Officers of America v. Akal Security, Inc., 475 F.Supp.2d 732, 741-42 (S.D.Oh. 2006). ("USGOA"). In both Auerbach and USGOA, the plaintiffs had suffered no injury because they could not show that they had been treated differently than younger employees. Mot. Ps&As. 24:15 25:10. Without an injury in fact, the plaintiffs had no standing to sue based on the ADEA. Similarly in this case, Plaintiff has not shown an injury in fact as he cannot find even one younger employee that was treated better than him. Lacking an injury in fact, Plaintiff has no standing.

IV. CONCLUSION

For the reasons stated above, Defendant respectfully asks the Court to deny Plaintiff's motion for partial summary judgment.

DATED: November 20, 2009

KAREN P. HEWITT
United States Attorney

s/ Timothy C. Stutler

TIMOTHY C. STUTLER
Assistant U.S. Attorney
Cindy M. Cipriani
Assistant U.S. Attorney
Attorneys for the Defendant

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SCOTT, Plaintiff, v. MICHAEL CHERTOFF, SECRETARY, DEPARTMENT OF HOMELAND SECURITY, Defendants. | Civil No. 08cv0735BTM(JMA) CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED THAT:

I, Timothy C. Stutler, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of the following document(s) on the parties indicated below by electronically filing said document(s) with the Clerk of the District Court using its ECF System, which electronically notifies them:

DOCUMENT(S) SERVED:

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [REDACTED]

PARTIES ON WHOM SERVED:

Matthew G. English, Esq., Law Offices of Matthew G. English, 7676 Hazard Center Drive, Suite 500, San Diego, CA 92108

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 24, 2009.

s/ Timothy C. Stutler
TIMOTHY C. STUTLER