KAREN P. HEWITT
United States Attorney
TIMOTHY C. STUTLER
Assistant U.S. Attorney
California State Bar No. 131794
CINDY M. CIPRIANI
Assistant U.S. Attorney
California State Bar No. 144402
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7387/7390
Email: tim.stutler@usdoj.gov
Email: cindy.cipriani@usdoj.gov

Attorneys for Defendant

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SCOTT,<br><br>Plaintiff,<br><br>v.<br><br>JANET A. NAPOLITANO, SECRETARY, DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendant. | Case No. 08cv0735BTM(JMA)<br><br>NOTICE OF LODGMENT OF EXHIBITS IN SUPPORT OF DEFENDANT'S REPLY RE OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT<br><br>DATE: December 4, 2009<br>TIME: 11:00 a.m.<br>CTRM: 15<br>JUDGE: Hon. Barry T. Moskowitz |

///

///

///

///

Defendant, Janet A. Napolitano, Secretary of the Department of Homeland Security, hereby submits her Notice of Lodgment of Exhibits in Support of Defendant's Reply Re Opposition to Motion for Summary Judgment or Partial Summary Judgment.

| **Exhibit** | **Description** | **NOL Page Numbers** |
|---|---|---|
| 100[1/] | Excerpts from the Deposition of Martha Montano | 1385 - 1399 |
| 101 | Email chain commenced on 6/10/05 by John Morgan - Exhibit 22 to Deposition of Martha Montano | 1400 - 1409 |
| 102 | Excerpts from the Deposition of Rudy Negrete | 1410 - 1416 |

DATED: December 4, 2009

Respectfully submitted,

KAREN P. HEWITT
United States Attorney

s/ Timothy C. Stutler
________________________________
TIMOTHY C. STUTLER
Assistant United States Attorney
Attorneys for Defendant

[1/] Defendant filed the first 96 exhibits under seal in this matter on September 16, 2009, in support of Defendant's Motion for Summary Judgment or Partial Summary Judgment (see Docket No. 29-3), and exhibits 97 through 99 under seal on November 24, 2009, in support of Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment. Defendant incorporates those exhibits by reference in this Notice of Lodgment and in Defendant's Memorandum of Points and Authorities in Reply re Opposition to Motion for Summary Judgment or Partial Summary Judgment.

# EXHIBIT 100

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

---

JAMES SCOTT, )
)
Plaintiff, )No. 08-CV-0735-BTM (JMA)
)
vs. )
)
JANET NAPOLITANO, SECRETARY, )
DEPARTMENT OF HOMELAND SECURITY, )
)
Defendants. )
_______________________________________)

CERTIFIED COPY

DEPOSITION OF MARTHA MONTANO

taken at the U. S. Attorney's Office

located at 450 Golden Gate Avenue - 9th Floor

San Francisco, California

Thursday, July 16, 2009

ATKINSON-BAKER, INC.
COURT REPORTERS
500 North Brand Boulevard, Third Floor
Glendale, California 91203
(818)551-7300

REPORTED BY: MARGARET "MARGO" GURULE, CSR No. 12976
FILE NO.: A3057F2

Q. From the documents that we do have, the pages we do have of this e-mail string, it appears from the first page your e-mail response was sent on July 21st where it looks like you start to outline the events that John Morgan had requested in his July 18th e-mail; would you agree with that?

A. Yes.

Q. I'm presuming that the continuation of the narrative continued onto the page -- we're not missing page 203, and we have an altered version of it -- or I mean an alternative version of it that appears to indicate that the summary continues much as it began. But for our purposes here, I'm just trying to understand that, in the middle of July, it appears that you -- the only thing that you did up to this point with regard from Special Agent Scott's case was provide a summary of the scheduled exam dates to date and their outcomes to John Morgan. Is that accurate?

MR. STUTLER: Well, that's what the e-mail reflected, but I'm not sure it says she didn't do anything else in the interim.

MR. ENGLISH: It doesn't say that. It doesn't say that.

