1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

11 | JAMES SCOTT,                          CASE NO. 08cv0735 BTM(JMA)

12 |                        Plaintiff,    **ORDER GRANTING IN PART AND
                                          DENYING IN PART DEFENDANT'S**
13 |      v.                              **MOTION FOR SUMMARY
                                          JUDGMENT AND GRANTING IN**
14 | JANET A. NAPOLITANO, SECRETARY,      **PART AND DENYING IN PART
     DEPARTMENT OF HOMELAND               PLAINTIFF'S MOTION FOR**
15 | SECURITY,                            **PARTIAL SUMMARY JUDGMENT**
16 |                        Defendant.

17
18

19        Defendant has filed a motion for summary judgment.  Plaintiff has filed a cross-motion

20   for partial summary judgment.  For the reasons discussed below, Defendant's motion for

21   summary judgment is **GRANTED IN PART** and **DENIED IN PART** and Plaintiff's cross-

22   motion for partial summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

23

24                              **I.  <u>FACTUAL BACKGROUND</u>**

25

26   **A.  <u>General Employment History</u>**

27        In 1991, Plaintiff James Scott ("Plaintiff") was hired by the Federal Protective Service

28   ("FPS") as a uniformed federal protective officer in Los Angeles, California.  (Scott Decl. of

9/15/09, ¶ 3.)[1]  In 1992, Plaintiff was promoted to the position of Special Agent/Criminal Investigator.  (Id. at ¶ 4.)  In 1993, Plaintiff transferred to San Diego to open a criminal investigative office for FPS.  (Id. at ¶ 5.)  In or about 2003, Plaintiff was again promoted and was detailed to the FBI's Joint Terrorism Task Force.  (Id. at ¶ 7.)

## B. **Plaintiff's Health Issues**

In November 1998, Plaintiff was diagnosed with having an adjustment disorder with mixed depression and anxiety and was placed on work stress disability for several months. (Def. Ex. 82, 485:2-9.)  Plaintiff was placed on long-term disability from approximately July 31, 2000 to February 2, 2002.  (Id. at 490:16-491:9.)  On or about August 23, 2000, Plaintiff filed a Workers' Compensation claim for his adjustment disorder.  (Id. at 490:7-12.)  Plaintiff underwent an independent psychological evaluation in or about January 2001, and was diagnosed as suffering from an adjustment disorder with mixed depression and anxiety with a corroborating diagnosis of "chronic work-related adjustment disorder to include a stress-related physiological response affecting medical condition."  (Id. at 491:17-492:10.)

In the Spring of 2004, Plaintiff filed a Workers' Compensation claim for sinusitus/rhinitis.  Plaintiff's sinus problems were exacerbated by wildfires and construction work at Plaintiff's office.  (Def. Ex. 88, 202-05; Def. Ex. 10.)  John P. Morgan, Plaintiff's supervisor, authorized Plaintiff to work at home for a period of time so that he could avoid the excessive dust and airborne particles at his office.  (Def. Ex. 10.)

On September 17, 2004, Plaintiff reported that he had been diagnosed with work-related tendonitis of the upper right arm and shoulder area.  (Def. Ex. 11.)  A medical impairment form ("DMI") from Kaiser Permanente indicated that Plaintiff was restricted for a period of seven calendar days from grasping, hand motion, pushing, pulling, reaching above his shoulder, or lifting with his right hand.  (Def. Ex. 12.)

On September 21, 2004, Mr. Morgan told Plaintiff that based on the medical

---

[1]  The FPS "is a federal law enforcement agency that provides integrated security and law enforcement services to federally owned and leased buildings, facilities, properties and other assets."  http://www.dhs.gov/xabout/structure/gc_1253889058003.shtm

08cv0735 BTM(JMA)

impairment documentation from Kaiser, "I believe it prudent that you NOT carry a FPS duty firearm at this time until your condition improves and you are no longer under doctor's care. Please assure me that you will secure your weapon until such time as you are able to proceed with your full range of duties and responsibilities." (Def. Ex. 13.) Two days later, Plaintiff informed Mr. Morgan that Kaiser had confirmed the existence of a work-related "repetitive motion injury" involving his upper right arm and shoulder and had recommended an "ergonomic evaluation." (Def. Ex. 14.) Plaintiff also explained, "Carrying a firearm is authorized, and no work restrictions have been imposed. However, 5 minute rests of the injured area every 30 minutes have been directed, along with continued training/usage of the left arm/hand as much as possible until further notice." (Id.) Plaintiff submitted a new DMI to this effect. (Def. Ex. 15.)

On October 8, 2004, Plaintiff submitted a Workers' Compensation claim for repetitive motion injury causing pain in his upper arm, shoulder, and neck. (Def. Ex. 16.) In an e-mail dated October 18, 2004, Mr. Morgan expressed surprise that Plaintiff was still conducting the same work activities that caused Plaintiff's injuries. (Def. Ex. 17.) Mr. Morgan requested more information from Plaintiff regarding his work activities and what he was doing to care for his condition. (Id.)

A DMI dated October 21, 2004, did not indicate any work restrictions but recommended 5 minutes of rest for every 30 minutes worked. (Def. Ex. 19.) DMIs dated December 13, 2004 and January 10, 2005 also did not indicate any work restrictions.

## C. Revocation of Plaintiff's Law Enforcement Authority

In early 2005, Plaintiff was scheduled to attend two separate training courses, an "ALERT 504" law enforcement training course scheduled for February 7, and a VIP Protection Course scheduled for January 31.

The notification for the "ALERT 504" training course stated: "This is a rigorous program containing advanced training in the areas of arrest techniques, defensive tactics and firearms designed to emulate the physical stresses of the field. Therefore, it is the FPS

08cv0735 BTM(JMA)

National Academy's expectation that all attendees have a baseline fitness level required for FPS law enforcement positions."  (Def. Ex. 28.)

Based on written materials Plaintiff received regarding the "ALERT 504" training regimen, Plaintiff mistakenly believed that the course would require him to (1) demonstrate the maximum weight he could bench press in a single lift and (2) complete a U.S. Border Patrol obstacle course that required rigorous upper body strength.  (Pl. Ex. 25 in Opp. to MSJ, ¶ 10; Pl. Ex. 31 in Opp. to MSJ.)  According to Plaintiff, although he had largely concluded his rehabilitation with Kaiser, he was precluded from participating in any general weight training and was concerned about the maximum bench press and obstacle course requirements.  (Pl. Ex. 25 in Opp. to MSJ, ¶ 11.)  On January 27, 2005, Plaintiff saw his Kaiser physician who placed him on a 20 pound weight restriction.  (Def. Ex. 29.)

