1
2
3
4
5
6
7

8        **UNITED STATES DISTRICT COURT**

9        **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   JAMES SCOTT,                          Case No. 08cv0735 BTM(JMA)

12                           Plaintiff,    **ORDER GRANTING AN
                                           EVIDENTIARY HEARING IN
13         v.                              CONNECTION WITH
                                           DEFENDANT'S MOTION TO
14   JANET A. NAPOLITANO, SECRETARY,       ENFORCE SETTLEMENT AND
     DEPARTMENT OF HOMELAND               DENYING PLAINTIFF'S MOTION TO
15   SECURITY,                             ENFORCE SETTLEMENT

16                           Defendant.

17

18        Plaintiff and Defendant have filed competing motions to enforce settlement.  For the

19   reasons discussed below, the Court **GRANTS** an evidentiary hearing in connection with

20   Defendant's motion to enforce settlement and **DENIES** Plaintiff's motion to enforce

21   settlement.

22

23                          **I.  FACTUAL BACKGROUND**

24   A.  District Court Case

25        Prior to his termination in 2007, Plaintiff was a Special Agent and Criminal Investigator

26   with the Department of Homeland Security's ("DHS") Federal Protective Service ("FPS").

27   Plaintiff was terminated after he refused to provide responses to certain medical questions

28   and refused to release his medical records.  On April 23, 2008, Plaintiff commenced this suit.

Plaintiff sued Defendant for (1) disability discrimination in violation of the Rehabilitation Act of 1973, 29 US.C. § 794(a); (2) retaliation; and (3) age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA").

In an Order filed on May 3, 2010 ("Summary Judgment Order"), the Court granted partial summary judgment in favor of Plaintiff on Plaintiff's claim for violation of the Rehabilitation Act/ADA based on disability-related inquiries.  The Court granted summary judgment in favor of Defendant on Plaintiff's claims for disability discrimination under the Rehabilitation Act/ADA, retaliation under Title VII, and violation of the ADEA.

B. Mediation and Memorandum

After the Court issued its Summary Judgment Order, the parties agreed to retain the private services of a mediator.  At the mediation, both parties were represented by legal counsel.  After two days of mediation, the parties executed a Memorandum of Settlement ("Memorandum") dated August 12, 2010.  (Def. NOL, Ex. 1.)

The Memorandum provides that the parties "agree to the following settlement terms" and that the "terms set forth herein are to be included in a formal settlement agreement to be signed by the partes."  The Memorandum explains that the formal settlement agreement will contain "other normal settlement terms and shall be subject to the approval of the parties, which approval shall not be unreasonably withheld."

The terms set forth in the Memorandum include:

- Plaintiff shall receive retirement benefits under the MRA retirement plan, which will pay him approximately $12,100 per year at age 56 and approximately $17,100 per year at age 60, including survivor's benefits and COL adjustments at age 62.  The parties acknowledge that the OPM must approve the retirement plan and will calculate the actual payments payable to Plaintiff. This settlement is subject to Plaintiff's approval of the amounts and terms determined by OPM, which approval shall not be unreasonably withheld.

- Defendant shall pay Plaintiff the sum of $655,000, which includes $5,000 to purchase his years of military service, $150,000 to defer the costs of health insurance for Plaintiff and his family, and $500,000 for emotional distress and attorney's fees.

- Defendant shall pay the entire cost of the mediation and all mediation fees paid by Plaintiff will be reimbursed to him.

2

- • All documentation in Plaintiff's personnel file related to the discipline at issue in this case shall be removed and the file will indicate that Plaintiff voluntarily resigned.

- • A neutral reference procedure will be established with respect to future employment inquiries.

- • In the future, Plaintiff is free to apply for employment with any federal government agency other than DHS.

- • Plaintiff shall release the Government from all claims related to his employment or this action.

C.     Post-Mediation Settlement Discussions

According to Plaintiff, after signing the Memorandum, he began inquiring about the cost of health insurance and care that would be equivalent to that which he would be entitled to receive as a retiring agent. (Scott Decl. ¶ 5.) He found that the $150,000 provided for in the Memorandum would not provide a comparable health care plan. He also learned that a waiver could possibly be obtained from the OPM that would allow him and his family to be placed back on the federal medical plan. Accordingly, Plaintiff refused to sign a formal settlement agreement.