Q. But do you have any recollection of doing anything else, other than this -- other than this summary that you provided?

A. No.

Q. You have no memory?

A. No, I don't think I did anything else. Management would have been discussing their options that may have been when they suspended him or something. It started issuing him letters and what have you, which I wouldn't, you know, I had no part of. I'm not his supervisor or anything like that.

Q. Right. And we talked about at the outset of the deposition, that you didn't have any direct involvement in those decisions or those processes, correct?

A. Correct.

Q. Do you understand whether or not Special Agent Scott received any discipline in 2005 for anything relating to the fitness for duty exam?

A. I think he was suspended for two weeks.

Q. You don't know whether that occurred in 2005 or 2006, for example?

A. No. I don't for a fact exactly when, no.

Q. Why did you think that he was suspended for two weeks?

A. I think that's what J. P. said that that was their choice. They were running out of -- they were running out of options. He was suspended for not doing something. I don't know if it was this or if it was for not providing the medical examination when he did actually go for the exam later on.

Q. Well, we should have been working our way through the

stack here, so there is not as much to sort through. I would ask you to look for a nine-page e-mail sequence with the beginning Bates number DEF_762?

A. 762?

Q. 762. It should run sequentially all the way through 770?

A. Through 770. Any attachments?

Q. I don't believe so.

A. Okay. Let's hope not. Otherwise that will be it. Got it.

Q. Great. Let's go ahead because it's the same type of document.

MR. ENGLISH: I'm going to have the court reporter mark it as Exhibit Number 22.

(Exhibit 22 marked.)

THE WITNESS: Where is 21? Okay. 20. And I don't know about these stragglers here.

BY MR. ENGLISH:

Q. So it appears that this e-mail string starts all the way back on June 10th of 2005, and an ongoing conversation that you can find on the second-to-last page identified as page 8 of 9 in the upper right-hand corner and Bates number 769 in the lower right-hand corner.

A. Yes, I found it.

Q. And you were cc'ed on this e-mail string, were you

not, between John Morgan and John Hartman?
A. Yes.
Q. Do you recall specifically this initiating e-mail?
A. Okay. From J. P. to Hartman?
Q. The first e-mail appears to be John Morgan directing John Hartman to make sure that certain employees follow through with scheduled medical exams of whatever type?
A. Yes. That's what this e-mail is basically saying.
Q. And there are four people mentioned. None of them in this initial e-mail are Bill Scott -- James Scott, correct?
A. Correct.
Q. Who is Andy; do you know?
A. Andrew Jensen.
Q. And who is George?
A. George Chapman.
Q. And Ruben is Ruben Ballestros?
A. Yes. Do you want me to write their names on this?
Q. No. Thank you, though.
The second e-mail dated June 10th in the string is actually limited to just John Hartman and John Morgan before it picks back up again and you become included in the cc string.
A. Yeah, that's as it's addressed from Hartman to J. P.
Q. So on June 13th, Morgan responds to John Hartman and cc's you again and Russell Oase, correct?
A. Yes.

Q. He said that he's starting to call around for additional information, or something along those lines? He actually makes a specific --

A. Yes.

Q. -- a specific reference to Ms. Carol Canty, C-A-N-T-Y --

A. Yes.

Q. -- the Safety and Health Coordinator.

Do you see that?

A. Yes.

Q. Because actually, you respond to his reference to that in the next e-mail in the chain. Your response is dated June 13, 2005, at 12:16 p.m. Take a look at your response and tell me if you have any specific recollection of making those statements.

A. Yeah, vaguely.

Q. Do you know whether or not CHS pays their federal taxes?

MR. ENGLISH: Strike that question. It must be getting late.

THE WITNESS: I don't know.

BY MR. ENGLISH:

Q. Do you know what you meant when the -- you said the accident and safety people don't have anything to do with our medicals?

A. Well, that's who Carol Canty works with, accident and -- Department of Labor type information for ICE.

Q. You didn't think she had anything to do with the medical testing issues that you were overseeing and involved in as the regional medical coordinator for Region 9 in 2005, though?