In an e-mail dated January 27, 2005, Plaintiff advised Mr. Morgan that he developed another upper respiratory infection due to construction work at his office that released dust that had been trapped in the ceiling.  Plaintiff noted, "I'll file another DOL/OWCP Claim later this month."  (Def. Ex. 30.)  Mr. Morgan expressed concern regarding Plaintiff's ability to perform his full range of duties and discussed his concern with Branch Chief Don Meyerhoff. (Def. Ex. 30.)  Mr. Morgan recommended that Plaintiff's law enforcement authority be removed (Def. Ex. 87 at 66:21-22.)  Mr. Meyerhoff agreed and made the final decision to remove Plaintiff's law enforcement authority.  (Id. at 75:21-78:4.)

On January 31, 2005, before the VIP training started, Mr. Morgan excused Plaintiff from participating in the training and revoked his law enforcement authority, securing Plaintiff's vehicle and weapon.  (Def. Ex. 87 at 86:1-16.)

On February 22, 2005, Plaintiff submitted a DMI which did not indicate any weight-lifting restriction or any other restriction.  (Def. Ex. 34.)

**D.  Physical and Psychiatric Exams Ordered by FPS**

On March 1, 2005, Mr. Meyerhoff directed Plaintiff to submit to a fit-for-duty physical examination and informed him that he would remain in non-law enforcement status until he

successfully passed the physical.  (Def. Ex. 37.)

On March 4, 2005, Martha Montano, the FPS staff employee who coordinated medical examinations for Region 9, contacted Plaintiff to schedule a fitness-for-duty ("FFD") examination.  (Def. Ex. 38.)

On March 31, 2005, Ms. Montano sent Plaintiff two "Return to Work Clearance" forms, which asked Plaintiff to list his medical condition and release medical records to Comprehensive Health Services ("CHS"), the medical contracting service retained by FPS to evaluate agency employees.  (Def. Exs. 24-25, 82 at 361:14-25.)  Plaintiff refused to sign and return the forms.  (Def. Ex. 42.)

On April 13, 2005, Ms. Montano requested that CHS schedule an Independent Medical Examination ("IME") for Plaintiff to evaluate him for fitness-for-duty.  (Def. Ex. 45.) Ms. Montano requested that a psychiatrist be available to examine Plaintiff.  She described Plaintiff's physical ailments as consisting of pain in his arm, including his shoulder due to excessive use of a computer mouse, and recurrent sinusitis and upper respiratory infection. (Id.)  Ms. Montano also described Plaintiff as suffering from "mental health issues":

> Mr. Scott appears to be apprehensive with heightened states of anxiety and we are concerned with a potential of hostile encounters with the public.

> There is a concern with his emotional stability as he has had a vexation about an "FPS management conspiracy against him."  Mr. Scott expresses his agitation, both, verbally and in writing, through various emails.

(Id.)

In response to Ms. Montano's request, Dr. Lawrence Saladino, FPS's Medical Review Officer at CHS, recommended an "Incumbent Medical Exam and Psych IME."  (Def. Ex. 47.)

In a letter dated April 22, 2005, Mr. Morgan stated that there was insufficient information to determine whether Plaintiff could perform full unrestricted work as an FPS Criminal Investigator in light of his medical conditions, including recurring sinusitis, upper respiratory infection, and injury to the upper arm. (Def. Ex. 49.) Mr. Morgan also expressed concern regarding statements allegedly made by Plaintiff referring to a management conspiracy: "These continued references bring to question your mental health status and your ability to perform the full range of duties required for the position of an FPS Criminal

1  Investigator . . . due to what appears to be unresolved mental health problems." (Id.) Mr.

2  Morgan stated that he was exercising FPS's authority under 5 CFR 339.301 to require that

3  Plaintiff undergo a medical/psychological fitness-for-duty examination to be performed at

4  FPS's expense by a doctor(s) selected by FPS in consultation with CHS.[2]  (Id.)

5  Plaintiff was initially scheduled for the physical examination on May 6, 2005.

6  Beforehand, Plaintiff received copies of CHS examination request forms for an "Incumbent

7  Exam Age 45 and Older."  The examination did not take place due to a disagreement as to

8  the scope of the examination.  Plaintiff communicated that he would not submit to a

9  comprehensive physical examination, but, rather, would only permit an examination

10  regarding his recurring sinusitis or rhinitis and repetitive motion injury to the upper right arm

11  and shoulder.  (Def. Ex. 52; 81, 166:8-167:7.)  It appears that Plaintiff took the position that

12  under FPS's Periodic Medical Examination Program, his periodic comprehensive

13  examination was not due until his birthday.  (Def. Ex. 86, 140:9-24; Ex. 50.)[3]

14  Plaintiff's examination was rescheduled to May 24, 2005, however, once again,

15  Plaintiff refused to submit to a comprehensive physical examination.  (Id.)  No examination

16  was conducted.  Shortly thereafter, Plaintiff's psychiatric examination was canceled.

17

18

19

20  [2]  5 C.F.R. § 339.103(b) provides that an agency may require an individual who
occupies a position which has medical standards or physical requirements to report for a

21  medical examination (1) prior to appointment or selection; (2) on a regularly, recurring,
periodic basis after appointment; or (3) whenever there is a direct question about an

22  employee's continued capacity to meet the physical or medical requirements of a position.
The regulation also explains that an agency may order a psychiatric examination only when

23  . . . "[t]he result of a current general medical examination which the agency has the authority
to order under this section indicates no physical explanation for behavior or actions which

24  may affect the safe and efficient performance of the individual or others . . . ."

25  [3]  Under the Periodic Medical Examination Program, implemented in 2000, FPS law
enforcement officers were supposed to be subjected to periodic medical examinations to

26  ensure that they met a "level of medical and psychological fitness commensurate with the
essential functions of their positions." (Def. Ex. 6.)  Under the Program, the frequency of the

27  medical exams was tied to the age of the employee.  Employees 35 and under were to be
tested every 3 years, employees 36-44 years old were to be tested every 2 years, and

28  employees 45 and above were to be tested every year.  Examinations were to be completed
within 30 days following the employee's month of birth.

08cv0735 BTM(JMA)

### E. Birth-Month Examination and Release

On November 9, 2005, Plaintiff appeared for his birth-month examination at Healthworks' San Diego facility.  Plaintiff underwent a full physical examination.  (Scott Decl. ¶ 13.)  Plaintiff was also provided with a medical questionnaire form ("GSA/FPS Pre-Placement and Incumbent Medical Exam Form").  (Pl. Ex. 5.)  Although Plaintiff completed most of the questionnaire, he refused to answer the following questions and indicated that they violated the ADA/Rehabilitation Act.

- Have you ever been treated for a mental condition?  (If yes, specify when, where, and give details)

- Have you ever had any illness, injury, or other condition (including learning disability, attention deficit disorder, etc.) other than those already noted?  (If yes, specify when, where and give details)

- Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past years for other than minor illness?  (If yes, give complete address of doctor, hospital, clinic, and details.)