A settlement conference was scheduled before Magistrate Judge Adler on November 10, 2010. Mr. English, Plaintiff's counsel of record at that time, submitted a settlement/status conference brief, which explained that although the formal settlement agreement was ready for signature, Plaintiff had decided to revoke his agreement to settle and proceed to trial. (Def. NOL, Ex. 2.) Mr. English expressed that he no longer wished to be Plaintiff's attorney due to a continuing breakdown in the attorney-client relationship. (Id.)

At the settlement conference, Plaintiff represented that his wife needed surgery and that the Memorandum did not provide enough money to purchase insurance that would cover her. (Stutler Decl. dated 11/23/11, ¶ 7.) The following day, Plaintiff sent Defendant's counsel, Mr. Stutler, an e-mail with two proposed options for securing FEHB for Plaintiff and his family. (Id.; Reply Ex. 4.) The first option involved requesting a waiver from OPM. Under the second option, Defendant would reinstate Plaintiff on paper so that he could enroll in FEHB and then Plaintiff would "immediately retire under MRA +10 (on or after November

3

1   20, 2010)."

2       Plaintiff's e-mail reminded Mr. Stutler that Plaintiff's mandatory retirement date of

3   November 20, 2010, was quickly approaching.  Although Defendant was not previously

4   interested in authorizing a "sham employment relationship" to allow Plaintiff to obtain

5   benefits, once the mandatory retirement date had passed, Defendant could theoretically

6   reinstate Plaintiff through November 20, 2010, allowing him to retire and get his FEHB and

7   other benefits without Plaintiff ever re-entering the workplace. (Stutler Decl. dated 11/23/11,

8   ¶ 10.)  Defendant agreed to look into this possibility.  (Id. at ¶ 11.)

9        On November 12, 2010, the Court authorized Plaintiff to proceed in pro per.   On

10  November 15, 2010, Mr. English filed a notice of lien for legal fees and costs.  On January

11  20, 2011, William K. Brewer was substituted in as Plaintiff's attorney.

12      During subsequent communications between Mr. Stutler, and Mr. Brewer, Mr. Stutler

13  made it clear that Defendant did not want any new settlement proposal from Defendant to

14  be construed as a rescission of the Memorandum Agreement.  In an e-mail dated March 8,

15  2011, Mr. Stutler emphasized:

16          Although we do not expect you to concede the point, we regard [the mediation
            agreement] as binding.  We don't have to debate that issue presently, but do
17          **not** want any new proposal from us to be regarded as a rescission,
            amendment or abandonment of the mediation agreement – until such time as
18          we have an enforceable agreement on the record.  We have delayed filing a
            motion to enforce the mediation agreement, because we all prefer a resolution
19          everyone can live with.

20  (Def. NOL in Opp. to Pl.'s Mot., Ex. 2.)

21      Mr. Stutler also explained that the issue of Mr. English's lien would have to be

22  resolved in a way that would protect the government's interests.  In his e-mail of March 8,

23  2011, Mr. Stutler stated:

24          Another issue we will need to keep in mind as we move forward is Mr.
            English's lien.  Because he would have an argument that the government is
25          responsible for his lien if we settle around him, we will either need Mr.
            English's concurrence with any new settlement, or determine whether the
26          parties should proceed via some sort of impleader action.  Although the
            government does not necessarily agree that we would be liable for the lien, we
27          don't want to expose ourselves.

28  (Id.)

4

In an e-mail dated March 18, 2011, Mr. Stutler again raised the issue of Mr. English's lien and expressed that "it makes sense to continue trying to resolve the issue of Mr. English's fees before they become an obstacle to settling." (Def. NOL in Opp. to Pl.'s Mot., Ex. 3.)  In the e-mail, Mr. Stutler discussed California caselaw and expressed concern regarding the government's potential liability.  Mr. Stutler explained that he needed to take protective steps to avoid future litigation/liability absent clear law allowing the government to settle the case without accounting for Mr. English's lien.  "Obviously, the simplest solution from my perspective would be to get Mr. English's concurrence with any settlement agreement we reach.  Such a settlement might involve payment of an agreed sum certain to him, depositing disputed portions of the settlement into a client trust account until any fee disagreement between Mr. Scott and Mr. English is resolved, or some other action."   Mr. Brewer responded by explaining that he could not discuss the contents of the attorney fee agreement but was "mindful of the lien notice" and would "provide a method to assure that the government's interests are protected." (Id.)