A. Well, what I'm trying to remember is whether -- Hartman, John Hartman, he -- especially John, I guess he didn't feel that they should be part of the medical program, that they should have been exempted.

Q. Who do you mean, "they"?

A. The criminal investigator.

Q. Or who did he mean "they"?

A. The criminal investigators. And he didn't like -- he didn't like, you know, what I was telling him, that the criminal investigators should be examined as stated in this -- as in Exhibit 1. I wasn't telling him what he wanted to hear.

Q. You understood his opinions to be that the criminal investigators should not be included in the periodic incumbent medical exams?

A. Yes.

Q. Your response to John Morgan, you make reference to -- well, I'm going to just read it as, quote, "Very recently, on another subject, I queried Susan" -- referring to Susan Spannbauer -- "whether we are still" -- whether we are

still following the guidelines in place or if we have any new DHS guidelines."

I assume you're making reference to guidelines that had been in effect when FPS was under GSA, as opposed to DHS guidelines that may have been more recently imposed once the agency transitioned?

Do you have any recollection of what you're --

A. There was some sort of -- there was some sort of change in that time frame that -- let's see. It wasn't -- there was some sort of change in the way our medical program was going to be handled.

I don't remember if it was we were going to start having to follow the medical program as ICE did theirs. But FPS was -- even though FPS was under Department of Homeland Security officially on paper and the whole nine yards in 2003, the medical program, for whatever reason, was done a little bit differently and there was some sort of change, I think, in that time frame. Because that's what I'm asking Susan.

Q. Okay. Well, if you have a specific recollection of what that change might be, you can mention it as we move along here. But I think I'll move through the next parts of the e-mail chain so I can understand where we get to at the end in August.

A. Okay.

Q. John Morgan replies to you thanking you for the

information. He includes a new person in the cc list, Joseph Loerzel.

Do you see that?

A. Yes.

Q. And then the next response in this chain comes from Joseph Loerzel to John Morgan on that same day, June 13th --

A. Yes.

Q. -- refer to his Minnesota farm-boy mentality, and asks what the issues are.

MR. STUTLER: Is there a question out there?

BY MR. ENGLISH:

Q. That's correct. You see where I'm talking about, right?

A. I'm still looking for where you say about Minnesota.

Q. Starting with 765 at the bottom, that's where the from line from Joseph Loerzel is. And then at the top of page 766 --

A. Okay. I see it.

Q. And Loerzel writes that to John Morgan and to you, and cc's Russell Oase and John Hartman, correct?

A. Yeah. Yes.

Q. And then at the top of that same page, John Morgan -- again, this is still back in June -- replies to Joseph Loerzel but adds Bruce Hori to the cc list and drops John Hartman.

A. Okay.

THE WITNESS: We've got a question flashing on the screen. You have been in a call for 480 minutes. Do you want to discontinue, yes or no. What do we press? Hello. I guess that takes care of that.

MR. STUTLER: I don't know if that was the right way to do it, but it seemed to work.

BY MR. ENGLISH:

Q. Mr. Loerzel responds to John Morgan's e-mail, and John Morgan, I believe identified the issue that you just mentioned a bit ago, that there are some criminal investigators who believe they are exempt from mandatory physical exams due to their incumbent status.

So Loerzel responds to that, sets forth how he wants to address things. And then the e-mails jump, for whatever reason, to August.

Do you see that on the middle of the third page, 764?

A. Yeah, it jumps.

Q. Bruce Hori restarts this thread on August 26th with an e-mail to John Morgan, and now Bill Scott is back into the dialogue, correct?

A. Yes.

Q. Bruce Hori wants to meet with John Morgan to discuss Bill Scott -- the approaching Monday to address the, quote, situation with Bill Scott.

Do you see that?