- Have you ever received, is there pending, or have you applied for pension or compensation for existing disability?  (If yes, specify what kind, granted by whom, and what amount, when, why)

- Have you or do you currently experience any of the following: psychiatric/psychological consult, episodes of depression, periods of nervousness?  Please specify.

- List all medication (prescription and non-prescription) you are currently taking with dosage and [f]requency, and reason below.

(Pl. Ex. 5 at 2, 4.)  In response to the last question about his medication, Plaintiff noted: "I am not taking any medications that would impair my ability to perform my position."  (Pl. Ex. 5 at 4.)

The form also included the following release language:

I certify that I have reviewed the foregoing information supplied by me and that it is true and complete to the best of my knowledge.  I authorize any of the doctors, hospitals, or clinics mentioned on these forms to furnish the Government a complete transcript of my medical record for purposes of processing my application for this employment or service.  I authorize the release of all medical information to the designated Agency Physician and on a need to know basis, the designated Regional POC, Director Management Analysis Division, Central Office POC, designated physician at FLET and HR POC.

(P. Ex. 5 at 5.)  Plaintiff crossed out this language and wrote: "I only authorize the release

7

08cv0735 BTM(JMA)

1    of the results of this exam to authorized agency medical personnel.  I do not authorize the
2    release of any other personal medical records."  (Id.)

3    In an e-mail dated November 28, 2005, Dr. Saladino stated that due to Plaintiff's
4    failure to complete the questionnaire and the release, "the information available to me at the
5    present time will not be sufficient . . . to provide a medical determination letter."  (Def. Ex.
6    58.)

7

8    **F.   2006 Suspension**

9    On December 8, 2005, Rudy Negrete, Plaintiff's new Branch Chief, directed Plaintiff
10   to complete a request for additional medical records and documentation by CHS.  (Def. Ex.
11   59; 62.)  Mr. Negrete directed Plaintiff to comply within 14 calendar days and warned him
12   that failure to comply may result in disciplinary action.  (Id.)  Plaintiff did not comply.

13   On April 17, 2006, Mr. Negrete advised Plaintiff that he was proposing a fourteen-day
14   suspension for failure to carry out his instructions regarding the unanswered questions and
15   release.  (Def. Ex. 63.)   On April 28, 2006, Plaintiff responded in writing to the proposed
16   suspension, explaining that the "FPS Incumbent Exam pursues confidential medical
17   information that is beyond the reasonable scope permitted by Equal Employment &
18   Opportunity Commission enforcement guidelines."  (Pl. Ex. 7.)  On May 8, 2006, Joyce
19   Nesbitt-Simon, Region 9's new Acting Deputy Director suspended Plaintiff from May 15 to
20   May 27, 2006, for failing to carry out instructions of a superior.  (Def. Ex. 64.)

21

22   **G.   2007 Termination**

23   In November 2006, the FPS transferred to Region 10 (located in Seattle, Washington)
24   the authority to handle Plaintiff's fitness for duty issues.  (Def. Exs. 65-67.)   On December
25   21, 2006, Tamra Hirano, Region 10's Chief of Mission Support, ordered Plaintiff to respond
26   to the following questions, which were based on the questions Plaintiff had previously
27   refused to answer:

28   1.  Have you ever had a learning disability or attention deficit disorder?

08cv0735 BTM(JMA)

2.  Have you ever been treated for a mental condition?  (If yes, specify when, where and give details)

3.  Have you consulted or been treated by clinic, physicians, healers, or other practitioners for other than minor illness?  (If yes, give complete address of doctor, hospital, clinic, and details)

4.  Have you ever received, is there pending, or have you applied for pension or compensation for existing disability?  (If yes, specify what kind, granted by whom, what amount, when and why)

5.  Have you had a psychiatric/psychologic consult?

6.  Have you had episodes of depression?

7.  Have you had problems with anxiety?

8.  Describe all medication (prescription and non-prescription) you are currently taking with dosages, frequency, and reason for taking the medication.

(Def. Ex. 68.)  Ms. Hirano ordered Plaintiff to respond to the questions no later than January 5, 2006.

Ms. Hirano also ordered Plaintiff to sign a release of information to Dr. Saladino.  The release stated:

I authorize the following individuals to receive the medical records described below: Dr. Larry Saladino, his agents, employees and representatives

Information to be Released:

I authorize FPS Chief, Mission Support Tamra Hirano to release all medical records in her possession pertaining to my workers' compensation injury that occurred on or about September 8, 2004, relating to the right side of my neck, my right upper arm and shoulder area.

Purpose:

To release records necessary to determine my fitness for duty as a Criminal Investigator.

(Def. Ex. 68.)

Ms. Hirano explained that she was informed that Plaintiff's responses and release of information were necessary in order for Dr. Saladino to make a medical determination about Plaintiff's ability to perform the essential functions of his law enforcement position.  (Def. Ex. 68.)

Plaintiff did not respond to the questions or sign the release.  Accordingly, on January 25, 2007, Ms. Hirano proposed that he be removed from his position with the FPS as a

1    Criminal Investigator.  (Def. Ex. 70.)  On March 5, 2007, Stephen Slagowski, Region 10's
2    Acting Regional Director, agreed with Ms. Hirano's proposal and terminated Plaintiff.  (Def.
3    Ex. 71.)

4

5                                    **II.  <u>STANDARD</u>**

6            Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil
7    Procedure if the moving party demonstrates the absence of a genuine issue of material fact
8    and entitlement to judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322
9    (1986).  A fact is material when, under the governing substantive law, it could affect the
10   outcome of the case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Freeman</u>
11   <u>v. Arpaio</u>, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute is genuine if a reasonable jury could
12   return a verdict for the nonmoving party.  <u>Anderson</u>, 477 U.S. at 248.

13           A party seeking summary judgment always bears the initial burden of establishing the
14   absence of a genuine issue of material fact.  <u>Celotex</u>, 477 U.S. at 323.  The moving party
15   can satisfy this burden in two ways: (1) by presenting evidence that negates an essential
16   element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party
17   failed to establish an essential element of the nonmoving party's case on which the
18   nonmoving party bears the burden of proving at trial.  <u>Id.</u> at 322-23.  "Disputes over irrelevant
19   or unnecessary facts will not preclude a grant of summary judgment."  <u>T.W. Elec. Serv., Inc.</u>
20   <u>v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).

21           Once the moving party establishes the absence of genuine issues of material fact, the
22   burden shifts to the nonmoving party to set forth facts showing that a genuine issue of
23   disputed fact remains.  <u>Celotex</u>, 477 U.S. at 314.  The nonmoving party cannot oppose a
24   properly supported summary judgment motion by "rest[ing] on mere allegations or denials
25   of his pleadings."  <u>Anderson</u>, 477 U.S. at 256.  When ruling on a summary judgment motion,
26   the court must view all inferences drawn from the underlying facts in the light most favorable
27   to the nonmoving party.   <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
28   587 (1986).