On May 3, 2011, Defendant presented a settlement proposal to Plaintiff.  Under the proposal, Plaintiff would receive federal health benefits (with a projected cost to the government of $249,051) and cash payments totaling approximately $369,420 ($278,463 judgment fund lump payment, $48,132 net back pay, $19,000 TCC reimbursement, $14,376 annual annuity payment, and $9,449 annual leave reimbursement).  (Def. NOL in Opp. to Pl.'s Mot., Ex. 4.)   Mr. Stutler noted, "[F]or the reasons indicated in my March 18, 2011 e-mail, we will need to have Mr. English's release of any liens before we can finalize any settlement." (Id.)

At the request of the parties, Judge Adler held another settlement conference on July 28, 2011.  The parties worked through some unresolved issues, including an issue regarding whether Defendant could provide Plaintiff with an FPS special agent badge and credentials marked "retired." (Stutler Decl. dated 10/19/11, ¶ 6; Brewer Decl., ¶¶ 2-5.)  The issue of Mr. English's lien was not resolved at the settlement conference, and Mr. Stutler made clear that until the issue of Mr. English's lien was resolved to his satisfaction, Defendant could not and

08cv0735 BTM(JMA)

1   would not finalize any new settlement agreement.  (Stutler Decl. dated 10/19/11, ¶ 6.)

2      Defendant and Plaintiff continued working on the terms of the settlement and

3   exchanged drafts of the settlement agreement.  However, by August 3, 2011, Mr. Stutler was

4   beginning to worry that the lien issue would not get resolved:  "Finally, any word re the

5   English issue?  As discussed, we can't agree to anything that exposes us to suit by him.  I'm

6   getting a sinking feeling about that."  (Def. NOL in Opp. to Pl.'s Mot., Ex. 6.)

7      On August 17, 2011, Mr. English informed Mr. Brewer that his lien would be in the

8   amount of $361,367.30.  (Brewer Decl. ¶ 6.)  On August 30, 2011, Mr. Stutler sent an e-mail

9   to Mr. Brewer and Mr. English.  Mr. Stutler explained: "[B]ecause the government is on notice

10  that Mr. English has a lien and claims to be entitled to $361,367.30 in fees and costs based

11  on the mediation settlement agreement, the government is not in a position to settle the case

12  under the present circumstances.  Mr. English has indicated that he will seek relief against

13  the government if need be, and my assessment is that the government and its attorneys face

14  potential liability for his fees and costs if we settle before those are resolved."  (Def. NOL in

15  Opp. to Pl.'s Mot., Ex. 7.)  Mr. Stutler urged Mr. English and Mr Brewer to work out the issue

16  of Mr. English's fees and costs or at least come to interim terms that would result in the

17  release of Mr. English's lien as to the government.  (Id.)

18     On September 12, 2011, Mr. Brewer provided Mr. Stutler with a revised draft

19  settlement agreement, which provided that in light of Mr. English's lien, the government

20  would not pay out the cash payments under the settlement agreement until either Plaintiff

21  and Mr. English jointly instructed Defendant to release the settlement proceeds, Mr. English

22  released his lien, or a court ordered Defendant to release the funds.  (Pl. NOL, Ex. 8 at 4,

23  ¶ 12.)

24     In an e-mail dated September 16, 2011, Mr. Stutler responded to Mr. Brewer's revised

25  draft settlement agreement.  (Pl. NOL, Ex. 10.)  With respect to the new language in

26  Paragraph 12, the government explained that the withholding of funds would be possible if

27  only the judgment fund payment were involved, but it would be difficult to withhold the other

28  payments: "[O]nce we place Mr. Scott in a back pay status, the payroll/retirement machine

will start moving and the agency won't be able to control the resulting payouts."  Mr. Stutler proposed changing the language to provide that Defendant's duty to place Plaintiff in a "back pay status," to pay or arrange for the payment of the sums specified in the settlement agreement, to cancel the removal action of Plaintiff from the personnel/payroll system and replace it with voluntary retirement effective November 20, 2010, and to expunge all documentation pertaining to the removal and suspension actions, *shall not ripen* until either Plaintiff and Mr. English jointly instruct Defendant to release the settlement proceeds, Mr. English files a release of his lien, or a court directs Defendant to pay the funds.