A. Yes.
Q. Who is Le Lieu?
A. Le Lieu, she's a program analyst, supervisory program analyst in Los Angeles, California.
Q. Do you have any idea why she was cc'ed on Bruce Hori's August 26, 2005 e-mail about Bill Scott?
A. It may have been when she -- around the time frame when Le Lieu was temporarily working here in San Francisco. I don't know if that -- I don't know if that was around the time she was acting. I don't remember if it was for Bruce or filling in for one of the managers.
Q. Okay. I don't want to spend too much more time with this, but I believe it establishes our timeline again, so I want to get your confirmation on this.
John Morgan responds to Bruce Hori the middle of the next week after the initial Monday planned meeting or proposed meeting and suggests that Bill Scott should be rescheduled for a medical appointment in conjunction with his fit for duty.
Do you see that.
A. Yes.
Q. And then right above that, you're instructed to schedule Agent Scott, correct?
A. Yes.
Q. What's going on in this next e-mail from you on August 21st to Bruce Hori and John Morgan? It looks like some

information has been cut and pasted and you had some questions. Can you help explain what you're asking for here and what's going on?

A. With the -- in order for me to have completed the IME fit -- or if it was -- the CHS form, the IME independent -- the IME form, specific questions have to be answered.

Now, since --

Q. Like Exhibit 8?

A. Yes.

Q. Okay.

A. Certain questions have to be answered. And for me to -- before sending it to CHS. And then telling them, as well, that the San Diego office, Rees Sharp and whatever, they weren't -- they didn't really want to schedule Bill Scott in again because it was just -- it just wasted their time.

Q. You made reference to another incumbent exam and what type of IME exam and then answers these fitness for duty exams, IME?

A. Correct.

Q. Well, were you asking them which types of those three possibilities you were asked to be -- you were being requested to schedule?

A. Well, the doctor already said let's start off with the incumbent exam, so that was one exam. And if they still wanted a fitness for duty, they have to be specific, you know,

or at least tell me like in what area was it going to be, as I stated here, respiratory, orthopaedic, psychological. You know, I need to know what area to request.

Q. Okay. And did the e-mail immediately above that from John Morgan, the date of which is not immediately clear, did that answer those questions for you?

A. In his previous -- let's see -- August. Okay. Well, J. P. is pretty much saying what he wants.

Does it answer -- yeah, it answers my question.

Q. Did you understand --

A. Now, whether I did -- whether I scheduled -- what type of exam I scheduled thereafter, I would have to look in the documents.

Q. Okay. You can't tell from looking at Exhibit 22 what type of exam you ended up scheduling, though?

A. Correct, I cannot.

Q. Okay. Let's take a look at the document, three-page document beginning with the Bates number 828?

A. Okay. 828 is stating Dr. Saladino is now saying an orthopaedist.

Q. The long and the short of it is that Saladino has now weighed in in talking about a specialist, correct?

A. Yes.

Q. I looks like an orthopaedist was found, and the earliest date scheduled was November 4th, which would be into

REPORTER'S CERTIFICATE

I, MARGARET GURULE, No. 12976, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth;

That the statements made at the time of the proceedings were recorded stenographically by me and were thereinafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

DATED: August 12, 2009

Margaret A. Gurule

MARGARET GURULE, C.S.R. No. 12976

# EXHIBIT 101

**Morgan, John P**

**To:** Hori, Bruce T; Montano, Martha J

**Cc:** Oase, Russell S

**Subject:** RE: Scheduled Medical Appointments

Bruce/Martha:

When we first began attempting to get Agent Scott in for his physical examination we were interested in whether his condition precluded him from performing his assigned duties. This injury which was reported in September 2004 was for an upper arm injury caused by using his computer mouse. I believe we need to direct our exam to that issue initially. I also realize he has his periodical physical examination coming up which should be scheduled around his birthday in November. We need to schedule him again for the physical exam for "fit for duty" so that he can resume his Special Agent function if his previous injury has subsided. I believe you, me, Bruce and HQ will need to confer on this as well due to the many obstacles that we have encountered over the past 7 months. It is imperative that we continue to show positive approaches and responses on our part so that we are not percieved in an unfavorable light in the future. Our responsibility is to do everything possible to return Agent Scott to his active law enforcement capacity, with his assistance, or remove him from the rolls if necessary. Thanks.