### III.  DISCUSSION

Plaintiff has sued Defendant for (1) disability discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); (2) retaliation; and (3) age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 633a. Defendant moves for summary judgment on all of the claims.  Plaintiff moves for partial summary judgment on the following issues: (1) whether Defendant violated the Rehabilitation Act/Americans With Disabilities Act ("ADA") by making impermissible disability-related inquires; (2) whether Defendant retaliated against Plaintiff in violation of the Rehabilitation Act/ADA by suspending him and terminating him for opposing Defendant's impermissible disability-related inquiries; and (3) whether FPS's Periodic Medical Examination Program violated the ADEA.  The Court will analyze each of Plaintiff's claims below.

### A.  Impermissible Disability-Related Inquiries

Plaintiff contends that the questions he refused to answer on the medical exam form and the questions posed by Ms. Hirano, which were modeled on the questions he had previously refused to answer, were impermissible disability-related inquiries that ran afoul of the Rehabilitation Act and ADA.  The Court agrees with Plaintiff.

The ADA provides:

Examination and inquiry

(A) Prohibited examinations and inquiries

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

(B) Acceptable examinations and inquiries

A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

1    42 U.S.C. § 12112(d)(4).[4]

2         Under Ninth Circuit law, an individual does not have to be a "qualified individual with

3    a disability," as defined in 42 U.S.C. § 12111(8), to have standing to invoke the ADA's

4    protection against improper medical examinations and inquiries.  Fredenburg v. Contra

5    Costa County Dept. of Health Serv., 172 F.3d 1176, 1181-82 (9th Cir. 1999).

6         Plaintiff spends much of his brief arguing that his exam was a "periodic exam" as

7    opposed to a "fitness-for-duty" exam.[5]   However, the Court is unable to conclude that the

8    exam was one type of exam and not the other.  Although the exam was a "birth-month

9    exam," it is unclear whether it would have been scheduled absent Plaintiff's medical issues,

10   Defendant's concerns regarding Plaintiff's fitness for duty, and the difficulties Defendant

11   encountered in attempting to have Plaintiff examined.  Prior to November 2005, Plaintiff did

12   not undergo a birth-month examination even though, under the Program guidelines, he

13   would have been due for an examination in November 2003 and November 2004. (See Def.

14   Mem. of P & A in support of MSJ at 23-24.)  Thus, the Court cannot say that the exam was

15   a "periodic exam" and not a "fitness-for-duty" exam.

16        At any rate, in this case, the characterization of the exam as a "periodic exam" or

17   "fitness-for-duty" exam makes no difference to the outcome of the case.  Both periodic

18   physicals and fitness-for-duty exams are permissible as long as they are  "job related and

19   consistent with business necessity."  29 C.F.R. Pt. 1630, App., § 1630.14(c) (emphasis

20   added).  The Ninth Circuit has stated that "[t]he business necessity standard is quite high,

21   and is not [to be] confused with mere expediency."  Cripe v. City of San Jose, 261 F.3d 877,

22   890 (9th Cir. 2001).  The burden of establishing "business necessity" rests on the employer.

23   _____

24        [4]   The Rehabilitation Act, which governs here due to the federal defendant,
     incorporates by reference the ADA provisions regarding medical examinations and inquiries.
25   29 U.S.C. §§ 791(g), 794(d).  See also Greer v. O'Neill, 2003 WL 25653036 (D.D.C. Sept.
     25, 2003).
26

27        [5]  In early 2005, the FPS clarified the procedures for a "return-to-duty" exam, a type
     of "fitness-for-duty" exam.  (Def. Ex. 23.)  Under the procedures, a return-to-duty exam
28   should be scheduled through CHS when an employee returns to work afer an extended
     illness or injury.   Dr. Saladino then reviews the available information, contacts the
     employee's physician, and determines whether an IME is necessary.

Fredenburg, 172 F.3d at 1182.

The Second Circuit has held that in proving "business necessity," an employer must first show that the asserted "business necessity" is vital to the business.  Conroy v. New York State Dept. of Correctional Serv., 33 F.3d 88, 97 (2d Cir. 2003).  Business necessities may include ensuring workplace safety or curbing egregious absenteeism.  The employer must then show that "the examination or inquiry genuinely serves the asserted business necessity and that the request is no broader or more intrusive than necessary."  Id. at 98.  "The employer need not show that the examination or inquiry is the only way of achieving a business necessity, but the examination or inquiry must be a reasonably effective method of achieving the employer's goal."  Id.

There is no question that ensuring that an armed officer can perform his job properly and safely is a business necessity.  See, e.g., Watson v. City of Miami Beach, 117 F.3d 932 (11th Cir. 1999) (holding that City acted properly in ordering a fitness-for-duty examination where a department reasonably perceived plaintiff, an armed police officer, to be mildly paranoid, hostile, and oppositional); Pennsylvania State Troopers Ass'n v. Miller, 621 F. Supp. 2d 246 (M.D. Pa. 2008) (police asserted business necessity of detecting latent injuries that could impair members' job performance).  The issue in this case is whether the challenged questions were a reasonably effective method of achieving this goal.

In discussing return-to-duty examinations and periodic examinations, the EEOC's Compliance Manual stresses that the scope of the exams be limited in scope to determining whether the employee *is currently able to perform the essential functions of his or her job*. The EEOC explains that if an employer has a reasonable belief that an employee's present ability to perform essential job functions will be impaired by a medical condition or that s/he will pose a direct threat due to a medical condition, the employer may make disability-related inquiries or require the employee to submit to a medical exam.  "Any inquiries or examination, however, must be limited in scope to what is needed to make an assessment of the employee's ability to work.  Usually, inquiries or examinations related to the specific medical condition for which the employee took leave will be all that is warranted.  The

08cv0735 BTM(JMA)

employer may not use the employee's leave as a justification for making far-ranging disability-related inquiries or requiring an unrelated medical examination." <u>EEOC Compliance Man.</u> (BNA), 902:0190 (November, 2002).

Similarly, periodic medical examinations of employees in positions affecting public safety are permissible *if narrowly tailored to address specific job-related concerns*. <u>Id.</u> at 902:0190. A fire department could require its employees to have a comprehensive visual examination every two years and to have an annual electrocardiogram because visual acuity and a healthy heart are necessary for firefighters to perform their job without posing a threat. <u>Id.</u> In contrast, a police department may not periodically test all of its officers to determine whether they are HIV-positive, because "a diagnosis of that condition alone is not likely to result in an inability or impaired ability to perform essential functions that would result in a direct threat." <u>Id.</u>

Whether Plaintiff's exam is properly characterized as a "periodic exam" or "fitness-for-duty exam," the exam went beyond its proper scope in requiring Plaintiff to answer the questions at issue. Upon review of the questions, the Court concludes that the questions were disability-related inquiries that were not narrowly tailored to assessing whether Plaintiff could perform the essential functions of his job. The questions Plaintiff refused to answer on the medical exam form (which are substantially the same as those posed by Ms. Hirano) are:

- Have you ever been treated for a mental condition? (If yes, specify when, where, and give details)

- Have you ever had any illness, injury, or other condition (including learning disability, attention deficit disorder, etc.) other than those already noted? (If yes, specify when, where and give details)

- Have you consulted or been treated by clinics, physicians, healers, or other practitioners within the past years for other than minor illness? (If yes, give complete address of doctor, hospital, clinic, and details.)