Mr. English informed Mr. Stutler and Mr. Brewer that any payment or performance by Defendant under the settlement agreement without Mr. English's consent would expose the government to liability.  (Brewer Decl. ¶ 16.)  Mr. Stutler expressed that he was willing to freeze the judgment fund payment of $289,763.00 until Mr. English and Plaintiff worked out the issue of the lien, but would not agree to divert and freeze payroll and retirement disbursements because it was too much of a "logistical and bureaucratic challenge," that could expose the government to liability.  (Brewer Decl. ¶ 17.)    Mr. English refused Defendants' offer to freeze the judgment fund payment of $289,763.00 pending resolution of his lien.  (Brewer Decl. ¶ 18.)

## II. <u>DISCUSSION</u>

Plaintiff and Defendant have filed competing motions to enforce settlement.  Plaintiff seeks to enforce the Memorandum dated August 12, 2010.  Defendant seeks to enforce the alleged agreement reached on July 28, 2011 at the settlement conference.  As discussed below, the Court finds that although the Memorandum is an enforceable contract, there is an issue of material fact with respect to whether Plaintiff may avoid enforcement on the ground of unilateral or mutual mistake.  The Court also finds that any agreement reached on July 28, 2011 does not rise to the level of an enforceable settlement agreement.

///

///

///

7

1    A.  Memorandum of Settlement

2        1.  Enforceability

3        Defendant contends that the Memorandum is an enforceable settlement agreement.

4   Plaintiff, on the other hand, contends that the Memorandum was not a complete agreement

5   and that the parties anticipated that they would be bound only after they prepared and

6   executed a formal settlement agreement.  The Court agrees with Defendant.

7        A settlement agreement is interpreted in accordance with the same principles applied

8   to any other contract.  United Commercial Ins. v. Paymaster Corp., 962 F.2d 853, 856 (9th

9   Cir. 1992).[1]  Creation of a valid contract requires mutual consent.  Weddington Prod., Inc.,

10  v. Flick, 60 Cal. App. 4th 793, 811 (1998).  The existence of mutual consent is determined

11  by objective criteria; the "parties' outward manifestations must show that the parties all agreed

12  upon the same thing in the same sense."  Id. (internal quotation marks omitted).  The  court

13  must focus on the intent manifested in the agreement and by surrounding conduct, not the

14  subjective beliefs of the parties.  United Commercial, 962 F.2d at 856.

15       A proposal cannot form the basis of a contract unless the terms are sufficiently definite

16  – i.e., they provide a basis for determining the existence of a breach and for giving an

17  appropriate remedy.  1 B.E. Witkin, Summary of California Law, Contracts § 137 (10th ed.

18  2005).  If an essential element is reserved for the future agreement of the parties, "as a

19  general rule, the promise can give rise to no legal obligation until such future."  1 Williston on

20  Contracts (4th ed. 2007) § 4.29.

21       If there is a manifest intention that the agreement is not binding until reduced to a

22  formal writing that is executed by both parties, there is no binding contract until this occurs.

23  Rennick v. OPTION Care, Inc., 77 F.3d 309, 316 (9th Cir. 1996).  But "[w]hen parties intend

24

25       [1]  Defendant suggests that federal law governs, while Plaintiff asserts that California
    law applies.  Although the Ninth Circuit applies federal law to a release of claims under Title
26  VII, see Stroman v. W. Coast Grocery Co., 884 F.2d 458, 461 (9th Cir. 1989), the Ninth
    Circuit has also held that the interpretation of a settlement agreement is governed by
27  principles of state contract law, even where a federal cause of action is settled or released.
    See Botefur v. City of Eagle Point, 7 F.3d 152, 156 (9th Cir. 1993).  However, the Court need
28  not resolve the issue of which law applies because there is no discernable difference
    between California and federal contract law.  Cachil Dehe Band of Wintun Indians of Colusa
    Indian Community v. State of California, 618 F.3d 1066, 1073 (9th Cir. 2010).