J P Morgan, "Acting"
Chief, Threat Management Branch
Department of Homeland Security
Immigration and Customs Enforcement
Federal Protective Service, Region 9
450 Golden Gate Avenue, 5th Floor
San Francisco, CA 94102
Office: 415-522-3446
Cell: 916-275-6405

---

**From:** Montano, Martha J [mailto:Martha.Montano@dhs.gov]
**Sent:** Wednesday, August 31, 2005 3:22 PM
**To:** Hori, Bruce T; Morgan, John P
**Subject:** RE: Scheduled Medical Appointments

What type of exams?

You want another Incumbent exam and what type of IME exam. For the Incumbent, the San Diego medical facility does NOT want him to return to their office.

One of you two needs to answer these Fitness for Duty exams [IME].

MEDICAL:

Reason(s) for Fitness for Duty Request: **[Upper Right Shoulder Injury of September 2004 caused by computer mouse as diagnosed by Agent Scott's physician precluded employee from training January/February 2005. A few days prior to the scheduled training period, the Physician diagnoses {after several months of physical therapy} specifically stated employee could not lift over twenty (20) pounds. This information caused the immediate cancellation of all FPS training for the employee and subsequently placed him in a non-law enforcement capacity. Agent Scott has been in a non-law enforcement capacity since February 1, 2005.**



EXHIBIT 22
M. MONTANO

DEF_00762

Diagnosis: _ SEE ABOVE
Treating Physician: Dr. Thomas Wang

**Questions for IME Doctor:**

- o What, if any, additional medical records were reviewed in conjunction with this IME?
- o In your opinion, what is the employee's diagnosis, the severity of the condition at present, and the prognosis for the condition?
- o Is the employee able to meet the requirements of the job description at this time?
- o What, if any, restrictions or limitations does the employee currently have?
- o What, if any, accommodations would be required for the employee to perform all functions of the job?
- o If not presently employable, what is the prognosis for eventual return to work?
- o ____________________

**Information to Be Provided to IME Doctor:**

**Which of the following will you be faxing to CHS? o Job Description o Background Medical**

**Is the employee responsible for providing prior medical records to the doctor?**
**o Yes-required o Requested but not required o No**

---

**From:** Hori, Bruce T [mailto:Bruce.Hori@dhs.gov]
**Sent:** Wednesday, August 31, 2005 1:52 PM
**To:** Morgan, John P
**Cc:** Oase, Russell S; Montano, Martha J
**Subject:** RE: Scheduled Medical Appointments

Martha -

Please schedule Agent Scott.

---

**From:** Morgan, John P [mailto:John.Morgan@dhs.gov]
**Sent:** Wednesday, August 31, 2005 1:08 PM
**To:** Hori, Bruce T
**Cc:** Oase, Russell S; Montano, Martha J
**Subject:** RE: Scheduled Medical Appointments

Bruce:

Looks like we didn't make 10 am Monday. Anyway, Bill Scott should be rescheduled for a medical appointment as soon as possible in conjunction with his "fit for duty". If he fails to comply, again, we will proceed with an official removal. As to his "mouse injury" of Sept. 04, he has not submitted any leave slips for therapy for at least 3 months. I would assume he has recovered from the injury, but continues to

pursue his EEO on this issue. I hope this is in compliance with HQ as well as Laguna Niguel, but he has run out of work and we need to have an active FPS Agent (fully qualified) in the SD area. We have been extremely patient with Agent Scott, but we are not at liberty to wait for his anniversary date in November for a complete physical.

J P Morgan, "Acting"
**Chief, Threat Management Branch**
**Department of Homeland Security**
**Immigration and Customs Enforcement**
**Federal Protective Service, Region 9**
**450 Golden Gate Avenue, 5th Floor**
**San Francisco, CA 94102**
**Office: 415-522-3446**
**Cell: 916-275-6405**

---

**From:** Hori, Bruce T [mailto:Bruce.Hori@dhs.gov]
**Sent:** Friday, August 26, 2005 9:19 AM
**To:** Morgan, John P
**Cc:** Oase, Russell S; Montano, Martha J; Lieu, Le V
**Subject:** FW: Scheduled Medical Appointments

JP -

Let's meet at 10am Monday to address the situation with Bill Scott. Have the other agents complied with their medical requirements?