- Have you ever received, is there pending, or have you applied for pension or compensation for existing disability? (If yes, specify what kind, granted by whom, and what amount, when, why)

- Have you or do you currently experience any of the following: psychiatric/psychological consult, episodes of depression, periods of nervousness? Please specify.

- List all medication (prescription and non-prescription) you are currently taking with dosage and [f]requency, and reason below.

These questions clearly qualify as "disability-related inquiries" because they are likely to elicit information about a disability. [6] All of the questions broadly seek information about illnesses, mental conditions, or other impairments Plaintiff has or had in the past.

The questions were not narrowly tailored to address Plaintiff's current ability to work. The first question, which asked if Plaintiff had ever been treated for a mental condition, was not limited in time and would include, for example, a childhood phobia or a long-resolved eating disorder.  The second and third questions are even broader because they are not limited to mental conditions and would include, for example, a past episode of appendicitis or a bad bout of eczema.  The fourth question is ambiguous and overbroad in that it does not define "disability" and does not distinguish between job-related and non-job-related "disabilities."  The fifth question is not limited in time, does not address the severity of the "nervousness" or "depression," and extends to any type of pscyhiatric/ pscyhological consult, such as grief counseling.  The sixth question, which asks about all types of drugs, including prescription and non-prescription, is intrusive and not tailored to determining whether an employee is using a drug that may affect his ability to do his job.[7]  In answering this question, a person would have to reveal whether they were taking *any* medication, including Advil, birth control, or Viagra.  Given the scope of these questions, Defendant cannot satisfy its burden of establishing that the inquiries were "no broader or more intrusive than necessary" to accomplish its goal of ensuring that Plaintiff could still safely do his job.

Defendant claims that it had cause to be concerned about Plaintiff's mental condition as a result of statements Plaintiff made suggesting his belief in an FPS management conspiracy against him, and acts of insubordination.  (Def. Mem. of P & A in Support of MSJ at 39-40.)  Even if this is so, the broad questions regarding whether Plaintiff has at any time

---

[6] The Compliance Manual gives as examples of "disability-related inquiries," asking an employee whether he is taking prescription drugs or medication, asking about an employee's prior workers' compensation history, and asking an employee a broad question about his impairments such as "What impairments do you have?"  <u>EEOC Compliance Man.</u> 902:0183.

[7] The EEOC Compliance Manual explains that although a police department could require armed officers to report when they are taking medications *that may affect their ability to use a firearm or to perform other essential functions of their job*, an employer generally may not ask employees what prescription medications they are taking.  <u>EEOC Compliance Man.</u> 902:0187-88.

1  received treatment for any mental conditions and whether Plaintiff has at any time
2  experience(d) anxiety or depression would not assist Defendant in determining whether
3  Plaintiff was capable of performing his job.  A properly tailored mental examination may have
4  been permissible if Defendant had a reasonable concern about Plaintiff's mental health.
5  However, Defendant did not require Plaintiff to submit to a mental exam upon returning from
6  leave for his adjustment disorder with mixed depression and anxiety, canceled its request
7  for a psychiatric exam in 2005, and did not further pursue its request for a mental exam.

8  Relying on Conrad v. Bd. of Johnson County Comm'rs, 237 F. Supp. 2d 1204 (D.
9  Kan. 2002), Defendant argues that it cannot be held liable for inquiries made by medical
10  contractors.  However, Conrad is distinguishable.  In Conrad, the plaintiff objected to
11  questions regarding assault and alcoholism that were asked as part of the MMPI-2 test.
12  Outside health professionals chose to administer the test and there was no evidence that
13  the county defendant had any idea that such questions would be asked.  Here, the questions
14  were part of a form titled "GSA/FPS Pre-placement and Incumbent Medical Exam Form."
15  It is unlikely that FPS had no knowledge of this form.  Moreover, in this case, after Plaintiff
16  refused to answer the questions, FPS insisted that he answer the questions or be subjected
17  to discipline and even paraphrased the questions for him.  Defendant cannot use CHS to
18  shield itself from liability.

19  The Court emphasizes that it does not hold that a law enforcement agency can not
20  make inquiries regarding an employee's mental health or subject the employee to a mental
21  examination.  The Court's holding is limited to the questions on the medical exam form and
22  the questions posed by Ms. Hirano, which were overbroad in scope and in time.  These
23  disability-related inquiries were not narrowly tailored to evaluate whether Plaintiff could
24  perform the essential functions of the job and violated 42 U.S.C. § 12112(d)(4)(A) and the
25  Rehabilitation Act.  Therefore, Plaintiff's motion for summary judgment is granted as to this
26  claim.

27
28

08cv0735 BTM(JMA)

**B.  Disability Discrimination**

Plaintiff claims that he suffered disability discrimination in violation of the Rehabilitation Act.  The adverse employment actions he claims he suffered as a result of the disability discrimination include the loss of his law enforcement authority, his suspension, and his termination.  Defendant is entitled to summary judgment on this claim because Plaintiff has not shown that he was "disabled" within the meaning of the Rehabilitation Act.

The standards used to determine liability for discrimination under the ADA are incorporated in the Rehabilitation Act.  29 U.S.C. § 749(d); 29 C.F.R. § 1614.203.  To state a prima facie case of disability discrimination under the Rehabilitation Act, the plaintiff must demonstrate that (1) he is a person with a disability; (2) who is otherwise qualified for employment; and (3) suffered discrimination because of his disability.  <u>Walton v. U.S. Marshals Serv.</u>, 492 F.3d 998, 1005 (9th Cir. 2007).

The ADA provides:

(1) Disability

The term "disability" means, with respect to an individual--

    (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

    (B) a record of such an impairment; or

    (C) being regarded as having such an impairment (as described in paragraph (3)).

(2) Major life activities

    (A) In general

    For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

42 U.S.C. § 12102.

Plaintiff does not claim that he is disabled, but, rather, that the FPS regarded him as disabled.  A person is "regarded as" having a disability "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual

1    or perceived physical or mental impairment whether or not the impairment limits or is

2    perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

3         The EEOC's regulations explain:

4         Is regarded as having such an impairment means:

5         (1) Has a physical or mental impairment that does not substantially limit major
          life activities but is treated by a covered entity as constituting such limitation;

6
          (2) Has a physical or mental impairment that substantially limits major life
7         activities only as a result of the attitudes of others toward such impairment; or

8         (3) Has none of the impairments defined in paragraph (h) (1) or (2) of this
          section but is treated by a covered entity as having a substantially limiting
9         impairment.