8                                    08cv0735 BTM(JMA)

that an agreement be binding, the fact that a more formal agreement must be prepared and executed does not alter the validity of the agreement." Blix Street Records, Inc. v. Cassidy, 191 Cal. App. 4th 39, 49 (2010). "Whether a writing constitutes a final agreement or merely an agreement to make an agreement depends primarily upon the intention of the parties. In the absence of ambiguity this must be determined by a construction of the instrument taken as a whole." Smissaert v. Chiodo, 163 Cal. App. 2d 827, 830 (1958).

Based on the language of the Memorandum, the Court finds that the parties intended the Memorandum to be a binding agreement even though a more formal agreement was going to be executed at a future date. The Memorandum states that the parties "agree to the following settlement terms." The Memorandum proceeds to set forth the essential terms of the settlement. Plaintiff agrees that he "shall release the Government from all claims related to his employment or the pending District Court action" in exchange for Defendant's promises to pay Plaintiff the total sum of $655,000, pay the entire cost of the mediation, provide Plaintiff with retirement benefits under the MRA retirement plan, remove all documentation in Plaintiff's personnel file related to the discipline at issue in this case, and establish a neutral employment reference procedure.

The Memorandum notes that the formal settlement agreement will contain other "normal settlement terms," an indication that the Memorandum includes all of the substantive terms. Although the formal settlement agreement is subject to the approval of the parties, the approval "shall not be unreasonably withheld." Similarly, although the actual amounts and terms of Plaintiff's retirement benefits are to be calculated by OPM and are subject to Plaintiff's approval, such approval "shall not be unreasonably withheld." That Plaintiff's approval cannot be unreasonably withheld shows that the parties did more than agree to make a future agreement.

A very similar agreement was found to be enforceable in Bryant v. Amtrak, 2011 WL 291233 (S.D. Cal. Jan. 26, 2011). In Bryant, the plaintiff, Bryant, and Amtrak agreed to settle the lawsuit during a mandatory settlement conference and memorialized the terms of the settlement in a "Memorandum of Settlement" that was signed by both parties. The

08cv0735 BTM(JMA)

1  Memorandum included the material terms of the settlement, including the amount of money

2  that would be paid to Bryant, and provided that a long form agreement would be prepared.

3  Bryant refused to sign the long form agreement.  Amtrak brought a motion to enforce the

4  settlement, which the district court granted.   The district court held that although a long form

5  agreement was to be prepared, both parties had agreed to the terms of the Memorandum of

6  Settlement and intended the agreement to be binding.

7      Plaintiff argues that Defendant's failure to tender payment is evidence that there was

8  no binding agreement.   However, Defendant's performance was excused by Plaintiff's

9  repudiation of the contract.  "The law does not require the performance of an idle act, and a

10  formal tender of performance is excused by the refusal in advance of the party to accept the

11  performance owing."  Beverage v. Canton Placer Mining Co., 43 Cal. 2d 769, 777 (1955).

12     The Court concludes that Plaintiff and Defendant mutually assented to be bound by

13  the terms set forth in the Memorandum, subject only to Plaintiff's ability to *reasonably*

14  withhold final approval based on the OPM's calculations or language of the formal settlement

15  agreement. [2]

16

17     2. Mistake

18     Plaintiff argues that even if the Memorandum is enforceable, he is entitled to rescind

19  the agreement based on mistake. According to Plaintiff, he entered into the Memorandum

20  with the understanding that the government had no ability to provide federal medical coverage

21  to him and his family.  (Scott Decl. ¶¶ 2-3.)  However, as later discovered by Plaintiff, it was

22  possible to request a waiver from OPM that would allow Plaintiff and his family to obtain

23  federal health benefits.  (Scott Decl. ¶ 5.)  The Court finds that there is an issue of material

24  fact with respect to whether Plaintiff is entitled to rescind on this ground and/or mistake

25  _____

26     [2]   Plaintiff argues that he reasonably withheld approval of the settlement after
    determining that the government could provide a federal medical plan.  However, the
27  Memorandum does not provide for withholding approval on that ground.  Plaintiff's more
    meritorious argument, which is addressed below, is that he is entitled to rescind the
28  agreement based on a mistake of fact regarding the government's ability to provide federal
    health care benefits.