---

**From:** Loerzel, Joseph A [mailto:Joseph.Loerzel@dhs.gov]
**Sent:** Tuesday, June 14, 2005 5:56 AM
**To:** Morgan, John P; Ballestros, Ruben; Hartman, John N; Juarbe, Maria J; Skultety, David A; Boggs, Kalvin D; Rivero, Timothy A; Jensen, Andrew F; Chapman, George J
**Cc:** Oase, Russell S; Montano, Martha J; Hori, Bruce T
**Subject:** RE: Scheduled Medical Appointments

10-4

Just a note of caution to everyone – I am not willing to accept the burden of responsibility for the agency if something goes wrong when an employee is involved in an action and is behind on training, medical requirements – I just went through an ordeal I am not interested in repeating. Therefore - JP, if this continues, pull their credentials, badges, and prepare a 52 detailing them to the district director on unspecified duties until all requirements are met. As you are aware, any SL over 5 days will automatically trigger a fitness for duty situation.

If your employees call in sick in close proximity to a medical appointment, that should be PC for initiating same action described above. THIS IS A GAME I WILL NOT PLAY!!!

---

**From:** Morgan, John P [mailto:John.Morgan@dhs.gov]
**Sent:** Monday, June 13, 2005 3:42 PM
**To:** Loerzel, Joseph A
**Cc:** Oase, Russell S; Montano, Martha J; Hori, Bruce T
**Subject:** RE: Scheduled Medical Appointments

Joe:

The issues are stemming from the CI's who believe they are exempt from mandatory physical exams due to their incumbent status. Martha, Russ, Bruce and I (alongwith Susan Spanbauer) have provided every possible memorandum and directive, but we are still experiencing some discontent and uncooperative behavior amongst the CI's. Supervisory Special Agent Hartman missed his scheduled appointment today either by error or intention. I have directed him to meet with me on Wednesday morning at 0800 to address this issue. Through SSA Hartman, I have given direct orders for these appointment, made by Martha, to be kept. I will take the necessary actions if this continues. Agent Ballestros has an appointment in the morning, but called in Sick today. I am awaiting disposition on this one as well.


J P Morgan, "Acting"

Chief, Threat Management Branch

Department of Homeland Security

Immigration and Customs Enforcement

Federal Protective Service, Region 9

450 Golden Gate Avenue, 5th Floor

San Francisco, CA 94102

Office: 415-522-3446

Cell: 916-275-6405


---

**From:** Loerzel, Joseph A [mailto:Joseph.Loerzel@dhs.gov]
**Sent:** Monday, June 13, 2005 1:38 PM
**To:** Morgan, John P; Montano, Martha J
**Cc:** Oase, Russell S; Hartman, John N

**Subject:** RE: Scheduled Medical Appointments

I suppose its because of my Minnesota farm-boy mentality, but what are the issues here?

---

**From:** Morgan, John P [mailto:John.Morgan@dhs.gov]
**Sent:** Monday, June 13, 2005 1:16 PM
**To:** Montano, Martha J
**Cc:** Oase, Russell S; Hartman, John N; Loerzel, Joseph A
**Subject:** RE: Scheduled Medical Appointments

Martha: Again, thanks for the information. I have received no other information that would lead me to believe we are anything but correct in our assessment of the program and its components. I will continue to stress compliance with our directives as to attendance and participation in the physical exams we have scheduled and continue to schedule. Thanks.