10   29 C.F.R. § 1630.2(l).

11        The Supreme Court explained, "[I]t is necessary that a covered entity entertain

12   misperceptions about the individual – it must believe either that one has a substantially

13   limiting impairment that one does not have or that one has a substantially limiting impairment

14   when, in fact, the impairment is not so limiting." Sutton v. United Air Lines, Inc., 527 U.S.

15   471, 489 (1999).  The Ninth Circuit requires that a plaintiff alleging a "regarded as" claim

16   "provide evidence of the employer's 'misperception,' or subjective belief that the plaintiff is

17   substantially impaired." Walton, 492 F.3d at 1006.  A plaintiff who does not have direct

18   evidence of the employer's subjective belief that the plaintiff is substantially limited in a major

19   life activity must provide evidence that the impairment imputed to the plaintiff is, objectively,

20   a substantially limiting impairment.  Id. at 1006.

21        Plaintiff's main argument in support of his "regarded as" claim is that Mr. Morgan

22   "initiated all of the salient activities targeting Agent Scott" and "orchestrat[ed] a grossly

23   disingenuous campaign to discredit Agent Scott with loose and unsubstantiated allegations

24   about Agent Scott's mental health." (Pl. Opp. to MSJ at 2.)  According to Ruben Ballestros,

25   who was a Senior Special Agent/Criminal Investigator and Firearms Instructor with FPS in

26   2005, prior to the VIP Protection training, Ballestros talked to Morgan to obtain a head count.

27   (Pl. Ex. 27 in Opp. to MSJ, ¶ 23.)  Morgan told Ballestros that he did not want Plaintiff to be

28   included in the training, explaining, "I don't want him there because he's a f___ nut, he's

18

08cv0735 BTM(JMA)

1    crazy.  He's got some mental issues, and I don't want a crazy man running around with a

2    machine gun, getting in and out of a helicopter, getting us all killed.  The guy is a ticking time

3    bomb, waiting to go off."  (Id. at ¶ 24.)  When Ballestros asked Morgan why he would say

4    such a thing, Morgan indicated that he wanted to get back at Plaintiff for personal reasons.

5    (Id. at ¶ 25.)  On the Friday before the VIP training commenced, Ballestros asked Morgan

6    if there was a genuine safety issue with respect to Plaintiff.  (Id. at ¶ 26.)  Morgan did not say

7    that Plaintiff actually presented a danger, but, rather, reiterated that he didn't want Plaintiff

8    around because of a personal grudge.  (Id.)  Morgan explained that Plaintiff had humiliated

9    the Morgan family by not taking a deal negotiated by Morgan's brother-in-law during an

10   MSPB proceeding several years earlier.  (Id. at ¶¶ 25, 26, 41, 43, 44.)

11       Agent John Hartman also recalls Morgan using the word "crazy" in reference to

12   Plaintiff.  (Pl. Ex. 14 in Opp. to MSJ at 84:14-15.)  Morgan did not elaborate on what he

13   meant by calling Plaintiff crazy, but Hartman inferred that it had something to do with

14   Morgan's brother-in-law.  (Id. at 84:19-24.)

15       The problem with Plaintiff's theory of liability is that Morgan apparently did not actually

16   *believe* that Plaintiff was disabled as a result of a mental condition.  Plaintiff's own papers

17   explain that although Morgan called Plaintiff "crazy" and "nuts," "he didn't actually believe it."

18   (Pl. Opp. to MSJ at 30:4-5.)  In Sullivan v. River Valley School Dist., 197 F.3d 804 (6th Cir.

19   1999), the Sixth Circuit explained:

20           The ADA simply does not protect an employee from an employer's knowingly
             false accusation of having a disability. Rather, it protects employees from
21           employers who mistakenly treat them as if they have a disability. An
             employee's lack of a disability does not shield an employer from liability for
22           discriminatory conduct based on a mistaken but genuine belief that an
             employee is disabled, *but the ADA does not proscribe deliberately fostering a*
23           *false impression of disability. It only protects an employee who actually has or*
             *is actually believed to have a disability*. As another court has put it recently:
24           "The ADA prohibits discrimination, not action taken using discrimination as a
             pretext." Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 195 n. 10 (3d
25           Cir.1999).

26   Id. at 814.

27       According to Plaintiff's evidence and argument, Morgan had a personal vendetta

28   against Plaintiff and, as a result, disparaged him by making comments about his mental

health.  Morgan's alleged actions, while reprehensible, do not violate the ADA.

Plaintiff argues that Morgan's "poisonous gospel" that Plaintiff was a "nut" spread as far as FPS Headquarters in Washington, D.C.  Ballestros recalls how in early 2006, he met with Mr. Negrete and Regional Director Dean Hunter to request that Plaintiff's law enforcement authority be reinstated.  (Pl. Ex. 27 in Opp. to MSJ, ¶ 62.)  Hunter responded, "I've heard about Scott, I don't see why he can't be reinstated.  But this goes all the way back to D.C.  He's f____, and I'm too close to the top.  I have plans.  I'm not going to be the one to un-f___ him."  (Id. at ¶ 63.)  When Ballestros asked Hunter why Plaintiff was "f____," Hunter responded that he had heard from D.C., Mr. Morgan, and Russ Oase, that Plaintiff was a "nut."  (Id. at 64-65.)

Hunter's vague statement that he heard from "D.C." that Plaintiff was a "nut" is insufficient to establish that the decision-makers in this case were motivated by a belief that Plaintiff is disabled.  There is no evidence that Mr. Negrete, Ms. Nesbitt-Simon, Ms. Hirano, or Mr. Slagowski had heard any rumors about Plaintiff being mentally unstable.

Plaintiff argues that Region 10 was aware that Plaintiff had not been medically-cleared to return to duty, and contends, "Every action taken related to the basic question of find[ing] out if Scott could be qualified to return him to work, or to remove him from federal service."  (Pl. Opp. to MSJ at 20:9-14.)   However, the fact that an employer questions whether an individual can perform a specific job does not mean that the employer regards the individual as disabled.  The term "substantially limits" with respect to the major life activity of "working" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  29 C.F.R. § 1630.2(j)(3)(i).

An employer's perception that health problems *may* be adversely affecting an employee's job performance, resulting in a request that an employee obtain a medical exam, does not in and of itself prove perception of a disability.  Sullivan, 197 F.3d at 811.  "Doubts

alone do not demonstrate that the employee was held in any particular regard." <u>Tice v. Centre Area Transp. Auth.</u>, 247 F.3d 506, 516 (3d Cir. 2001). "[E]ven an improper IME request, without more, might not be sufficient to demonstrate that an employee was 'regarded as' disabled." <u>Id.</u> at 515.