08cv0735 BTM(JMA)

1   regarding the cost of obtaining comparable medical coverage.

2         Under California law, a party may rescind a contract if his or her consent was given by

3   mistake.  Cal. Civ. Code § 1689(b)(1).  A mistake of fact is "a mistake, not caused by the

4   neglect of a legal duty on the part of the person making the mistake, and consisting in . . . an

5   unconscious ignorance or forgetfulness of a fact past or present, material to the contract."

6   Cal. Civ. Code § 1577.   Where a party wants to rescind a contract based on a unilateral

7   mistake of fact and the other party has no reason to know of and did not cause the mistake

8   of fact, the party seeking rescission must establish that: (1) he made a mistake regarding a

9   basic assumption upon which he made the contract; (2) the mistake has a material effect

10  upon the agreed exchange of performances that is adverse to him; (3) he does not bear the

11  risk of the mistake; and (4) the effect of the mistake is such that enforcement of the contract

12  would be unconscionable.  <u>Donovan v. RRL Corp.</u>, 26 Cal. 4th 261, 282 (2001).

13        Based on the record before the Court, it is possible that the Memorandum was the

14  result of a unilateral or mutual mistake.  Plaintiff claims that federal health benefits were very

15  important to him and that he eventually agreed to a cash payment of $150,000 to cover the

16  premiums of medical insurance because the government represented that it had no ability to

17  provide federal health benefits to Plaintiff.  (Scott Decl. ¶¶ 3-4.)  The government counters

18  that Plaintiff knew that the government *could* provide federal health benefits to Plaintiff *if*

19  Defendant reinstated him.  But at the time of the mediation, Defendant refused to reinstate

20  Plaintiff because Defendant *was not willing* to have Plaintiff back in the work place and did

21  not want to enter into a sham employment relationship. (Stutler Decl. dated 11/23/11, ¶¶ 3-4).

22        However, Plaintiff also discovered another option for obtaining federal health benefits -

23  the OPM waiver.  Defendant argues that the DHS would have no control over the OPM's

24  decision.  Nevertheless, if Plaintiff knew that requesting the waiver was an *option*, Plaintiff

25  might not have agreed to the cash payment before exhausting the option.  Taking into

26  consideration Plaintiff's pre-existing medical conditions (Scott Decl. ¶ 3) and the difficulties

27  inherent in estimating the costs of obtaining comparable health insurance, it is plausible that

28  Plaintiff would not have agreed to the Memorandum if he knew that there was a potential

1  avenue for obtaining federal health coverage.  Based on the record before the Court, it

2  appears that Defendant may not have been aware of the possibility of obtaining an OPM

3  waiver either.  Thus, there is an issue of material fact with respect to whether there was a

4  mutual or unilateral mistake regarding a basic assumption upon which the contract was made.

5  If the mistake was unilateral, Plaintiff would also have to show that the mistake had a

6  material effect upon the agreed exchange of performances that is adverse to him and that

7  the effect of the mistake is such that enforcement of the contract would be unconscionable.

8  Plaintiff may be able to satisfy these requirements.  Plaintiff claims that he discovered that

9  $150,000 would not provide comparable health benefits for Plaintiff and his family.  (Scott

10  Decl. ¶¶ 5-6.)  If $150,000 is significantly less than the actual cost of providing comparable

11  health coverage, Plaintiff's mistake would have an "overly harsh" result.  See Donovan, 26

12  Cal. 4th at 292.

13  The alleged inaccuracy of the $150,000 figure may itself be a mistake that is grounds

14  for rescission.  If Plaintiff or both Plaintiff and Defendant believed that $150,000 was sufficient

15  to provide comparable health coverage, but it turns out that this is not the case, Plaintiff may

16  be able to rescind based on this mistake as well.[3]

17  Accordingly, the Court grants an evidentiary hearing on the issue of whether Plaintiff

18  is entitled to rescind the settlement agreement based on a mistake of fact with respect to the

19  availability of a potential avenue for obtaining federal health benefits (the OPM waiver) and/or

20  the calculation of the cash amount that would be sufficient to provide comparable health

21  coverage.