J P Morgan, "Acting"

Chief, Threat Management Branch

Department of Homeland Security

Immigration and Customs Enforcement

Federal Protective Service, Region 9

450 Golden Gate Avenue, 5th Floor

San Francisco, CA 94102

Office: 415-522-3446

Cell: 916-275-6405

---

**From:** Montano, Martha J [mailto:Martha.Montano@dhs.gov]
**Sent:** Monday, June 13, 2005 12:16 PM
**To:** Morgan, John P; Hartman, John N
**Cc:** Oase, Russell S
**Subject:** RE: Scheduled Medical Appointments

JP,

The accident & safety people don't have anything to do with our medicals.

There is nothing yet from DHS. I would imagine in time there will be.

Susan Spannbauer in headquarters oversees our medical program. She has always been very good at disseminating new policy and changes. I gave John Susan's phone number so she probably has already answered this question.

Very recently on another subject I queried Susan whether we are still following the guidelines in place or if we have any new DHS guidelines.

Is the next thing we're asked to be asked whether the medical companies pay their federal taxes.

Martha

[T] 415-522-3443 - [F] 415-522-3218

Email: Martha.Montano@dhs.gov

---

**From:** Morgan, John P [mailto:John.Morgan@dhs.gov]
**Sent:** Monday, June 13, 2005 1:53 PM
**To:** Hartman, John N
**Cc:** Oase, Russell S; Montano, Martha J
**Subject:** RE: Scheduled Medical Appointments

John:

Even though I feel we are in compliance based on the existing policies and directives, I too want to get this right. Commencing last Thursday, I began calling sources to locate an individual who could provide the necessary information. As I had nothing concrete on the subject I felt further discussions on the subject with anyone would have been unproductive. I have left a voice mail message, but have been unable to

speak with Safety and Health Coordinator, Ms. Carole Canty, 214-905-5259. I believe she holds the key to our concerns and will undoubtedly be able to convey with clarity the government's position. Needless to say, I will continue to attempt contact. If you would like to contact Ms. Canty on your own for the information, please do so. If you would like to pass this infoimation on, you may do so as well.

J P Morgan, "Acting"

Chief, Threat Management Branch

Department of Homeland Security

Immigration and Customs Enforcement

Federal Protective Service, Region 9

450 Golden Gate Avenue, 5th Floor

San Francisco, CA 94102

Office: 415-522-3446

Cell: 916-275-6405

---

**From:** Hartman, John N [mailto:John.Hartman@dhs.gov]
**Sent:** Friday, June 10, 2005 2:21 PM
**To:** Morgan, John P
**Subject:** RE: Scheduled Medical Appointments

JP,

you stated that you conferred with management concerning this issue. Could you tell me who you specifically conferred with? Also, did you contact anyone in DHS Personnel concerning this issue?

Thanks!

SA John N. Hartman

Federal Protective Service - Region 9

Department of Homeland Security

FBI JTTF: (510) 251-4149

CELL: (415) 850-8790

---

**From:** Morgan, John P [mailto:John.Morgan@dhs.gov]
**Sent:** Friday, June 10, 2005 1:34 PM
**To:** Hartman, John N
**Cc:** Montano, Martha J; Oase, Russell S; Loerzel, Joseph A; Hori, Bruce T
**Subject:** Scheduled Medical Appointments

John:

After conferring with Management and those that are familiar with the program I am directing you to inform the below named individuals immediately to attend their respective appointments. Previous Information as to the date, time and location of the exams was provided in earlier e-mails. If they cannot locate this information they may contact Ms. Martha Montano for assistance. I will also be attending the required FPS physical exam on Tuesday, June 14, 2005 and will not be available that day. It is extremely important that they receive this directive in a timely manner as not incur another "no show" fee against the government. Thanks.

Here are the dates of the examinations:

J.Hartman's appt is Monday June 13

Ruben's Tues 6/14

Andy's 6/15

George's is 6/30

J P Morgan, "Acting"

Chief, Threat Management Branch

Department of Homeland Security

Immigration and Customs Enforcement

Federal Protective Service, Region 9

450 Golden Gate Avenue, 5th Floor

San Francisco, CA 94102

Office: 415-522-3446

Cell: 916-275-6405

9/1/2005

# EXHIBIT 102

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JAMES SCOTT,

Plaintiff,

CERTIFIED COPY

-vs-

No. 08-CV-0735-BTM (JMA)

JANET NAPOLITANO,
Secretary, Department
of Homeland Security,

Defendant.