By the time Mr. Negrete, Ms. Nesbitt-Simon, Ms. Hirano, and Mr. Slagowski became involved in the events at issue, crucial decisions had already been made regarding the removal of Plaintiff's law enforcement authority and the necessity of Plaintiff submitting to a medical examination. As Plaintiff explains, the initial actions of Morgan set the stage for all subsequent agency actions and decisions, and restricted the choices of all subsequent decision makers. (Pl. Opp. to MSJ at 20:27-21:6.) Mr. Negrete, Ms. Nesbitt-Simon, Ms. Hirano, and Mr. Slagowski made their decisions based on their knowledge that Plaintiff submitted to a medical examination, Plaintiff refused to answer certain questions in connection with the exam, and Dr. Saladino opined that he was unable to make a medical determination about Plaintiff's ability to perform his job without the information. Based on these facts, these decision-makers directed Plaintiff to comply and disciplined him for failing to do so. There is no evidence that they believed that Plaintiff was in fact significantly restricted in his ability to perform a class of jobs or a broad range of jobs in various classes.

Plaintiff has failed to raise a genuine issue of material fact with respect to whether he was "regarded as" disabled by the decision-makers at FPS. Plaintiff is not a "person with a disability." Therefore, Defendant's motion for summary judgment is granted as to Plaintiff's disability discrimination claim.

**C. Retaliation**

    1. ADA/Rehabilitation Act

Plaintiff contends that he was disciplined and ultimately terminated in retaliation for the exercise of his rights under the ADA/Rehabilitation Act. The Court finds that there are triable issues with respect to this claim that preclude summary judgment either in favor or against Plaintiff.

1    The Rehabilitation Act incorporates the ADA's prohibition against retaliation.   29

2  U.S.C. § 794(d).  The pertinent provision of the ADA provides: "No person shall discriminate

3  against any individual because such individual has opposed any act or practice made

4  unlawful by this chapter or because such individual made a charge, testified, assisted, or

5  participated in any manner in an investigation, proceeding, or hearing under this chapter."

6  42 U.S.C. § 12203(a).

7    To establish a prima facie case of retaliation under the ADA, the employee must

8  establish that: (1) he or she engaged in a protected activity; (2) suffered an adverse

9  employment action; and (3) there was a causal link between the two.   Pardi v. Kaiser

10  Foundation Hospitals, 389 F.3d 840, 849 (9th Cir. 2004).

11    Here, Plaintiff asserted his rights under the ADA/Rehabilitation Act by refusing to

12  answer the disability-related inquiries on the medical exam form.  Plaintiff's valid assertion

13  of his rights was a protected activity.  Plaintiff was suspended and ultimately terminated

14  because he refused to answer the questions and sign the releases provided to him.

15  Therefore, there was a causal link between his protected activity and the adverse

16  employment actions.

17    Defendant counters that Plaintiff would have been suspended and terminated even

18  if he had answered the questions because he refused to sign the releases.  In retaliation

19  cases under the ADA as well as under Title VII, the employer can assert a mixed-motive

20  defense.  See Metoyer v. Chassman, 504 F.3d 919, 939-40 (9th Cir. 2007); McNutt v. Bd.

21  or Trs. of the Univ. of Ill., 141 F.3d 706, 708-09 (7th Cir. 1998); Roberts v. Rayonier, Inc.,

22  135 Fed. Appx. 351 (11th Cir. 2005); Milner v. Lee County, Alabama, 2006 WL 1361147

23  (M.D. Ala., May 16, 2006).  Under this defense, an employer can avoid liability for retaliation

24  by showing that it would have made the same decision absent any impermissible motivation.

25  Metoyer, 141 F.3d at 939-40.

26    Defendant contends that Plaintiff would have been suspended and terminated for

27  failure to sign the releases alone.  Prior to his suspension and termination, Plaintiff was

28

22

1   ordered to respond to the unanswered questions <u>and</u> sign the releases.[8]   Ms. Hirano states

2   that she would have recommended Plaintiff's termination for failure to release the medical

3   records as ordered even if he had complied with the order to answer the questions.  (Def.

4   Ex. 84, 96:18-97:6.)  Mr. Slagowski confirms that one of the direct orders was to release the

5   medical records.  (Def. Ex. 93, 39:11-17.)

6        The Court finds that Defendant has not presented sufficient evidence to support

7   summary judgment based on the mixed-motive defense.  "[S]ince the defendant bears the

8   burden of proof on the mixed-motive defense, 'the defendant [ ] must vault a very high

9   hurdle' to obtain judgment as a matter of law.'"  <u>Metoyer</u>, 504 F.3d at 940 (quoting

10  <u>Settlegoode v. Portland Public Schools</u>, 371 F.3d 503, 512 (9th Cir. 2004)).  Although Ms.

11  Hirano states she would have recommended Plaintiff's termination for failure to release the

12  medical records alone, it is unclear whether the matter would have ever been transferred to

13  Region 10 absent the dispute over Plaintiff's refusal to answer the questions.  It is possible

14  that Plaintiff's protected activity of refusing to answer the questions was pivotal in driving the

15  issue of Plaintiff's failure to comply with requests/orders forward.  The Court questions

16  whether the situation would have ever snowballed to the point of disciplinary action if Plaintiff

17  had answered the questions in the first instance and modification of the release was the only

18  issue raised in relation to the examination.

19       Accordingly, the Court denies Plaintiff's motion for partial summary judgment and

20

21       [8] Plaintiff suggests that the releases were overbroad and violated his privacy rights.
    The Court does not agree.  The release on the medical form provided, "I authorize any of the
22  doctors, hospitals, or clinics mentioned on these forms to furnish the Government a
    complete transcript of my medical record for purposes of processing my application for this
23  employment or service.  I authorize the release of all medical information to the designated
    Agency Physician . . . ."  Plaintiff did not mention any doctors, hospitals, or clinics on the
24  form, therefore, Plaintiff's signing of the release would not have authorized Defendant to
    obtain medical records from any of Plaintiff's medical providers.  As for the second part of
25  the release, the medical information would have been limited to the information already in
    Defendant's possession - i.e., medical records previously submitted in connection with
26  medical work restrictions or medical leave.  The release Ms. Hirano ordered Plaintiff to sign
    was even narrower - "I authorize FPS Chief, Mission Support Tamra Hirano to release all
27  medical records in her possession pertaining to my workers' compensation injury that
    occurred on or about September 8, 2004, relating to the right side of my neck, my right upper
28  arm and shoulder area."  Plaintiff argues that it was unclear to him what medical records
    were in Ms. Hirano's possession.  However, this is an issue Plaintiff could have clarified with
    Ms. Hirano.

1  Defendant's motion for summary judgment on Plaintiff's claim for retaliation under the

2  Rehabilitation Act/ADA.  Whether Plaintiff would have been suspended and terminated even

3  if he had answered the disability-related inquiries is for the trier of fact to decide.