22

23  B.  July 28, 2011 Agreement

24  Plaintiff contends that the parties entered into an enforceable settlement agreement

25  at the July 28, 2011 settlement conference.  Plaintiff admits that the parties did not resolve

26  how to handle Mr. English's lien, but argues that this issue should not be considered an

27  ─────────────────

28  [3]  It is unclear from the record how the $150,000 figure was reached and to what
extent Plaintiff was involved in the determination of the appropriate amount to cover health
insurance.

08cv0735 BTM(JMA)

1  essential term to the settlement.  Plaintiff suggests that the Court should enter an order that

2  Defendant pay the judgment lump sum payment of $289,763.00 into a blocked account and

3  that all payments received by Plaintiff from the settlement be paid into the blocked account

4  until a total of $361,367.30 has been deposited into the blocked account, where the funds

5  shall remain until either Plaintiff and Mr. English jointly instruct the bank to release the

6  settlement proceeds, Mr. English files a release of his lien, or a court directs the bank to

7  release the fund.

8       The Court is not persuaded that any enforceable settlement agreement was reached

9  at the July 28, 2011 settlement conference.  Defendant consistently expressed that there

10  would be no settlement until the issue of Mr. English's lien was resolved in a manner that

11  would protect the government from liability.  In the settlement proposal dated May 3, 2011,

12  Mr. Stutler explicitly stated "[F]or the reasons indicated in my March 18, 2011 e-mail, we will

13  need to have Mr. English's release of any liens before we can finalize any settlement."  (Def.

14  NOL in Opp. to Pl.'s Mot., Ex. 4.)  Mr. Stutler reiterated his position at the settlement

15  conference.  (Stutler Decl. dated 10/19/11, ¶ 6.)

16       Defendant's concerns about the government's exposure to liability were justified, as

17  shown by Mr. English's subsequent assertion that he would seek relief against the

18  government if need be.  (Def. NOL in Opp. to Pl.'s Mot., Ex. 7.)  Despite the efforts of Mr.

19  Stutler, Mr. Brewer, and Mr. English to come to a compromise that would work for everyone,

20  no resolution was ever reached.  Mr. English was not satisfied with Defendant's offer to

21  withhold the judgment fund lump payment pending resolution of his lien.

22       Defendant clearly did not intend to enter into a binding settlement agreement absent

23  resolution of the lien issue.  Because the lien issue was never resolved, no contract was

24  formed.  The lack of an enforceable agreement is highlighted by Plaintiff's request that the

25  Court order that Defendant pay the judgment lump sum payment into a blocked account in

26  addition to all other payments received by Plaintiff from the settlement until a total of

27  $361,367.30 has been deposited into the account. During settlement negotiations, Defendant

28  *rejected* this proposed method for handling the lien because Defendant believed that it would

1  be too difficult to control the payroll and retirement disbursements and did not want to expose
2  the government to liability.  Then, as now, the parties have been unable to reach a settlement
3  that harmonizes the conflicting  interests of Plaintiff, Defendant, and Mr. English.

4       The fact that Mr. English may have to enforce his lien in a separate action is irrelevant.
5  Defendant understandably wishes to protect itself from liability *in the event* that Mr. English's
6  lien is determined to be valid.  Defendant is not required to wait until a court rules on the
7  existence, amount, and enforceability of the lien before seeking a release or other assurance
8  that Defendant will not be held liable for the lien amounts.

9       Any agreement reached on July 28, 2011 was not a binding settlement agreement.
10  Therefore, Plaintiff's motion to enforce settlement agreement is **DENIED**.

11

12                                    **III.  CONCLUSION**

13       For the reasons set forth above, the Court **GRANTS** an evidentiary hearing on the
14  issue of whether Plaintiff can avoid enforcement of the Memorandum of Settlement based
15  on unilateral or mutual mistake of fact.  The Court sets the evidentiary hearing for September,
16  18, 2012 at 2:00 p.m.  The Court **DENIES** Plaintiff's motion to enforce settlement [Doc. No.
17  84].

18  **IT IS SO ORDERED.**

19  DATED:  July 10, 2012

20                              _Barry Ted Moskowitz_
                              BARRY TED MOSKOWITZ, Chief Judge
21                              United States District Court

22

23

24

25

26

27

28

                                         14