---

The teleconference deposition of RUDY NEGRETE, taken before David J. Demski, Certified Shorthand Reporter, and Notary Public, pursuant to the provisions of the Federal Rules of Civil Procedure of the State of California and the Rules of the Supreme Court thereof, pertaining to the taking of depositions for the purpose of discovery, at the Office of the United States Attorney, 219 South Dearborn Street, Fifth Floor, Chicago, Illinois, at 11:00 o'clock a.m. on Monday, July 20, 2009.

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

FILE NO.: A3057F6

began thinking of what disability that Mr. Scott had that required protection. I then took a look at the policy as it existed, and in doing so came to the understanding of my review that the policy had been vetted through the -- at least at the headquarters level with Federal Protective Service management in conjunction with legal input and that it was in compliance with all of the required ADA, EEO, and all legal regulations requiring medical clearances and background for individuals in this job capacity.

Q. You understood that it was in compliance because it had been vetted, correct?

A. Yes, to my understanding it was. Yes.

Q. You didn't understand that it was in compliance because you did your own independent analysis of the applicable regulations as applied to the FPS medical program in its entirety, did you?

A. I took it at face value from what the policy directive indicated that it had been -- had gone through this process for implementation and that it was inconsistent guidance or within the guidelines of the statute that allowed that type of medical background to be conducted.

Q. And that was sufficient in your assessment not to

pursue the matter any further?
A. Yes.
Q. This is the same policy that's no longer in effect, correct?
A. Yes.
Q. One that was discontinued?
A. Well, for correction, my understanding is that it was suspended pending review. That's what I know of it.
Q. You're correcting my use of the phrase discontinued?
A. Yes.
Q. What did it matter, in your mind, of what disability Mr. Scott may have had that needed protection, to use the words that you described?
A. Well, as I indicated, once I saw that it became sort of an officer safety issue with me. I mean, was he actually capable of carrying out his job as a law enforcement officer. I had no idea what type of condition that Mr. Scott had or may have that prompted that response to Mr. Saladino or to the doctor that was conducting the physical. So I began looking at it from the prospective of what potential harm, if any, would that cause to his fellow agents and officers.
Q. What did you conclude, if anything?

A. Actually I concluded nothing that I would be able to take action upon. It was just my own thought processes to why he refused to answer several questions. It was just a concern.

Q. Did you consider ordering a fitness for duty examination?

A. No, I did not.

Q. So it was -- I'm trying to get a sense of the level of your thought process, as we were describing and you told me you've gone through this process, you didn't reach any final conclusions. Am I correct in assuming that it did not rise to the level of calling for a fitness for duty examination in your mind?

A. Yes, with an explanation.

Q. Please?

A. I'm methodical in how I approach this and how I approach a lot of what I become involved with, and thinking in terms of a fit for duty to me was too far in advance. We haven't even begun getting close to obtaining information that would allow me to formulate a decision as to whether a fit for duty was needed, so that didn't come into play.

Q. Near the bottom of the stack of papers that were provided to you this morning is a letter dated

STATE OF ILLINOIS )
)SS.
COUNTY OF C O O K )

I, DAVID J. DEMSKI, Certified Shorthand Reporter, in and for the County of Cook, State of Illinois, do hereby certify that on the 20th day of July 2009, the deposition of the witness, RUDY NEGRETE, called by the Plaintiff, was taken before me, reported stenographically and was thereafter reduced to typewriting through computer-aided transcription.

The said witness, RUDY NEGRETE, was first duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

I further certify that the foregoing is a true, accurate and complete record of the questions asked of and answers made by the said witness, at the time and place hereinabove referred to.

The signature of the witness was not waived by agreement.

Witness my official signature as Notary Public, in and for Cook County, Illinois on this 5th day of August, 2009.

______________________________
DAVID J. DEMSKI
C.S.R. No. 084-004386