4

5      2.  <u>Title VII</u>

6      It appears that Plaintiff also alleges retaliation in violation of Title VII based on the

7  actions of Arthur Clabby.  During his deposition, Clabby admitted that he authored the April

8  22, 2005 letter, in which Mr. Morgan required that Plaintiff undergo a psychological

9  examination (Clabby was Region 9 Chief of Staff at the time).  (Pl. Ex. 28 in Opp. to MSJ,

10  96:13-24.)  Several years earlier, Clabby was investigated by the Office of the Inspector

11  General ("OIG") for possessing an unauthorized badge and credentials. (<u>Id.</u> at 23:19-26:25)

12   Clabby later heard that Plaintiff had filed a complaint with the OIG regarding unauthorized

13  badges and credentials.  (<u>Id.</u> at 45:2-46:20.)  Sometime after the OIG investigation, Plaintiff

14  filed a complaint that FPS management had retaliated against him by, among other things,

15  boarding up his office door.  (Pl. Ex. 25, ¶¶ 6, 7.)  The Office of Special Counsel investigated

16  Plaintiff's complaint and verified the substance of Plaintiff's allegation.  (Pl. Ex. 26.)  In his

17  deposition, Clabby stated that he believed that Scott filed an "EEO complaint" for retaliation

18  stemming from the unauthorized credential incident.  (Pl. Ex. 28 in Opp. to MSJ, 125:15-20.)

19      Plaintiff contends that Clabby became involved in FPS's attempt to subject him to a

20  psychological examination to retaliate against him for being involved in *perceived* EEO

21  activity.  (Pl. Opp. to MSJ at 21:15.)  The Court finds that the facts presented by Plaintiff do

22  not support a claim for retaliation under Title VII.

23      Title VII provides that "[i]t shall be an unlawful employment practice for an employer

24  to discriminate against any of his employees . . . because he has opposed any practice

25  made an unlawful employment practice by this subchapter."  42 U.S.C.  § 2000e-3(a).  To

26  establish a prima facie case of retaliation, an employee must show that (1) he has engaged

27  in statutorily protected expression; (2) he has suffered an adverse employment action; and

28  (3) there is a causal link between the protected expression and the adverse action.  <u>EEOC</u>

24

1   v. Dinuba Medical Clinic, 222 F.3d 580, 586 (9th Cir. 2000).  This provision "protects only
2   those employees who oppose what they reasonably perceive as discrimination *under the*
3   *Act*."  Learned v. City of Bellevue, 860 F.2d 928, 932 (9th Cir. 1988).  See also Silver v. KCA,
4   Inc., 586 F.2d 138, 142 (9th Cir.1978) ("under the clear language of the 'opposition' clause
5   of [section] 704(a), a case of retaliation has not been made out unless the 'retaliation' relates
6   to the employee's opposition to a [section] 703 violation").

7        Here, Plaintiff does not allege that he opposed discrimination based upon race, color,
8   religion, sex, or national origin.   If Clabby mistakenly thought Plaintiff was opposing
9   discrimination prohibited by Title VII, Plaintiff arguably would have a retaliation claim under
10  Title VII.   Cf. Fogelman v. Mercy Hopsital, Inc., 283 F.3d 561 (3d Cir. 2002) (holding that
11  plaintiff could bring an ADA retaliation claim based on the theory that the defendant
12  employer mistakenly believed that plaintiff was assisting his father in connection with the
13  father's ADA claims against the employer).   However, there is no evidence that Clabby
14  believed Plaintiff was opposing discrimination prohibited by Title VII. Clabby simply appears
15  to be confused as to what an "EEO Complaint" is.  Clabby's misunderstanding regarding the
16  definition of an "EEO Complaint" does not support a claim for retaliation under Title VII.

17       Plaintiff has not presented any other evidence in support of a retaliation claim in
18  violation of Title VII.   Therefore, to the extent Plaintiff claims retaliation in violation of Title
19  VII, Defendant's motion for summary judgment is granted as to this claim.

20

21  **D.  ADEA**

22   Plaintiff contends that Defendant's Periodic Medical Examination Program violated the
23  ADEA because, under the program's guidelines, the frequency of the exams was tied to the
24  age of the incumbent employee.  Under the guidelines, the frequency of the examinations
25  was to be every 3 years for employees 35 and under, every 2 years for employees 36-44,
26  and every year for employees 45 and above.  (Def. Ex. 6.)

27       However, Plaintiff has not established that the allegedly discriminatory policy
28  regarding the frequency of exams was applied to him or that he was subjected to a birth-

month examination on account of his age.   Under the guidelines, Plaintiff, who was 48 when he was promoted in May 2003,  should have been examined in November 2003, November 2004, and November 2005.  (Def. Ex. 6 at 2.)  However, Plaintiff did not submit to an initial examination until November 2005.  (Def. Ex. 81,135:5-14, 169:7-16; 170:22-171:6.)

Indeed, it is questionable whether  the guidelines' frequency schedule was followed at all.  Ruben Ballestros explained that Plaintiff's birth-month exam in November 2005, "was the first time I had heard any reference to an FPS incumbent medical exam since the program's inception in 2000. . . . I had never been asked to submit to an Incumbent exam up to that point, and I was not aware of any other eligible agent or officer who had either." (Pl. Ex. 27 in Opp. to MSJ ¶ 42.)

There is no evidence that employees 45 and above were being examined more frequently than employees under 45.  There is also no evidence that Plaintiff in particular was directed to submit to a birth-month exam in 2005 because of his age.  The evidence before the Court indicates that Plaintiff was singled out for a birth-month exam in 2005 because of the issues pertaining to his fitness for duty.  It seems that Defendant would have required Plaintiff to submit to a birth-month examination even if he had been 35 years old (the examination arguably would have been permissible under the guidelines because it was Plaintiff's third birthday after his promotion and Plaintiff had not yet submitted to an exam).

Plaintiff has not established that he was required to submit to his birth-month exam as part of the age-based frequency schedule set forth under the guidelines or was otherwise discriminated against based on his age.  Therefore, the Court grants Defendant's motion for summary judgment as to this claim.

///
///
///
///
///
///

08cv0735 BTM(JMA)

## IV.  CONCLUSION

For the reasons discussed above, Defendant's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's Motion for Partial Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** summary judgment in favor of Defendant on Plaintiff's claims for disability discrimination under the Rehabilitation Act/ADA, retaliation under Title VII, and violation of the ADEA.  The Court **GRANTS** summary judgment in favor of Plaintiff on Plaintiff's claim for violation of the Rehabilitation  Act/ADA based on disability-related inquiries.  Plaintiff's and Defendant's motions are **DENIED** as to Plaintiff's claim for retaliation under the Rehabilitation Act/ADA. **IT IS SO ORDERED.**

DATED:  May 3, 2010

Honorable Barry Ted Moskowitz
United States District Judge

08cv0735 BTM(JMA)